Nos. 2023-2158, -2159

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

VLSI TECHNOLOGY LLC,

*Appellant,*

*v.*

OPENSKY INDUSTRIES, LLC,

*Cross-Appellant,*

INTEL CORPORATION,

*Appellee.*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2021-01064 and IPR2022-00366

## APPELLEE INTEL CORPORATION'S OPPOSITION TO APPELLANT VLSI TECHNOLOGY LLC'S MOTION TO STAY APPEALS AND FOR A LIMITED REMAND

STEVEN J. HORN
GARY M. FOX
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

BENJAMIN S. FERNANDEZ
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO  80202
(720) 274-3135

August 17, 2023

WILLIAM F. LEE
LAUREN B. FLETCHER
MADELEINE C. LAUPHEIMER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Appellee Intel
Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

BACKGROUND ............................................................................2

    A.    VLSI's Serial Lawsuits Against Intel And Forum Shopping ............................................................................2

    B.    The Board's *Fintiv* Denials Of Intel's Original IPR Petitions ............................................................................3

    C.    The Verdict, Judgment, And Appeal In The Texas Case.....................4

    D.    The Board's Institution Of OpenSky's IPR Petition And Intel's Joinder IPR Petition ............................................................................5

    E.    The Director's *Sua Sponte* Review Of The Board's Institution Decision ............................................................................6

    F.    The Director's Decision Not To Terminate The IPR...........................7

    G.    The Director's Order That OpenSky Should Pay Attorneys' Fees............................................................................8

    H.    The Board's Final Written Decision Finding All Challenged Claims Unpatentable And The Parties' Appeals To This Court ............................................................................9

ARGUMENT ............................................................................10

I.    VLSI'S REQUEST TO STAY ITS APPEAL FROM THE BOARD'S FINAL WRITTEN DECISION SHOULD BE DENIED. ............................................10

    A.    VLSI's Appeal Is Ripe For Review And Should Move Forward Without Delay To Avoid Unfairly Prejudicing Intel.............................................................................10

B.      The Director's Pending Quantification Of Attorneys' Fees Does Not Warrant Staying VLSI's Appeal. ...............................12

C.      VLSI's Attempt To Appeal The Director's Decision Not To Terminate The IPR Also Does Not Warrant Staying VLSI's Appeal. ....................................................................................15

II.    TO THE EXTENT THE COURT GRANTS VLSI'S REQUEST TO STAY ITS APPEAL, THE COURT SHOULD ALSO STAY OR COORDINATE FOR ORAL ARGUMENT THE RELATED DISTRICT COURT APPEAL. ..................20

CONCLUSION .................................................................22

CERTIFICATE OF INTEREST

EXHIBITS

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Apple Inc. v. Universal Secure Registry LLC*,
No. 2020-1223, ECF 55 (Fed. Cir. Oct. 15, 2020)
(nonprecedential) ................................................................22

*Apple Inc. v. Voip-Pal.com, Inc.*,
No. 2018-1456, ECF 21 (Fed. Cir. Feb. 21, 2018)
(nonprecedential) ................................................................20

*Bayer CropScience AG v. Dow AgroSciences LLC*,
580 F. App'x 909 (Fed. Cir. 2014) (per curiam) (nonprecedential) .................13

*Bayer CropScience AG v. Dow AgroSciences LLC*,
851 F.3d 1302 (Fed. Cir. 2017) ...........................................13

*Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.*,
825 F. App'x 773 (Fed. Cir. 2020) (nonprecedential) ................................12, 19

*Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.*,
905 F.3d 1311 (Fed. Cir. 2018) ...........................................18

*Blue Spike, LLC v. Adobe Systems, Inc.*,
No. 2015-1803, ECF 26 (Fed. Cir. Oct. 2, 2015) (nonprecedential) .................14

*Cuozzo Speed Technologies, LLC v. Lee*,
579 U.S. 261 (2016) ...........................................................17

*CyWee Group v. Google LLC*,
847 F. App'x 910 (Fed. Cir. 2021) (nonprecedential), *mandate
recalled on other grounds*, 2021 WL 9979071 (Fed. Cir. Sept. 23,
2021) .................................................................................17

*Divix Golf, Inc. v. Mohr*,
No. 2012-1235, ECF 20 (Fed. Cir. June 28, 2012)
(nonprecedential) ................................................................14

*Elbit Systems Land & C4I Ltd. v. Hughes Network Systems, LLC*,
927 F.3d 1292 (Fed. Cir. 2019) ...........................................12

*Fresenius USA, Inc. v. Baxter International, Inc.*,
    721 F.3d 1330 (Fed. Cir. 2013) ..........................................................21

*GS CleanTech Corp. v. Adkins Energy LLC*,
    No. 2016-2231, ECF 42 (Fed. Cir. July 5, 2018) (nonprecedential)..................14

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
    643 F. App'x 1014 (Fed. Cir. 2016) (per curiam) (nonprecedential)................13

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
    876 F.3d 1372 (Fed. Cir. 2017) ..........................................................13

*Kahn v. General Motors Corp.*,
    889 F.2d 1078 (Fed. Cir. 1989) ..........................................................13

*Landis v. North American Co.*,
    299 U.S. 248 (1936)..........................................................................11

*Unified Messaging Solutions LLC v. Google, Inc.*,
    No. 2014-1611, ECF 229 (Fed. Cir. Sept. 26, 2014)
    (nonprecedential) ..............................................................................14

*Vehicle Operation Technologies, LLC v. BMW of North America LLC*,
    No. 2014-1831, ECF 61 (Fed. Cir. Feb. 19, 2015)
    (nonprecedential) ..............................................................................14

*VirnetX Inc. v. Apple Inc.*,
    No. 2021-1672, 2023 WL 2770074 (Fed. Cir. Mar. 31, 2023)
    (nonprecedential) ..............................................................................21

*VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*,
    No. 2020-2271, ECF 64 (Fed. Cir. Nov. 24, 2021)
    (nonprecedential) ..............................................................................21

*Wireless Discovery LLC v. The Meet Group, Inc.*,
    No. 2023-1582, ECF 25 (Fed. Cir. July 24, 2023) (per curiam) ......................14

## DOCKETED CASES

*Apple Inc. v. Voip-Pal.com, Inc.*,
    No. 2018-1456, ECF 6 (Fed. Cir. Jan. 25, 2018)................................................20

*Orenshteyn v. Citrix Systems, Inc.*,
  No. 2003-1427, ECF 7 (Fed. Cir. July 30, 2003) ...............................14

*VLSI Technology LLC v. Intel Corp.*,
  No. 2022-1906, ECF 17 (Fed. Cir. Sept. 14, 2022)..........................2, 3

*VLSI Technology LLC v. Intel Corp.*,
  No. 2022-1906 (Fed. Cir.) .............................................................5, 21

*Wireless Discovery LLC v. The Meet Group, Inc.*,
  No. 2023-1582, ECF 19 (Fed. Cir. June 9, 2023)..............................13

*Wireless Discovery LLC v. The Meet Group, Inc.*,
  No. 2023-1582, ECF 21 (Fed. Cir. June 20, 2023).............................14

## STATUTES AND REGULATIONS

28 U.S.C. § 1295(a)(4)(A) ...................................................................10

35 U.S.C.
  § 314(a) ...........................................................................................4
  § 314(d)..........................................................................................17
  § 315(b)............................................................................................6
  § 319...............................................................................................10

37 C.F.R. § 42.122(b) ............................................................................6

## ADMINISTRATIVE PROCEEDINGS

*Apple Inc. v. Fintiv, Inc.*,
  IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) .............................4

*Intel Corp. v. VLSI Technology LLC*,
  IPR2020-00106, Paper 3 (PTAB Oct. 31, 2019)................................3

*Intel Corp. v. VLSI Technology LLC*,
  IPR2020-00106, Paper 7 (PTAB Feb. 7, 2020)..................................4

*Intel Corp. v. VLSI Technology LLC*,
  IPR2020-00106, Paper 17 (PTAB May 5, 2020) ...............................4

*Intel Corp. v. VLSI Technology LLC*,
  IPR2020-00498, Paper 4 (PTAB Feb. 4, 2020)..................................3

*Intel Corp. v. VLSI Technology LLC*,
   IPR2020-00498, Paper 10 (PTAB May 21, 2020) ...............................................4

*Intel Corp. v. VLSI Technology LLC*,
   IPR2020-00498, Paper 16 (PTAB Aug. 19, 2020) ...............................................4

## OTHER AUTHORITIES

PTO Director, "Interim Procedure for Discretionary Denials in AIA
   Post-Grant Proceedings with Parallel District Court Litigation"
   (June 21, 2022), www.uspto.gov/sites/default/files/documents/
   interim_proc_discretionary_denials_aia_parallel_district_court_liti
   gation_memo_20220621_.pdf ............................................................................4

# INTRODUCTION

This appeal arises from an IPR involving U.S. Patent No. 7,725,759 ("'759 patent"). VLSI Technology LLC purchased the '759 patent, along with numerous other patents, as part of a scheme to target Intel Corporation through a series of patent-infringement lawsuits. After forum shopping for a place to assert the '759 patent, VLSI eventually obtained a $675 million damages award against Intel in the Western District of Texas—a judgment currently on appeal to this Court. Although Intel had initially sought to defend itself by filing timely IPR petitions challenging the '759 patent, the Patent Trial and Appeal Board ("Board") denied institution of those petitions solely on discretionary grounds based on the then-scheduled Texas trial date that VLSI had obtained through venue gamesmanship.

Following the verdict, the Board instituted the underlying IPR that is the subject of this appeal based on a petition filed by OpenSky Industries, LLC—an entity with no relationship to either Intel or VLSI. After Intel joined the proceedings, the PTO Director *sua sponte* reviewed the Board's institution decision and denied VLSI's request to terminate the IPR. The Board subsequently entered a final written decision finding all challenged claims—including all claims asserted in Texas—unpatentable on two independent grounds.

Recognizing that affirmance of the Board's unpatentability determinations will moot the $675 million award against Intel, VLSI now seeks to delay its own

appeal from the Board's final written decision.  In particular, VLSI requests a stay "pending resolution of ongoing sanctions proceedings."  ECF 15 ("Mot.") at 1.  But the only remaining sanctions issue is the Director's quantification of attorneys' fees awarded against OpenSky, a collateral issue that does not justify delaying VLSI's merits appeal.  Nor does VLSI's intent to appeal the Director's decision not to terminate the IPR support a stay, as that decision is final and not appealable.  On balance, a stay would not promote judicial economy, as VLSI claims, but would unfairly prejudice Intel by delaying this Court's review of the Board's unpatentability determinations.  VLSI's motion to stay should therefore be denied.

## BACKGROUND

### A.     VLSI's Serial Lawsuits Against Intel And Forum Shopping

VLSI was formed in 2016 by Fortress Investment Group LLC, a New York-based hedge fund represented by VLSI's counsel.  *See VLSI Tech. LLC v. Intel Corp.*, No. 22-1906, ECF 17 at 6 (Fed. Cir. Sept. 14, 2022).  Three days after its formation, VLSI began acquiring patents from NXP Semiconductor as part of a scheme to monetize old patents.  *Id.*  Over the next few years, VLSI purchased more than 170 patents—including the '759 patent—from NXP for a total payment of $35 million.  *Id.* at 6-7.  VLSI has just two employees and has never made or sold any products.  *Id.* at 7.  Its only business has been asserting former NXP patents against Intel across

multiple jurisdictions, where VLSI has demanded more than $22 billion in damages. *Id.* at 3, 7.

VLSI initially sued Intel in California and Delaware alleging infringement of thirteen patents. Ex. 1501 ¶ 167.[1]  VLSI filed a second suit in Delaware in March 2019, this time accusing Intel of infringing the '759 patent and five others.  *Id.*  One month later, VLSI voluntarily dismissed the second-filed Delaware suit and refiled it as three actions (with two additional patents) in the Western District of Texas.  *Id.* The cases were assigned to Judge Albright, the only judge assigned to patent cases filed in Waco, Texas at that time.  Ex. 1512.  Judge Albright originally set all three cases for trial on the same day in October 2020, even though VLSI was seeking and eventually received separate trials in all three cases.  Ex. 1514 at 6.

### B.   The Board's *Fintiv* Denials Of Intel's Original IPR Petitions

After VLSI initiated litigation, Intel filed two timely IPR petitions challenging all claims of the '759 patent asserted by VLSI.  IPR2020-00106, Paper 3 (PTAB Oct. 31, 2019); IPR2020-00498, Paper 4 (PTAB Feb. 4, 2020).  VLSI urged the Board to deny institution, relying largely on the difference between the then-scheduled trial date in Texas and the expected deadlines for final written decisions

---

[1] Citations to "Paper" and "Ex." refer to filings in the underlying IPR (IPR2021-01064).  Orders, as well as filings cited in the Argument section, are attached as exhibits to this brief.

in the IPRs.  IPR2020-00106, Paper 7 at 4-16 (PTAB Feb. 7, 2020); IPR2020-00498, Paper 10 at 3-16 (PTAB May 21, 2020).

The Board accepted VLSI's argument and exercised its discretion to deny institution under 35 U.S.C. § 314(a), based on the rule announced in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020).  As its primary reason for denying institution, the Board emphasized that final written decisions in the IPRs would not be likely to issue until after the then-scheduled trial date in Texas. IPR2020-00106, Paper 17 at 4-13 (PTAB May 5, 2020); IPR2020-00498, Paper 16 at 4-11 (PTAB Aug. 19, 2020).  Notably, in denying institution, the Board did not consider the merits of Intel's unpatentability arguments.[2]

## C.    The Verdict, Judgment, And Appeal In The Texas Case

Meanwhile, trial did not occur in Texas on the schedule VLSI had successfully leveraged to oppose Intel's IPR petitions.  Trial instead took place months later in February 2021.  A jury found that Intel infringed the '759 patent and awarded VLSI $675 million for that patent.  Ex. 1027 at 3, 6.  The jury was not asked to assess

---

[2] The Director subsequently issued new "interim guidance" for how the Board should apply *Fintiv*, explaining that the Board must "consider[] the merits of a petitioner's challenge" and that "compelling, meritorious challenges will be allowed to proceed at the PTAB even where district court litigation is proceeding in parallel." PTO Director, "Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation" at 4 (June 21, 2022), www.uspto.gov/sites/default/files/documents/interim_proc_discretionary_denials_ aia_parallel_district_court_litigation_memo_20220621_.pdf.

invalidity based on the grounds raised in Intel's original IPR petitions. Intel instead relied on product prior art that it could not have raised in an IPR. *Id.* at 5.

The Texas court entered final judgment against Intel in April 2022. Ex. 1515. That was more than one year after trial and two years after Intel filed its IPR petitions. Intel's appeal from the Texas judgment is pending before this Court. *VLSI Tech. LLC v. Intel Corp.*, No. 2022-1906 (Fed. Cir.).

### D.   The Board's Institution Of OpenSky's IPR Petition And Intel's Joinder IPR Petition

In June 2021, OpenSky—an entity with no connection to Intel or VLSI—filed an IPR petition challenging the '759 patent based on the same grounds as Intel's original IPR petitions. Paper 2. The Board granted institution in December 2021. Paper 17. Addressing the merits of the prior-art challenges for the first time, the Board found that OpenSky's petition demonstrated a reasonable likelihood that the challenged claims would be found unpatentable on two independent grounds. *Id.* at 15-29.

The next business day, Intel filed an IPR petition challenging the same '759 patent claims based on the same prior art and grounds as the instituted OpenSky IPR. IPR2022-00366, Paper 3. Intel also moved to join the OpenSky IPR. IPR2022-

00366, Paper 4.  In June 2022, the Board instituted Intel's joinder petition and granted Intel's joinder motion.  IPR2022-00366, Paper 14.[3]

### E.    The Director's *Sua Sponte* Review Of The Board's Institution Decision

In January 2022, VLSI requested rehearing and precedential opinion panel ("POP") review of the OpenSky institution decision.  Paper 20.  VLSI argued that the institution decision should be overturned because, according to VLSI, OpenSky was formed and filed its IPR petition for the purpose of harassing and extorting VLSI after the infringement verdict in Texas.  *Id.* at 5-10.

In June 2022, the Director ordered "sua sponte Director review of the Board's Institution Decision" in the OpenSky proceeding.  Paper 41 at 2.[4]  In a follow-on scheduling order, the Director made clear that she "discern[ed] no error in the Board's decision to institute review of [OpenSky's] meritorious [IPR] Petition" based on the unpatentability and discretionary issues the Board considered.  Paper 47 at 6-7 & n.4 ("I agree with the Board's determination that OpenSky demonstrated a reasonable likelihood of prevailing as to at least one challenged claim."); *id.* at 7

---

[3] Intel's joinder petition was timely because the one-year time bar does "not apply to a request for joinder," 35 U.S.C. § 315(b), and Intel filed its petition within one month of the OpenSky institution decision, 37 C.F.R. § 42.122(b).  *See* IPR2022-00366, Paper 14 at 8 n.7, 12.

[4] Concurrently, the POP dismissed VLSI's requests for rehearing and POP review.  Paper 42.

("I further discern no error in the Board's findings and determinations with respect to its analysis of the *Fintiv* or *General Plastic* factors.").

The Director, however, decided to review the Board's institution decision based on VLSI's allegations of abuse of process. Paper 47 at 7-8. As the Director noted, the Board retains discretion to deny institution "[w]hen abuse has been demonstrated[.]" *Id.* at 7. The Director accordingly ordered OpenSky, Intel, and VLSI to provide discovery and briefing on "[w]hat action the Director, and by delegation the Board, should take when addressing allegations of abuse of process[.]" *Id.* at 7-12.

### F.   The Director's Decision Not To Terminate The IPR

In response to the Director's review, VLSI asked the Director to "terminate [OpenSky's] IPR and vacate the decision instituting it, as well as the decision joining Intel." Paper 84 at 21; *see id.* at 21-25; Paper 92 at 2. That was the only relief that VLSI sought for OpenSky's alleged abuse of process at that time.

In October 2022, the Director issued an order addressing OpenSky's purported misconduct. Paper 102. With respect to VLSI's request to terminate the IPR, the Director recognized that "the unique dynamics of this case, coupled with the public interest in evaluating patent challenges with compelling merits" counseled in favor of permitting the IPR to continue if "the unpatentability merits were compelling as of the time of institution[.]" *Id.* at 47. The Director accordingly

remanded for the Board to determine "whether the record … prior to institution indicates that the Petition presents a compelling, meritorious challenge." *Id.* at 49. The Director explained that "[s]hould the Board find that such a challenge was made prior to institution, the Board shall move forward with the proceeding[.]" *Id.* Otherwise, "the Board shall dismiss the Petition[.]" *Id.* In her decision, the Director also found no wrongdoing by Intel. *Id.* at 47-48.[5]

On remand, the Board concluded that "the record … prior to institution in this proceeding indicates that the Petition presents a compelling, meritorious challenge." Paper 107 at 11; *see id.* at 4-11. The Director affirmed that decision in December 2022, thereby allowing the IPR to move forward. Paper 121. The Director also "admonish[ed] VLSI and its counsel for supporting their arguments with misleading statements of law and fact." *Id.* at 3-4. In a subsequent order, the Director again "strongly admonish[ed] VLSI for making arguments distorting the Board's prior statements and carelessly citing case law." Paper 138 at 10-11.

### G.     The Director's Order That OpenSky Should Pay Attorneys' Fees

In parallel with the "compelling merits" review of the underlying IPR petition, the Director also ordered OpenSky and VLSI (but not Intel) to address whether

---

[5] The Director later denied VLSI's request for reconsideration, explaining that "[o]rdering the Board to reconsider the Petition and the original institution decision under the compelling merits standard as a remedy for abuse of process provides VLSI with the possibility of terminating a previously instituted trial, to VLSI's benefit." Paper 114 at 7.

OpenSky should "pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse of process." Paper 102 at 50-51. In response to that order, VLSI argued for the first time that it should be awarded fees based on OpenSky's conduct. *See* Paper 117; Paper 119.

In February 2023, six weeks after the Director's order denying VLSI's request to terminate the IPR, the Director issued an order determining that OpenSky should pay VLSI's reasonable attorneys' fees incurred for time spent addressing OpenSky's misconduct, including the Director review process, but not for responding to the merits of the IPR petition. Paper 127 at 13. The Director further authorized VLSI to file a motion detailing its fees. *Id.*

VLSI filed its fee motion in February 2023, and OpenSky opposed in March 2023. Mot. 10. VLSI's fee motion is currently pending before the Director.[6]

### H.    The Board's Final Written Decision Finding All Challenged Claims Unpatentable And The Parties' Appeals To This Court

In May 2023, the Board issued a final written decision finding all challenged claims of the '759 patent unpatentable. Paper 135. The Board explained that the

---

[6] As a further sanction against OpenSky, the Director initially "elevat[ed] Intel to an active party" and "relegat[ed] OpenSky to a silent understudy role[.]" Paper 102 at 47. The Director later dismissed OpenSky from the IPR (Paper 121 at 2-3), but ultimately vacated that portion of her decision and restored OpenSky as a petitioner (Paper 127 at 3).

challenged claims would have been obvious over the prior art, relying on two independent grounds for each claim. *Id.* at 13-44.

In July 2023, VLSI appealed the final written decision "and all other underlying and related findings, orders, decisions, rulings, opinions, or other determinations merged into that Decision." Paper 139 at 1. OpenSky also filed a notice of appeal "to protect its right to appeal" in case VLSI's fee motion "is granted after the time to appeal the" final written decision "has run." Paper 140 at 2. This Court *sua sponte* consolidated the two appeals, designating VLSI's appeal as the lead appeal and OpenSky's appeal as the cross-appeal. ECF 2 at 1-2.

## ARGUMENT

### I. VLSI's REQUEST TO STAY ITS APPEAL FROM THE BOARD'S FINAL WRITTEN DECISION SHOULD BE DENIED.

#### A. VLSI's Appeal Is Ripe For Review And Should Move Forward Without Delay To Avoid Unfairly Prejudicing Intel.

In its final written decision, the Board determined that each challenged claim of the '759 patent is unpatentable on two independent grounds. Paper 135 at 43-44. That decision is final and appealable. *See* 35 U.S.C. § 319 ("A party dissatisfied with the final written decision … may appeal the decision[.]"); 28 U.S.C. § 1295(a)(4)(A) (granting this Court exclusive jurisdiction over appeals from Board decisions). Indeed, VLSI *agrees* that the Board's final written decision is an appealable final judgment. *See* Mot. 2 (VLSI noting it "timely appealed" the final

written decision); ECF 14 at 1 (VLSI's docketing statement identifying the final written decision as a "Final Judgment, 28 USC § 1295"). Thus, there is no dispute that VLSI's appeal from the Board's final written decision in Appeal 2023-2158 is ripe for review by this Court.

VLSI nevertheless seeks to stay its timely appeal from the final written decision "pending resolution of ongoing sanctions proceedings in the underlying [IPR]." Mot. 1. But VLSI's request rests on a misleading description of what is still pending before the PTO and its unfounded claim that a stay would promote judicial economy. In fact, the only "sanctions" issue that remains for the Director to decide is the amount of attorneys' fees to award against OpenSky—a collateral issue that will not affect this Court's review of the final written decision. VLSI's focus on the Director's decision not to terminate the IPR similarly fails to support a stay, as that decision is both final and not appealable. *Infra* § I.C. In short, there is no efficiency to be gained from VLSI's proposed stay.

VLSI's motion also ignores the unfair prejudice to Intel that favors denying a stay. *See Landis v. North Am. Co.*, 299 U.S. 248, 255 (1936) ("[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else."). As outlined above, VLSI's forum shopping allowed it to avoid IPR review of the '759 patent for years while it obtained a $675 million

verdict against Intel in Texas. Intel would be unfairly prejudiced if VLSI were permitted to delay affirmance of the Board's unpatentability determinations—which will moot VLSI's infringement claim—while the district court appeal moves forward. *Infra* p. 21. VLSI's requested stay should therefore be denied.

### B. The Director's Pending Quantification Of Attorneys' Fees Does Not Warrant Staying VLSI's Appeal.

VLSI acknowledges that this Court may "decide an appeal from a final written decision before sanctions are resolved." Mot. 16 n.5. Here, the ***only*** sanctions issue that remains pending before the PTO is the Director's quantification of fees awarded to VLSI as a sanction against OpenSky. *Supra* pp. 8-9. Intel does not object to deconsolidating and staying OpenSky's Appeal 2023-2159 until the Director quantifies the fee award. That pending sanctions issue, however, does not warrant staying VLSI's separate appeal from the Board's final written decision in Appeal 2023-2158.

This Court routinely reviews final judgments without waiting for the tribunal below to decide collateral sanctions issues such as the quantification of fees. *E.g.*, *Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.*, 825 F. App'x 773, 776-783 (Fed. Cir. 2020) ("*Bennett II*") (affirming Board's final written decision holding claims unpatentable while declining to exercise jurisdiction over unquantified fee award); *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1296-1306 (Fed. Cir. 2019) (affirming district court's infringement judgment, while

recognizing that the court's unquantified fee award was not final and thus not appealable).

While VLSI contends that a stay would "avoid[] multiple, piecemeal appeals in a single case" (Mot. 17), it ignores the strong judicial interest in avoiding delay. *See Kahn v. General Motors Corp.*, 889 F.2d 1078, 1080 (Fed. Cir. 1989) ("It is the duty of courts to avoid unnecessary delay in resolving the rights of litigants."). Indeed, this Court often reviews the merits of a patent judgment in one appeal and a fee award from the same case in a later appeal. *E.g.*, *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 643 F. App'x 1014 (Fed. Cir. 2016) (per curiam) (affirming patent ineligibility); *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372 (Fed. Cir. 2017) (later affirming fee award from same case); *Bayer CropScience AG v. Dow AgroSciences LLC*, 580 F. App'x 909 (Fed. Cir. 2014) (per curiam) (affirming summary judgment); *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302 (Fed. Cir. 2017) (later affirming fee award from same case).

It is thus unsurprising that this Court has denied stay requests in similar circumstances. For example, in *Wireless Discovery LLC v. The Meet Group, Inc.*, the appellees sought to stay an appeal from an order declaring patents invalid pending the district court's resolution of their motion for attorneys' fees, emphasizing "[j]udicial efficiency." No. 2023-1582, ECF 19 at 1-3 (Fed. Cir. June

9, 2023).  The appellant opposed the motion, No. 2023-1582, ECF 21 (Fed. Cir. June 20, 2023), and this Court denied it, No. 2023-1582, ECF 25 (Fed. Cir. July 24, 2023) (per curiam).  Similarly, in *GS CleanTech Corp. v. Adkins Energy LLC*, this Court denied a motion to continue a stay of appeals based on a pending fee motion in the district court.  No. 2016-2231, ECF 42 at 3 (Fed. Cir. July 5, 2018).

VLSI cites a handful of cases for the proposition that this Court "often grants stays of merits appeals where collateral issues in the same case … remain unresolved in the lower tribunal."  Mot. 17-18 & n.7.  But those cases all involved ***unopposed or joint*** motions for stays.  *See Orenshteyn v. Citrix Sys., Inc.*, No. 2003-1427, ECF 7 (Fed. Cir. July 30, 2003) (docket entry referring to "unopposed consented to motion"); *Blue Spike, LLC v. Adobe Sys., Inc.*, No. 2015-1803, ECF 26 at 1 (Fed. Cir. Oct. 2, 2015) ("does not oppose"); *Divix Golf, Inc. v. Mohr*, No. 2012-1235, ECF 20 at 2 (Fed. Cir. June 28, 2012) ("moves without opposition"); *Vehicle Operation Techs., LLC v. BMW of N. Am. LLC*, No. 2014-1831, ECF 61 at 2 (Fed. Cir. Feb. 19, 2015) ("move jointly"); *Unified Messaging Sols. LLC v. Google, Inc.*, No. 2014-1611, ECF 229 at 3 (Fed. Cir. Sept. 26, 2014) ("move without opposition").  Here, by contrast, Intel opposes VLSI's stay request because Intel would be prejudiced by delay in this Court's review of the Board's unpatentability determinations.

**C.    VLSI's Attempt To Appeal The Director's Decision Not To Terminate The IPR Also Does Not Warrant Staying VLSI's Appeal.**

Implicitly recognizing that the Director's pending quantification of fees does not provide a compelling reason to stay its appeal from the Board's final written decision, VLSI largely premises its stay request on its intended appeal from the Director's decision not to terminate the IPR.  More specifically, VLSI argues that judicial economy favors a stay because the Director's decision not to terminate the IPR is not yet final and VLSI's forthcoming appeal on that issue could render it unnecessary for this Court to review the final written decision on the merits.  Mot. 2-3, 14-17.  VLSI's argument is wrong for multiple reasons.

1.    As an initial matter, VLSI misleadingly suggests that the Director's decision on whether to terminate the IPR as a sanction against OpenSky is still pending below.  *See* Mot. 2 (VLSI asserting that "the critical issue of sanctions— ***including the Director's refusal to terminate this IPR***—remains before the PTO")[7]; *id.* at 12 (VLSI stating that "the sanctions issues remain pending before the Director" and claiming that those issues "includ[e] the refusal to terminate").  That is incorrect.  The Director denied VLSI's request to terminate the IPR in a decision dated December 22, 2022.  Paper 121 at 5-10; *supra* pp. 7-8.  VLSI's motion seems to acknowledge this fact in its background discussion of the IPR's procedural history.

---

[7] Emphasis is added unless otherwise indicated.

*See* Mot. 9 ("The Director affirmed [the Board's compelling-merits determination] on *sua sponte* review, and on that basis refused to order termination of the IPR as a sanction."). There is nothing left for the Director or the Board to decide concerning VLSI's request to terminate the IPR.

2.     VLSI's intent to appeal the Director's decision not to terminate the IPR cannot provide a basis for staying VLSI's merits appeal because the Director's non-termination decision is not appealable. The Director denied VLSI's request to terminate the IPR as part of her review of the Board's institution decision. *See* Paper 41 at 2 (ordering "sua sponte Director review of the Board's ***Institution Decision***"); Paper 47 at 12 (ordering that "the Board's Decision ***Instituting*** [IPR] … is submitted for Director review"); Paper 102 at 49 (remanding for the Board to determine if the record "***prior to institution*** indicates that the Petition presents a compelling, meritorious challenge"); Paper 114 at 7 ("Ordering the Board to reconsider the Petition and the ***original institution decision*** under the compelling merits standard as a remedy for abuse of process provides VLSI with the possibility of terminating a previously instituted trial[.]"); Paper 121 at 10 (affirming "the Board's finding of compelling merits based on the record before the Board ***prior to institution***"). VLSI itself understood the Director to be reviewing the institution decision, as it asked her to "terminate this IPR and vacate the decision instituting it, as well as the decision joining Intel." Paper 84 at 21-25; *see* Paper 106 at 1 (VLSI arguing that a petition

such as OpenSky's "should not be granted institution"); *id.* at 11-12 (VLSI describing compelling-merits decision as an "institution-stage decision").

It is well-established that institution decisions are "final and nonappealable." 35 U.S.C. § 314(d) ("The determination by the Director whether to institute an [IPR] … shall be final and nonappealable."); *see Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 274 (2016) (holding that § 314(d) "preclud[es] review of the Patent Office's institution decisions"). As a review of the institution decision, the Director's decision not to terminate the IPR is also "final and nonappealable." *See CyWee Grp. v. Google LLC*, 847 F. App'x 910, 912 (Fed. Cir. 2021) (holding that motion to terminate "amounted to nothing more than a request for the Board to reconsider its institution decision," which is "final and nonappealable"), *mandate recalled on other grounds*, 2021 WL 9979071 (Fed. Cir. Sept. 23, 2021). Therefore, any appeal by VLSI challenging the Director's decision not to terminate the IPR should be dismissed and will have no bearing on VLSI's merits appeal.

3.     This Court should also reject VLSI's attempt to bootstrap the Director's decision not to terminate the IPR (which is final and not appealable) to the Director's pending decision on the amount of attorneys' fees by characterizing them both as "sanctions decisions." *See* Mot. 13-14. The Director's non-termination decision was separate from her decision to award fees and has nothing to do with the pending quantification of fees. *Compare* Paper 121 (Director's compelling-merits decision)

*and* Paper 102 (ordering compelling-merits review), *with* Paper 127 (awarding fees). In fact, VLSI's briefing seeking termination of the IPR made no request for attorneys' fees. Rather, the first time VLSI requested fees was after the Director had already decided that the IPR should continue if the petition presented compelling merits. *Supra* pp. 7-9.

VLSI's reliance on *Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.*, 905 F.3d 1311 (Fed. Cir. 2018) ("*Bennett I*"), is thus misplaced. Although the Court in *Bennett I* held that denial of a termination request was not a final decision subject to appeal, the decision denying termination there was part of a "single decision" addressing the patentee's "entire motion for sanctions," which was filed after a final written decision and "requested both termination and compensatory sanctions." *Id.* at 1316. Here, by contrast, the Director's decision not to terminate the IPR preceded the final written decision, was part of the Director's review of the institution decision, and appeared in separate orders from the Director's determination that OpenSky owed VLSI attorneys' fees. *Supra* pp. 15-17. There is accordingly no basis for treating the Director's non-termination decision as part of the pending quantification of fees.

4.    Even if VLSI could appeal the Director's decision not to terminate the IPR, judicial economy still would not favor staying VLSI's appeal from the final written decision. VLSI indicated in its notice of appeal and docketing statement that,

to the extent the issue is appealable now, it "seeks reversal or vacatur of the Director's decision not to terminate the IPR" in Appeal 2023-2158. ECF 14 at 3; *see* Paper 139 at 2-3. Given that the Director's non-termination decision is final, the parties can address VLSI's challenge to that decision in the same appeal and in the same briefs addressing the Board's unpatentability determinations. That would alleviate VLSI's concern about not wanting to brief "overlap[ping]" issues of obviousness in separate appeals. *See* Mot. 17 & n.6. Of course, any appeal from the Director's non-termination decision would be meritless, both because this Court lacks jurisdiction to review institution decisions and because VLSI cannot show that the Director abused her discretion by not terminating a meritorious IPR. Indeed, VLSI has identified no authority where this Court has ordered the Director or Board to terminate a meritorious IPR as a sanction for alleged misconduct.

To the extent the Director's decision not to terminate the IPR were considered not yet final (as VLSI claims), that should not impede or delay this Court's review of the Board's final written decision. Even in *Bennett*, this Court affirmed a final written decision finding unpatentability while determining that the termination denial there was not final. *Bennett II*, 825 F. App'x at 782-783. *Bennett* therefore does not support VLSI's stay request. On the contrary, it confirms that the Court should allow VLSI's appeal from the final written decision to move forward without delay.

VLSI's reliance on *Apple Inc. v. Voip-Pal.com, Inc.* does not counsel otherwise. In that case, the Court granted Apple's **unopposed** original motion for a stay in a one-page order. No. 2018-1456, ECF 21 at 1-2 (Fed. Cir. Feb. 21, 2018) (noting Voip-Pal.com took "no position" on the motion). The Court therefore did not consider whether delay in reviewing the Board's final written decision would prejudice a party, as it would prejudice Intel here. Moreover, in *Apple*, the Court noted that Apple's sanctions motion was filed **after** the final written decision. *Id.* And that sanctions motion, which included a request for relief that could moot the entire IPR, "remain[ed] pending." *Id.*; *see* No. 2018-1456, ECF 6 at 1-3 (Fed. Cir. Jan. 25, 2018) (filing indicating that Apple sought judgment in its favor as a sanction). Here, by contrast, the Director reached a final (and non-appealable) decision not to terminate the IPR **before** the final written decision, *supra* pp. 16-17, and the only pending sanctions issue (i.e., quantification of fees) will indisputably not obviate VLSI's appeal. Thus, there is no reason to delay this Court's review of the Board's unpatentability determinations for the '759 patent.

## II.    TO THE EXTENT THE COURT GRANTS VLSI'S REQUEST TO STAY ITS APPEAL, THE COURT SHOULD ALSO STAY OR COORDINATE FOR ORAL ARGUMENT THE RELATED DISTRICT COURT APPEAL.

In the Texas case, a jury awarded VLSI $675 million for Intel's alleged infringement of the '759 patent. Due to VLSI's forum shopping, which led to the Board's discretionary denial of Intel's original IPR petitions under *Fintiv*, the Texas

court entered final judgment on that verdict before the Board issued its final written decision finding all asserted claims unpatentable. *Supra* pp. 2-5. Intel's appeal from that district court judgment is currently pending. *See VLSI Tech. LLC v. Intel Corp.*, No. 2022-1906 (Fed. Cir.).

Through its stay request, VLSI seeks to delay affirmance of the Board's final written decision. But Intel would be unfairly prejudiced by further delay, including because affirmance of the Board's unpatentability determinations will moot the district court action. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013) ("[W]hen a claim is cancelled, the patentee loses any cause of action based on that claim, and any pending litigation in which the claims are asserted becomes moot."); *VirnetX Inc. v. Apple Inc.*, No. 2021-1672, 2023 WL 2770074, at *1 (Fed. Cir. Mar. 31, 2023) ("Now that we have affirmed the Board's finding of unpatentability, VirnetX has lost its cause of action, and its dispute with Apple is moot."). As explained above, the Court should therefore deny VLSI's motion to stay.

However, to the extent the Court grants VLSI's request to stay its appeal from the Board's final written decision, the Court should also stay or coordinate for oral argument the related district court appeal. Doing so would mitigate the prejudice that Intel faces from any further delay in these IPR proceedings. *See VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*, No. 2020-2271, ECF 64 at 3 (Fed. Cir. Nov.

24, 2021) (granting opposed motion to set district court and IPR appeals involving same patent as companion cases); *Apple Inc. v. Universal Secure Registry LLC*, No. 2020-1223, ECF 55 at 2 (Fed. Cir. Oct. 15, 2020) (same).

## CONCLUSION

Intel respectfully requests that the Court deny VLSI's motion to stay VLSI's appeal from the Board's final written decision (Appeal 2023-2158).  Intel does not object to staying OpenSky's appeal from the Director's as-yet unquantified fee award (Appeal 2023-2159) if that appeal is deconsolidated from VLSI's appeal.

Respectfully submitted,

/s/ William F. Lee

| | |
|---|---|
| STEVEN J. HORN | WILLIAM F. LEE |
| GARY M. FOX | LAUREN B. FLETCHER |
| WILMER CUTLER PICKERING | MADELEINE C. LAUPHEIMER |
| HALE AND DORR LLP | WILMER CUTLER PICKERING |
| 2100 Pennsylvania Avenue, NW | HALE AND DORR LLP |
| Washington, DC  20037 | 60 State Street |
| (202) 663-6000 | Boston, MA  02109 |
| | (617) 526-6000 |
| BENJAMIN S. FERNANDEZ | |
| WILMER CUTLER PICKERING | |
| HALE AND DORR LLP | |
| 1225 Seventeenth Street, Suite 2600 | |
| Denver, CO  80202 | *Attorneys for Appellee Intel* |
| (720) 274-3135 | *Corporation* |

August 17, 2023

# CERTIFICATE OF INTEREST

Counsel for Appellee Intel Corporation certifies the following:

**1.    Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Intel Corporation

**2.    Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.    Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP:  David Cavanaugh

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X]  Yes (file separate notice; see below)      [ ]  No      [ ]  N/A (amicus/movant)

Already Filed.

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6.    Organizational Victims and Bankruptcy Cases**.    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  August 17, 2023              /s/ William F. Lee
                                     WILLIAM F. LEE
                                     WILMER CUTLER PICKERING
                                       HALE AND DORR LLP
                                     60 State Street
                                     Boston, MA  02109
                                     (617) 526-6000

# EXHIBITS

# TABLE OF CONTENTS

| Exhibit No. | Description |
| --- | --- |
| Exhibit A | Decision Granting Institution of *Inter Partes* Review, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 17 (PTAB Dec. 23, 2021) |
| Exhibit B | Order, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 41 (PTO Director June 7, 2022) |
| Exhibit C | Order, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 42 (PTAB June 7, 2022) |
| Exhibit D | Order Setting Schedule for Director Review, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 47 (PTO Director July 7, 2022) |
| Exhibit E | Non-Confidential Redacted Version of Patent Owner's Brief in Response to Director Review Order (Excerpted), *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 84 (Aug. 19, 2023) |
| Exhibit F | Decision Determining Abuse of Process, Issuing Sanctions, and Remanding to Patent Trial and Appeal Board Panel for Further Proceedings, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 102 (PTO Director Oct. 4, 2022) |
| Exhibit G | Patent Owner's Request for Reconsideration of and Objections to Director's October 4, 2022 Decision (Excerpted), *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 106 (Oct. 13, 2022) |
| Exhibit H | Order:  Decision on Remand Assessing Merits at Institution, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 107 (PTAB Oct. 14, 2022) |

| Exhibit I | Order Denying Request for Reconsideration, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 114 (PTO Director Nov. 4, 2022) |
| --- | --- |
| Exhibit J | Decision Denying Request for Rehearing, Affirming Decision on Remand, Dismissing Petitioner OpenSky Industries, LLC, Ordering Patent Owner to Show Cause, and Lifting Stay, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 121 (PTO Director Dec. 22, 2022) |
| Exhibit K | Order Restoring OpenSky as a Party, Awarding Reasonable Fees as Sanctions Against Petitioner, Authorizing Patent Owner to File Motion for Fees, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 127 (PTO Director Feb. 3, 2023) |
| Exhibit L | Judgment: Final Written Decision Determining All Challenged Claims Unpatentable and Denying Patent Owner's Motion to Exclude, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 135 (PTAB May 12, 2023) |
| Exhibit M | Order Admonishing Patent Owner and Granting Petitioner's Motion to Seal, *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 138 (PTO Director June 27, 2023) |
| Exhibit N | Patent Owner VLSI Technology, LLC's Notice of Appeal (Excerpted), *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 139 (July 13, 2023) |

# EXHIBIT A

Trials@uspto.gov
571-272-7822

Paper No. 17
Entered: December 23, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

OPENSKY INDUSTRIES, LLC,
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

IPR2021-01064
Patent 7,725,759 B2

Before THOMAS L. GIANNETTI, BRIAN J. MCNAMARA, and
JASON W. MELVIN, *Administrative Patent Judges*.

MELVIN, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
35 U.S.C. § 314

IPR2021-01064
Patent 7,725,759 B2

# I. INTRODUCTION

OpenSky Industries, LLC ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting institution of *inter partes* review of claims 1, 14, 17, 18, 21, 22, and 24 ("the challenged claims") of U.S. Patent No. 7,725,759 B2 (Ex. 1001, "the '759 patent"). VLSI Technology LLC ("Patent Owner") filed a Preliminary Response. Paper 9 ("Prelim. Resp."). As authorized, Petitioner filed a Preliminary Reply (Paper 13 ("Prelim. Reply")), and Patent Owner filed a Preliminary Sur-Reply (Paper 16 ("Prelim. Sur-Reply")). As also authorized, Patent Owner filed a Supplemental Brief regarding *In re Vivint, Inc.*, 14 F.4th 1342 (Fed. Cir. 2021). Paper 11 ("PO Supp. Br."). Petitioner filed an opposition brief. Paper 15 ("Pet. Supp. Opp.").

An *inter partes* review may not be instituted unless "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). For the reasons set forth below, we conclude that Petitioner has shown a reasonable likelihood it will prevail in establishing the unpatentability of at least one challenged claim, and we institute *inter partes* review.

## A. RELATED MATTERS

The parties both identify the following matter related to the '759 patent: *VLSI Technology LLC v. Intel Corporation*, No. 6:19-cv-00254-ADA (consolidated as 1:19-cv-00977) (W.D. Tex.) (trial concluded with jury verdict). Pet. 5; Paper 5. Patent Owner identifies the following additional matters: *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00057 (W.D. Tex.); *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00299 (W.D. Tex.); *Intel Corp. v. VLSI Tech. LLC*, IPR2020-00498 (PTAB) (on appeal to Federal Circuit,

IPR2021-01064
Patent 7,725,759 B2

No. 21-1617); *Intel Corp. v. CLSI Tech. LLC*, IPR2020-00106 (PTAB) (on appeal to Federal Circuit, No. 21-1614). Paper 5.

## B.   Real Parties in Interest

Petitioner identifies only itself as the real party in interest. Pet. 5. Patent Owner identifies VLSI Technology LLC and CF VLSI Holdings LLC as real parties in interest. Paper 5.

## C.   The '759 Patent

The '759 patent is titled System and Method of Managing Clock Speed in an Electronic Device. Ex. 1001, code (54). It describes a method of monitoring a plurality of master devices coupled to a bus, receiving an input from a master device that is a request to increase the bus clock frequency, and increasing the bus clock frequency in response to the request. *Id.*, code (57).

## D.   Challenged Claims

Challenged claim 1 is reproduced below:

1.   A method, comprising:

monitoring a plurality of master devices coupled to a bus;

receiving a request, from a first master device of the plurality of master devices, to change a clock frequency of a high-speed clock, the request sent from the first master device in response to a predefined change in performance of the first master device, wherein the predefined change in performance is due to loading of the first master device as measured within a predefined time interval; and

in response to receiving the request from the first master device:

IPR2021-01064
Patent 7,725,759 B2

> providing the clock frequency of the high-speed clock as
> an output to control a clock frequency of a second
> master device coupled to the bus; and

> providing the clock frequency of the high-speed clock as
> an output to control a clock frequency of the bus.

Ex. 1001, 7:66–8:15. Claims 14 and 18 are independent and recite
limitations similar to claim 1. *Id.* at 8:50–9:4, 9:19–40. The other challenged
claims depend from one of the independent claims.

### E.   PRIOR ART AND ASSERTED GROUNDS

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 14, 17 | 103 | Shaffer[1], Lint[2] |
| 18, 21, 22, 24 | 103 | Shaffer, Lint, Kiriake[3] |
| 1, 14, 17 | 103 | Chen[4], Terrell[5] |
| 18, 21, 22, 24 | 103 | Chen, Terrell, Kiriake |

Pet. 7. Petitioner relies also on the Declarations of Dr. Bruce Jacob.
Exs. 1002, 1046.

---

[1] US 6,298,448 B1, issued Oct. 2, 2001 (Ex. 1005).
[2] US 7,360,103 B2, issued Apr. 15, 2008 (Ex. 1006).
[3] US 2003/0159080 A1, published Aug. 21, 2003 (Ex. 1028).
[4] US 5,838,995, issued Nov. 17, 1998 (Ex. 1003).
[5] US 2004/0098631 A1, published May 20, 2004 (Ex. 1004).

IPR2021-01064
Patent 7,725,759 B2

## II.    ANALYSIS

### A.    DISCRETIONARY DENIAL

### 1.    *Dr. Jacob's Declaration*

Patent Owner argues that Petitioner relies on expert declarations filed by Intel in another proceeding. Accordingly, unless cross-examination is available, those declarations are hearsay in this proceeding. Prelim. Resp. 26.[6] The declarations of Dr. Jacob (Exs. 1002, 1046) and Dr. Hall-Ellis (Ex. 1040) were prepared for and filed in two prior IPR proceedings, *Intel Corporation v. VLSI Technology LLC*, IPR2020-00106 (for Exs. 1002 and 1040), and *Intel Corporation v. VLSI Technology LLC*, IPR2020-00498 (for Ex. 1046), (collectively "the Intel IPRs"). The Board denied institution in the Intel IPRs. IPR2020-00106, Paper 17 (denying institution), Paper 22 (denying rehearing); IPR2020-00498, Paper 16 (denying institution), Paper 21 (denying rehearing). Petitioner filed Dr. Jacob's and Dr. Hall-Ellis's declarations here without change, as reflected by the title pages indicating the Intel IPRs. *See* Exs. 1002, 1040, 1046.

Patent Owner argues that Petitioner will be unable to produce either of its declarants for cross-examination, and therefore their statements should be given little weight in this proceeding.[7] Prelim. Resp. 27–29. In that regard, Patent Owner relies on statements in a petition filed by another party, Patent Quality Assurance ("PQA") in IPR2021-01229 ("the PQA IPR"). *Id.* at 27

---

[6] Fed. R. Evid. 804(b)(1) provides a hearsay exception for former testimony offered against a party who had an "opportunity and similar motive" to develop it by cross-examination. That does not apply here.

[7] Under our rules, cross examination of declaration testimony of retained experts is authorized as mandatory discovery. 37 C.F.R. § 42.51(b)(1)(ii).

IPR2021-01064
Patent 7,725,759 B2

(citing IPR2021-01229, Paper 1, 4–5). The PQA IPR does not challenge the
'759 patent, but the petition there asserted the existence of an exclusive
agreement with Dr. Hall-Ellis. IPR2021-01229, Paper 1, 4. Since filing its
petition, however, PQA has corrected itself, confirming that it does not have
an exclusive arrangement with Dr. Hall-Ellis. IPR2021-01229, Paper 8, 8 n.2
(stating that the petitioner in that case "erroneously claimed exclusivity with
Dr. Hall-Ellis." (citing IPR2021-01229, Ex. 1033 ¶ 9)).

　　　Without any evidence that Dr. Jacob or Dr. Hall-Ellis would be
unwilling to testify on behalf of OpenSky, or that PQA asserts a right to
prevent them from testifying in this proceeding, we disagree with Patent
Owner's assertion that PQA's contentions "make clear that Dr. Hall-Ellis
will be unable to testify in this matter and cast significant doubt upon
OpenSky's ability to produce Dr. Jacob." Prelim. Resp. 27. In that regard,
the facts of this proceeding differ significantly from those of
IPR2021-01056, in which OpenSky challenges another one of Patent
Owner's patents. While we conclude in that proceeding that the facts support
denial of the petition due to the existence of an agreement with PQA
preventing Petitioner's proffered expert from appearing for cross-
examination, we reach a different decision on the different facts here.

　　　Petitioner contends that it will seek Dr. Jacob's cooperation if trial is
instituted. Prelim. Reply 9. While we are somewhat surprised that Petitioner
apparently submitted Dr. Jacob's declaration in this proceeding without first
seeking this cooperation, on this record we have no reason to think Dr. Jacob
would be unwilling to participate, given his prior participation in the Intel
IPRs. Of course, under our rules and procedures, Petitioner is responsible for
producing Dr. Jacob for cross examination and bears a risk that Dr. Jacob

IPR2021-01064
Patent 7,725,759 B2

would not be willing to support the Petition here by appearing for a deposition. *See* Consolidated Trial Practice Guide 23 (November 2019); 37 C.F.R. § 42.53(g) (burden of producing a witness for cross-examination falls on the party presenting the witness).

Petitioner argues that the best approach would be to institute review and consider Patent Owner's objections later. Prelim. Reply 11 (distinguishing cases cited by Patent Owner). We agree that, in some circumstances, Patent Owner's objections may be addressed at trial. For instance, if Dr. Jacob adopts his prior assertions for purposes of this proceeding and undergoes cross-examination, that would allow for a normal discovery process to take place and would require no substantive change to the Petition's contentions.

Because the present record does not indicate that Dr. Jacob would be unwilling to participate in this proceeding or is constrained by a prior agreement from participating, we determine that the best course is to consider the Petition on its merits to determine whether to institute *inter partes* review.

### 2.   *District-court litigation*

Patent Owner argues that we should deny institution under *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (Mar. 20, 2020) (precedential). Prelim. Resp. 10–20. The argument is based on a prior litigation in which a jury determined that Intel infringed the '759 patent and that the patent was not shown invalid over "the Yonah Processor" ("the Intel litigation"). Ex. 1027 (March 2, 2021, verdict).

Patent Owner addresses each of the *Fintiv* factors for evaluating parallel litigation involving the challenged claims. *See* Prelim. Resp. 11–20.

7

IPR2021-01064
Patent 7,725,759 B2

Petitioner submits that the factors have limited applicability here, where
Petitioner is not a litigation party. Prelim. Reply 6.

Because the Intel litigation is complete, there is no possibility of a
stay. *See* Prelim. Resp. 11. Similarly, the Intel litigation has a known
outcome and investment. *Id.* at 11–14 (discussing *Fintiv* factors 1, 2, and 3).
On the other hand, the only invalidity basis presented to the jury does not
overlap with the grounds here, and Petitioner was not a party in the Intel
litigation. *Id.* at 14–17.

In our view, Petitioner correctly emphasizes *Fintiv*'s language noting
that the Board generally disfavors discretionary denial when litigation did
not involve the petitioner, unless "the issues are the same as, or substantially
similar to those already or about to be litigated, or other circumstances
weigh against redoing the work of another tribunal." *Fintiv*, IPR2020-00019,
Paper 11, 13–14. Indeed, in multiple decisions Patent Owner cites for
support, the Board determined that instituting review would require
resolving issues that would also have been resolved by a district court. *E.g.*,
*Fitbit, Inc. v. Philips N. Am. LLC*, IPR2020-00828, Paper 13, 15–16
(considering the patent owner's litigation with a non-petitioning party that
would overlap with the *inter partes* review at issue); *Mylan Labs. Ltd. v.
Janssen Pharmaceutica N.V.*, IPR2020-00440, Paper 17, 19–23 (same, and
additionally considering litigation involving the petitioner).

Here, because the Intel litigation did not resolve issues presented by
this proceeding, there is no chance of an inconsistent outcome. Indeed,
"redoing the work of another tribunal" would only arise when that tribunal
has resolved a dispute at issue before the Board. Patent Owner has not
argued that resolving a dispute in this proceeding would conflict with an

IPR2021-01064
Patent 7,725,759 B2

aspect of the Intel litigation. Thus, we do not agree with Patent Owner that, because "the [litigation] parties and the District Court invested enormous amounts of time and money litigating validity and infringement issues relating to the '759 patent," instituting review here would mean redoing the work of another tribunal. Prelim. Resp. 17.

Patent Owner argues that instituting review here would lead to harassment of Patent Owners who prevail at trial, and that such an outcome fundamentally conflicts with Board precedent and policy. *Id.* at 18. We do not agree that prevailing in litigation against one party should insulate a patent owner from challenge by a different party based on grounds that were not resolved in the litigation.

Considering all of the *Fintiv* factors, we are persuaded that we should not exercise our discretion to deny institution in light of the Intel litigation.

### 3.    *Prior petitions*

Patent Owner argues that we should exercise discretion to deny institution because the Petition presents the same challenges as prior petitions for which the Board denied review. Prelim. Resp. 20–26. In that regard, Patent Owner relies on the framework from *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (Sept. 6, 2017) (precedential).

As discussed above, the Board denied institution in the Intel IPRs. Importantly, however, it did so based on parallel district-court litigation. *See* IPR2020-00106, Paper 17, 4–13; IPR2020-00498, Paper 16, 4–10. Neither denial considered the merits of Intel's challenges.

IPR2021-01064
Patent 7,725,759 B2

*Factor 1: whether the same petitioner previously filed a petition*
*directed to the same claims of the same patent*

"[W]hen different petitioners challenge the same patent, we consider any relationship between those petitioners when weighing the *General Plastic* factors." *Valve Corp. v. Elec. Scripting Prods. Inc.*, IPR2019-00062, Paper 11, 9 (Apr. 2, 2019). In *Valve*, however, the petitioner and the prior petitioner were co-defendants accused of infringement based on the same product. *Id.* at 9–10. Patent Owner argues that the Board has found a relationship between petitioners when one uses substantive challenges from an earlier petition. Prelim. Resp. 21 (citing *Ericsson Inc. v. Uniloc 2017 LLC*, IPR2019-01550, Paper 8, 12). *Ericsson* imposed a relationship in light of the derivative nature of the petition at issue. *Ericsson*, IPR2019-01550, Paper 8, 12. That decision, however, has not been designated as precedential or informative by the Board, and other decisions have determined that factor 1 weights against discretionary denial for an independent petitioner. *E.g.*, *United Fire Protection Corp. v. Engineered Corrosion Solutions, LLC*, IPR2018-00991, Paper 10 (determining that petitioner independence weighed against discretionary denial, but that substantive similarity with an unrelated prior petition meant the factor only moderately weighed against discretionary denial). We determine that factor 1 weighs somewhat against discretionary denial because Petitioner has not filed a prior petition, but did copy its substantive grounds from a prior petition.

That the Board has not substantively addressed the merits of the prior petitions, in our view, weighs against discretionary denial, because that approach best balances the desires to improve patent quality and patent-system efficiency against the potential for abuse of the review process by

10

IPR2021-01064
Patent 7,725,759 B2

repeated attacks on patents. *See General Plastic*, IPR2016-01357, Paper 19, 16–17. We view substantive consideration as an important factor in that balance, because to determine otherwise would asymmetrically insulate patent owners from potential abuse without addressing the desire to improve patent quality. Patent Owner suffers no abuse from having this tribunal consider the merits of these grounds for the first time.

> *Factor 2: whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it; and*
> *Factor 4: the length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;*

Patent Owner argues that the public was on notice of the grounds asserted in the Intel IPRs, and that OpenSky has thus not offered an adequate explanation of waiting to file the Petition here. Prelim. Resp. 22–23. Petitioner submits that neither it nor any associated persons knew of Intel's petitions or litigation until after the March 2021 verdict. Prelim Reply 4.

We recognize that OpenSky was not formed until after the Intel litigation verdict, but agree with Patent Owner that OpenSky's members' knowledge before forming the entity is nonetheless relevant to our inquiry. *See* Prelim. Sur-Reply 5–6. Petitioner's declarant states that "[n]o person affiliated with OpenSky was aware of the dispute" between Intel and Patent Owner, or aware of the Intel IPRs. Ex. 1048. Without some factual support calling those statements into question, we decline to conclude Petitioner should have known about the art it asserts. Although Patent Owner questions the declaration that OpenSky uses to establish its knowledge, we do not agree that the Board should infer an individual's knowledge based on

11

IPR2021-01064
Patent 7,725,759 B2

unrelated business associations with other individuals. *See* Prelim.
Sur-Reply *id.* at 6 (asserting that OpenSky's declarant, Mr. Larocca, has a
business partner in other ventures who was aware of the Intel litigation
before the verdict).

We conclude that neither factor 2 nor factor 4 supports discretionary
denial here.

> *Factor 3: whether at the time of filing of the second petition the*
> *petitioner already received the patent owner's preliminary*
> *response to the first petition or received the Board's decision*
> *on whether to institute review in the first petition*

Patent Owner argues that because Petitioner reviewed both Patent
Owner's preliminary responses and also the Board's institution decisions
from the Intel IPRs, factor 3 strongly supports discretionary denial.
Prelim. Resp. 23. We agree that Petitioner benefited from Patent Owner's
preliminary response, but Patent Owner has not identified how the institution
decisions denying review based on *Fintiv* created any further imbalance.
Those decisions did not discuss any substantive aspects of Intel's petitions,
and did not allow Petitioner to modify its approach through roadmapping.
*See* IPR2020-00106, Paper 17 (discussing only discretionary denial under
*Fintiv*); IPR2020-00498, Paper 16 (same).

Petitioner's ability to review Patent Owner's preliminary responses in
the Intel IPRs allowed Petitioner to address those arguments before filing the
present Petition. It is unclear at this time what, if any, changes were made in
response. Although we agree with Patent Owner that the opportunity for
roadmapping existed, we are unaware of any actual roadmapping here. We
conclude that factor 3 weighs in favor of discretionary denial.

IPR2021-01064
Patent 7,725,759 B2

> *Factor 5: whether the petitioner provides adequate explanation*
> *for the time elapsed between the filings of multiple petitions*
> *directed to the same claims of the same patent;*

Considering two petitions from the same petitioner, or petitions from related petitioners, an additional burden arises from not having a consolidated challenge. We determine that OpenSky has offered a reasonable explanation for the timing of the Petition. Here, it was reasonable for OpenSky to take interest in the '759 patent after a substantial damages award, and choose to challenge the patent at that time. *See* Prelim. Reply 5.

We agree with Patent Owner that Petitioner misstates that the Intel litigation did not involve invalidity of the '759 patent (*see* Prelim. Resp. 24), but significant to our analysis here, that litigation did not involve invalidity based on the grounds in the Petition (*compare* Ex. 1027, 5, *with* Pet. 7). Petitioner's explanation that it learned of the large verdict, formed OpenSky, then prepared the Petition adequately explains the Petition's timing. We conclude that factor 5 weighs against discretionary denial.

> *Factor 6: the finite resources of the Board; and*
> *Factor 7: the requirement under 35 U.S.C. § 316(a)(11) to*
> *issue a final determination not later than 1 year after the date*
> *on which the Director notices institution of review*

Patent Owner submits that the Board has expended sufficient resources reviewing the Intel IPRs, and that we stand at risk for parties "flooding the Board with belated challenges to patents that have already been challenged and/or litigated." Prelim. Resp. 25; *accord* Prelim. Sur-Reply 7 ("The Board already expended extraordinary resources here, and instituting here would flood it with (and subject patent owners to) harassing challenges brought by fly-by-night LLC's facing no threat of

IPR2021-01064
Patent 7,725,759 B2

litigation."). That assertion, however, fails to distinguish between the Board expending resources on substantive consideration (which it has not done for the '759 patent) and considering why another forum may be better suited to do so (as in the Intel IPRs). Without any Board proceeding requiring ongoing resources for the '759 patent, we conclude that factors 6 and 7 weigh against discretionary denial.

*Summary*

Having considered all the *General Plastic* factors, based on the present record, we conclude that most factors support institution whereas only one factor weighs against institution. We therefore determine not to exercise our discretion to deny institution under § 314(a).

4.    *Consistent exercise of discretion*

Patent Owner argues that we should deny institution under § 325(d) because *Vivint* "confirms that denial under § 325(d) is required here." PO Supp. Br. 2. We do not agree.

The Federal Circuit held that "the Patent Office, when applying § 325(d), cannot deny institution of IPR based on abusive filing practices then grant a nearly identical reexamination request that is even more abusive." *Vivint*, 14 F.4th at 1354. It found important that, when the Board denied Alarm.com's IPR petition, the Board considered Alarm.com's earlier petitions and reasoned that "allowing similar, serial challenges to the same patent, by the same petitioner, risks harassment of patent owners and frustration of Congress's intent in enacting the [AIA]." *Id.* at 1353 (quoting IPR2016-01091, Paper 11, 12) (alteration in original) (emphasis omitted).

IPR2021-01064
Patent 7,725,759 B2

The facts here are not remotely similar. The Intel IPRs were not denied for abusive filing practices, but rather were denied to avoid overlap with a parallel district-court litigation. *See* IPR2020-00106, Paper 17, 4–13; IPR2020-00498, Paper 16, 4–10. This proceeding involves a different petitioner, which has not before petitioned for review of the '759 patent. Those facts show that this Decision does not involve potentially abusive filing practices by the same challenger, as was at issue in *Vivint*.

Patent Owner has not identified how instituting review would be inconsistent with a prior decision on this patent. As explained above, because the invalidity issues presented at trial were different from those considered in the prior application of *Fintiv*, we reach a different conclusion under that doctrine based on different facts here. Thus, *Vivint* is not germane to our decision.

B.    UNPATENTABILITY GROUNDS INCLUDING SHAFFER AND LINT

Petitioner relies on Schaffer for most limitations of claim 1, further relying on Lint to support that a "predefined change in performance is due to loading of the first master device as measured within a predefined time interval." Pet. 22–31. Petitioner first asserts that Shaffer teaches the limitation by disclosing that "the CPU 20 operates at a lower speed when the OS 32 determines that no processing is occurring or has not occurred for a predetermined amount of time." *Id.* at 27 (quoting Ex. 1005, 4:6–8). Petitioner relies on Lint as an alternative to Shaffer's teachings in that regard, submitting that Lint discloses "changing the 'performance state . . . based in part on the data representing the average performance over the previous period of time.'" *Id.* (quoting Ex. 1006, 3:1–7). Petitioner reasons that Shaffer describes a "CPU utilization percentage" and that Lint discloses

IPR2021-01064
Patent 7,725,759 B2

a way of calculating that percentage that would allow Shaffer's system "to better interface with processor chips featuring hardware coordination of [performance]-states" by saving power, and that doing so would amount to nothing more than using a known technique to improve similar devices in the same way. *Id.* at 27–30 (citing Ex. 1006, 3:2–7, 2:33; Ex. 1002 ¶¶ 208–226).

### 1.    *The prior art's disclosures*

Shaffer discloses a "CPU speed control system." Ex. 1005, code (57). "The system includes a programmable frequency synthesizer for providing the CPU and other system buses in the device with a variable clocking frequency based on the application or interrupt being executed by the device." *Id.* at 2:17–20.

16

IPR2021-01064
Patent 7,725,759 B2

Shaffer's Figure 1 is reproduced below:



FIG. 1

Ex. 1005, Fig. 1. Figure 1 depicts CPU speed control system 18, including CPU 20 coupled to intelligent programmable clock module 50 such that CPU 20 can instruct clock module 50 to increase or decrease the output frequency as needed, and data/command bus 21 connecting CPU 20 with memory controller 22 and system/peripheral bus controller 24. *Id.* at 3:8–4:25. Shaffer discloses that "when the OS 32 sends a signal to the clock module 50 instructing it to provide the CPU 20 with the clock speed specified . . . both the memory controller 22 and the system controller 24 operate at the specified lower clock speed." *Id.* at 4:41–46.

Shaffer describes that, "in a multiprocessor system (not shown), a separate clock module 50 may be used for each processor, or a single clock

IPR2021-01064
Patent 7,725,759 B2

module 50 may drive all the processor clocks." *Id.* at 6:2–5. That same discussion explains that "the CPU and system buses may be clocked using separate clock modules" but that most power savings come from varying CPU clock speed. *Id.* at 6:5–14.

    *a.    Plurality of master devices coupled to a bus*

Patent Owner argues that Petitioner fails to show that Shaffer's CPUs, memory controller, and bus controller are master devices. Prelim. Resp. 30–40. First, Patent Owner asserts that because Shaffer does not identify its CPU, memory controller, or bus controller as a "master device," Petitioner's argument is one of inherency. *Id.* at 30–31. We do not agree. Shaffer may use different words to express that those components are consistent with the '759 patent's notion of a master device.

Petitioner notes that a master device may be "a processor, an input/output bus controller, a direct memory access (DMA) controller, an error correction code module or an external memory interface." Pet. 22–23 (quoting Ex. 1001, 3:23–28). We agree with Patent Owner that the patent's statement in that regard does not mean that all instances of the listed types are necessarily master devices. *See* Prelim. Resp. 33–34. But Petitioner relies on more than just falling within one of the possible device types listed by the '759 patent.

Petitioner relies on Dr. Jacob to establish that Shaffer's identified devices are master devices. Pet. 23 (citing Ex. 1002 ¶¶ 229–233). Dr. Jacob explains that Shaffer's "CPU 20, Memory Controller 22, and Peripheral Bus Controller 24 are all master devices, as they are all on the system bus, a shared bus organization (see the *Background* section)." Ex. 1002 ¶ 229 (citing *id.* ¶¶ 53–59). The cross-referenced section explains that a shared bus

IPR2021-01064
Patent 7,725,759 B2

permits multiple bus masters where "each bus master (e.g., each CPU or 'processor') is allowed to make its own decisions about when and how to access the shared bus." *Id.* ¶¶ 53, 58. Dr. Jacob states that Shaffer's bus 21 "is a shared-bus organization" with a "system bus controller," and that Shaffer refers to it as "system bus," all indicating that "system bus 21 has multiple bus masters, including the CPU 20, the memory controller 22, the peripheral bus controller 24 . . . , and potentially multiple CPUs." *Id.* ¶ 232.

Patent Owner disputes whether Shaffer discloses multiple master devices. In Patent Owner's view, only CPU 20 is a master device that can request speed changes. Patent Owner submits that because "Shaffer's CPU has a signal line (line 49) to clock module 50 in Figure 1, while controllers 22 and 24 do not," a skilled artisan would understand that the latter devices cannot instruct the clock module 50 to change frequency. Prelim. Resp. 33.

Regarding Petitioner's assertion that Shaffer discloses an embodiment with multiple CPUs, Patent Owner challenges whether disclosing a "multiprocessor" system means the system has multiple CPUs, and whether additional CPUs would be bus masters. Prelim. Resp. 37–38. We disagree with Patent Owner's argument that Shaffer's description of a "multiprocessor" system does not refer to multiple CPUs. Foremost, Shaffer's uses "processor," "microprocessor," and "CPU" interchangeably. *E.g.*, Ex. 1005, 1:38–51, 2:13–15, 2:46–49, 2:53–61, 5:21–30, 5:66–6:14. As noted, Shaffer does not illustrate its described multiple-CPU configuration. But nothing about Shaffer's disclosures are inconsistent with a second CPU mirroring the functionality of the illustrated single CPU. Petitioner asserts that it would have been obvious for a second CPU to be coupled to the same bus as Figure 1's CPU. Pet. 23 (citing Ex. 1002 ¶ 232 ("As the system uses a

IPR2021-01064
Patent 7,725,759 B2

shared-bus organization, a person of ordinary skill would understand that any additional CPUs, if present, would be attached to the system bus 21 in the same manner as CPU 20.")). We determine that the record adequately supports Petitioner's contention.

Because Petitioner's contentions regarding Shaffer's multiple CPU embodiment are adequate, we need not determine whether its contentions regarding other possible bus master devices (memory controller 22 or bus controller 24) additionally disclose the claimed "plurality of master devices."

b.    *Output to control a clock frequency of the bus*

Patent Owner argues that Petitioner fails to show the prior art discloses an "output to control a clock frequency of the bus." Prelim. Resp. 40–49. In Patent Owner's view, Petitioner relies on Shaffer's "data/command bus 21" for the claimed bus, but relies on Shaffer's "system bus" for receiving a clock frequency from the clock module. *Id.* at 41–42. We do not agree.

Petitioner cites to Shaffer's disclosures that indicate the clock module provides the clock signal to all of the buses, including the data/command bus 21. For example, Shaffer's Summary of the Invention refers to "other system buses" generically, without mentioning any more-specific bus. Ex. 1005, 2:17–19; *accord id.*, code (57). Shaffer also discloses that the "CPU speed control system 18" provides the clock frequency "to the other controllers and buses in the system" and specifically mentions the "data/command bus 21." *Id.* at 4:15–25. Shafer's statement that "the clock module 50 drives the entire system bus (as mentioned above)" is in the context of alternative disclosures in which separate clock modules may be

IPR2021-01064
Patent 7,725,759 B2

achieved to provide different clock signals to the CPU and system buses. *Id.* at 5:66–6:7. That statement does not undermine Shaffer's primary embodiment, in which a single clock signal is provided throughout the system, including "to control a clock frequency of the bus" as claimed.

### 2. *Objective indicia of nonobviousness*

Patent Owner submits that the commercial success of its patented invention demonstrates that it is not obvious. Prelim. Resp. 69–71. As evidence, Patent Owner points to the jury's verdict awarding $675 million in damages for the '759 patent. *Id.* at 70.

We do not evaluate Patent Owner's evidence or arguments regarding commercial success at this time. The issue presents a factual issue that Petitioner will have an opportunity to address at trial.

### 3. *Summary*

Other than as discussed above, Patent Owner does not challenge Petitioner's contentions for grounds including Shaffer and Lint. Based on the present record, we conclude that Petitioner has shown a reasonable likelihood it will prevail with respect to unpatentability of claim 1 over Shaffer and Lint—Petitioner's showing justifies institution. Pet. 22–31. Our conclusion considers Petitioner's stated motivation for modifying Shaffer in light of Lint.

We have reviewed Petitioner's contentions for claims 14 and 17 as unpatentable over Shaffer and Lint (Pet. 31–33), and for claims 18, 21, 22, and 24 as unpatentable over Shaffer, Lint, and Kiriake (*id.* at 34–39), and reach the same conclusions for those claims.

IPR2021-01064
Patent 7,725,759 B2

### C. Unpatentability Grounds Including Chen and Terrell

Petitioner relies on Chen for most limitations of claim 1, submitting that Terrell additionally teaches requesting a clock speed change "in response to a predefined change in performance of the first master device" and that the predefined change "is due to loading of the first master device as measured within a predefined time interval." Pet. 40–49.

Chen discloses an extension to an input/output ("I/O") bus and bridge chip that allows higher speed operation. Ex. 1003, code (57), 1:6–8. To that end, Chen discloses a system "for switching between different data transfer speeds." *Id.* at 1:61–62. Chen's host bridge "interconnects a system bus with an I/O bus" and includes control logic to allow "bus transactions at both a high frequency and a lower frequency." *Id.* at 2:1–6.

IPR2021-01064
Patent 7,725,759 B2

Chen's Figure 1 is reproduced below:



Ex. 1003, Fig. 1. Figure 1 depicts CPU 10 connected to system bus 12, which connects to host bridge 20, which interconnects system bus 12 with I/O bus 40 that communicates with devices 34 and 36. *Id.* at 2:50–3:4. Device 36 is a "soldered device" while device 34 is a "pluggable device" in slot 32. *Id.* at 3:1–3. Devices 34 and 36 have speed requesting circuits 38 and 35, respectively, that communicate with clock gate logic circuit 24,

IPR2021-01064
Patent 7,725,759 B2

which causes the frequency of bus 40 to be dynamically changed through unique clock lines 27. *Id.* at 3:4–22.

Terrell discloses a system and method for controlling the frequency of a common clock shared by a number of processing elements. Ex. 1004, code (57). Terrell states that "it is desirable to be able to reduce the frequency of a shared clock to the minimum frequency that allows the processing elements to function correctly while using the least amount of power." *Id.*, ¶ 5. Terrell states that its goal would be desirable in "[a]n on-chip bus that hosts two or more bus masters, all of which share a common bus clock." *Id.*, ¶ 6.

To implement its approach, Terrell discloses "two basic steps":

1. Over a sample period, measure how many clock cycles are being used by each processing element that is attached to the shared clock.

2. Adjust the system clock frequency to provide the minimum number of clock cycles required by the processing element that is using the largest number of clock cycles.

*Id.*, ¶¶ 25–27.

1.    *"Providing the clock frequency . . . as an output to control a clock frequency of a second master device"*

Patent Owner argues that Petitioner fails to show that Chen discloses "providing the clock frequency . . . as an output to control a clock frequency of a second master device." Prelim. Resp. 50–56. Patent Owner asserts that Petitioner relies on the same aspect of Chen for providing the clock frequency to a second master device and also to the bus, but that Chen does not disclose such dual use. *Id.* at 50–51.

IPR2021-01064
Patent 7,725,759 B2

As to providing the clock frequency to the bus, Petitioner relies on Chen's disclosure that, "'[i]n response to' a frequency control signal, 'control logic in the bridge chip causes the higher frequency clock in the bridge chip to be activated such that the host bridge, bus and I/O device are all then operating at the higher frequency.'" Pet. 49 (quoting Ex. 1003, 2:8–14).

As to providing the clock frequency to the second master device, Petitioner relies on Chen's disclosure of a peer-to-peer mode, in which "[b]oth master devices 34, 36 would be provided with the same clock frequency of the high-speed clock (signal of clock line 27) as an output (from clock gate logic 24)." Pet. 48. In that regard, Petitioner cites Chen's statement that "if device 36 requires data from device 34, and both of these devices activate their side band signals (SBD1 and SBD2, respectively), then the data can be transferred at the higher frequency (100Mhz, if both devices are enabled to operate at that speed)." *Id.* (quoting Ex. 1003, 5:61–65). Thus, we do not agree with Patent Owner that Petitioner relies on the same disclosure for both limitations.

But we understand Patent Owner's argument to be that the clock gate logic changes only the bus frequency, rather than also separately setting the frequency of devices 34 and 36. Chen, however, states that the "[c]lock gate circuit 24 causes the frequency of bus 40 to be dynamically changed (gated) by transmitting the appropriate device unique clock lines 27." Ex. 1003, 3:20–22. That indicates that the clock lines 27 are specific to the devices on the bus. Patent Owner argues that, even if lines 27 provide clock frequencies to device 34 and 36, that does not mean the frequencies "'control a frequency of' those devices as claimed." Prelim. Resp. 55 (emphasis

IPR2021-01064
Patent 7,725,759 B2

omitted). It is unclear, however, what providing a clock frequency to a device would do besides control its frequency. Similarly, Patent Owner argues that providing devices 34 and 36 with a clock frequency in a peer-to-peer mode would control only the frequency of the data being transmitted between the devices, not the frequency of the devices themselves. *Id.* at 56. Again, Patent Owner does not explain the distinction or why that would be the case.

While Patent Owner has raised reasonable questions regarding Chen's operation, at most those questions identify factual issues appropriate for resolution through trial. The present record supports that Petitioner's showing is adequate for institution.

*2.    Motivation to combine Chen and Terrell*

Patent Owner argues also that Petitioner fails to show skilled artisans would have been motivated to combine Chen and Terrell or that they would have had a reasonable expectation of success if doing so. Prelim. Resp. 56–69.

Patent Owner first challenges whether the Petition adequately justifies using Terrell's teachings to show the limitation "the request sent from the first master device in response to a predefined change in performance of the first master device." Prelim. Resp. 56–57 (citing Pet. 42–47). In that regard, however, the Petition asserts first that Chen alone discloses that limitation because Chen discloses triggering the speed request circuit "when the higher frequency operation is desired." Pet. 42 (citing Ex. 1003, 3:5–13; Ex. 1002 ¶¶ 150, 153). Petitioner points out that a predefined change in performance may include "an event such as a desired increase in device performance." *Id.*

26

IPR2021-01064
Patent 7,725,759 B2

(citing Ex. 1001, 3:64–4:19). That assertion alone appears sufficient to preclude a need to rely on Terrell for this limitation.

As to using Terrell's teachings such that Chen's requests would be sent "based on 'how many clock cycles are being used by each processing element'" (Pet. 44 (quoting Ex. 1004 ¶ 26)), Petitioner asserts it would have been obvious to do so because "[r]educing clock speed was a well-known technique for reducing power consumption." Pet. 44 (citing Ex. 1002 ¶¶ 125–142, 145). While Patent Owner argues that Chen seeks to maximize clock frequency, in opposition to Terrell's goal of minimizing it, we determine that Petitioner has adequately justified the combination. In particular, Dr. Jacob's declaration explains Chen's approach of selecting clock frequency based on the common capabilities of the involved devices, and how that would work with Terrell's approach of determining the performance need by measuring system load. Ex. 1002 ¶ 136. In particular, Dr. Jacob explains the approach of using Terrell's system to determine individual device requirements, which may be reduced because of load, and then using Chen's central arbiter to choose the highest common frequency. *Id.* Dr. Jacob explains that approach "would reduce the clock frequency (and thus the power dissipation, which is a cost) when the system is idle, but if one or more devices are not idle, and therefore likely need more performance, then the clock speed would not be reduced below their needs." *Id.* (emphasis omitted). In our view, that adequately explains how the two approaches would work together. We do not agree with Patent Owner that Terrell's approach is incompatible with Chen's.

Patent Owner disputes certain factual aspects of Chen's system, including whether it discloses a need for lowest-common-frequency

IPR2021-01064
Patent 7,725,759 B2

operation. Prelim. Resp. 60 (citing Ex. 1003, 3:5–9, 3:25–29; Ex. 2002
¶¶ 85–86). In that regard, Patent Owner argues that skilled artisans "would
not look beyond Chen for something in Chen," especially where doing so
would increase complexity. *Id.* To the extent Patent Owner argues that Chen
already has a capability addressed through a combination with Terrell (*see
id.* at 60, 63), that does not undermine the combination, because a
substitution of one known approach for another may be obvious. *See KSR
Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("[W]hen a patent claims
a structure already known in the prior art that is altered by the mere
substitution of one element for another known in the field, the combination
must do more than yield a predictable result.") (citing *United States v.
Adams*, 383 U.S. 39, 50–51 (1966)). And Patent Owner's argument that the
combination would unduly increase complexity such that a skilled artisan
would not pursue it establishes a factual issue that we decline to resolve on
the present record. *See* Prelim. Resp. 64–68.

Patent Owner further criticizes Petitioner's reliance on Terrell's
statement that its approach is suitable for applications including an "on-chip
bus that hosts two or more bus masters, all of which share a common bus
clock." Prelim. Resp. 61 (quoting Pet. 46). Patent Owner asserts that Chen
does not describe an on-chip bus, but a peripheral, off-chip bus. *Id.* at 62
(citing Ex. 2002 ¶ 88; Ex. 1003, 3:1–3, Fig. 1). Because of different design
constraints for the two bus types, Patent Owner submits that Terrell's
statement does not apply to Chen's system. *Id.* at 62–63. In light of our
conclusion above regarding Petitioner's primary justification, Patent
Owner's argument does not give reason to deny institution. At trial, the

IPR2021-01064
Patent 7,725,759 B2

parties will be able to support their contrary views of Terrell's asserted express justification.

Finally, Patent Owner submits that Petitioner has failed to explain why artisans combining Chen and Terrell would have had a reasonable expectation of success. Prelim. Resp. 68–69. That argument appears to rely on the same ideas discussed above, that the two approaches were not compatible and that combining them would have added substantial complexity to the system. *Id.* Dr. Jacob explains why combining Chen and Terrell would have been readily achievable by persons of skill, and in our view that explanation is sufficient. *See* Ex. 1002 ¶¶ 138–139, 143–145.

### 3.   *Summary*

Other than as discussed above, Patent Owner does not challenge Petitioner's contentions for grounds including Chen and Terrell. Based on the present record, we conclude that Petitioner has shown a reasonable likelihood it will prevail with respect to unpatentability of claim 1 over Chen and Terrell—Petitioner's showing justifies institution.

We have reviewed Petitioner's contentions for claims 14 and 17 as unpatentable over Chen and Terrell (Pet. 49–53), and for claims 18, 21, 22, and 24 as unpatentable over Shaffer, Lint, and Kiriake (*id.* at 54–60), and reach the same conclusions for those claims.

### III.   CONCLUSION

For the reasons discussed above, we conclude Petitioner has shown a reasonable likelihood of prevailing with respect to at least one claim. We have evaluated all of the parties' submissions and determine that the record supports institution. We conclude that instituting review in this proceeding is

29

IPR2021-01064
Patent 7,725,759 B2

in the interest of efficient administration of the Office and the integrity of the patent system. *See* 35 U.S.C. § 316(b). Accordingly, we institute an *inter partes* review of all challenged claims under all grounds set forth in the Petition.

Our determination at this stage of the proceeding is based on the evidentiary record currently before us. This decision to institute trial is not a final decision as to patentability of any claim for which *inter partes* review has been instituted. Our final decision will be based on the full record developed during trial.

## IV.   ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '759 patent is instituted on the claims and grounds set forth in the Petition;

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this decision.

IPR2021-01064
Patent 7,725,759 B2

PETITIONER:

Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com


PATENT OWNER:

Baback Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT B

Trials@uspto.gov                                        Paper No. 41
571-272-7822                                        Date: June 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR
OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

ORDER

IPR2021-01064
Patent 7,725,759 B2

On December 23, 2021, the Patent Trial and Appeal Board ("Board") issued a Decision granting institution of an *inter partes* review of claims 1, 14, 17, 18, 21, 22, and 24 of U.S. Patent No. 7,725,759 B2 ("the '759 patent"). Paper 17 ("Institution Decision"). VLSI Technology LLC ("Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review. *See* Paper 20; Ex. 3002. Concurrent with this Order, the POP has dismissed the requests for rehearing and POP review.

I have reviewed the Board's Institution Decision, the Papers, and the Exhibits of record in this proceeding. I determine that Director review of the Board's Institution Decision is appropriate because this case raises novel issues of law and policy, as well as issues of particular importance to the Office and the patent community. *See Interim process for Director review*[1] Question 10 (setting forth issues that may warrant Director review), Question 22 (providing for sua sponte Director review of institution decisions in AIA proceedings and explaining that "the parties to the proceeding will be given notice" if Director review is initiated sua sponte). At this time, the case is not stayed and will proceed with the original panel according to the issued Scheduling Order. *See* Paper 18. I will issue an Order in due course setting forth a schedule for the Director review that includes dates for party and amicus briefing.

Accordingly, based on the foregoing, it is:

ORDERED that a sua sponte Director review of the Board's Institution Decision (Paper 17) is initiated;

---

[1] Available at https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review.

IPR2021-01064
Patent 7,725,759 B2

FURTHER ORDERED that, at this time, the case is not stayed and will proceed with the original panel according to the issued Scheduling Order; and

FURTHER ORDERED that a schedule including dates for party and amicus briefing will issue in due course.

IPR2021-01064
Patent 7,725,759 B2

PETITIONER:

Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com

PATENT OWNER:

Baback Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com

# EXHIBIT C

Trials@uspto.gov                                    Paper No. 42
571-272-7822                                     Date: June 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

OPENSKY INDUSTRIES, LLC,
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*, SCOTT R. BOALICK, *Chief Administrative Patent Judge*, and JACQUELINE WRIGHT BONILLA, *Deputy Chief Administrative Patent Judge.*

PER CURIAM.

IPR2021-01064
Patent 7,725,759 B2

ORDER

The Office received a rehearing request and a request for Precedential Opinion Panel (POP) review of issues raised in the Board's Decision on Institution in this case. *See* Paper 20; Ex. 3002. The requests were referred to the POP panel referenced above.

Director review of the Board's Decision on Institution is ordered in this proceeding, concurrent with this Order. Accordingly, POP review will not be granted, and the requests for rehearing and POP review are dismissed in light of the Director review. The requests will remain part of the record and may be considered during the Director review process.

Upon consideration of the requests, it is:

ORDERED that the requests for rehearing and POP review are dismissed.

IPR2021-01064
Patent 7,725,759 B2


PETITIONER:

Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com


PATENT OWNER:

Baback Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com

# EXHIBIT D

Director_PTABDecision_Review@uspto.gov                Paper 47
571-272-7822                                    Dated: July 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

―――――――

IPR2021-01064[1]
Patent 7,725,759 B2

―――――――

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER
*Setting Schedule for Director Review*

―――――――

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has been joined as a party to this proceeding.  Paper 43.

IPR2021-01064
Patent 7,725,759 B2

## I.   INTRODUCTION

On December 23, 2021, the Patent Trial and Appeal Board ("Board") issued a Decision granting institution of an *inter partes* review of claims 1, 14, 17, 18, 21, 22, and 24 ("challenged claims") of U.S. Patent No. 7,725,759 B2 ("the '759 patent"), as OpenSky Industries, LLC ("OpenSky") requested.  Paper 17 ("Institution Decision").  VLSI Technology LLC ("Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 20 ("Req. Reh'g"); Ex. 3002.  I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 41.  Concurrent with my Order, the POP dismissed the rehearing and POP review requests.  Paper 42. On June 8, 2022, the Board joined Intel as a Petitioner in this case.  Paper 43.

In accordance with United States Patent and Trademark ("USPTO" or "Office") policies, this Order identifies the issues subject to review and sets forth the schedule for the Director review process.  *See* Paper 41; *Interim process for Director review*[2] §§10 (encouraging focused issues), 11 ("Responsive or amicus briefing may only be submitted if requested by the Director."), 22 ("If Director review of an institution decision is initiated sua sponte by the Director, the parties to the proceeding will be given notice and may be given an opportunity for briefing.  The public also will be notified and the Director may request amicus briefing.").

## II.   BACKGROUND

In October 2019 and February 2020, Intel filed two petitions for *inter partes* review challenging claims of the '759 patent in IPR2020-00106 and IPR2020-

---

[2] Available at https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review.

IPR2021-01064
Patent 7,725,759 B2

00498.  IPR2020-00106, Paper 3; IPR2020-00498, Paper 4.  Considering the factors set forth in the Board's precedential decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("the *Fintiv* factors"), the Board exercised discretion to deny institution of both proceedings, based on the advanced state of litigation concerning the '759 patent then pending in the United States District Court for the Western District of Texas.  IPR2020-00106, Paper 17, 13; IPR2020-00498, Paper 16, 10.  Intel requested POP review of the Board's decisions, which was denied.  IPR2020-00106, Papers 19, 20; IPR2020-00498, Papers 19, 20.  The district court cases concluded on March 2, 2021, with a jury verdict finding Intel infringed the '759 patent and U.S. Patent No. 7,523,373 B2 ("the '373 patent").  Paper 9, 5.  The jury awarded Patent Owner $2.175 billion in damages, $675 million of which was attributable to infringement of the '759 patent.  *Id.*; *VLSI Tech. LLC v. Intel Corp.*, Case No. 6:19-cv-00254-ADA (consolidated as 19-cv-00977) (W.D. Tex.).  *Id.*

On June 7, 2021, OpenSky filed the Petition for *inter partes* review in this proceeding, challenging claims 1, 14, 17–18, 21–22, and 24 of the '759 patent. Paper 2 ("Petition" or "Pet.").  OpenSky also filed a petition for *inter partes* review in IPR2021-01056, challenging claims 1–3, 5, 6, 9–11, and 13 of the '373 patent. IPR2021-01056, Paper 2.  In its Petition, OpenSky argued that the Board should not exercise discretion to deny institution under 35 U.S.C. §§ 314(a) or 325(d). Pet. 7–10.  In addressing the *Fintiv* factors, OpenSky argued that:

> the Board needs to institute review to maintain the integrity of the patent system, because a jury found that this patent is worth at least $675 million ($675,000,000), yet no judge or jury (or PTAB proceeding) has ever double-checked the validity of the '759 patent. The *Fintiv* analysis is designed to determine whether the integrity of the system would be furthered by instituting review.  *Apple v. Fintiv*, IPR2020-00019, Paper 11, p. 6 ("the Board takes a holistic view of

IPR2021-01064
Patent 7,725,759 B2

> whether efficiency and integrity of the system are best served by
> denying or instituting review."). The integrity of the entire patent
> system is threatened whenever a patent owner constructs a set of
> proceedings in which no one ever checks the validity of a patent found
> to be worth over six hundred million dollars. The denial of invalidity
> review cannot be proper; OpenSky urges the Board to find that this
> factor weighs strongly in favor of institution.

*Id.* at 9–10.

Patent Owner filed a Preliminary Response on September 24, 2021, explaining that this was the third *inter partes* review petition filed against the '759 patent. Paper 9, 1 (noting discretionary denial of Intel's petitions in IPR2020-00106 and IPR2020-00498). Patent Owner argued that this Petition should be denied, alleging that "[s]hortly after the widely-reported Verdict" finding that Intel infringed the '759 and '373 patents, "OpenSky formed in Nevada on April 23, 2021. OpenSky's only apparent business activity is the filing of two IPR petitions against VLSI." *Id.* at 5 (citation omitted). Patent Owner also noted that "OpenSky fashioned this Petition by copying and then stitching together portions of the rejected Intel Petitions. Rather than provide its own expert testimony, OpenSky just refiled Intel's declarations without even changing the cover pages."[3] *Id.* at 1–2, 6. Moreover, Patent Owner noted that "[j]ust one week after OpenSky filed its petitions, yet another new entity was created, to file yet another petition against the '373 patent using a similar approach." *Id.* at 1–2 (identifying IPR2021-01229, that Patent Quality Assurance, LLC filed as petitioner).

In this proceeding, the Board reviewed the evidence and arguments in the

---

[3] Such practice has become known as "copycat" petition practice and, to date, has not been held to be improper any more than copying claims to invoke interference proceedings.

IPR2021-01064
Patent 7,725,759 B2

Petition, Preliminary Response, Preliminary Reply, and Preliminary Sur-reply, and
instituted the requested *inter partes* review. Institution Decision 30. Specifically,
the Board found that the *Fintiv* factors did not weigh in favor of discretionary
denial in large part because the district court jury trial did not resolve the issues
presented in this proceeding. *Id.* at 8–9. The Board was not persuaded that
"prevailing in litigation against one party should insulate a patent owner from
challenge by a different party based on grounds that were not resolved in the
litigation." *Id.* at 9. The Board also disagreed with Patent Owner's arguments that
institution should be denied because the Petition presents the same challenges as
the prior Intel petitions, namely, because the Board did not reach the merits of the
prior Intel petitions. *Id.* at 10, 12 (relying on factors set forth in *General Plastic
Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19
(Sept. 6, 2017) (precedential) ("the *General Plastic*" factors).

In IPR2021-01056, however, the Board denied institution of an *inter partes*
review due to the unavailability of an expert declarant upon which OpenSky relied
in its contentions. IPR2021-01056, Paper 18, 10.

Following the Board's Institution Decision in this case, Patent Owner filed a
request for rehearing and for POP review. In the rehearing request, Patent Owner
argued that "the Board should not permit entities formed after the verdict and
facing no infringement threat to treat these proceedings as leverage to extract
ransom payments in exchange for withdrawing abusive attacks." Req. Reh'g 1, 3–
4, 6–8. Patent Owner argued that such a proceeding advances no valid public
interest and "fail[s] to weigh the overarching interests of fairness to the parties and
the integrity of the patent system." *Id.* at 1, 9–10. Patent Owner also criticized the
Board's reliance on two expert declarations, which Patent Owner contended
constitute inadmissible hearsay. *Id.* at 11–15.

IPR2021-01064
Patent 7,725,759 B2

As noted above, I initiated Director review of the Board's Institution
Decision on June 7, 2022.  Paper 41.  Concurrent with my Order, the POP
dismissed the rehearing and POP review requests.  Paper 42.  Subsequently, on
June 8, 2022, the Board joined Intel as a Petitioner in this case.  Paper 43.

III.    DISCUSSION

A. The Board's Institution Decision

On this record, I discern no error in the Board's decision to institute review
of a meritorious Petition where the challenged patent was previously litigated in
district court and was the subject of previous *inter partes* review proceedings,
which were not instituted based on *Fintiv*.[4]  As the Institution Decision explains,
the challenges presented here have not yet been adjudicated, either by the Board or
in district court.  Institution Decision 8–9, 10–14.

In the Leahy-Smith America Invents Act ("AIA"), Congress established
post-grant proceedings, including *inter partes* review, post-grant review, and
covered business method review proceedings, to improve and ensure patent quality
by providing "quick and cost-effective alternatives to litigation" for challenging
issued patents.  H.R. Rep. No. 112–98, pt. 1, at 48 (2011); *see also* S. Rep.
No. 110–259, at 20 (2011) (explaining that the "post-grant review system . . . will
give third parties a quick, inexpensive, and reliable alternative to district court
litigation to resolve questions of patent validity").  Congress granted the Office
"significant power to revisit and revise earlier patent grants" as a mechanism "to
improve patent quality and restore confidence in the presumption of validity that

---

[4] I have reviewed the parties' pre-institution papers concerning the merits and I
agree with the Board's determination that OpenSky demonstrated a reasonable
likelihood of prevailing as to at least one challenged claim.  Institution
Decision 15–29.

6

IPR2021-01064
Patent 7,725,759 B2

comes with issued patents." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272 (2016) (quoting H.R. Rep. No. 112-98, pt. 1, at 45, 48). Given those objectives, compelling, meritorious challenges will proceed at the Board even where district court litigation is proceeding in parallel. *See Discretionary Denial Guidance* 3–5.

I further discern no error in the Board's findings and determinations with respect to its analysis of the *Fintiv* or *General Plastic* factors. Institution Decision 7–9. Accordingly, in this Director review proceeding, no further briefing is permitted as to the merits of the unpatentability challenges as it pertains to institution, or the *Fintiv* or *General Plastic* factors.

## B. Issues of First Impression

When abuse has been demonstrated, the Board retains discretion to, *inter alia*, deny institution of AIA proceedings or terminate instituted trials. Although I agree with the Board that the Petition should not have been discretionarily denied under the Board's currently established discretionary policies, that leaves questions of first impression as to what action the Director, and by delegation the Board, should take when addressing allegations of abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA.

## C. Scope of Director Review

As noted above, this proceeding presents issues of first impression. It also involves issues of particular importance to the Office, the United States innovation economy, and the patent community. In particular, the following issues are relevant:

1. What actions the Director, and by delegation the Board, should take when faced with evidence of an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA; and

7

IPR2021-01064
Patent 7,725,759 B2

2. How the Director, and by delegation the Board, should assess conduct to determine if it constitutes an abuse of process, or if it thwarts, as opposed to advances, the goals of the Office and/or the AIA, and what conduct should be considered as such.

Because of the importance of these issues to the Office in fulfilling its mission, which includes curbing behavior that may thwart that mission, and because of the importance to the patent community at large, the parties shall address these issues in their briefing, including through new arguments and non-declaratory evidence. Additionally, *amici curiae* are permitted and encouraged to submit briefing on these issues, as set forth below. Any briefing by *amici curiae* in this case will be considered submitted in IPR2021-01229.

In addition, the parties' briefing shall address the following additional interrogatories and shall cite supporting documentary evidence:

a. When was OpenSky formed? For what purpose? What is the business of OpenSky? Who are members of OpenSky? Which other persons or entities have an interest in OpenSky or any of its activities including this proceeding? Explain.

b. What is the relationship between OpenSky and each of the other parties? Other than communications already in the record, what communications have taken place between OpenSky and each of the other parties?

c. Could OpenSky be subject to claims of infringement of the '759 patent? Does OpenSky have development plans to create a product that could arguably infringe the '759 patent? Does OpenSky have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers? Explain.

d. Does the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA and, if so, which evidence and how should that evidence be weighted and addressed?

e. What is the basis for concluding that there are no other real parties in interest, beyond OpenSky (*see* Pet. 5)? Are there additional people or

8

IPR2021-01064
Patent 7,725,759 B2

entities that should be considered as potential real parties in interest? Explain.

f. Did OpenSky ever condition any action relating to this proceeding, including but not limited to delaying, losing, not participating in, withdrawing from, or taking action that will influence any experts' participation in this proceeding, on payment or other consideration by Patent Owner or anyone else?  Explain.

The parties are instructed that sanctions may be considered for any misrepresentation, exaggeration, or over-statement as to the facts or law made in the parties' briefing.  *See, e.g.*, 37 C.F.R. §§ 11.19(a), 11.101 *et seq.*, 42.11.

## IV.   MANDATED DISCOVERY

In order to allow all parties to answer the questions set forth above, the parties shall exchange the following information, including electronically stored information, by July 21, 2022.  Any exchanged information may be relied upon in the parties' briefs, and only information that is relied upon may be filed as an exhibit along with the party's brief.

OpenSky shall provide to other parties to this proceeding:

i. all documents filed with state, federal, and/or other governmental regulatory entities related to the formation of OpenSky and any communications related to the same or to the formation of OpenSky;

ii. all documents relating to OpenSky's business plan including its funding, its potential revenue, and the future allocation of any of its profits;

iii. all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record in the proceeding;

iv. all documents and communications relating to the filing, settlement, or termination of any other *inter partes* review proceeding concerning the '759 patent, not already of record in the proceeding;

v. all documents and communications with Dr. Bruce Jacob relating to

IPR2021-01064
Patent 7,725,759 B2

his retention by OpenSky, including any agreements with him;

vi.    all documents and communications relating to any real party in interest and decisions made to list or not list any person or entity as a real party in interest; and

vii.   all communications with any named party relating to the filing, settlement, or potential termination of this proceeding.

Patent Owner also shall provide to other parties to this proceeding all documents responsive or relevant to i–vii above.

Likewise, Intel shall provide to other parties to this proceeding all documents responsive or relevant to i–vii above. Intel also shall provide all communications with OpenSky (including its attorneys or agents) relating to this or any other *inter partes* review of or litigation related to the '759 patent, created or exchanged prior to the December 23, 2021 institution date of this proceeding.

These obligations extend to all documents within the possession, custody, or control of OpenSky, Intel, and Patent Owner, including without limitation documents maintained by officers, directors, employees, agents, experts, consultants, or outside counsel. The requests above shall be interpreted inclusively and broadly to include text messages, voice mail messages, calendar entries, and any other communications or documents. Any attempt to withhold evidence based on a narrow interpretation of the requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable.

The parties shall exchange the aforementioned evidence with all other parties, subject to the Modified Default Protective Order in this proceeding, unless a good faith claim of attorney-client privilege, work product doctrine, or any other applicable privilege or immunity exists in which case the evidence may be withheld from production. *See* Paper 48. Documents should not be excluded on

10

IPR2021-01064
Patent 7,725,759 B2

the basis that they were created during the course of district court litigation or Board proceedings.  If evidence is withheld, that party shall maintain a privilege log of any responsive evidence that is withheld as privileged and shall exchange that privilege log on the date the documents are to be exchanged.

Within one week of receiving a privilege log, a receiving party may identify any documents they believe the Director should review in camera.  Within one week of such identification, the party providing the privilege log must file those documents to the Office, submitted as "Board Only" within the PTAB E2E system.[5]

## V.    BRIEFING AND SCHEDULE

Any evidence cited in a party's brief shall be referenced by existing exhibit number or shall be entered into the record.  *See Interim process for Director review* §7 ("The Director will not consider new evidence or arguments not part of the official record.  Parties should also generally avoid citing cases not cited in the official record.  Exceptions are issues of first impression or issues involving intervening changes in the law or USPTO procedures, guidance, or decisions.").  Only evidence that is relied upon may be filed as an exhibit along with a party's brief.

New declaratory evidence is not permitted.  The parties may submit evidence under seal if necessary.  The parties shall file a motion to seal accompanied by the Modified Default Protective Order as necessary.  *See* Paper 48.

OpenSky, Intel, and Patent Owner are authorized to submit initial briefing,

---

[5] The Office does not consider a party to waive any applicable privilege by providing allegedly privileged documents to the Office for in camera review, when filed as "Board Only."

IPR2021-01064
Patent 7,725,759 B2

limited to the policy issues and questions identified above, of no more than twenty-five (25) pages, due on August 4, 2022.

Additionally, *amici curiae* are authorized to submit a brief to Director_PTABDecision_Review@uspto.gov, limited to the policy issues identified above, of no more than twenty-five (25) pages and due on August 4, 2022. Amici are not authorized to submit evidence. The Board will enter the *amicus curiae* briefs into the record.

OpenSky, Intel, and Patent Owner are further authorized to file responsive briefing of no more than twenty-five (25) pages, due on August 18, 2022. The parties also may respond to the *amicus curiae* briefing in their responsive briefs.

No further briefing is authorized at this time.

Oral argument may be authorized for this proceeding. If so, I will issue a Hearing Order in due course setting forth the date, time, and location for an oral hearing.

As noted in the Order initiating Director review, the *inter partes* review is not stayed and will proceed according to the schedule stipulated to by the parties. *See* Paper 41, 3.

## VI.   ORDER

Accordingly, based on the foregoing, it is:

ORDERED that the Board's Decision Instituting *Inter Partes* Review (Paper 17) is submitted for Director review on the policy issues, interrogatories, and schedule identified above;

FURTHER ORDERED that OpenSky, Intel, and Patent Owner shall exchange evidence as identified above and on the schedule identified above; and

FURTHER ORDERED that, if a party must contact the Office related to this Director review proceeding, they do so by email to

IPR2021-01064
Patent 7,725,759 B2

Director_PTABDecision_Review@uspto.gov.

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:

IRELL & MANELLA LLP
bredjaian@irell.com
Kenneth J. Weatherwax
Parham Hendifar
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com

# EXHIBIT E

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

Case IPR2021-01064[*]
Patent 7,725,759

_____

**PATENT OWNER'S BRIEF IN RESPONSE
TO DIRECTOR REVIEW ORDER**



~~CONTAINS CONFIDENTIAL PROTECTIVE ORDER MATERIAL~~
NON-CONFIDENTIAL REDACTED VERSION



_____


[*] Intel Corporation, which filed a petition in IPR2022-00366, has been joined as a party to this proceeding.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..........................................................................1

II.  INTERROGATORY RESPONSES. .........................................................2

    A.   When was OpenSky formed?  For what purpose?  What is the business of OpenSky?  Who are members of OpenSky?  Which other persons or entities have an interest in OpenSky or any of its activities including this proceeding?  Explain. ....................................2

    B.   What is the relationship between OpenSky and each of the other parties? Other than communications already in the record, what communications have taken place between OpenSky and each of the other parties? ..............................................................................3

    C.   Could OpenSky be subject to claims of infringement of the '759 patent? Does OpenSky have development plans to create a product that could arguably infringe the '759 patent? Does OpenSky have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers? Explain. ......................................................................8

    D.   Does the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA and, if so, which evidence and how should that evidence be weighted and addressed? ..............................................................................8

    E.   What is the basis for concluding that there are no other real parties in interest, beyond OpenSky (see Pet. 5)? Are there additional people or entities that should be considered as potential real parties in interest? Explain. ..................................................9

    F.   Did OpenSky ever condition any action relating to this proceeding, including but not limited to delaying, losing, not participating in, withdrawing from, or taking action that will influence any experts' participation in this proceeding, on

Case IPR2021-01064
Patent 7,725,759

payment or other consideration by Patent Owner or anyone else? Explain..............................................................................10

**III.  THIS IPR SHOULD BE TERMINATED AND VOIDED**
     ***AB INITIO.***...................................................................**11**

     A.   Petitions Filed By Newly Formed Entities Against Patents That Are The Subject Of A Damages Verdict Should Presumptively Be Denied, Or Terminated If Instituted, Absent Compelling Proof They Were Filed In Good Faith And Not For Extortion....................12

     B.   OpenSky's Egregious Conduct Constitutes An Abuse Of Process And Thwarts The Goals Of the Office And The AIA........................14

          1.   OpenSky Filed an Extortive IPR Petition. ................................16

          2.   OpenSky Violated Numerous Office Rules.............................16

          3.   OpenSky Has Violated The Director's Orders With Contempt. ...................................................................19

     C.   This IPR Should Be Terminated And Voided *Ab Initio*. ....................21

**IV.  CONCLUSION.** ...........................................................................**25**

*privilege log*, or other documents" would "violat[e] OpenSky's … constitutional

rights."  Paper 54, 5, 6 (Director's Order "contravenes Congressional intent by

demanding production of formation documents [category (i)], business plans and

funding records [category (ii)], settlement discussions [categories (iii)-(iv)], and

protected communications between a party and its lawyers and experts.").  Though

the Director expressly and repeatedly reiterated these objections could not justify

withholding or failing to log documents, OpenSky has nonetheless stood on its

objections and refused to produce responsive documents or a privilege log, in

violation of the orders.  And these orders make clear that OpenSky's withholding

of documents and the failure to provide a log is sanctionable.

### C.    This IPR Should Be Terminated And Voided *Ab Initio*.

The Director should terminate this IPR and vacate the decision instituting it,

as well as the decision joining Intel.  OpenSky's purpose is to use the IPR process

for extortion, auctioning off whether to settle or pursue its IPR to the highest

bidder.  Filing an IPR and demanding tens of millions of dollars to drop it is an

improper and harassing use of the IPR process.  In pursuit of its goals, OpenSky

misrepresented its motives, proposed a fraud on the Office, falsely claimed that its

fraudulent proposal was VLSI's, and violated the Director's Orders by failing to

produce responsive internal documents or a privilege log.  This proceeding never

should have been instituted and, as discussed above, permitting it to proceed will

invite copycat petitioners to create similarly problematic situations without making

their extortion demands explicit.

      While the full extent of OpenSky's misconduct is not publicly known, or

known even to VLSI in view of OpenSky's failure to produce documents,

OpenSky's conduct has been the subject of national public attention and

unanimous scorn.  Senators Tillis and Hirono recognized that OpenSky's petitions

are "an apparent attempt to extort money from … VLSI" and "[t]he motives behind

these IPR petitions were suspect from the outset" and that "[a]ny doubt about

OpenSky's motives was extinguished" based upon the OpenSky Email wherein

"OpenSky's counsel proposed a scheme in which the company would actively

work to undermine the IPR it brought—thereby protecting VLSI's patents from

other challenges—in exchange for monetary payment."  Ex. 2076, 1-2.  The

Senators' sentiments were shared by respected analysts, who have condemned

OpenSky's conduct.  Exs. 2057; 2058; 2059 (OpenSky Email is a "huge black eye

for the agency," and "***[t]he PTAB would be wise to terminate the Open Sky

proceedings as a sanction***"); 2060 ("OpenSky's conduct puts the legal profession

in a bad light. … [t]he content of the [OpenSky Email] offends the senses").  When

the OpenSky Email was shown to OpenSky's own expert in deposition, he was

shocked, proclaiming "[o]h, my God.  It's like I got dragged into a Hollywood

gangster movie," "I don't know whether to be horrified or what," "if this is real, I

won't be working with OpenSky ever again," and "this is shocking. Holy moly. ...

Is this even legal?" Ex. 2066, 24:13-26:6.

This is egregious conduct and deserves the strictest sanctions. The Office's

rules make clear that the Director may issue terminating sanctions for misconduct.

37 C.F.R. §§ 11.18(c)(5) (Director may "[t]erminat[e] the proceedings in the

Office" where a party submits a paper for "any improper purpose, such as to harass

someone" or misrepresents facts); 11.18(b)(2)(i), (iii), (iv); 42.12(b)(8) (sanctions

may include "dismissal of the petition"). The Office must repudiate the institution

of these extortive IPRs by terminating them and vacating the institution and joinder

decisions. As discussed above, anything short of termination and vacatur will

motivate future opportunistic petitioners to strategically file abusive "lottery-ticket

petitions" without saying the quiet part out loud. The incentives to leverage post-

verdict petitions as tools to extort patent owners and accused infringers are simply

too great, and future opportunistic filers will avoid creating written records of their

misconduct and harassment. Thus, termination and vacatur not only fall within the

Director's sanction authority, but they are also prudent policy.

This case should end. Indeed, it never should have begun. Look at the

morass this case has become, the chaos, the demands for tens of millions of dollars,

secretive proposals to sabotage cases for pay, the disregard of and contempt for

orders, the refusals to produce discovery or disclose OpenSky's actual motives, the

*seven* IPRs filed against the VLSI patents after prevailing at trial.  Absent vacatur

rendering this proceeding void *ab initio*, the extraordinary misconduct committed

by OpenSky and PQA will become the default, severely harming the reputation of

the Office.  No injustice would be suffered by termination and vacatur here.  Had

OpenSky revealed its actual motives and purpose—that it sought to extort VLSI

for tens of millions of dollars—there is little chance this IPR would have been

instituted in the first place.  OpenSky's IPR should not be allowed to continue.

Nor should Intel be allowed to take advantage of OpenSky's misconduct at

VLSI's expense.  Intel was long-time barred and its validity defense was

unanimously rejected (Ex. 1027, 5) after Intel forfeited its right to present its IPR

defenses to the jury (Ex. 2004).  On April 21, 2022, the Court entered a Final

Judgment providing, "[j]udgment is entered against defendant Intel on its

counterclaim of invalidity of the asserted claims of the '759 Patent."  Ex. 2110.

And, where the Board has found an IPR was improperly instituted, as the Director

should so find here, it has consistently terminated that IPR as to any otherwise

time-barred joined party.  *I.M.L. SLU v. WAG Acquisition, LLC*, IPR2016-01658,

Paper 46, 3, 5 (Feb. 27, 2018) ("having vacated the [institution decision], we

necessarily also vacate the grant of [the joinder party's] Motion for Joinder …");

*Mylan Pharma Inc. v. Horizon Pharma USA, Inc*., IPR2017-01995, Paper 71, 12-

13 (Mar. 17, 2019) ("Because § 315(a) barred us from instituting this proceeding,

we also lacked, authority to join [the joined party] as a petitioner to this proceeding."); *Intel Corp., v. Alacritech, Inc*., IPR2018-00234, Paper 66, 23 (June 4, 2019) ("because we vacate our [institution] decision …and terminate this proceeding, there is no instituted review to which [the joined] petitions could have been properly joined ..."); *Sling TV, LLC v. Realtime Adaptive Streaming, LLC*, IPR2018-01331, Paper 39, 8 (Jan. 17, 2020) (similar), *appeal dismissed*, No. 20-01596 (Fed. Cir. Mar. 15, 2021).  Permitting Intel to step into OpenSky's shoes will only encourage future opportunists to collude with otherwise time-barred parties to enjoy a second bite at the apple after money changes hands in secret.

The Director should confirm the Office will not tolerate entities abusing the IPR process.  A clear signal should be sent that IPRs are not to be brought for purposes of extortion—and if they are, they will not be instituted—and if they are instituted under false pretenses, they will be terminated.  Moreover, to allow this extortive IPR to continue would be to punish the victim.  OpenSky's scheme led to seven IPRs being brought after VLSI prevailed at trial and Intel's validity defense was rejected.  This proceeding was rotten from its inception and deserves to be terminated and rendered void *ab initio*.

## IV.  CONCLUSION.

The Director should terminate this IPR and vacate the institution and joinder decisions.

Respectfully submitted,

Dated: August 18, 2022        \_\_\_\_/ Babak Redjaian /_____
Babak Redjaian, Reg. No. 42,096
IRELL & MANELLA LLP

# EXHIBIT F

Director_PTABDecision_Review@uspto.gov                    Paper No. 102
571-272-7822                                              Date: October 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064[1]
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

DECISION
Determining Abuse of Process, Issuing Sanctions, and Remanding to Patent
Trial and Appeal Board Panel for Further Proceedings

_____

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

## I.     INTRODUCTION

On December 23, 2021, the Patent Trial and Appeal Board ("PTAB" or "Board") issued a Decision granting institution of an *inter partes* review ("IPR") of claims 1, 14, 17, 18, 21, 22, and 24 ("challenged claims") of U.S. Patent No. 7,725,759 B2 ("the '759 patent"), based on a Petition filed by OpenSky Industries, LLC ("OpenSky").  Paper 17 ("Institution Decision"). VLSI Technology LLC ("VLSI" or "Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 20 ("Req. Reh'g"); Ex. 3002.  I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 41.  Concurrent with my Order, the POP dismissed the rehearing and POP review requests. Paper 42.  On June 8, 2022, the Board joined Intel as a Petitioner in this case.  Paper 43.

I explained that Director review would address questions of first impression as to what actions the Director, and by delegation the Board, should consider when addressing allegations of abuse of process or conduct that otherwise thwarts the goals of the United States Patent and Trademark Office ("USPTO" or "Office") and/or the America Invents Act ("AIA"). Paper 47, 7.  Due to the importance of the issues to the Office in fulfilling its mission, I ordered the parties to respond to interrogatories and to exchange information ("Mandated Discovery") to assist me in evaluating these issues of first impression.  *Id.* at 8–11; *see also* Paper 51.

For the reasons below, I determine that OpenSky has engaged in discovery misconduct by failing to comply with my Order for interrogatories and Mandated Discovery.  *See* Paper 47, 8–11.  Failure to comply with an order is sanctionable.  37 C.F.R. § 42.12(a)(1).  Accordingly, when

2

IPR2021-01064
Patent 7,725,759 B2

analyzing whether OpenSky's conduct amounted to an abuse of process, I apply a negative inference and hold facts to have been established adverse to OpenSky. *See* 37 C.F.R. § 42.12(b)(1) (providing that sanctions may include "[a]n order holding facts to have been established in the proceeding"); Paper 47, 10 ("Any attempt to withhold evidence based on a narrow interpretation of the requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable."); Paper 52, 4 ("As highlighted in the Scheduling Order, failure to comply with my Order may be sanctionable. . . . For example, and without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding.'").

Based on the evidence of record and the facts held to have been established, I determine that OpenSky, through its counsel, abused the IPR process by filing this IPR in an attempt to extract payment from VLSI and joined Petitioner Intel, and expressed a willingness to abuse the process in order to extract the payment. OpenSky's behavior in this proceeding is entirely distinguishable from conventional settlement negotiations that take place in an adversarial proceeding. I also find that OpenSky engaged in abuse of process and unethical conduct by offering to undermine and/or not vigorously pursue this matter in exchange for a monetary payment. *See Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592, 606 (E.D. Pa. 2018) ("The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law."). Each aspect of OpenSky's conduct—discovery misconduct, violation of an express order, abuse of the IPR process, and unethical conduct—taken alone, constitutes sanctionable conduct. 37 C.F.R. § 42.12(a)(6). Taken together,

3

IPR2021-01064
Patent 7,725,759 B2

the behavior warrants sanctions to the fullest extent of my power. Not only are such sanctions proportional to the conduct here, but they are necessary to deter such conduct by OpenSky or others in the future. *See* 37 C.F.R. § 42.11(d)(4).

Given OpenSky's conduct, from this day forward OpenSky and their counsel are precluded from actively participating in the underlying proceeding. The conduct of the individual attorneys in this case might also rise to the level of an ethical violation under the rules of their respective bars. OpenSky is precluded from filing further papers into the record or presenting further argument or evidence in the underlying proceeding or on Director review unless expressly instructed to do so by me or the Board. *See* 37 C.F.R. §§ 42.12(b)(2–4) (providing that sanctions include "[a]n order expunging or precluding a party from filing a paper"; "[a]n order precluding a party from presenting or contesting a particular issue"; and "[a]n order precluding a party from requesting, obtaining, or opposing discovery").

Moreover, I order OpenSky to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding. I further order OpenSky to address the appropriate time period for which any fees should be assessed. *See* 37 C.F.R. § 42.12(b)(6) (providing that sanctions include "[a]n order providing for compensatory expenses, including attorney fees"). As set forth below, I order briefing from OpenSky and VLSI on this issue.

Lastly, as to the underlying proceeding, for the reasons articulated below, I am remanding for the Board to determine, within two weeks of the date of this Order, whether OpenSky's Petition, based only on the record before the Board prior to institution, presents a compelling, meritorious

4

IPR2021-01064
Patent 7,725,759 B2

challenge.  I recognize that the record in this proceeding has progressed
through oral hearing.  Nevertheless, as discussed in more detail below, the
Board is to confine its compelling-merits analysis to the record that existed
prior to institution, consistent with the June 21, 2022, Director's
Memorandum ("Memorandum") and my additional direction below.[2]  If the
Board finds that OpenSky's Petition presented compelling merits, the
underlying proceeding to determine whether the '759 patent should be
canceled will, in the interest of the public, continue.  If the Board finds the
Petition does not rise to this standard, the Board will dismiss the IPR.  As
explained in more detail below, requiring the Board to assess whether the
Petition presents a compelling-merits case based on the record before the
Board prior to institution balances the interests of patent owners, including
practicing entities and small to medium-sized enterprises, in reliable patent
rights, with the public interest in canceling invalid patents, clearing the path
for future innovation, and removing the tax on society caused by the
litigation and licensing of invalid patents.

## II.    BACKGROUND

The dispute over the challenged patent has a long and complex
history, starting with VLSI's complaint against Intel for infringing the '759
patent, filed in the Waco Division of the United States District Court for the
Western District of Texas on April 22, 2019.

---

[2] Available at www.uspto.gov/sites/default/files/documents/interim
_proc_discretionary_denials_aia_parallel_district_court_litigation_memo_2
0220621_.pdf.

IPR2021-01064
Patent 7,725,759 B2

A.    *Intel's Prior Petitions and Litigation*

After being sued by VLSI, Intel filed two petitions for IPR, challenging claims of the '759 patent.  IPR2020-00106, Paper 3; IPR2020-00498, Paper 4.  Considering the factors set forth in the Board's precedential decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("the *Fintiv* factors"), the Board exercised discretion to deny institution of both proceedings.  IPR2020-00106, Paper 17, 13; IPR2020-00498, Paper 16, 10.  In particular, the Board highlighted "the advanced stage of the Western District of Texas litigation, a currently scheduled trial date approximately seven months before the would-be deadline for a final written decision, and the overlap between the issues."  IPR2020-00106, Paper 17, 13; *see* IPR2020-00498, Paper 16, 6, 10.  The Board did not address the merits of the Petition, other than determining "that the merits of the Petition[s] do not outweigh the other *Fintiv* factors."  IPR2020-00106, Paper 17, 13.  Notably, the Board issued these decisions prior to the issuance of the Memorandum, which clarifies that "the PTAB considers the merits of a petitioner's challenge when determining whether to institute a post-grant proceeding in view of parallel district court litigation" and that "compelling, meritorious challenges will be allowed to proceed at the PTAB even where district court litigation is proceeding in parallel."  Memorandum at 4–5.

Intel requested POP review of the Board's decisions, which was denied.  IPR2020-00106, Papers 19 and 20; IPR2020-00498, Papers 19 and 20.  The trial in the Western District of Texas began on February 22, 2021, months after the date that was presented to the Board for the discretionary denial analysis.  *See* Ex. 2025; *cf.* Memorandum at 8 ("A court's scheduled

6

IPR2021-01064
Patent 7,725,759 B2

trial date [] is not by itself a good indicator of whether the district court trial
will occur before the statutory deadline for a final written decision."). The
trial resulted in a jury verdict finding that Intel neither literally nor willfully
infringed the '759 patent, but did infringe claims 14, 17, 18, and 24 under
the doctrine of equivalents. Ex. 1027, 2–4. The jury also found that Intel
had not proven by clear and convincing evidence that claims 14, 17, 18, and
24 were invalid as anticipated. *Id.* at 5. The invalidity basis presented to the
jury during the trial did not overlap with the grounds for unpatentability in
Intel's Petitions. Institution Decision 8. The jury awarded VLSI $675
million in damages for infringing the '759 patent.[3] *Id.* at 6. Intel appealed
to the Federal Circuit, and that appeal is currently pending as *VLSI
Technology LLC v. Intel Corporation*, No. 22-1906 (Fed. Cir. June 15,
2022). The appeal will not resolve the patentability issues pending before
the Board.

### B.    OpenSky's Petition

On June 7, 2021, OpenSky filed the Petition for IPR in this
proceeding, challenging claims 1, 14, 17, 18, 21, 22, and 24 of the
'759 patent. Paper 2 ( "Pet."). OpenSky also filed a Petition for IPR,
challenging claims 1–3, 5, 6, 9–11, and 13 of U.S. Patent No. 7,523,373 B2
("the '373 patent"). IPR2021-01056, Paper 2. OpenSky copied extensively
from Intel's two earlier petitions. Ex. 2024 (redline comparison of portions
of the Petition in this IPR with portions of Intel's petitions in IPR2020-

---

[3] Concurrently, the jury found that Intel had also infringed U.S. Patent
No. 7,523,373 B2 ("the '373 patent"), owned by VLSI, and awarded VLSI
$1.5 billion in damages. Ex. 1027, 6. The '373 patent is the subject of
IPR2021-01229.

IPR2021-01064
Patent 7,725,759 B2

00106 and IPR2020-00498). OpenSky further refiled Intel's supporting

declarations of Dr. Bruce Jacob, without his knowledge. *See* Exs. 1002,

2097, 1046.[4]

In its Petition, OpenSky argued that the Board should not exercise

discretion to deny institution under 35 U.S.C. §§ 314(a) or 325(d). Pet. 7–

10. In addressing the *Fintiv* factors, OpenSky argued:

> the Board needs to institute review to maintain the integrity of
> the patent system, because a jury found that this patent is worth
> at least $675 million ($675,000,000), yet no judge or jury (or
> PTAB proceeding) has ever double-checked the validity of the
> '759 patent. The *Fintiv* analysis is designed to determine
> whether the integrity of the system would be furthered by
> instituting review. *Apple v. Fintiv*, IPR2020-00019, Paper 11,
> p. 6 ("the Board takes a holistic view of whether efficiency and
> integrity of the system are best served by denying or instituting
> review."). The integrity of the entire patent system is
> threatened whenever a patent owner constructs a set of
> proceedings in which no one ever checks the validity of a patent
> found to be worth over six hundred million dollars. The denial
> of invalidity review cannot be proper; OpenSky urges the Board
> to find that this factor weighs strongly in favor of institution.

*Id.* at 9–10.

VLSI filed a Patent Owner Preliminary Response on September 24,

2021, explaining that this was the third IPR Petition filed against the '759

patent. Paper 9, 1 (noting discretionary denial of Intel's petitions in

IPR2020-00106 and IPR2020-00498). VLSI argued that this Petition should

---

[4] OpenSky also filed identical copies of declarations of Intel's other expert,
Dr. Hall-Ellis, without change. Paper 17, 5. Dr. Hall-Ellis is a librarian who
proffered testimony regarding the prior art status of certain references relied
on in Intel's previous petitions. *See* Ex. 1040.

IPR2021-01064
Patent 7,725,759 B2

be denied, alleging that "[s]hortly after the widely-reported Verdict" finding that Intel infringed the '759 and '373 patents, "OpenSky formed in Nevada on April 23, 2021. OpenSky's only apparent business activity is the filing of two IPR petitions against VLSI." *Id.* at 5 (citation omitted). VLSI also noted that "OpenSky fashioned this Petition by copying and then stitching together portions of the rejected Intel Petitions. Rather than provide its own expert testimony, OpenSky just refiled Intel's declarations without even changing the cover pages."[5] *Id.* at 1–2, 6. Moreover, VLSI noted that "[j]ust one week after OpenSky filed its petitions, yet another new entity was created, to file yet another petition against the '373 patent using a similar approach." *Id.* at 1–2 (identifying IPR2021-01229, filed by Patent Quality Assurance, LLC).

In this proceeding, the Board reviewed the evidence and arguments in the Petition, Patent Owner Preliminary Response, Preliminary Reply, and Preliminary Sur-reply, and instituted the requested IPR on December 23, 2021. Institution Decision 30. Specifically, the Board found that the *Fintiv* factors did not weigh in favor of discretionary denial, in large part because the district court jury trial did not resolve the unpatentability issues presented in this proceeding. *Id.* at 8–9. Because the Board did not reach the merits of the prior Intel petitions, the Board disagreed with VLSI's arguments that institution should be denied because the Petition presents the

---

[5] Such practice has become known as "copycat" petition practice and, to date, has not been held to be improper any more than copying claims to invoke interference proceedings, which have likewise not been found to be improper.

IPR2021-01064
Patent 7,725,759 B2

same challenges as the prior Intel petitions.[6] *Id.* at 10, 12 (relying on factors set forth in *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (Sept. 6, 2017) (precedential) ("the *General Plastic*" factors)). *See Code200, UAB v. Bright Data Ltd.*, IPR2022-00861, Paper 18, 5 (PTAB Aug. 23, 2022) (precedential) ("Where the first-filed petition under factor 1 was discretionarily denied or otherwise was not evaluated on the merits, factors 1–3 only weigh in favor of discretionary denial when there are 'road-mapping' concerns under factor 3 or other concerns under factor 2. . . . '[R]oad-mapping' concerns are minimized when, as in this case, a petitioner files a later petition that raises unpatentability challenges substantially overlapping with those in the previously-filed petition and the later petition is not refined based on lessons learned from later developments.").

The Board then, for the first time, discussed the merits of the Petition. Institution Decision 15–29. The Board instituted the underlying proceeding, concluding that the "Petitioner has shown a reasonable likelihood it will prevail with respect to unpatentability of claim 1 over Shaffer and Lint—Petitioner's showing justifies institution." *Id.* at 21. The Board likewise concluded that because the "Petitioner has shown a reasonable likelihood it will prevail with respect to unpatentability of claim 1 over Chen and Terrell—Petitioner's showing justifies institution." *Id.* at 29.

On January 6, 2022, VLSI sought to challenge the institution decision, filing requests for rehearing and for POP review. In the rehearing request,

---

[6] In IPR2021-01056, however, the Board denied institution of an IPR due to the unavailability of another expert declarant on which OpenSky relied in its contentions in that case. IPR2021-01056, Paper 18, 10.

IPR2021-01064
Patent 7,725,759 B2

VLSI argued that "[t]he Board should not permit entities formed after the verdict and facing no infringement threat to treat these proceedings as leverage to extract ransom payments in exchange for withdrawing abusive attacks." Req. Reh'g 1, 3–4, 6–8. VLSI argued that such a proceeding advances no valid public interest and "fail[s] to weigh the overarching interests of fairness to the parties and the integrity of the patent system." *Id.* at 1, 9–10. VLSI also criticized the Board's reliance on two expert declarations, which VLSI contended constitute inadmissible hearsay. *Id.* at 11–15.

### C.    *Intel's Motion for Joinder*

Within a month of the Board instituting IPR in this proceeding, Intel timely filed its own Petition for IPR with a Motion for Joinder to this proceeding. IPR2022-00366, Papers 3 and 4. The Board joined Intel to this proceeding on June 8, 2022, determining that Intel's Petition warranted institution and declining to discretionarily deny institution under 35 U.S.C. §§ 314(a) and 325(d). Paper 43, 19–20. In considering discretionary denial, the Board determined that:

> [a]lthough Petitioner has directed this Petition to the same claims and relies on the same art as in its first two petitions, that the Board did not substantively address the merits of the prior Intel petitions, in our view, weighs against discretionary denial here. The district-court trial that led to the denial of its initial petitions is over and did not resolve the challenges presented here. Allowing Petitioner the opportunity to pursue a decision on the merits from the Board at this time—by joining OpenSky's substantially identical petition—best balances the desires to improve patent quality and patent-system efficiency against the potential for abuse of the review process by repeated attacks on patents.

IPR2021-01064
Patent 7,725,759 B2

*Id.* at 9–10 (citing *General Plastic*, Paper 19 at 16–17). The Board correctly identified that the statute expressly provides an exception to the 1-year time bar (set forth in 35 U.S.C. § 315(b)) for a request for joinder. *Id.* at 12 (citing 35 U.S.C. § 315(b)) ("The time limitation set forth . . . shall not apply to a request for joinder under subsection (c)"). VLSI requested POP review of the Board's decision to join Intel to the proceeding, and that request was denied. Paper 53. On August 30, 2022, the Board authorized VLSI to file a Motion to Terminate Intel from the proceeding, setting forth VLSI's arguments on res judicata. Paper 86, 2. The Board authorized Intel to file an opposition to the motion. *Id.* VLSI filed the Motion to Terminate on September 27, 2022. Paper 99. Intel's opposition is pending.

D.     <em>Director Review</em>

As noted above, I ordered a *sua sponte* Director review of the Board's institution decision in this proceeding on June 7, 2022, one day before the Board joined Intel as a Petitioner in this case. Paper 41. Concurrent with my Order, the POP dismissed the rehearing and POP review requests. Paper 42. Because I did not yet have all the facts before me, I did not stay the underlying proceeding.

On July 7, 2022, I issued a Scheduling Order for the Director review. Paper 47. The Scheduling Order defined the scope of my review, as I determined that "this proceeding presents issues of first impression" and "involves issues of particular importance to the Office, the United States innovation economy, and the patent community." *Id.* at 7–8. In particular, I identified the following issues as relevant:

> 1.     What actions the Director, and by delegation the Board, should take when faced with evidence of an abuse of process or

12

IPR2021-01064
Patent 7,725,759 B2

> conduct that otherwise thwarts, as opposed to advances, the
> goals of the Office and/or the AIA; and

> 2.    How the Director, and by delegation the Board, should
> assess conduct to determine if it constitutes an abuse of process
> or if it thwarts, as opposed to advances, the goals of the Office
> and/or the AIA, and what conduct should be considered as
> such.

*Id.* I directed the parties to address these questions and to support their

answers "in their briefing, including through new arguments and non-

declaratory evidence." *Id.* at 8. I also invited amici curiae briefing. *Id.*

To enable me to address those questions in the context of this Review,

my Scheduling Order also instructed the parties to answer interrogatories

and exchange certain categories of information as Mandated Discovery. *Id.*

at 8–11; 35 U.S.C. § 316(a)(5) ("The Director shall prescribe regulations

setting forth standards and procedures for discovery of relevant evidence . . .

otherwise necessary in the interest of justice"). My interrogatories ordered

the parties to address specific questions related to the "issues of particular

importance" in this Review. *Id.* at 8–9.

I ordered the Mandated Discovery "to allow all parties to answer the

questions" I set forth, and to give each party an opportunity to produce

evidence supporting its position. *Id.* at 9–10. The Mandated Discovery

included categories of documents relating to the formation and business of

OpenSky; documents and communications "relating to the filing, settlement,

or potential termination of this proceeding, or experts in this proceeding, not

already of record in the proceeding"; and "communications with any named

party relating to the filing, settlement, or potential termination of this

proceeding." *Id.* My Scheduling Order warned "that sanctions may be

considered for any misrepresentation, exaggeration, or over-statement as to

13

IPR2021-01064
Patent 7,725,759 B2

the facts or law made in the parties' briefing" (*id.* at 9), and that "[a]ny attempt to withhold evidence based on a narrow interpretation of the [discovery] requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable." *Id.* at 10.

On July 15, 2022, OpenSky requested an extension of the deadlines in the Scheduling Order.  Ex. 3012.  On July 21, 2022, I extended the deadlines for the parties to exchange information and accordingly extended the briefing deadlines:  as extended, the parties' initial briefs and briefs of amici curiae were due on August 18, 2022,[7] and the parties' responsive briefs were due on September 1, 2022.  Paper 51.  In the Order granting a two-week extension, I reminded the parties that "as set forth in the Scheduling Order, a party may lodge legitimate, lawful grounds for withholding documents, and shall maintain a privilege log of documents withheld."  *Id.*

On July 29, 2022, I issued a further Order addressing the scope of Mandated Discovery.  Paper 52.  I reminded the parties that "they are required to comply with the full scope of the Scheduling Order, including its

---

[7] Fourteen amici curiae briefs have been entered into the record of this proceeding, from the following:  American Intellectual Property Law Association (Paper 55) ("AIPLA"); Association of Amicus Counsel (Paper 56); Naples Roundtable (Paper 57) ("Naples"); Ramzi Khalil Maalouf (Paper 64) ("Maalouf"); Engine Advocacy et al. (Paper 74) ("Engine"); High Tech Inventors Alliance (Paper 75) ("HTIA"); Robert Armitage (Paper 76); Computer and Communications Industry Association (Paper 77) ("CCIA"); BSA | The Software Alliance (Paper 78) ("BSA"); The Alliance of U.S. Startups et al. (Paper 79) ("USIJ"); Hon. Paul R. Michel (Paper 80); Unified Patents et al. (Paper 81) ("Unified"); Public Interest Patent Law Institute (Paper 82) ("PIPLI"); and Centripetal Networks, Inc. (Paper 83) ("Centripetal").

IPR2021-01064
Patent 7,725,759 B2

Mandated Discovery provisions now due to be exchanged by August 4, 2022," and "failure to comply with my Order may be sanctionable." *Id.* at 4. I explained that potential sanctions may include, for example, "[a]n order holding facts to have been established in the proceeding." *Id.* (quoting 37 C.F.R. § 42.12). The parties were further "reminded that legitimate, lawful grounds for withholding documents may be lodged and, if so, the party shall maintain a privilege log of documents withheld. No responsive document may be withheld without being included in such a privilege log." *Id.* (internal citations omitted). Thus, I provided specific notice of potential sanctions to the parties, in addition to the general notice provided by the Office's regulations.

As discussed in detail below, OpenSky did not comply with the Mandated Discovery as ordered. *See* Paper 84, 19–21.[8] It produced a minimal number of documents to the other parties and wholly inadequate answers to my interrogatories, and did not produce a privilege log. *See id.* In contrast, both VLSI and Intel produced responsive documents and detailed privilege logs, as ordered.

## III.     FAILURE TO COMPLY

As explained above, I initiated Director review to answer questions of first impression related to the IPR process. Paper 47, 7. Before proceeding to those questions, however, I must address OpenSky's deficient responses to the discovery required in my Scheduling Order.

---

[8] Paper 84 is the nonconfidential version of VLSI's Initial Brief in response to the Director review order; Paper 70 is the confidential version.

IPR2021-01064
Patent 7,725,759 B2

### A.    OpenSky's Objections to Mandated Discovery

The deadline for exchange of documents and communications contemplated by my Mandated Discovery order was August 4, 2022. Paper 51, 4. The deadline for the parties to submit briefs addressing the Director's interrogatories with supporting documentary evidence was August 18, 2022. *Id.* at 4; Paper 47, 8–10. The parties were repeatedly warned that no documents may be withheld without being included in a privilege log, and that any attempt to withhold evidence may be sanctionable. Paper 47, 10; Paper 52, 4.

On August 4, 2022, OpenSky filed a Notice of Objections to my Mandated Discovery. Paper 54. I find their objections have no merit. For example, OpenSky contends that the Order is inconsistent with 35 U.S.C. § 6(c) as modified by *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1987 (2021). Paper 54, 2. But OpenSky does not explain this assertion. OpenSky further contends that the Order exceeds the discovery permitted under 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.51. *Id.* at 2. OpenSky's argument on this point is not persuasive. 35 U.S.C. § 316(a)(5) provides that discovery may be sought where "necessary in the interest of justice," which is at the heart of the inquiry as to whether OpenSky has abused the IPR process. And 37 C.F.R. § 42.51 is not relevant to Director-ordered discovery, because that rule governs only discovery between the parties. Furthermore, in general, it is within my purview to "determine a proper course of conduct in a proceeding for any situation not specifically covered by [the other regulations]" and to "enter non-final orders," such as the Scheduling Order, "to administer the proceeding." 37 C.F.R. § 42.5(a).

16

IPR2021-01064
Patent 7,725,759 B2

OpenSky also argues that the Scheduling Order is inconsistent with Board procedures governing non-routine discovery.  Paper 54, 2–3.  For example, OpenSky contends that there is no evidence "tending to show beyond speculation that in fact something useful will be uncovered."  *Id.* at 3 (quoting *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001 (PTAB Mar. 5, 2013) (Paper 26) (precedential)).  Again, while Board procedures governing party conduct do not formally apply to the Director's inquiry into process abuses, my Scheduling Order makes plain the basis for the ordered discovery here.  The Scheduling Order explains that the discovery would permit the parties to answer the questions I identified as germane to my inquiry into the circumstances surrounding OpenSky's formation and conduct—information about which is uniquely in the parties' (and specifically OpenSky's) possession.  Paper 47, 7–10; 37 C.F.R. § 42.11(a) ("Parties and individuals involved in the proceeding have a duty of candor and good faith to the Office during the course of a proceeding.").

OpenSky's other arguments similarly lack merit.  OpenSky contends that, in its judgment, certain categories of Mandated Discovery are not in dispute.  *See, e.g.*, Paper 54, 3–4.  That is not OpenSky's judgment to make.  It is not appropriate for OpenSky to simply assert that something is undisputed and, on that basis, refuse to comply with my Order by failing to produce or log such materials.  OpenSky's argument that the Order is not "easily understandable" is also not persuasive.  *Id.* at 4.  No other party indicated that they had any issue understanding the Order, nor did they have issues complying.  OpenSky's argument that the discovery is overly burdensome (Paper 54, 4–5) fares no better.  OpenSky could have sought to file a motion to revise the standing protective order (37 C.F.R.

IPR2021-01064
Patent 7,725,759 B2

§ 42.54(a)(1)), or at least have requested a second extension if it could demonstrate an actual burden, but instead chose noncompliance.

OpenSky submits that the Order violates its and its members' constitutional rights. Paper 54, 5–6. OpenSky cites no court case to support this proposition, and instead gestures to the First Amendment right to freedom of association and the Fourteenth Amendment's right to due process of law. OpenSky does not explain how complying with a discovery order results in a constitutional violation. Further, by choosing to file this IPR, OpenSky availed itself of my and the Board's jurisdiction and opened itself to questions regarding its members and purpose, among others.

OpenSky ends its objections with a series of similarly unpersuasive arguments. OpenSky opines that the Order is inconsistent with the purposes of the AIA. Paper 54, 6. OpenSky does not explain why it believes that to be the case, and the argument lacks merit for reasons explained below. Moreover, even if true, the argument does not provide sufficient basis for OpenSky to disregard my Order. OpenSky's argument that the Order is inconsistent with the guidelines for Director review rests on its contention that "the Order does not identify any issue of first impression." *Id.* at 7. OpenSky provides no citation for the claim that Director review is limited to issues of first impression. In any event, my Order indicated that the issues here are ones of first impression. *Id.* Finally, OpenSky contends that the Order would require it to waive privilege objections (*id.* at 7–8), but avoiding such waiver is the point of a privilege log, which OpenSky did not submit.

18

>    B.    *OpenSky's Failure to Comply with Mandatory Discovery*

OpenSky failed to comply with the discovery requirements set forth in the Scheduling Order by:  (1) refusing to provide confidential documents to the other parties in the proceeding, or instead, a privilege log listing privileged documents withheld for in camera review; and (2) failing to respond in good faith to the interrogatories, including with supporting evidence.  Paper 47, 8–10.  Each of these failures to comply is independently sanctionable.  *Id.* at 10.

>    1.    *OpenSky refused to produce confidential documents under seal, or a privilege log of what was not produced*

As explained above, the deadline for the exchange of documents and communications was August 4, 2022.  On August 11, 2022, VLSI requested in camera review, as to the production made by OpenSky.  Paper 62.  VLSI asserts that it:

> cannot identify with specificity documents for in camera review in OpenSky's responsive documents, because OpenSky has (i) failed to produce internal documents; (ii) failed to produce any documents it deems either confidential or highly-confidential under the Director's modified direct protective order, Ex. 3011; and (iii) failed to provide any privilege log in this matter, each in violation of the Director's Orders (see Papers 47, 51, and 52).

*Id.* at 1.  VLSI asserts that "OpenSky produced approximately 170 documents, all 'nonconfidential,' largely consisting of public filings and correspondence already available to all parties."  *Id.* at 3.  VLSI contends that the produced non-public documents include only emails from OpenSky's lead counsel, Andrew Oliver, and "a single internal communication."  *Id.* at 3–4.  Notably, VLSI asserts that "OpenSky has not logged a single document."  *Id.* at 4.  VLSI argues that, due to OpenSky's

IPR2021-01064
Patent 7,725,759 B2

failure to produce documents, I should—again—order OpenSky to produce "***all*** withheld responsive documents in the seven categories of mandated discovery." *Id.* at 8 (emphasis in original).

On August 18, 2022, OpenSky filed its initial brief in response to the Director review order. Paper 71.[9] In the brief, OpenSky does not dispute VLSI's assertions that OpenSky failed to produce internal or confidential documents and failed to produce a privilege log of withheld evidence. *See id.* In its responsive brief, filed September 1, 2022, OpenSky asserts that it produced "over 240MB of responsive documents to VLSI and Intel, of which more than half were nonconfidential and of which the others bore either confidential or highly confidential designations." Paper 91, 19 (*see* Exs. 1066, 1067)[10]. However, quantity does not substitute for quality. OpenSky's new exhibits merely show the size of the files shared with opposing counsel, not the contents of files. *See* Exs. 1066, 1067. Notably, OpenSky did not file any of the documents as exhibits in this proceeding, despite the existence of the Modified Default Protective Order. And directly contradicting the Scheduling Order's requirements, OpenSky confirms that it "will not be producing, filing, or lodging any privileged documents in this proceeding; accordingly, OpenSky will not be producing a privilege log for purposes of identifying documents for an *in camera* review that will not take place." Paper 91, 20. OpenSky's refusal to comply with the requirements set forth in the Scheduling Order is alone sanctionable conduct. *See* Paper 47, 4.

---

[9] Paper 71 is the nonconfidential version of OpenSky's Initial Brief in response to the Director review order; Paper 67 is the confidential version.

[10] OpenSky filed a corrected version of its responsive brief as Paper 101.

IPR2021-01064
Patent 7,725,759 B2

2. *OpenSky's responses to the interrogatories are inadequate and lack evidentiary support*

In addition to its express refusal to comply with the Mandated Discovery, OpenSky failed to respond adequately to the interrogatories set forth in the Scheduling Order, which required the parties to respond with citation to supporting documentary evidence. Paper 47, 8. In its initial brief, OpenSky asserts that VLSI "has promoted a false narrative in which it portrayed itself as a victim of 'harassment' or a 'shakedown.'" Paper 71, 2. OpenSky presents its own version of the facts and refers to alleged communications between OpenSky and VLSI that purportedly show VLSI to be the bad actor. *See id.* at 2–6. However, throughout this portion of its brief, OpenSky fails to cite a single source of evidence to support its allegations of harassment, apart from a single citation to Exhibit 2055 (of record as of April 11, 2022), which is addressed below. *Id.* at 5.

In addition to its largely unsupported narrative, OpenSky's initial brief purports to address the interrogatories listed in the Scheduling Order but fails to do so adequately. *Id.* at 8–18. OpenSky refers to three sources of evidence previously of record to support its answers to the interrogatories, Exhibits 1048, 2055, and 2066. *See id.* As a result, many of the interrogatories remain unanswered or unsubstantiated by OpenSky.

For example, interrogatory (a) asked about OpenSky's formation and business. Paper 47, 8. To answer these questions, the Scheduling Order required OpenSky to provide the other parties with communications related to the formation of OpenSky and documents related to OpenSky's business plan. *Id.* at 9. OpenSky responds by stating that "OpenSky has not limited its business purpose" because "[a] Nevada Limited Liability Company is not

21

IPR2021-01064
Patent 7,725,759 B2

required to state a 'business' on formation." Paper 71, 9. This answer is non-responsive. In addition to its effective refusal to answer the interrogatory, OpenSky did not provide any required evidence that would allow me, VLSI, or Intel to consider OpenSky's position. *See* Paper 66, 10–11; Paper 84, 2–3.

Interrogatory (b) asked, "[o]ther than communications already in the record, what communications have taken place between OpenSky and each of the other parties?" Paper 47, 8. To answer this question, the Scheduling Order required OpenSky to provide the other parties with "all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record." *Id.* at 9. OpenSky admits that "the parties have had numerous communications," but asserts that "[t]he communications related to substance and procedure in this proceeding would be unduly burdensome to log and are not relevant to the topics of the Director's review." Paper 71, 10. OpenSky does not identify evidentiary support for these assertions and does not raise a good faith claim to withhold this evidence. *See id.* For example, OpenSky does not argue that the communications are privileged, or exchange a privilege log of the communications, as required by the Scheduling Order. *Id.* Rather, OpenSky impermissibly determines on its own that no evidence is relevant to topics of the Director review and withholds evidence on that basis. *Id.* Accordingly, OpenSky's answer is evasive and non-responsive to interrogatory (b).

Interrogatory (c) asked, "[c]ould OpenSky be subject to claims of infringement of the '759 patent," and "[d]oes OpenSky have a policy reason for filing the Petition that benefits the public at large beside any reasons

articulated in the already-filed papers?"  Paper 47, 8.  OpenSky asserts that
this question is "irrelevant," and states that "OpenSky has not attempted to
perform an infringement analysis."  Paper 71, 11.  OpenSky also asserts that
"it is possible" it could infringe the '759 patent *if* it has a computer product
containing an Intel product.  *See id.*  OpenSky lists a number of potential
policy reasons for filing the Petition, none of which are supported by
evidence showing OpenSky's intent at the time of filing.  *See id.*
Accordingly, OpenSky's answer is non-responsive to interrogatory (c).

Interrogatory (d) asked, "[d]oes the evidence in this proceeding
demonstrate an abuse of process . . . [and] if so, which evidence and how
should that evidence be weighted and addressed?"  Paper 47, 8.  To answer
this question, the Scheduling Order required OpenSky to provide the other
parties with "all communications with any named party relating to the filing,
settlement, or potential termination of this proceeding."  *Id.* at 10.  OpenSky
asserts that "[t]he evidence demonstrates abuse of process . . . only by VLSI.
No evidence demonstrates any such abuse by Intel or OpenSky."  Paper 71,
12.  OpenSky refers to a single piece of evidence already of record,
Exhibit 2055, and offers no other supporting evidence.  *See id.* at 13.  As to
other communications between the parties, OpenSky asserts that "parties'
discussions of potential settlement positions are not admissible evidence in
this proceeding," according to Rule 408 of the Federal Rules of Evidence.
*Id.* at 12–13.  OpenSky's argument is misplaced.

First, "Rule 408 does not warrant protecting settlement negotiations
from discovery.  On its face, the rule applies to the admissibility of evidence
at trial, not to whether evidence is discoverable."  *Phoenix Sols. Inc. v. Wells
Fargo Bank, N.A.*, 254 F.R.D. 568, 584 (N.D. Cal. 2008).  Second, Rule 408

23

IPR2021-01064
Patent 7,725,759 B2

does not bar the admission of settlement discussions for all purposes. Rather, it only excludes certain settlement statements offered for the purpose of "prov[ing] or disprov[ing] the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. 408(a). Settlement discussions may be admissible for other purposes. *See, e.g.*, *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005) ("The district court has broad discretion to admit [408 settlement] evidence for a purpose other than proving liability."); *BTG Int'l Inc. v. Bioactive Labs.*, No. CV 15-04885, 2016 WL 3519712, at *8 (E.D. Pa. June 28, 2016) ("Rule 408 does not bar the introduction of settlement discussions if offered for 'another purpose,' such as to show a party's knowledge or intent."). Therefore, Rule 408 does not control, and OpenSky failed to respond to interrogatory (d).

Interrogatory (e) asked, "[w]hat is the basis for concluding that there are no other real parties in interest, beyond OpenSky," and "[a]re there additional people or entities that should be considered as potential real parties in interest?" Paper 47, 8–9. To answer this question, the Scheduling Order required OpenSky to provide the other parties with "all documents relating to OpenSky's business plan including its funding, its potential revenue, and the future allocation of any of its profits." *Id.* at 9. OpenSky asserts that "OpenSky acted entirely on its own and with its own funding in bringing its Petition" and that it "did not have the support of any other entity." Paper 71, 17. Again, OpenSky provides no evidence to support its allegation. *See id.* For example, because OpenSky does not provide evidence of its funding, it is not possible to ascertain whether or not OpenSky merely acts as a shell for other entities seeking to challenge the

IPR2021-01064
Patent 7,725,759 B2

'759 patent.  And as a newly formed entity, seemingly created solely for filing this IPR, OpenSky must have some source of undisclosed funding. Accordingly, OpenSky's answer is evasive and non-responsive to interrogatory (e).

Interrogatory (f) asked, "[d]id OpenSky ever condition any action relating to this proceeding . . . on payment or other consideration by Patent Owner or anyone else?"  Paper 47, 9.  OpenSky asserts that it "has not conditioned any action relating to this proceeding on payment or other consideration."  Paper 71, 17.  OpenSky does not cite supporting evidence for this assertion, except to show that, at some point in time, OpenSky paid its expert.  *See id.* at 17–18 (citing Ex. 2066, 19:17–24).  By contrast, VLSI and Intel provide documentary evidence that contradicts OpenSky's assertion that it did not condition any action on payment or other consideration, as discussed in detail below.  Accordingly, OpenSky's answer is misleading and non-responsive to interrogatory (f).  *See* 37 C.F.R. § 42.11(a) ("Parties and individuals involved in the proceeding have a duty of candor and good faith to the Office during the course of a proceeding.").

### C. *Sanctions for OpenSky's Failure to Comply*

OpenSky has identified no authority that would allow it to ignore the interrogatories and Mandated Discovery in my Order.  Therefore, I determine that OpenSky has failed to comply.  I further determine that it is appropriate to sanction OpenSky for its discovery misconduct.  *See* 37 C.F.R. § 42.12(b) (non-exhaustive list of sanctions).

IPR2021-01064
Patent 7,725,759 B2

The Director[11] has the authority to impose sanctions against a party for misconduct.  35 U.S.C. § 316(a); 37 C.F.R. § 42.12(a); *see Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020); *see also* AIPLA, 9; BAS, 6–7; Unified, 3–5, 12–17; Naples, 6.  Though 37 C.F.R. § 42.12(a) uses the permissive language "may" ("The Board may impose a sanction against a party for misconduct"), the sanctity of practice before the Board is best preserved by imposing sanctions for misconduct as a matter of course absent extenuating circumstances.

Whether sanctions are appropriate is a highly fact-specific question, and the relevant considerations will vary from case to case.  Prior sanction contexts have considered:

(1) whether the party has performed conduct warranting sanctions;

(2) whether that conduct has caused harm (to, for example, another party, the proceedings, or the USPTO); and

(3) whether the potential sanctions are proportionate to the harm.

*See, e.g.*, *R.J. Reynolds Vapor Co. v. Fontem Holdings 1 B.V.*, IPR2017-01318, Paper 16 at 5 (PTAB Aug. 6, 2018).  The Director may impose sanctions, for example, for "[f]ailure to comply with an applicable rule or order in the proceeding"; "[a]buse of discovery"; "[a]buse of process"; or "[a]ny other improper use of the proceeding, including actions that harass or cause unnecessary delay or an unnecessary increase in the cost of the proceeding."  37 C.F.R. §§ 42.12(a)(1), (5), (6), (7).  Sanctions may include, for example, "[a]n order holding facts to have been established in the

---

[11] The Director of the USPTO, the Deputy Director of the USPTO, the Commissioner for Patents, the Commissioner for Trademarks, and the Administrative Patent Judges constitute the PTAB.  35 U.S.C. § 6(a). Accordingly, the Director may levy sanctions as a member of the Board.

26

IPR2021-01064
Patent 7,725,759 B2

proceeding"; "[a]n order precluding a party from filing a paper"; and "[a]n order providing for compensatory expenses, including attorney fees." *Id.* §§ 42.12(b)(1), (2), (6). Additionally, the Director may issue sanctions not explicitly provided in 37 C.F.R. § 42.12(b). *See Voip-Pal.com*, 976 F.3d at 1323–24. Any sanction must be commensurate with the harm caused. *See R.J. Reynolds*, IPR2017-01318, Paper 16 at 5.

As a result of OpenSky's failure to comply with my ordered Mandated Discovery provisions, I, VLSI, and Intel do not have a complete record to fully examine OpenSky's assertion that it has not committed an abuse of the IPR process, or to evaluate whether its allegation of "harassment" is supported.

OpenSky should not be allowed to profit from its discovery misconduct. Accordingly, I determine that the proper sanction is to hold disputed facts as established against OpenSky. 37 C.F.R. § 42.12(b)(1); Paper 52, 4 (warning parties that "failure to comply with my Order may be sanctionable," and specifically warning that "without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding" under 37 C.F.R. § 42.12(b)(1)). The Federal Circuit has approved this remedy of adverse inference in the context of district court litigation, stating that "when 'the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction.'" *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1363 (Fed. Cir. 2017) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

IPR2021-01064
Patent 7,725,759 B2

In view of the record as discussed above, including OpenSky's response to interrogatory (f), I find that OpenSky was not only non-responsive to my interrogatories but that OpenSky was evasive in its responses, and engaged in egregious conduct. I further apply adverse inferences in my decisions on abuse of process below.

## IV.    ABUSE OF PROCESS

I initiated Director review in this proceeding to examine and address VLSI's allegations of abuse of process by OpenSky. *See* Paper 47. Under existing Office regulations, an abuse of process is sanctionable (i.e., it is "conduct that warrants sanctions"). 37 C.F.R. § 42.12(a)(6). Abuse of process is a fact-based inquiry, and existing regulations do not attempt to specify what acts constitute an abuse of process. Accordingly, I consider OpenSky's conduct to determine whether it demonstrates an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA.

### A.    Background Principles

Congress created the AIA to support the "important congressional objective" of "giving the Patent Office significant power to revisit and revise earlier patent grants," among other objectives. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272 (2016). Congress did not implement a standing requirement for petitioners; any party (other than the patentee) may seek such review. 35 U.S.C. § 311(a). AIA post-grant proceedings, and more specifically, the IPR proceedings at issue here, do not exist in isolation but are part of a larger patent and innovation ecosystem. Congress intended AIA proceedings to be a less-expensive alternative to district court litigation to resolve certain patentability issues. AIA proceedings were not, however,

28

IPR2021-01064
Patent 7,725,759 B2

intended to replace patent litigation, which remains a vital forum for determining patent validity.  Nor were they intended to be tools of patent owner harassment.  Congress expressed the intent of the AIA in the statute when it directed the Director, when prescribing regulations, to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." 35 U.S.C. § 316(b).  I consider this mandate not just when promulgating regulations, but in administering the AIA through guidance and decision-making.  Abuse of AIA proceedings undermines these important objectives, and the Office will not tolerate it.

### B.    OpenSky's Conduct

Although OpenSky's Petition stressed that granting IPR was necessary to maintain the "integrity of the patent system" (Pet. 8–9), OpenSky's conduct belies that statement.  OpenSky's subsequent conduct made clear that OpenSky was using the IPR process to extract payment from either Intel or VLSI without meaningfully pursuing unpatentability grounds. *See* Exs. 2055; 1524–1529.  Again, this differs from typical settlement negotiations between adversaries during AIA proceedings, in which parties may offer payment or other consideration in return for settlement of the dispute.  Using AIA post-grant proceedings, including the IPR process, for the sole purpose of extracting payment is an abuse of process warranting sanctions.

After OpenSky filed its Petition and before institution, on August 28, 2021, OpenSky and VLSI entered into a "Confidential Discussions Agreement" for settlement negotiations.  Paper 84, 3 (citing Ex. 2081–2083).  Although OpenSky insists throughout its briefs that VLSI initiated

IPR2021-01064
Patent 7,725,759 B2

and pursued settlement negotiations, and not vice versa (*see* Paper 71, 13–16; Paper 91, 4–9 (*see* Exs. 1063, 1065)), I draw an adverse inference and find that OpenSky initiated settlement negotiations. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that" the evidence would have exposed facts unfavorable to the non-disclosing party.). Typically, the query about who initiated settlement talks does not raise questions about abuse of the IPR process. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide ("Consolidated Practice Guide")[12] at 86 ("There are strong public policy reasons to favor settlement between the parties to a proceeding"). However, the adverse inference here that OpenSky initiated settlement negotiations is relevant to the larger question of whether OpenSky's pursuit of the IPR constitutes improper, abusive conduct.

After institution, OpenSky contacted Intel about collaborating in the IPR. *See* Paper 84, 6 (citing Ex. 2095, 2096); Paper 66, 11–12 (citing Ex. 1520). OpenSky's counsel told Intel's counsel that "VLSI has already reached out to OpenSky to discuss resolving the newly instituted IPR," but "[w]hile OpenSky remains open to discussing this matter with VLSI, OpenSky would prefer to discuss the matter directly with Intel." *Id.* (emphasis omitted). Specifically, OpenSky sought monetary payment from Intel in return for success in the IPR. Paper 66, 12 (citing Exs. 1520, 1521). "Intel rejected OpenSky's request and stated that it would not make

---

[12] Available at www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2021-01064
Patent 7,725,759 B2

OpenSky any monetary offer, including to avoid any potential risk of becoming a real-party-in-interest in OpenSky's IPR." *Id.* (citing Ex. 1520).

Following Intel's rejection of OpenSky's offer, OpenSky reengaged with VLSI. *See* Paper 84, 4–5 (citing Ex. 2084–2087). The negotiations were now complicated by the joinder request of Patent Quality Assurance, LLC ("PQA") in IPR2022-00480, by which PQA sought to join this proceeding. *See id.* at 4 (citing Ex. 2090–2093). Intel also filed a Motion for Joinder to this proceeding in IPR2022-00366. Paper 43, 1.

VLSI asserts, and I find, that settlement negotiations between it and OpenSky culminated in a scheme proposed by OpenSky in an email dated February 23, 2022.[13] Paper 84, 4–5 (citing Ex. 2055). Specifically, OpenSky set forth a "construct of a proposed deal" that included the following terms (screen shot of email reproduced here):

- Parties agree to work together to secure dismissal or defeat of the petition.

- OpenSky agrees not to negotiate with Intel or PQA

- VLSI takes full three months to oppose PQA joinder

- VLSI files its patent owner response

- OpenSky refuses to pay expert for time at deposition so expert does not appear for deposition

- The day after VLSI files response, OpenSky and VLSI file motion to dismiss

---

[13] OpenSky contends that VLSI violated a confidentiality agreement with OpenSky (Ex. 1051) by bringing the email to the Board's attention and making the email public. Paper 71, 14–16. Although VLSI properly brought OpenSky's conduct to the Board's attention, VLSI should have filed the document confidentially with the Board only. *See* Ex. 2055 (filed as public material). My decision in this case should not be viewed as an endorsement of VLSI's behavior or of others potentially violating confidentiality agreements.

IPR2021-01064
Patent 7,725,759 B2

Ex. 2055, 1–2.  While OpenSky's email did not list monetary amounts, it did make clear:  "First payment upon execution of agreement" and "Second payment upon denial of both joinder petitions."  *Id.* at 2.  Moreover, OpenSky agreed that if PQA's Motion for Joinder to the proceeding was granted, OpenSky would not produce its expert, on whom PQA relied, for deposition, creating "a potentially fatal evidentiary omission that PQA would be unable to remedy."  *Id.* at 1.  OpenSky provided that, in that situation, "[t]here could be an alternative second payment if joinder is granted but claims are affirmed because of OpenSky's refusal to produce witnesses."  *Id.* at 2.

In pressing the urgency of its proposal to VLSI, OpenSky pointed out that any deal would "not benefit [VLSI] unless it ultimately leads to dismissal of the petition, or affirmance of the claims."  *Id.*  OpenSky also noted that "there is substantial value to VLSI in settling with OpenSky before the Board takes up" either Intel's or PQA's "joinder petition[s]."  *Id.* VLSI reported this scheme to the Board, and there were no further negotiations between OpenSky and VLSI.  Ex. 2094.  Initiating a legal proceeding to deliberately sabotage for money, including offering to violate the duties of candor and good faith owed to the Board, amounts to an abuse of process.  *See Woods Servs.*, 342 F. Supp. 3d at 605–606; *see also BTG Int'l Inc. v. Bioactive*, 2016 WL 3519712 at *12 ("BTG has accordingly alleged sufficient facts to demonstrate that Defendants were using the IPR petition for an improper purpose—specifically, "as a threat and a club to extort and coerce millions of dollars . . . from BTG").

After engaging in an abuse of process with regard to its conduct with VLSI that did not prove fruitful to OpenSky, OpenSky continued its

IPR2021-01064
Patent 7,725,759 B2

discussions with Intel.  Indeed, after Intel was joined to this proceeding

(IPR2022-00366, Paper 43), it became clear that OpenSky had no interest in

meaningfully pursuing the unpatentability grounds in its Petition.[14]

Ex. 1524.  For example, OpenSky proposed that it might rest on "its initial

filings and may decide not to depose VLSI's expert or file a reply brief."  *Id.*

OpenSky allegedly offered Intel the leading role in the case, but only if Intel

compensated OpenSky "for its prior work in the IPR" as well as "additional

remuneration."  *Id.*  OpenSky did not notice VLSI's expert for deposition

until after Intel proposed going to the Board to seek a more active role.

Paper 44.  Even then, OpenSky's counsel noticed the deposition for July 7,

2022—a mere four days before its reply brief was due, leaving little time to

incorporate VLSI's expert testimony into the brief.  Ex. 1525.  In addition,

OpenSky's counsel indicated they were scheduled to be in trial between June

24–30, 2022, leaving little time to prepare the reply brief (or prepare for the

deposition).  *Id.*

Given OpenSky's representations, Intel offered to help "with Dr.

Conte's deposition and the petitioner's reply," and suggested that OpenSky

seek a two-week extension "to give more time to integrate the deposition

materials into the petitioner's reply."  Ex. 1526.  OpenSky's counsel

proceeded with Dr. Conte's deposition on July 7, 2022, with the benefit of

---

[14] To be clear, parties will make choices during the course of an IPR
regarding what arguments to make, papers to file, issues to pursue, etc.
Those kinds of judgment calls and tactical decisions do not reflect a failure
to "meaningfully pursue the merits."  As explained further below,
OpenSky's conduct here goes beyond ordinary strategic decisions and
reflects a failure to essentially take any steps to develop or otherwise pursue
an unpatentability case.

33

IPR2021-01064
Patent 7,725,759 B2

Intel's deposition outline.  Ex. 1062.  However, OpenSky declined to seek an extension to file its reply brief.

On Friday, July 8, 2022—three days before its reply brief was due—OpenSky's counsel initiated discussions with Intel in which OpenSky's counsel maintained that, as a result of the need to respond to the Scheduling Order (Paper 47), OpenSky intended to "refrain from considering or making further invalidity arguments and to file a reply on Monday [July 11, 2022] indicating that OpenSky believes that its original petition establishes invalidity and OpenSky rests on the arguments in that petition," and not file a reply.  Ex. 1528.

At the same time, OpenSky "offered to let Intel write the reply on OpenSky's behalf in exchange for remuneration and indemnity against any lawsuit brought by VLSI against OpenSky based on the IPR proceeding." Ex. 1529.  Intel declined OpenSky's offer but agreed to provide OpenSky with a fully complete reply brief with supporting expert declaration.  *Id.* OpenSky agreed to "file it in full or in part" (*id.*), and did so two days later, as Paper 49 (July 11, 2022).

On August 11, 2022, VLSI requested oral argument.  Paper 61. OpenSky did not request oral argument (the deadline passed August 11, 2022; Paper 18, 11) and did not meaningfully participate in the oral hearing.

### C.    Case-specific Considerations

#### 1.    Petitioner's interest in the proceeding

I am mindful that Congress did not itself include a standing requirement for IPRs.  35 U.S.C. § 311(a); *see Cuozzo*, 579 U.S. at 279 ("Parties that initiate [IPRs] need not have a concrete stake in the outcome; indeed, they may lack constitutional standing."); *see also* Engine, 13–14

34

IPR2021-01064
Patent 7,725,759 B2

("Congress created IPR so that any 'person who is not the owner of a patent' may file an IPR petition. . . . It would be improper for the PTO to supplant that choice.") (citations omitted).  Instead, Congress left it to the USPTO to prescribe regulations, to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings."  35 U.S.C. § 316(b).

The Office has repeatedly instituted IPRs where the petitioner has not been sued for infringement.  *See, e.g.*, *Athena Automation Ltd. v. Husky Injection Molding Systems Ltd.*, IPR2013-00290, Paper 18, 12–13 (PTAB Oct. 25, 2013) (precedential) (declining to deny a petition based on assignor estoppel); *Fresenius Kabi USA, LLC, et al. v. Chugai Seiyaku Kabushiki Kaisha, Inc. et al.*, IPR2021-01336, Paper 27, 48 (PTAB Feb. 23, 2022).  In practice, however, there is commonly a high degree of interplay between IPR petitions/trials and Article III patent litigation.  *See, e.g.*, *The Patent and Trial Appeal Board:  Examining Proposals to Address Predictability, Certainty, and Fairness*, Hearing Before the S. Comm. on Intellectual Prop., 117th Cong. at 1:14:27–1:14:37 (June 22, 2022) (testimony of Tim Wilson, Head of Patents and Intellectual Property Litigation, SAS Institute, Inc.) (stating that IPR petitions are typically filed in response to a patent infringement lawsuit).

Barring evidence to the contrary, there is little need to question the motives of a party sued for infringement.  However, where a petitioner has not been sued for infringement, and is a non-practicing entity, legitimate questions may exist regarding whether the petitioner filed the petition for an improper purpose or one that does not advance the goals of the AIA or this Office.  For example, an amici identifies a concern with petitioners who file

35

IPR2021-01064
Patent 7,725,759 B2

"petitions, filed for the primary purpose of obtaining a cash settlement" from patent owners in order to settle and terminate the proceeding.  *See* Naples, 2. Not only would such a purpose not advance legitimate goals, but the PTAB proceedings under the AIA are not intended to be a tool for patent owner harassment.

To be clear, there is nothing *per se* improper[15] about a petitioner who is not a patent infringement defendant filing an IPR petition.  For example, there may be circumstances in which a petitioner has not yet been sued, but believes it may be, or otherwise wants to make sure it has the freedom to operate.  Alternatively, there may be circumstances in which a petitioner is planning to enter the field of technology that the patent protects and is trying to clear entry barriers.  *See* Engine, 10–11.  Or a petitioner may act on behalf of the public without having any research or commercial activities involving the challenged patent.  *See Consumer Watchdog v. Wisconsin Alumni Rsch. Found.*, 753 F.3d 1258, 1260 (Fed. Cir. 2014).

Although it is not *per se* improper for a person not charged with infringement to file an IPR petition, the posture of a petitioner, in conjunction with other surrounding circumstances, could raise legitimate questions about whether the petition is reasonably designed to advance the beneficial aims of the AIA or this Office and whether, in addition, the filing amounts to an abuse of process.

So it is here.  OpenSky has not been sued for infringing the '759 patent.  Pet. 5.  When I asked whether OpenSky could be sued for

---

[15] I address here only what conduct is improper and do not suggest that all conduct that is not improper warrants institution.  Such decisions are better suited for guidelines and notice-and-comment rulemaking.

IPR2021-01064
Patent 7,725,759 B2

infringement (*see* Paper 47, 8), OpenSky merely indicated that it has not performed an infringement analysis and that it uses products that may incorporate accused Intel products, so it might be sued for infringement in the future.  Paper 71, 11.  OpenSky has not substantiated this argument, despite my Order providing it an opportunity to do so.  Thus, the lack of evidence on this point is directly attributable to OpenSky's failure to follow my Order, and I draw negative inferences from that failure.  *See Residential Funding Corp.*, 306 F.3d at 110 (finding that intentional acts that hinder discovery support an inference that the evidence was harmful to the non-producing party).  Accordingly, I find the fact established that OpenSky does not have a legitimate belief that it may be sued for patent infringement in the future, and that fear of infringement did not motivate OpenSky to file its Petition.

OpenSky maintains that its interest is in the integrity of the patent system.  Paper 71, 11–12.  The record (and additional factors discussed below) belies that representation.  Indeed, I ordered OpenSky to produce documentation and answer interrogatories related to its business purpose, and it has not done so.  In its briefing, for example, OpenSky says that it was "not required to state a 'business' on formation," and therefore, "OpenSky has not limited its 'business.'"  *Id.* at 9.  Again, the lack of evidence of OpenSky's business is due to OpenSky's discovery misconduct, and therefore, I find the fact established that OpenSky did not file this case for its alleged purpose of testing patent quality or preserving the integrity of the patent system.  Indeed, based on the record and adverse inferences, I find that the sole reason OpenSky filed the Petition was for the improper purpose of extracting money from either or both Intel and VLSI.

IPR2021-01064
Patent 7,725,759 B2

### 2.    *Recent trial verdict awarding significant damages*

The mere existence of a trial verdict (whether by jury or from the bench) does not automatically make the filing of a subsequent IPR on the involved patent(s) an abuse of process.  Indeed, patents are often asserted, either in demand letters or in litigation, against multiple entities in serial fashion.  Both those entities subject to current or future assertions, or potential assertions, and the public have a vested interest in canceling invalid patents.

That said, an entity filing an IPR on the heels of a large jury verdict may, when combined with other facts, raise legitimate questions regarding the motivation behind the Petition.  *See* USIJ, 15–16 (discussing petitions filed after infringement verdicts).

Such is the case here.  As the parties and amici are well aware, a jury in the Western District of Texas rendered a verdict of more than $2 billion against Intel for infringing two VLSI patents, including the '759 patent ($675 million in damages).  Ex. 1027.  OpenSky filed its Petition shortly after the infringement verdict and, as noted in section IV(C)(1) of this decision above, without any established fear that it would be subject to a subsequent assertion.  Together with the significant damages award, this suggests that the purpose of the IPR could be to extract a settlement from VLSI or payment from Intel.

Notably, despite being given the opportunity, OpenSky has not provided adequate evidence that it had another purpose for filing this IPR.  As explained previously, OpenSky flouted Mandated Discovery by refusing to turn over documentation of the "purpose" for which OpenSky was formed.  Paper 47, 8.  Accordingly, per the sanction for OpenSky's

IPR2021-01064
Patent 7,725,759 B2

discovery misconduct, I find that it has been established that OpenSky filed its Petition for the purposes of extracting payment from VLSI or Intel.

### 3.     *Proximity of petitioner's formation to jury award*

Large jury awards attract publicity and attention. When the evidence demonstrates that an IPR petitioner was formed from whole cloth soon after a damages award, and in particular a significant damages award, this suggests that the petitioner could be motivated to extract a financial windfall from the patent owner or the adjudicated infringer, rather than being motivated by any legitimate purpose.

Here, the evidence demonstrates that OpenSky was formed seven weeks after a jury found that Intel infringed the '759 patent, and awarded VLSI $675 million in damages. *Compare* Ex. 1027 (Jury Verdict Form dated March 2, 2021) *with* Ex. 2006 (OpenSky formation date of April 23, 2021). OpenSky refiled Intel's discretionarily denied IPR petitions six weeks after that. This timing, in the absence of contrary evidence from OpenSky, supports the finding that OpenSky was formed in an attempt to capitalize on that verdict. Moreover, and as explained in the previous factor, OpenSky has provided inadequate evidence that it was formed for another purpose, despite my Order giving it an opportunity to do so. As a sanction for that discovery violation, I find that it has been established that OpenSky was formed for the express and sole purpose of extracting payment from VLSI or Intel.

### 4.     *Seeking compensation from both parties*

It is not unusual for parties to seek to settle their dispute; litigation is both risky and costly. Indeed, both this Office and the Federal Rules of Evidence encourage settlement. *See* Consolidated Practice Guide at 86. A

IPR2021-01064
Patent 7,725,759 B2

petitioner's agreement to dismiss a petition or terminate a proceeding in return for a payment from the patent owner may be the result of sound business judgment by both parties.

What is unusual, however, is a petitioner seeking compensation from *both the patent owner and another petitioner* in exchange for advocacy against whichever party does not pay. The problem with this behavior should be immediately apparent. For the purposes of the present analysis, however, such double-dealing suggests that a petition was filed purely to extract rents, in either direction, rather than for legitimate purposes.

The evidence against OpenSky here is both strong and concerning. As explained above, I find that OpenSky initiated early settlement talks with VLSI before institution. The evidence further demonstrates that following institution, OpenSky asked both VLSI and Intel for money in exchange for its cooperation in this IPR. Indeed, OpenSky contacted Intel on the very day that the Board granted institution (Ex. 1518) and communicated with VLSI both before and after the grant (Ex. 2083, 2084). That OpenSky, through its counsel, was willing to offer its advocacy to either side of this adversarial proceeding, depending on who was willing to pay, further suggests that its Petition was purely motivated by a wish to extract a quick settlement from either interested party in this proceeding. I am particularly concerned with OpenSky's counsel's proposal to VLSI (Ex. 2055) to intentionally undermine the proceeding and thereby violate the duty of good faith and candor to the Board. *See* 37 C.F.R. § 41.11. This behavior alone is sanctionable and will not be tolerated.

Moreover, OpenSky's predatory behavior did not end once it became clear that neither VLSI nor Intel was interested in paying OpenSky.

IPR2021-01064
Patent 7,725,759 B2

OpenSky also suggested that it lacked the resources to pursue this IPR and intimated that Intel should reimburse OpenSky for the predictable expenses associated with filing its Petition. *See, e.g.*, Ex. 1528 (email from OpenSky's counsel to Intel indicating that "OpenSky has been forced to reallocate its remaining funds to address the director's review," and therefore, "OpenSky has directed me to refrain from considering or making further invalidity arguments" and to "rest[] on the arguments in th[e] petition"); Ex. 1529 (email from OpenSky's counsel to Intel stating that "it is unfortunate that Intel is not willing to reimburse OpenSky for any of the considerable filing fees and legal fees that were incurred in filing this petition . . ."). Taken at face value, OpenSky's comments that it was running out of money indicate that it did not budget for litigating this proceeding throughout its expected life, to a final written decision. In other words, in the absence of contrary evidence due to its discovery misconduct, OpenSky's behavior and complaints about budgeting establish that it did not intend to pursue the patentability merits but instead intended to leverage the IPR's existence only to extract a payout from one side or the other.

*5.    Failure to meaningfully pursue the merits*

The evidence demonstrates that both before and after institution, OpenSky was focused on getting payment from VLSI or Intel as opposed to pursuing the merits of its patentability challenge. *See, e.g.*, Ex. 1518 (OpenSky email to Intel Dec. 23, 2021); Ex. 2084 (OpenSky email to VLSI Dec. 27, 2021).

Instead of vigorously litigating the IPR, as would be expected of a lead petitioner, OpenSky continued to seek payment from Intel. For example, OpenSky "offered to let Intel write the reply on OpenSky's behalf

41

IPR2021-01064
Patent 7,725,759 B2

in exchange for remuneration and indemnity against any lawsuit brought by VLSI against OpenSky based on the IPR proceeding." Ex. 1527. Intel refused. *Id.* OpenSky then lamented Intel's unwillingness "to reimburse OpenSky for any of the considerable filing and legal fees that were incurred in filing this petition" and stated that, nevertheless, it was "still willing to partner with Intel"—its *co-petitioner*, allegedly working toward the same goal—"moving forward." Ex. 1529. Despite Intel's refusal to pay, OpenSky filed a reply brief that Intel drafted and used Intel's deposition outline. Exs. 1527, 1529. Moreover, OpenSky did not request oral argument (the deadline passed August 11, 2022; Paper 18, 11) and did not meaningfully participate in the oral hearing.

This focus on settlement or reimbursement, rather than litigating the merits, further indicates that OpenSky's goal was to extract a payment rather than litigate the validity of VLSI's patent.

### 6.  *Filing a copycat petition*

As my Scheduling Order notes, filing a "copycat" petition is not inherently improper. Paper 47, at 4 n.3. For example, under the current joinder rules, a time-barred party may file a copycat petition when it is seeking joinder as provided by the AIA. *See* 35 U.S.C. § 315(c); 37 C.F.R. §§ 42.122(b), 42.101(b). There may be circumstances, however, in which the filing of a petition that copies a previously denied petition may suggest an abuse of process.

The present case provides an example. In addition to OpenSky filing what was essentially a copy of Intel's IPR petition, which had previously been denied based on the *Fintiv* factors, OpenSky also filed a copy of Intel's expert declaration, without OpenSky notifying that expert that it was doing

IPR2021-01064
Patent 7,725,759 B2

so, let alone confirming that his opinions had not changed. Ex. 2097. OpenSky had also not engaged the expert to testify in the case, negotiated a rate for his services, or inquired as to his interest or availability. *Id.* Submitting a declaration in a proceeding, without securing the ability of the declarant to be challenged, raises serious process concerns. The lack of control over a key witness puts the entire case in jeopardy, which is exactly what happened in OpenSky's other IPR, which was denied because OpenSky could not ensure that Intel's expert, Dr. Singh, would appear for deposition. *See* IPR2021-01056, Paper 18 (Dec. 23, 2021). On these facts, this conduct suggests that OpenSky was attempting to file a petition with the lowest possible cost in an effort to generate leverage against VLSI, but without the intent or expectation of litigating the proceeding through trial.

### D.    Conclusion

Viewed as a whole, OpenSky's conduct has been an abuse of the IPR process, the patent system, and the Office. The totality of OpenSky's conduct evinces a singular focus on using an AIA proceeding to extort money, from any party willing to pay, and at the expense of the adversarial nature of AIA proceedings. Despite being given the opportunity, OpenSky failed to offer a verifiable, legitimate basis for filing its IPR Petition, which was filed only after a district court awarded large monetary damages keyed to the subject '759 patent. And the Petition it filed was not generated by OpenSky, but was a copy of Intel's earlier petition, filed without engaging Intel's expert or confirming his opinions or willingness to participate. Further, after filing the Petition, OpenSky did not conduct itself in a manner consistent with the AIA's purpose of exploring patentability issues. OpenSky's post-institution activity was dominated by attempts to extract

IPR2021-01064
Patent 7,725,759 B2

money from either Intel or VLSI instead of engaging with the patentability merits.

Seeking an AIA trial for the primary purpose of extorting money, while being willing to forego or sabotage the adversarial process, does not comport with the purpose and legitimate goals of the AIA and is an abuse of process. Opportunistic uses of AIA proceedings harm the IPR process, patent owners, the Office, and the public. Naples, 2; USIJ, 4.[16] To safeguard the proper functioning of the patent system, and the confidence therein, it is incumbent on me and the USPTO to protect against that harm.

## V.    REMEDY FOR ABUSE OF PROCESS

The AIA granted the Office broad authority to prescribe regulations aimed at sanctioning the "abuse of process, or any other improper use of the proceeding." 35 U.S.C. § 316(a)(6). Our existing regulations take full advantage of that authority and provide a broad range of potential sanctions to address such abuse, ranging from awarding "compensatory expenses" to "[j]udgment in the trial." 37 C.F.R. § 42.12(a)(6), (b). These enumerated sanctions are not exclusive. The Federal Circuit has held that § 42.12(b) "allows the Board to issue sanctions not explicitly provided in the regulation." *Voip-Pal.com*, 976 F.3d at 1323. Accordingly, the Office has robust powers to sanction the abuse of process where it occurs and to deter similar abuse. The Director will ensure that the remedy suits the

---

[16] This situation thus meaningfully differs from others in which a "profit motive" was arguably present but there was not otherwise an allegation or proof that the petitioner had failed to meaningfully pursue the patentability merits. *See, e.g.*, *Coalition for Affordable Drugs VI, LLC v. Celgene Corp.*, Case IPR2015-01092, Paper 18 (Sept. 25, 2015) (denying motions for sanctions for abuse of process).

IPR2021-01064
Patent 7,725,759 B2

wrongdoing, both in this specific case and more generally when faced with evidence of an abuse of process or conduct that thwarts, rather than advances, the goals of the Office and the AIA.

Here, in addition to any monetary sanctions I may levy (*see* below), I must decide whether to maintain or dismiss the underlying proceeding.

VLSI contends that the remedy for OpenSky's abuse should be termination of this IPR.  Paper 84, 21.  VLSI also argues that Intel should not be "allowed to take advantage of OpenSky's misconduct at VLSI's expense."  Paper 84, 24.  VLSI asserts that Intel was a time-barred party, and that the Board has previously terminated joined time-barred parties when finding that an IPR was improperly instituted.  *See id.* at 24–25 (citing *I.M.L. SLU v. WAG Acquisition, LLC*, IPR2016-01658, Paper 46, 3, 5 (PTAB Feb. 27, 2018); *Mylan Pharma Inc. v. Horizon Pharma USA, Inc.*, IPR2017-01995, Paper 71, 12–13 (PTAB Mar. 17, 2019); *Intel Corp. v. Alacritech, Inc.*, IPR2018-00234, Paper 66, 23 (PTAB June 4, 2019); *Sling TV, LLC v. Realtime Adaptive Streaming, LLC*, IPR2018-01331, Paper 39, 8 (PTAB Jan. 17, 2020).

Intel responds that, in "VLSI's cited cases, the IPRs were terminated because the ***original*** petitioner was ***statutorily barred*** from bringing the petition in the first instance," so the petition was void *ab initio*.  Paper 89, 12 (emphasis in original).  That reasoning, however, does not apply to the current proceeding.  As Intel correctly points out, in other cases, the Board has allowed a joined petitioner to step into an active role after the original petitioner was terminated from the proceeding.  *See id.* at 13 (citing *Apple Inc. v. Traxcell Techs., LLC*, IPR2021-01552, Paper 19, 2 (PTAB May 26, 2022); *AT&T Servs., Inc. v. Convergent Media Sols., LLC*, IPR2017-01237,

IPR2021-01064
Patent 7,725,759 B2

Paper 11, 26–28 (PTAB May 10, 2017); *Qualcomm Inc. v. Bandspeed, Inc.*,

IPR2015-01577, Paper 12 at 2–3, 6, 8 (PTAB Nov. 16, 2015).

Amici recognize that I must "weigh the policy goals of the Office and

the AIA" when facing abusive behavior because "the public has a clear

interest in discouraging conduct that is abusive or otherwise thwarts

Congress's goals in passing the AIA and the Office's goals in overseeing

post-grant proceedings."  AIPLA, 5–6.  Many amici have pointed out that

"[o]ur patent system is rooted in the fact that valid claims . . . support

innovation, progress, and the public's interests" (Engine, 3), while "[i]nvalid

patents unduly restrict innovation, competition, and access to knowledge"

(PIPLI, 2).  *See* CCIA, 2; HTIA, 7; BSA, 10.  Accordingly, "ensuring that

invalid patents do not remain in force [is] one of the core missions of the

PTAB" (CCIA, 2), and "AIA trials thus broadly aim to 'protect the public's

paramount interest in seeing that patent [rights] are kept within their

legitimate scope'" (HTIA, 5 (quoting *Cuozzo*, 579 U.S. at 789–80)).  *See*

Unified, 5–6, Engine, 7–8.  On the other hand, other amici highlight that

"the patent system incentivizes inventors to publicly disclose innovations

that advantage the public by granting an inventor a patent, upon which an

'exclusive enjoyment is guaranteed.'"  Centripetal, 14; USIJ, 15; Maalouf, 6.

Those amici point out that the legislative history of the AIA shows Congress

recognized the importance of reliable patent rights.  Maalouf, 6 (citing H.R.

Rep. No. 112-98, pt. 1, at 48 (2011)); Centripetal, 13; USIJ, 15.

Going back to first principles, to further the objectives of this Office

in promoting and protecting innovation for the greater good of the public, I

must advance the goals of securing reliable patent rights and removing

patents that do not support innovation.  *See* Lamar Smith, *Don't Weaken the*

IPR2021-01064
Patent 7,725,759 B2

*Leahy-Smith America Invents Act*, Bloomberg Law (Mar. 30, 2022), at 3
("In the committee report on the AIA, we wrote about the importance to
inventors of having 'quiet title'—clear ownership that can't be challenged");
H.R. Rep. No. 112-98, pt. 1, at 40 (2011); 2011 U.S.C.C.A.N. 67, 69; S.
Rep. No. 110-259, at 20 (2008) (the congressional intent behind the AIA
was "to establish a more efficient and streamlined patent system that will
improve patent quality and limit unnecessary and counterproductive
litigation costs").

I recognize that OpenSky should not benefit from its abusive use of
the IPR process. Accordingly, due to OpenSky's abuse of the process, I am
temporarily elevating Intel to an active party and am relegating OpenSky to
a silent understudy role for the duration of this proceeding. Removing
OpenSky's control of the IPR removes its ability to leverage that control for
or against a particular party. Therefore, for the duration of this case,
OpenSky will be prevented from presenting or contesting any particular
issue; requesting, obtaining, or opposing discovery; filing any additional
papers; or participating in oral argument, unless specifically authorized to do
so, for example, as detailed below in relation to an order to show cause. 37
C.F.R. §§ 42.12(b)(2–4).

On the issue of whether to terminate the proceeding, that sanction
could be the appropriate remedy here or in future proceedings reflecting an
abuse of process. However, the unique dynamics of this case, coupled with
the public interest in evaluating patent challenges with compelling merits,
counsels for a different approach here by permitting this IPR to continue
only if the panel determines that the unpatentability merits were compelling
as of the time of institution and on the record as it existed at that time.

IPR2021-01064
Patent 7,725,759 B2

Predicating dismissal on the application of the compelling-merits standard best serves the competing interests here.

I recognize that some may believe that I am allowing Intel to benefit from OpenSky's wrongdoing by not immediately terminating the proceeding.[17]  However, there is no evidence that Intel was complicit in OpenSky's abuse.  I therefore focus on a principled, replicable approach that is in the best interest of the public and advances the USPTO and AIA goals to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." 35 U.S.C. § 316(b).

The circumstances of this particular case are unusual and are not likely to reoccur.[18]  As discussed above, after being sued by VLSI, Intel filed its original IPR Petitions within the required time.  35 U.S.C. § 311(c)(1).  At that time, the Board exercised discretion to deny institution based on the advanced state of a district court litigation that also involved the patent.  IPR2020-00106, Paper 17, 13; IPR2020-00498, Paper 16, 6, 10.  Consistent with how *Fintiv* was applied at that time, the Board did not address the

---

[17] Under the USPTO's rules, promulgated on August 14, 2012, and past practices, even though Intel would have been otherwise time barred, it was permitted to file a petition for joinder within one month of the institution decision.  35 U.S.C. § 315(b); 37 C.F.R. §§ 42.122(b), 42.101(b).

[18] Apart from the Memorandum that will require an earlier determination of compelling merits in future cases with similar fact patterns, the Board issued its Decisions several months before *Sotera* was designated precedential.  *See Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 (issued Dec. 1, 2020, designated precedential Dec. 17, 2020) (applying *Fintiv* and instituting review after the Petitioner filed a broad stipulation to limit grounds in district court, addressing factor 4 in *Fintiv*).

48

IPR2021-01064
Patent 7,725,759 B2

merits of the Petition, except to state "that the merits of the Petition[s] do not outweigh the other *Fintiv* factors."  IPR2020-00106, Paper 17, 13.  Although I recognize that the "compelling merits" analysis would not normally apply where the *Fintiv* factors are not implicated (as the Board correctly determined here on OpenSky's petition), when determining whether to continue an IPR initially filed for improper purposes, I must consider the public interest, which compels the USPTO to evaluate unpatentability challenges that, at the institution stage, evidence compelling merits.[19]

I remand the decision to the Board to issue an order within two weeks on whether the record before the Board prior to institution indicates that the Petition presents a compelling, meritorious challenge as consistent with the Memorandum.  In assessing compelling merits, the Board should apply the guidance set forth in my Memorandum.  There, I explained that "[c]ompelling, meritorious challenges are those in which the evidence, if unrebutted at trial, would plainly lead to a conclusion that one or more claims are unpatentable by a preponderance of the evidence."  *Id.* at 4.

To be clear, a compelling-merits challenge is a higher standard than the reasonable likelihood required for the institution of an IPR under 35 U.S.C. § 314(a).  A challenge can only "plainly lead to a conclusion that one or more claims are unpatentable" (*id.*) if it is highly likely that the petitioner would prevail with respect to at least one challenged claim.  I recognize that all relevant evidence likely will not have been adduced at the point of institution; trial should produce additional evidence that may support a

---

[19] My decision to conduct a compelling-merits determination here, per the Memorandum, is limited to the facts of this case and should not be treated as an endorsement of retroactive application of that Memorandum to institution decisions made before it issued.

IPR2021-01064
Patent 7,725,759 B2

determination in the Final Written Decision that unpatentability has not been adequately proven. Thus, a determination of "compelling" merits should not be taken as a signal to the ultimate conclusion after trial. The Board shall provide its reasoning in determining whether the merits are compelling.

In making its determination, the Board must analyze the evidence and the parties' arguments as they existed at the date of institution. Consistent with the ordinary course of institution, I do not authorize the parties to provide any additional briefing or argument on this issue.

Should the Board find that such a challenge was made prior to institution, the Board shall move forward with the proceeding with Intel as the active party.

Should the Board find that the Petition does not present a compelling, meritorious challenge prior to institution, the Board shall dismiss the Petition (filed by both OpenSky and Intel), subject to the Director, the Board, and the USPTO retaining jurisdiction over the issuance of sanctions.

## VI.    REQUESTS FOR IN CAMERA REVIEW

VLSI requested that I review in camera documents listed on Intel's privilege log and OpenSky's documents, generally. *See, e.g.*, Papers 62, 63. No other parties requested in camera review. For the reasons explained above, however, the evidence exchanged as Mandated Discovery is sufficient to resolve this Director review without resorting to in camera review. Accordingly, the request for in camera review is denied.

## VII.    SHOW CAUSE

Finally, for all the reasons discussed above, OpenSky also is ordered to show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse

50

IPR2021-01064
Patent 7,725,759 B2

of process. 37 C.F.R. § 42.12(b)(6). Within two weeks of this Decision, OpenSky and VLSI shall each file a 10-page Paper addressing whether an award of attorney fees is appropriate, and if so, how such fees should be determined, e.g., the appropriate time frame for which fees should be assessed.

## VIII. ORDER

For the foregoing reasons, it is hereby:

ORDERED that OpenSky is relegated to the silent understudy role in this proceeding and is precluded from presenting or contesting any particular issue; requesting, obtaining, or opposing discovery; or filing any additional papers, unless specifically directed to do so;

FURTHER ORDERED that Intel is elevated to an active party in the role of lead petitioner in this proceeding;

FURTHER ORDERED that the Board panel shall determine and issue an order, within two weeks, addressing whether the petition, based only on the record before the Board prior to institution, presents a compelling, meritorious challenge, and shall take the appropriate action to dismiss or maintain the underlying action as identified above based on its determination; and

FURTHER ORDERED that OpenSky and VLSI shall file a Paper responding to the show cause order for OpenSky, addressing whether compensatory expenses should be ordered as a further sanction for OpenSky's abuse of process. Briefing shall be filed within two weeks of this decision and shall be limited to 10 pages.

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:
Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:
Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT G

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR
OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

————————

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

————————

Case IPR2021-01064[*]
Patent 7,725,759

————————

**PATENT OWNER'S REQUEST FOR RECONSIDERATION OF
AND OBJECTIONS TO DIRECTOR'S OCTOBER 4, 2022 DECISION**

————————————

[*] Intel Corporation, which filed a petition in IPR2022-00366, has been
joined as a party to this proceeding.

# TABLE OF CONTENTS

**Page(s)**

**I.     BACKGROUND** ........................................................................**2**

**II.    THE DECISION FINDS ABUSE OF PROCESS THROUGHOUT THE CASE, BUT WORSENS RATHER THAN REMEDIES ITS EFFECTS.** ........................................................................**3**

    A.    The Decision Fails To Reconcile The Egregious Abusive Conduct Found In This Case With The Sanctions That It Orders........................3

    B.    The Decision Fails To Afford VLSI The Relief All Future Patent Owners Will Receive From Such Abuse Of Process. ...........................5

    C.    Demoting OpenSky Is No Remedy And No Sanction From OpenSky's Perspective...........................................................................6

    D.    Ordering That Intel Remain A Party And Now Be Lead Petitioner Contradicts Both The Director's Findings And The Statutory Bar. .....6

    E.    The "Compelling-Merits" Test Cannot Be Applied Retroactively.......8

    F.    Ordering An Institution-Record "Compelling-Merits Analysis" Here Creates An Impermissible Risk Of Biasing The Result. ............11

**III.   CONCLUSION** ........................................................................**15**

Patent owner VLSI Technology LLC ("VLSI") requests reconsideration[1] of the "sanctions" issued by the October 4, 2022 decision on Director Review (Paper 102, "Decision").  Director review was granted to address VLSI's request for relief from the abusive filing and pursuit of this case.  But the "sanctions" promise no relief, and treat VLSI differently from other patent owners.

The Decision's findings show—correctly—that this case was an abusive, unethical shakedown from the onset; that even the act of filing it was an abuse of process; that it was instituted on the basis of lies; and that such cases should not be granted institution.  Yet the Decision then insists on treating VLSI, the victim who reported that abuse, worse than other patent owners.  It denies the requested relief of termination of the case, and instead orders retroactive application, after the trial record is already complete, of a new test of how "compelling" the merits of the instituted grounds were *before* trial.  It declines to terminate the case as to the abusive original petitioner, and even *elevates* the time-barred joined petitioner,

---

[1] If no right to seek reconsideration is found, VLSI requests this filing be construed as objections to the Decision, similar to Petitioners' "objections" filed to the Director's prior orders, *e.g.,* Paper 54 (OpenSky's "Notice Of Objections" re discovery order); Paper 69 (Intel's "Objections" re in camera review), notwithstanding a lack of express authorization to file, *see* Paper 47, 12.

1

based on a finding that, based on the pre-institution record, "the merits of the Petition do not outweigh the other *Fintiv* factors."  IPR2020-00106, Paper 17, 13.

Had VLSI known that the "compelling merits" test, under which such merits trump other factors for discretionary denial even for abusive petitions, would be applied here, VLSI would have presented a very different pre-institution record. VLSI would have focused on why the merits were ***not*** compelling, including, for example, presenting its "request" arguments, with accompanying expert evidence.

If the test were applied with these arguments in the record it is plainly not met. On the Shaffer grounds the principal argument on the "request" limitation, absent from the POPR, was critical at trial.  *E.g.*, Paper 105, 17:8-15.  And the Chen grounds were found only "question[able]" even at institution.  Paper 17.

It cannot be argued that application of the test favors VLSI because the Director could alternatively simply have allowed the case to continue no matter what.  As noted, the Director's findings establish that this case was abusively filed and pursued, and instituted based on OpenSky's lies.  There is no reason for this abusive case to continue to a final decision no matter what.

### F.    Ordering An Institution-Record "Compelling-Merits Analysis" Here Creates An Impermissible Risk Of Biasing The Result.

Finally, requiring the panel, after the trial hearing, to apply this "compelling-merits" test, and then, ***if*** the merits are "compelling," quickly render a final written decision on those same merits, creates an impermissible risk of biasing the result

against VLSI.  The **same panel** is being asked to empty its mind of the complete trial record and decide if the merits are compelling, and, **if** it does, to almost immediately issue a final decision on those merits.  The Director has delegated the institution-stage decision from herself to the same Panel who will render a final decision on the merits of the instituted grounds.  For the same decisionmaker to render both of these decisions, in rapid succession, violates due process.

The Due Process Clause "ensur[es] that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).  Recently, in *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1911 (2016), the Supreme Court held that "[w]here a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case, the risk of actual bias in the judicial proceeding rises to an unconstitutional level."  The fact that the judge "made **a 'critical' decision" regarding whether the merits of the case meant that it should go forward** gives rise to an unconstitutionally unacceptable "risk that he 'would be so psychologically wedded' to his previous decision that it would violate the Due Process Clause for him to decide" those merits.  *Id.*, 1906, 1910.

Although the AIA's text and structure explicitly separated responsibilities for institution and adjudication between the Director and the Board, the Director

12

Date:  October 13, 2022                    Respectfully submitted,

   / Kenneth J. Weatherwax /

Babak Redjaian (Reg. No. 42,096)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Kenneth J. Weatherwax, Reg. No. 54,528
Nathan Lowenstein, *pro hac vice*
LOWENSTEIN & WEATHERWAX LLP
1016 Pico Boulevard
Santa Monica, CA 90405

16

# EXHIBIT H

Trials@uspto.gov                                    Paper No. 107
571-272-7822                                   Date: October 14, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

---

IPR2021-01064
Patent 7,725,759 B2

---

Before THOMAS L. GIANNETTI, BRIAN J. MCNAMARA, and
JASON W. MELVIN, *Administrative Patent Judges*.

MELVIN, *Administrative Patent Judge*.

ORDER
Decision on Remand
Assessing Merits at Institution

IPR2021-01064
Patent 7,725,759 B2

## I.   INTRODUCTION

OpenSky Industries, LLC ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting institution of *inter partes* review of claims 1, 14, 17, 18, 21, 22, and 24 ("the challenged claims") of U.S. Patent No. 7,725,759 B2 (Ex. 1001, "the '759 patent"). VLSI Technology LLC ("Patent Owner") opposed. Paper 9 (Preliminary Response, "Prelim. Resp."); Paper 16 (Preliminary Sur-Reply); *see also* Paper 13 (Petitioner's Preliminary Reply). On December 23, 2021, we instituted review. Paper 17 ("Institution Decision", or "Inst."). In addition, Intel Corporation filed a petition requesting *inter partes* review of claims 1, 14, 17, 18, 21, 22, and 24 of the '759 patent. IPR2022-00366, Paper 3. On June 8, 2022, we instituted review in IPR2022-00366 and joined Intel Corporation as a petitioner in this proceeding. Paper 43.

The Director initiated review of our Institution Decision on June 7, 2022. Paper 41. On October 4, 2022, the Director remanded the decision to us, directing us to issue an order by October 18, 2022, "on whether the record before the Board prior to institution indicates that the Petition presents a compelling, meritorious challenge" as consistent with the June 21, 2022, Director's Memorandum ("Memorandum").[1] Paper 102 ("Director Remand"), 49. The Director ordered us to apply the Memorandum's guidance, specifically that "[c]ompelling, meritorious challenges are those in which the evidence, if unrebutted at trial, would plainly lead to a conclusion

---

[1] *Available at* https://www.uspto.gov/sites/default/files/documents/
interim_proc_discretionary_denials_aia_parallel_district_court_
litigation_memo_20220621_.pdf

IPR2021-01064
Patent 7,725,759 B2

that one or more claims are unpatentable by a preponderance of the evidence." *Id.* (quoting Memorandum at 4) (alteration in original).

Having evaluated the record prior to institution, we conclude that the Petition presents a compelling, meritorious challenge.

## A.    THE '759 PATENT

The '759 patent is titled System and Method of Managing Clock Speed in an Electronic Device. Ex. 1001, code (54). The patent describes a method of monitoring a plurality of master devices coupled to a bus, receiving an input from a master device that is a request to increase the bus clock frequency, and increasing the bus clock frequency in response to the request. *Id.* at code (57).

## B.    CHALLENGED CLAIMS

Challenged claim 1 is reproduced below:

1. A method, comprising:

    monitoring a plurality of master devices coupled to a bus;

    receiving a request, from a first master device of the
        plurality of master devices, to change a clock frequency
        of a high-speed clock, the request sent from the first
        master device in response to a predefined change in
        performance of the first master device, wherein the
        predefined change in performance is due to loading of
        the first master device as measured within a predefined
        time interval; and

    in response to receiving the request from the first master
        device:

        providing the clock frequency of the high-speed clock as
            an output to control a clock frequency of a second
            master device coupled to the bus; and

IPR2021-01064
Patent 7,725,759 B2

> providing the clock frequency of the high-speed clock as
> an output to control a clock frequency of the bus.

Ex. 1001, 7:66–8:15. Claims 14 and 18 are independent and recite limitations similar to claim 1. *Id.* at 8:50–9:4, 9:19–40. The other challenged claims depend from one of the independent claims.

### C. PRIOR ART AND ASSERTED GROUNDS

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 14, 17 | 103 | Shaffer[2], Lint[3] |
| 18, 21, 22, 24 | 103 | Shaffer, Lint, Kiriake[4] |
| 1, 14, 17 | 103 | Chen[5], Terrell[6] |
| 18, 21, 22, 24 | 103 | Chen, Terrell, Kiriake |

Pet. 7. Petitioner relies also on the Declarations of Dr. Bruce Jacob. Exs. 1002, 1046.

### II. ANALYSIS

Our Institution Decision addressed Petitioner's contentions and Patent Owner's challenges to those contentions. *See generally* Inst. We need not repeat that analysis here. In the Director's Decision, she noted that "a compelling-merits challenge is a higher standard than the reasonable likelihood required for the institution of an IPR under 35 U.S.C. § 314(a)."

---

[2] US 6,298,448 B1, issued Oct. 2, 2001 (Ex. 1005).
[3] US 7,360,103 B2, issued Apr. 15, 2008 (Ex. 1006).
[4] US 2003/0159080 A1, published Aug. 21, 2003 (Ex. 1028).
[5] US 5,838,995, issued Nov. 17, 1998 (Ex. 1003).
[6] US 2004/0098631 A1, published May 20, 2004 (Ex. 1004).

IPR2021-01064
Patent 7,725,759 B2

Director Remand at 49. And she further clarified that a compelling-merits challenge requires concluding that it is "highly likely that the petitioner would prevail with respect to at least one challenged claim." *Id.*

A.   UNPATENTABILITY GROUNDS INCLUDING SHAFFER AND LINT

Petitioner relies on Shaffer for most limitations of claim 1, further relying on Lint to support that a "predefined change in performance is due to loading of the first master device as measured within a predefined time interval." Pet. 22–31. Petitioner first asserts that Shaffer teaches that limitation by disclosing that "the CPU 20 operates at a lower speed when the OS 32 determines that no processing is occurring or has not occurred for a predetermined amount of time." *Id.* at 27 (quoting Ex. 1005, 4:6–8). Petitioner relies on Lint as an alternative to Shaffer's teachings in that regard, submitting that Lint discloses "changing the 'performance state . . . based in part on the data representing the average performance over the previous period of time.'" *Id.* (quoting Ex. 1006, 3:1–7). Petitioner reasons that Shaffer describes a "CPU utilization percentage" and that Lint discloses a way of calculating that percentage that would allow Shaffer's system "to better interface with processor chips featuring hardware coordination of [performance]-states" by saving power, and that doing so would amount to nothing more than using a known technique to improve similar devices in the same way. *Id.* at 27–30 (citing Ex. 1006, 3:2–7, 2:33; Ex. 1002 ¶¶ 208–226).

Patent Owner contested Petitioner's showing as to the claimed master devices. Prelim. Resp. 31–40. In one aspect, Patent Owner challenged whether Shaffer's memory controller and bus controller could be master devices within the challenged claims. *Id.* at 31–37. We did not find it

IPR2021-01064
Patent 7,725,759 B2

necessary to determine whether Petitioner's contentions regarding the memory controller and bus controller justified institution. Inst. 20. Based solely on Petitioner's memory-controller and bus-controller contentions, we would not conclude the Petition presented a compelling-merits challenge.

Petitioner, however, also relied on Shaffer's multiple-CPU embodiment as disclosing a plurality of master devices. Pet. 23. Although Patent Owner challenged whether Shaffer adequately discloses multiple CPUs as master devices (Prelim. Resp. 37–39), we did not agree. Inst. 19–20.

Evaluating the parties' multiple-CPU contentions under the compelling-merits standard, we conclude the record at institution meets that standard. In particular, Shaffer states that, "in a multiprocessor system, . . . a single clock module 50 may drive all the processor clocks." Ex. 1005, 6:2–5. That disclosure supports the principle that the CPUs operate on the same bus. While Patent Owner argued that Shaffer's multiple CPUs would not necessarily act as master devices, would not necessarily connect to the same bus, and would not necessarily each request a speed change (Prelim. Resp. 37–39), those arguments did not undermine the Petition's showing, as further explained below. *See* Inst. 19–20.

As to requesting a speed change, Patent Owner did not seek a construction for "master device" that would require any master device be capable of requesting a speed change. *See* Prelim. Resp. 37–39. Thus, Patent Owner's assertion that Shaffer's multiple CPUs are not master devices because they do not request a speed change was not persuasive. As to connecting to the same bus or acting as master devices, the Petition asserted facts supporting that Shaffer's multiple CPUs would share a bus and

6

IPR2021-01064
Patent 7,725,759 B2

therefore act as master devices. Pet. 23 (citing Ex. 1002 ¶¶ 229–233).
Although Patent Owner challenged whether Shaffer's disclosures support
Petitioner's asserted facts, Patent Owner did not substantively address
statements by Petitioner's expert declarant, and instead only challenged the
declaration as hearsay or improperly incorporated argument. *See* Prelim.
Resp. 39.

We conclude that the expert testimony relied on in the Petition
(Ex. 1002 ¶¶ 231–233), if unrebutted at trial, would plainly lead to a
conclusion of unpatentability based on Shaffer's multiple CPUs. *See*
Memorandum at 4. That testimony supports the aspects of Petitioner's
contentions that were challenged by Patent Owner, and we conclude that
testimony presents logical, supported assertions, rooted in Shaffer's
disclosures. In particular, Dr. Jacob's testimony asserts that Shaffer's
multiple CPUs would operate on the shared "system bus," depicted with
shared-bus organization, and using a single clock module. Ex. 1002 ¶¶ 231–
232 (citing Ex. 1005, 6:2–5, Fig. 1).

Patent Owner further challenged Petitioner's showing as to an "output
to control a clock frequency of the bus." Prelim. Resp. 40–49. In Patent
Owner's view, Petitioner relied on different buses in Shaffer, thus failing to
show an output to the singular claimed bus. *Id.* Patent Owner's argument in
this regard was not persuasive, as it relied on narrowly reading Shaffer and
attempted to restrict Shaffer's teachings to one disclosed embodiment.
Inst. 20–21. Viewing the evidence under the compelling-merits standard, we
conclude that it was highly likely Petitioner would prevail regarding the
"output to control a clock frequency of the bus," based on Shaffer's plain
disclosures.

IPR2021-01064
Patent 7,725,759 B2

For a number of limitations, Patent Owner's Preliminary Response did not challenge Petitioner's assertions regarding Shaffer and Lint. Our review of those limitations indicated that they supported institution (*see* Inst. 21), and upon further review of the record before institution, we conclude that Petitioner's arguments and evidence for these limitations, if unrebutted at trial, would plainly lead to a conclusion of unpatentability.

Patent Owner argued that objective indicia of nonobviousness supported a conclusion of no unpatentability for the '759 patent. Prelim. Resp. 69–71. We determined in the Institution Decision that such arguments presented a factual issue for trial. Inst. 21. At least because Patent Owner's assertions in its Preliminary Response did not address a required element of objective indicia—a nexus with the challenged claims—Patent Owner's assertions of objective indicia do not call into question our view of Petitioner's case-in-chief as having presented a compelling, meritorious challenge prior to institution.

B.  UNPATENTABILITY GROUNDS INCLUDING CHEN AND TERRELL

Petitioner relies on Chen for most limitations of claim 1, submitting that Terrell additionally teaches requesting a clock speed change "in response to a predefined change in performance of the first master device" and that the predefined change "is due to loading of the first master device as measured within a predefined time interval." Pet. 40–49. Petitioner asserts it would have been obvious to use Terrell's teachings with Chen to adjust Chen's clock speed "based on 'how many clock cycles are being used by each processing element'" because "[r]educing clock speed was a well-known technique for reducing power consumption." Pet. 44 (quoting Ex. 1004 ¶ 26; citing Ex. 1002 ¶¶ 126–142, 145).

IPR2021-01064
Patent 7,725,759 B2

Patent Owner contested Petitioner's showing as to whether Chen discloses "providing the clock frequency . . . as an output to control a clock frequency of a second master device." Prelim. Resp. 50–56. In particular, Patent Owner challenged whether Chen's clock controller controlled the frequency of both the bus and multiple master devices on the bus. *Id.*

In this regard, Petitioner relies on Chen's statements that "control logic in the bridge chip causes the higher frequency clock in the bridge chip to be activated such that the host bridge, bus and I/O device are all then operating at the higher frequency" (Ex. 1003, 2:8–14), and "[c]lock gate circuit 24 causes the frequency of bus 40 to be dynamically changed (gated) by transmitting the appropriate device unique clock lines 27." *Id.* at 3:20–22. Because Chen's "unique clock lines 27" are specific to each bus device, we reasoned that those lines control the devices' frequencies. Inst. 25–26. Patent Owner's argument contradicted Chen's plain language and therefore we conclude that Petitioner's assertions, if unrebutted at trial, would plainly lead to a conclusion of unpatentability. That is, we determine the record prior to institution shows that it was highly likely Petitioner would prevail because its contentions were supported by the prior art's disclosures even without supporting expert testimony.

Patent Owner also contested Petitioner's assertions that skilled artisans would have combined Chen and Terrell. Prelim. Resp. 56–69. Specifically, Patent Owner argued that Chen and Terrell have competing interests—Chen in running its bus clock as fast as possible, to accommodate high-speed devices, and Terrell in reducing its clock to the minimum possible speed, to save power. *Id.* at 58–59.

9

IPR2021-01064
Patent 7,725,759 B2

In the Institution Decision, we concluded that Petitioner's expert, Dr. Jacob, adequately explained how a skilled artisan would view the two references as compatible and understand the benefit of combining them. Inst. 27 (citing Ex. 1002 ¶ 136). Petitioner's contentions, as supported by Dr. Jacob, if unrebutted at trial, would plainly lead to a conclusion of unpatentability because his testimony logically and fully explains how the combination would integrate the two references' teachings and offer a benefit. Ex. 1002 ¶¶ 136–145.

Patent Owner argued also that skilled artisans had no reason to look beyond Chen because doing so would increase a system's complexity. Prelim. Resp. 60. As noted in the Institution Decision, that argument failed to apply the applicable standard for obviousness and therefore was not persuasive. Inst. 28. At most, a conclusion that increased complexity would dissuade a skilled artisan from making the combination would require evidence that rebutted Petitioner's showing, which evidence was lacking prior to institution. Thus, Patent Owner's arguments did not undermine the strength of Petitioner's case at institution.

For a number of limitations, Patent Owner's Preliminary Response did not challenge Petitioner's assertions regarding Chen and Terrell. Our review of those limitations indicated that they supported institution (*see* Inst. 29), and upon further review of the record before institution, we conclude that Petitioner's arguments and evidence for these limitations, if unrebutted at trial, would plainly lead to a conclusion of unpatentability.

Considering Patent Owner's arguments against institution and supporting evidence, we conclude it was highly likely Petitioner would

IPR2021-01064
Patent 7,725,759 B2

prevail with unpatentability of at least one challenged claim over Chen and Terrell.

## III.  CONCLUSION

We have reviewed the record prior to institution and considered whether the Petition presents a compelling, meritorious challenge.  For the reasons discussed above, we conclude the Petition and supporting evidence, if unrebutted at trial, would plainly lead to a conclusion that one or more challenged claims are unpatentable. Balanced against Patent Owner's arguments and evidence against institution, the record prior to institution supports that it was highly likely that Petitioner would prevail with respect to at least one challenged claim.

## IV.  ORDER

Accordingly, it is

ORDERED that the record before the Board prior to institution in this proceeding indicates that the Petition presents a compelling, meritorious challenge.

IPR2021-01064
Patent 7,725,759 B2


PETITIONER INTEL CORPORATION:

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

PETITIONER OPENSKY INDUSTRIES LLC:

Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com


PATENT OWNER:

Baback Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com

IPR2021-01064
Patent 7,725,759 B2

hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT I

Director_PTABDecision_Review@uspto.gov               Paper No. 114
571-272-7822                                    Date: November 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064[1]
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

ORDER
Denying Request for Reconsideration

_____

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

## I.    INTRODUCTION

On October 4, 2022, I issued a Director review decision determining that Petitioner OpenSky Industries, LLC ("OpenSky") abused the *inter partes* review ("IPR") process by filing an IPR in an attempt to extract payment from Patent Owner VLSI Technology LLC ("VLSI") and/or joined Petitioner Intel, and expressing a willingness to abuse the process in order to do so. *OpenSky Industries, LLC v. VLSI Technology LLC*, IPR2021-01064, Paper 102, 3 (PTAB Oct. 4, 2022) ("Decision" or "Dec."). I sanctioned OpenSky by precluding OpenSky from actively participating in the proceeding and temporarily elevated Intel — who properly joined the instituted petition during the one-month post-institution window permitted by 37 C.F.R. § 42.122(b) — to the role of lead petitioner in the proceeding. Dec. 47; *see also Intel Corp. v. VLSI Tech. LLC*, IPR2022-00366, Paper 14 (Institution and Joinder Decision), 17–19 (PTAB June 8, 2022). I also ordered OpenSky to show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse of process. Dec. 50–51. Moreover, I remanded the proceeding for the Board to determine whether OpenSky's Petition, based on the record before institution, presented a "compelling, meritorious challenge." *Id.* at 49–50. If so, I explained that the proceeding would continue. *Id.* at 50. If the Board determined that compelling merits did not exist, I explained that the proceeding shall be dismissed. *Id.*

On October 13, 2022, VLSI filed Patent Owner's Request for Reconsideration of and Objections to Director's October 4, 2022 Decision ("Request for Reconsideration" or "Req. Recon."). Paper 106. The next day, the Board issued its decision on compelling merits. Paper 107. On

IPR2021-01064
Patent 7,725,759 B2

October 17, 2022, I ordered a *sua sponte* Director review of the Board's
compelling merits decision because "I feel duty-bound to conduct an
independent Director review of the compelling merits determination based
on the unusual and complex nature of this case."  Paper 108, 6.  I also
granted OpenSky's counsel's motion to withdraw from this proceeding.
Paper 109, 6.

I have reviewed the Request for Reconsideration and the relevant
papers.  I deny the Request for Reconsideration for the reasons set forth
below.

## II.    DISCUSSION

VLSI's Request for Reconsideration will be treated as a
Request for Rehearing and subject to the same standards set forth in
the USPTO's Interim Process for Director Review webpage,[2] which
provides, in pertinent part:

> Requests for rehearing [of] a Director review decision should be
> rare, and for focused purposes.  A request for rehearing of a
> Director review decision is not an opportunity raise new issues,
> reargue issues, or to disagree with the determinations by the
> Director.  Instead, if the requesting party has provided briefing
> for Director review, the rehearing request must demonstrate that
> the Director review decision was based upon a manifest error of
> law or fact.  If the requesting party has not provided briefing for
> Director review, the rehearing request must specifically identify
> what matter the Director review decision misapprehended or
> overlooked.  37 C.F.R. § 42.71(d).
>
> A party dissatisfied with a Director review decision may file a
> single request for rehearing without prior authorization, and that

---

[2] *See* https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-
process-director-review.

3

IPR2021-01064
Patent 7,725,759 B2

party carries the burden of showing the Director review decision should be modified.

In its Request for Reconsideration, VLSI advances a number of arguments as to why it believes the Decision ordering the Board to apply the compelling merits standard in assessing whether to allow the IPR to proceed was improper. None of VLSI's arguments, which I step through below, satisfies VLSI's burden to establish that the Decision was based upon a manifest error of law or fact.

Turning to VLSI's request, *first*, VLSI argues that "this case was instituted on false premises" and that the sanctions levied "do not [] grant VLSI a remedy for OpenSky's abuse." Req. Recon. 3–5. As to the premises on which this case was instituted, the Board properly applied the test set forth by Congress, finding that "Petitioner has shown a reasonable likelihood of prevailing with respect to at least one claim." Paper 17, 29.

As to VLSI's complaint about the sanctions contained in the Decision, they were issued "to deter such conduct by OpenSky or others in the future." Paper 102, 4 (citing 37 C.F.R. § 42.11(d)(4)). Section 42.11(d)(4) specifically provides: "A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated and should be consistent with § 42.12." Though VLSI may benefit from a potential award of attorney fees, our rules do not compel additional sanctions to benefit VLSI or make it whole. VLSI's dissatisfaction with the sanctions I ordered does not demonstrate a manifest error of law or fact.

At its core, VLSI's argument is that the only appropriate "remedy" here is termination, and I understand that termination is the result that would most benefit VLSI. However, as my Decision explains, "the unique

4

IPR2021-01064
Patent 7,725,759 B2

dynamics of this case, coupled with the public interest in evaluating patent challenges with compelling merits" counseled against immediate termination.  Paper 102, 47–49.  As I explained, evaluating for "compelling merits" based on the institution-stage record struck the appropriate balance for these competing dynamics.  That VLSI would have preferred a different result does not demonstrate error in the equitable remedies I provided in my Decision to directly address OpenSky's abusive conduct.

VLSI also states that my Decision found "that OpenSky 'abused the IPR process by filing this IPR' by improperly 'cop[ying] a previously denied petition.'"  Req. Recon. 3.  As I made clear in my Decision, the practice of filing a "copycat" petition "has not been held to be improper any more than copying claims to invoke interference proceedings, which have likewise not been found to be improper."  Dec. 9 n.5.  Indeed, because Intel's original petition here had been denied based on the policy set forth in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential), and that denial was based on an aggressive and ultimately inaccurate trial date, there is nothing inherently wrong with the copycat petition itself.  My findings as to misconduct relate to how that copycat petition was used including, importantly, OpenSky recycling an expert declaration without engaging the expert to testify in this case.  *See* Dec. 42–43.

VLSI's assertion that I erred because "the sanctions are ***not*** to the fullest extent of the Director's power," Req. Recon. 4, misunderstands the situation.  I am not required to employ any particular sanction to address a particular situation.  My Decision explains why I deemed the sanctions employed to be appropriate for this particular situation, and, conversely, why I considered other possible sanctions (such as immediate termination)

IPR2021-01064
Patent 7,725,759 B2

inappropriate. That VLSI would have made the policy choice to use a different sanction here does not demonstrate error in how I exercised my discretion.

**Second**, VLSI argues, without support, that it is being treated differently than future patent owners. Req. Recon. 5. VLSI also submits that "this case was . . . instituted based on lies." *Id*. Again, this case was instituted based on the well-reasoned analysis of the Board and its finding that "Petitioner has shown a reasonable likelihood of prevailing with respect to at least one claim." Paper 17, 29. VLSI's argument here lacks merit.

**Third**, VLSI argues that demoting OpenSky is "no sanction from OpenSky's perspective." Req. Recon. 6. As discussed above, the lens through which I issued sanctions was 37 C.F.R. § 42.11(d)(4). I see no basis in VLSI's arguments to revisit my decision to have OpenSky remain in the case while the USPTO and I assess other sanctions. Further, as discussed in my Decision, "[r]emoving OpenSky's control of the IPR removes its ability to leverage that control for or against a particular party." Dec. 47. This is indeed a sanction, as the record demonstrates OpenSky's desire to profit from that leverage.

**Fourth**, VLSI lacks merit in its assertion that "ordering that Intel remain a party and now be lead petitioner contradicts both the Director's findings and the statutory bar." Req. Recon. 6 (emphasis omitted). VLSI relies on its own speculation that Intel engaged in misconduct. *Id.* at 7. As discussed in my Decision, "there is no evidence that Intel was complicit in OpenSky's abuse." Dec. 48. Further, as made clear above, Intel was not time-barred from joining the petition and the Board presently has no rules or policies that would remove a joined party after institution based on a post-

IPR2021-01064
Patent 7,725,759 B2

hoc analysis of the joinder decision. To the extent VLSI raises policy issues, policy considerations are being considered by the USPTO in parallel, but will not be applied in this decision or retroactively.

*Fifth*, VLSI argues that the compelling merits test cannot be applied retroactively "to VLSI alone, unlawfully prejudicing VLSI for its reliance on the standards existing at the time of institution." Req. Recon. 8–9. It is unclear how holding the Petition to a higher standard (compelling merits versus reasonable likelihood of prevailing) prejudices VLSI. Contrary to VLSI's argument, applying the reasonable likelihood standard at the time of institution resulted in an instituted trial by the Board. *See* Paper 17, 29–30. Ordering the Board to reconsider the Petition and the original institution decision under the compelling merits standard as a remedy for abuse of process provides VLSI with the possibility of terminating a previously instituted trial, to VLSI's benefit.

*Sixth*, VLSI's due process argument fares no better. Req. Recon. 11–15. VLSI alleges that due process is lacking because the Decision directs the same Board panel to consider both compelling merits at institution *and* to make a final determination of unpatentability to be issued in a Final Written Decision and "in rapid succession." *Id.* I disagree. It is well established that the same Board panel may properly evaluate both institution — of which the compelling merits analysis is a part — and render a final written decision. The cases on which VLSI relies do not stand for the positions for which VLSI cites them.

VLSI relies on *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023 (Fed. Cir. 2016) and *Withrow v. Larkin*, 421 U.S. 35 (1975) (cited in *Ethicon*). Req. Recon. 13–15. *Ethicon* involved an appeal of an IPR

IPR2021-01064
Patent 7,725,759 B2

decision to the Federal Circuit in which Ethicon "challenged the final decision of the Board, arguing that the final decision should be set aside because it was made by the same panel that made the decision to institute inter partes review." *Ethicon*, 812 F.3d at 1028. The Federal Circuit disagreed with Ethicon and concluded that "where, as here, there are no other separate procedural-fairness infirmities alleged, the PTO's assignment of the institution and final decisions to one panel of the Board does not violate the due process under governing Supreme Court precedent." *Id*. at 1029. The Federal Circuit made it clear that, "[i]n fact, '[t]he Supreme Court has never held a system of combined functions to be a violation of due process, and it has upheld several such systems.'" *Id*. (citation omitted).

The Federal Circuit also directly addressed the *Withrow* Supreme Court case on which VLSI relies, distinguishing the case as follows:

> Here, combining the decision to institute with the final decision in a single panel is less problematic than the situation in Withrow. The Board first decides whether a petition demonstrates a likelihood of success on the merits, and, if it does, makes a decision to institute inter partes review. During the merits, the Board decides whether the petition actually succeeds. Both the decision to institute and the final decision are adjudicatory decisions and do not involve combining investigative and/or prosecutorial functions with an adjudicatory function. The inter partes review procedure is directly analogous to a district court determining whether there is "a likelihood of success on the merits" and then later deciding the merits of a case. . . . As *Withrow* also made clear, "pretrial involvements, such as issuing or denying a temporary restraining order or a preliminary injunction" do not "raise any constitutional barrier against the judge's presiding" over the latter trial. *See Withrow*, 421 U.S. at 56.

IPR2021-01064
Patent 7,725,759 B2

*Ethicon*, 812 F.3d at 1030.  The Federal Circuit acknowledged that, "as *Withrow* held, adjudicators are afforded a 'presumption of honesty and integrity' and even 'exposure to evidence presented in nonadversary investigative procedures is insufficient to impugn the fairness of [adjudicators] at a later adversary hearing.'"  *Id*. (quoting *Withrow*, 421 U.S. at 47, 55).

> As the Court has also made clear, 'opinions held by judges as a result of what they learned in earlier proceedings' are 'not subject to deprecatory characterization as 'bias' or 'prejudice.'"  *Id*. (quoting *Liteky v. U.S.*, 510 U.S. 540, 551, 114 S.Ct. 1147 (1994)). . . . To rise to the level of presenting actual bias, the challenger must show that an adjudicator is exposed to unofficial, 'extrajudicial' sources of information.  *See Liteky v. U.S.*, 510 U.S. 554, 114 S.Ct. 1147.

*Id.* at 1030–1031.  The Federal Circuit noted that there was no allegation of exposure to extra-judicial information and concluded that "[w]e see no due process concerns in combining the functions of initial decision and final disposition in the same Board panel."  *Ethicon*, 812 F.3d at 1030.  Instead of supporting VLSI's argument here, *Ethicon* and *Withrow* counsel against the finding VLSI seeks, and confirm that under any reasonable reading of those cases, due process was had.

VLSI's representations about the import of *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) are equally afield.  VLSI asserts that:

> The fact that the judge "made ***a 'critical' decision" regarding whether the merits of the case meant that it should go forward*** gives rise to an unconstitutionally unacceptable "risk that he 'would be so psychologically wedded' to his previous decision that it would violate the Due Process Clause for him to decide" those merits.

IPR2021-01064
Patent 7,725,759 B2

Req. Recon. 12 (quoting 136 S. Ct. at 1906, 1910). VLSI attempts to divorce the "critical decision" test from the facts of the case. *Williams'* holding is limited to cases in which "a judge earlier had a significant, personal involvement as a prosecutor in a critical decision regarding the . . . case." 136 S. Ct. at 1905. The Court explained that "[t]he due process guarantee that 'no man can be a judge in his own case' would have little substance if it did not disqualify a former prosecutor from sitting in judgement of a prosecution in which he or she had made a critical decision." *Id*. at 1906. Contrary to VLSI's representations, nothing in *Williams* suggests anything improper about a judge sitting in judgment of a case in which he or she previously made a critical decision.

Though VLSI seems to admit that *Ethicon* does not support its arguments, it states that *Williams* "calls into question much of *Ethicon*'s reasoning." Paper 106, 13 ("However, *Ethicon* was decided five months before, and so did not have the benefit of, the Supreme Court's decision in *Williams*, which calls into question much of *Ethicon*'s reasoning."). As explained above, it does not.

For the reasons stated above, I deny VLSI's request for reconsideration.

### III.    ORDER

It is hereby:

ORDERED that the Request for Reconsideration is DENIED.

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

Matthew K. Blackburn
Evan Boetticher
SULLIVAN BLACKBURN PRATT LLC
mblackburn@sullivanblackburn.com
eboetticher@sullivanblackburn.com

David Boundy
POTOMAC LAW GROUP, PLLC
dboundy@potomaclaw.com


For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com

IPR2021-01064
Patent 7,725,759 B2

smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT J

Director_PTABDecision_Review@uspto.gov                    Paper No. 121
571-272-7822                                        Date: December 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064[1]
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

DECISION
Denying Request for Rehearing, Affirming Decision on Remand,
Dismissing Petitioner OpenSky Industries, LLC,
Ordering Patent Owner to Show Cause, and Lifting Stay

---

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

## I.     INTRODUCTION

On October 4, 2022, I issued a Director review decision (Paper 102, "Decision") determining that Petitioner OpenSky Industries, LLC ("OpenSky") abused the *inter partes* review ("IPR") process by filing an IPR petition in an attempt to extract payment from Patent Owner VLSI Technology LLC ("VLSI") and joined Petitioner Intel Corporation ("Intel"), and by expressing a willingness to abuse the process in order to do so. *OpenSky Indus., LLC v. VLSI Tech. LLC*, IPR2021-01064, Paper 102, 3 (PTAB Oct. 4, 2022).  I sanctioned OpenSky by precluding OpenSky from actively participating in the underlying proceeding, and I elevated Intel to the role of lead petitioner, pending further review of the merits of the Petition.  *Id.* at 47.

## II.     DISMISSAL OF OPENSKY UNDER 37 C.F.R. § 41.12(B)(8)

In the Decision, I determined that OpenSky, through its counsel, abused the IPR process by filing this petition in an attempt to extract payment from VLSI and joined Petitioner Intel, and expressed a willingness to abuse the process in order to do so.  In addition to abusing the IPR process, I further determined that OpenSky engaged in further sanctionable conduct including discovery misconduct, violation of an express order, and unethical conduct. 37 C.F.R. § 42.12(a)(6).

At the time of my Decision, I did not dismiss OpenSky from the proceeding because the issue before me was one of first impression and I needed additional time to determine the appropriate course of action under such extraordinary circumstances.  Now having the benefit of additional time to consider this case, as well as *Patent Quality Assurance, LLC, v. VLSI Tech. LLC*, IPR2021-01229, I conclude that the best course of action is to

2

IPR2021-01064
Patent 7,725,759 B2

dismiss OpenSky from this case to ensure that OpenSky does not benefit from its abuse of the IPR process. Accordingly, I dismiss OpenSky from this proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issuance of sanctions. *See* 37 C.F.R. § 42.12(b)(8).

## III.   SHOW CAUSE FOR FAILURE TO COMPLY WITH 37 C.F.R § 42.11

In its Rehearing Request (Paper 113 ("Rehearing Request" or "Req. Reh'g")), VLSI advances several arguments as to the Board panel's compelling merits determination in its Remand Decision (Paper 107 ("Remand Decision")). Specifically, VLSI argues that the Remand Decision is inconsistent with the Board's Institution Decision (Paper 17 ("Institution Decision")), ignores factual issues identified by the Institution Decision, and relies on inadmissible hearsay. *See generally* Req. Reh'g. I am not persuaded by these arguments for the reasons I detail below, and furthermore I admonish VLSI and its counsel for supporting their arguments with misleading statements of law and fact in contravention of their obligations under 37 C.F.R. § 11.303 (Candor Toward the Tribunal) ("A practitioner shall not knowingly: (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the practitioner. . . ."); 37 C.F.R. § 42.11(a), (c). This is not the first time VLSI has made misleading statements of law or fact in an attempt to mislead me or the Board.[2]

---

[2] From VLSI's initial appearance, VLSI misrepresented the Federal Circuit's case law on secondary indicia of obviousness. *See* Prelim. Resp. 69–70 ("Significant for our purposes, both the Federal Circuit and the Board have relied upon an infringement verdict to find objective indicia of non-

IPR2021-01064
Patent 7,725,759 B2

For this reason, VLSI is ordered to show cause as to why it should not be ordered to pay Intel the reasonable attorney fees they incurred responding to VLSI's Rehearing Request. 37 C.F.R. § 42.11(d)(3) ("On its own, the Board may order an attorney, registered practitioner, or party to show cause why conduct specifically described in the order has not violated paragraph (c) of this section and why a specific sanction authorized by the Board should not be imposed."). While I recognize the amount of these fees may not be significant, I want to make clear to the parties and the public that we will hold attorneys and parties accountable for the ethical obligations they owe to the Board.

Within two weeks of this Decision, VLSI and Intel shall each file a 5-page paper addressing whether an award of attorney fees is appropriate as a sanction for VLSI's misleading statements of law and fact. Intel shall also identify its attorney fees incurred in responding to VLSI's Rehearing Request and may submit such evidence as necessary to support that identification. Within one week of the filing of such papers, VLSI and Intel may each file a 3-page paper in response.

---

obviousness, such as commercial success."). Further, in Patent Owner's Request for Reconsideration of my October 4, 2022 Decision, Paper 106 at 11–15, in arguing that having the same Board panel decide both compelling merits at institution and the final determination on patentability in the final written decision violated the Due Process Clause, VLSI misrepresented the holdings of the Federal Circuit and Supreme Court cases it cited. *See* Order Denying Request for Reconsideration, Paper 114 at 7–10 ("The cases on which VLSI relies do not stand for the positions for which VLSI cites them.").

IPR2021-01064
Patent 7,725,759 B2

## IV.    COMPELLING MERITS

In the Decision, I also remanded the underlying proceeding to the Board to determine whether OpenSky's IPR Petition, based only on the record before the Board prior to institution, presented a compelling, meritorious challenge.  *Id.* at 49.  On October 14, 2022, the Board issued a Remand Decision concluding that the Petition presented a compelling, meritorious challenge.  *See* Remand Decision.  Given the unusual and complex nature of this case, I then ordered Director review of the Board panel's Remand Decision on the issue of compelling merits.  Paper 108. With my authorization, VLSI filed a Rehearing Request of the Board panel's Remand Decision (Req. Reh'g) and Intel filed a response (Paper 115 ("Intel's Response" or "Response")).

I have reviewed the record as it stood before institution and have considered VLSI's Rehearing Request and Intel's Response.  I discern no error in the Board's Remand Decision and, in particular, find the Petition's evidence and the Board's reasoning as to the ground based on Chen and Terrell to be compelling.[3]  *See* Pet. 40–60; Remand Decision 8–11.  I also reviewed the Board's Institution Decision, and I agree with the Board's findings and conclusions in both the Institution Decision and the recent Remand Decision as they relate to the grounds based on the combination of Chen and Terrell.  For the reasons stated in the Institution Decision (Institution Decision 3–4, 22–29) and the Remand Decision (Remand Decision 8–11), and as further discussed below, I determine the combination

---

[3] Because I find the merits in the ground based on Chen and Terrell to be compelling, I do not reach any of VLSI's arguments specific to other grounds.

IPR2021-01064
Patent 7,725,759 B2

of Chen and Terrell, as presented in the Petition, presents a compelling, meritorious challenge based on the record prior to institution.

VLSI's principal argument is that the Remand Decision is inconsistent with the Institution Decision. Specifically, VLSI contends that the "Panel found that these grounds had a 'reasonable likelihood of success' and were 'adequate,' but found 'reasonable questions' and 'risk[s]' relevant to their strength.'" Req. Reh'g 1–3 (citing Institution Decision, 6, 20–21, 26–27, 29). VLSI argues that the Board's Remand Decision represents a shift in the panel's position without an explanation of its reasoning because the Board "never even suggested that it found their strength noteworthy in any way, or any more than 'adequate.'" *Id.* at 1–2 (citing Institution Decision 6, 20–21, 26–27, 29).

Much of VLSI's argument rests on the Board's finding that Petitioner's evidence was "adequate" to establish a reasonable likelihood of success in proving unpatentability. *See* Req. Reh'g 1–5. VLSI argues that the Board's compelling merits finding evidences an inconsistency rising to the level of an Administrative Procedure Act ("APA") violation, noting that "[t]he [Institution Decision] found Petitioner's grounds merely 'adequate,' not 'compelling.'" *Id.* at 1–3. VLSI's argument lacks merit.

When instituting a trial, the Board is required to determine whether "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). I commend the Board for not opining on the strength of the merits in its Institution Decision other than to say that the petition met the reasonable likelihood standard required for

6

IPR2021-01064
Patent 7,725,759 B2

institution. VLSI suggests that the Board, by making the assessment it was legally required to make and not opining further, implied that the evidence relied upon in the Institution Decision could not also meet the compelling merits standard — a standard not yet articulated at the time of the Institution Decision. That suggestion requires an unjustified leap that I am unwilling to take.

VLSI mischaracterizes the Institution Decision's statements regarding factual issues appropriate for trial. *See* Req. Reh'g 4–5, 9. For example, VLSI asserts that the Institution Decision found that "Patent Owner has raised ***reasonable*** questions regarding Chen's operation." *Id*. at 4 (quoting Institution Decision 24–26) (emphasis added by VLSI). VLSI's assertions fail to describe the full context of the Board's analysis and omit key language from the cited quote. The Board actually states that "[w]hile Patent Owner has raised reasonable questions regarding Chen's operation, ***at most*** *those questions identify factual issues appropriate for resolution through trial*." Institution Decision 26 (emphasis added). Further, just prior to that statement in the Institution Decision, in contrast to VLSI's characterization, the Board stated that VLSI had failed to fully explain their argument. Institution Decision 26 ("Patent Owner does not explain the distinction or why that would be the case."). In yet another example, VLSI wrongly asserts that the Institution Decision "found the record 'unclear'" (Req. Reh'g 5 (quoting Institution Decision 26)). To the contrary, the Board was making it quite clear that VLSI's argument was implausible: "It is unclear, however, what providing a clock frequency to a device would do besides control its frequency." Institution Decision 25–26.

7

IPR2021-01064
Patent 7,725,759 B2

Similarly, VLSI contends that the Remand Decision ignores arguments regarding the combination of Chen and Terrell that the Institution Decision indicates raise a factual dispute appropriate for trial. Req. Reh'g 9 (citing Institution Decision 28–29 ("At trial, the parties will be able to support their contrary views.")). Again, VLSI's characterization is misleading because the Board clearly states that "[w]e do not agree with Patent Owner that Terrell's approach is incompatible with Chen's," and that "Petitioner has adequately justified the combination." Institution Decision 27.

Next, VLSI argues that the Remand Decision improperly relies on Dr. Jacob's testimony, which VLSI contends is hearsay. Req. Reh'g 5–7 (citing Remand Decision 7, 10). I am not persuaded. Contrary to VLSI's arguments, the Board regularly considers sworn declarations in lieu of live testimony.[4] Moreover, the Remand Decision made it clear that "the record prior to institution shows that it was highly likely Petitioner would prevail because its contentions were supported by the prior art's disclosures *even without supporting expert testimony*." Remand Decision 9 (emphasis added).

VLSI also argues that the Remand Decision overlooks evidence of objective indicia of nonobviousness when addressing the required "nexus" with the challenged claims. Req. Reh'g 10 (citing Prelim. Resp. 69–71

---

[4] *See Grunenthal Gmbh v. Antecip Bioventures II LLC*, PGR2018-00062, Paper 32 at 15 (PTAB Oct. 29, 2019) (""Without exception, the Board accepts … sworn witness declarations in lieu of live testimony in administrative patent trials."); *Johns Manville Corp. v. Knauf Insulation, Inc.*, IPR2016-00130, Paper 35 at 19, 22–23 (PTAB May 8, 2017) (finding declarations not hearsay in IPR, where "direct testimony is typically provided via affidavit, with cross-examination taken via deposition").

8

IPR2021-01064
Patent 7,725,759 B2

("Preliminary Response" or "Prelim. Resp.")).  VLSI states that the
Preliminary Response "literally includes ***pages*** of such argument addressing
whether this evidence has a 'nexus' with the claims."  *Id.*  Though the Board
must consider and properly weigh objective indicia of non-obviousness, the
Board is not required to elevate form over substance.  In VLSI's pages of
argument, VLSI misrepresents Federal Circuit case law.  VLSI repeats those
misrepresentations in its Rehearing Request, stating that: "the Federal
Circuit and the Board have . . .[found] ***nexus*** based upon [a] jury verdict of
infringement."  Prelim. Resp. 69–71; Req. Reh'g 10.  None of the Federal
Circuit decisions VLSI cites hold as much.  *See, e.g.*, *Brown & Williamson
Tobacco Corp. v. Phillip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000);
*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016).

VLSI cites to a non-precedential Board decision — *RTI Surgical, Inc.
v. LifeNet Health*, IPR2019-00571, Paper 75, 46–47 (PTAB Aug. 4, 2020)
— for the same proposition.  However, in *RTI Surgical*, although the Board
mentions the jury verdict, the Board nowhere says that the verdict itself is
evidence of nexus.  Instead, the Board principally relies on expert testimony,
documentary product information, and claim charts as evidence establishing
a nexus to the claimed invention.  *Id.*

Of course, the Board can — and should — consider any evidence of
commercial success and nexus in its Final Written Decision, based on the
complete trial record.

None of VLSI's other arguments in its Rehearing Request fare any
better.

For the reasons stated above, I deny VLSI's request for rehearing and
affirm the Board's finding of compelling merits.

9

IPR2021-01064
Patent 7,725,759 B2

## V.     ORDER

For the foregoing reasons, it is hereby:

ORDERED that VLSI's Rehearing Request is DENIED;

FURTHER ORDERED that the Board's finding of compelling merits based on the record before the Board prior to institution is AFFIRMED;

FURTHER ORDERED that OpenSky is dismissed from the proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over OpenSky on the issue of sanctions;

FURTHER ORDERED that the stay in the underlying proceeding is lifted; and

FURTHER ORDERED that within two weeks of this Decision, VLSI and Intel shall each file a 5-page paper addressing whether an award of attorney fees is appropriate.  Intel shall also identify its attorney fees incurred in responding to VLSI's Rehearing Request and may submit such evidence as necessary to support that identification.

FURTHER ORDERED that within one week of the filing of such papers, VLSI and Intel may each file a 3-page paper in response.

10

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:
Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT K

Director_PTABDecision_Review@uspto.gov                     Paper 127
571-272-7822                                        Dated: February 3, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————————

IPR2021-01064[1]
Patent 7,725,759 B2

———————————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

ORDER
Restoring OpenSky as a Party
Awarding Reasonable Fees as Sanctions Against Petitioner
Authorizing Patent Owner to File Motion for Fees

———————————

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding. Paper 43.

IPR2021-01064
Patent 7,725,759 B2

## I.    INTRODUCTION

On October 4, 2022, I issued my decision on Director review of the institution decision in this proceeding. Paper 102 ("Decision" or "Dec."). In my Decision, I determined that Petitioner OpenSky Industries, LLC ("OpenSky") abused the *inter partes* review ("IPR") process in an attempt to extract payment from both Patent Owner VLSI Technology LLC ("VLSI") and Petitioner Intel, who was joined to the proceeding. *Id*. at 3. I also determined that OpenSky engaged in discovery misconduct and unethical conduct, and violated my express orders in the Director review process. *Id*. at 2–4. Due to OpenSky's actions, I ordered "OpenSky to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding." *Id*. at 4. I further ordered "OpenSky to address the appropriate time period for which any fees should be assessed." *Id*.

On November 17, 2022, OpenSky and VLSI submitted briefs pursuant to my order to show cause. Paper 116 (OpenSky); Paper 117 (VLSI). The parties submitted reply briefs on December 5, 2022. Paper 119 (VLSI); Paper 120 (OpenSky). For the reasons set forth below, I determine that it is appropriate to award attorney fees to VLSI for the time spent addressing OpenSky's abusive behavior, including the Director review process in its entirety. I do not award attorney fees for responding to the merits of the case, as I have determined that compelling merits were presented in the Petition. *See* Paper 121.

IPR2021-01064
Patent 7,725,759 B2

## II.    RESTORING OPENSKY TO THE PROCEEDING

I previously dismissed OpenSky from this proceeding, subject to the Director, Board, and USPTO retaining authority over the issuance of sanctions. *See* Paper 121, 2–3. In IPR2021-01229, an ongoing proceeding challenging another patent owned by VLSI, I restored dismissed petitioner Patent Quality Assurance, LLC to the proceeding. *See Patent Quality Assurance, LLC v. VLSI Technology LLC*, IPR2021-01229, Paper 108, 4 (PTAB Jan. 27, 2023). Similarly, I vacate the portion of my decision (Paper 121) dismissing OpenSky from this proceeding. This restores OpenSky as a petitioner in this proceeding.

## III.    SANCTIONS ANALYSIS

OpenSky argues that: (1) it cannot and should not be subject to any attorney fees sanction in this proceeding; (2) the order to show cause does not show any harm to VLSI due to OpenSky's misconduct; and (3) compensatory fees, if any, must be limited to specific time periods during the proceeding. Paper 116, 1, 23–24. I disagree with the first two arguments and address the proper assessment of fees below.

### A. OpenSky Is Subject to Attorney Fees in This IPR

OpenSky raises a number of arguments as to why it cannot and should not be subject to an attorney fees sanction. Paper 116, 7–23. First, OpenSky argues that under the "American Rule," each litigant pays their own fees unless otherwise provided by statute. *Id.* at 7–11 (citing *Peter v. NantKwest*, 140 S. Ct. 365, 370 (2019)). OpenSky argues that no statute authorizes attorney fees during an IPR proceeding. *Id.* at 8–9. OpenSky further argues that the relevant statute regulating the conduct of IPRs (35 U.S.C. § 316(a))

3

IPR2021-01064
Patent 7,725,759 B2

"specifically delegates to the Director authority to 'prescribe sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding,' but does not mention attorneys' fees." *Id.* at 9.

OpenSky incorrectly refers to my order as "fee shifting." *Id.* at 8. The order to show cause is not directed to fee shifting; it is a sanction order. *Cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (stating that an exception to the American Rule is "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'") (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975)). The fees are commensurate with the harm caused by OpenSky's abuse. *Id.* at 53 ("'[t]he award of attorney's fees for bad faith serves the same purpose as a remedial fine . . .'" (quoting *Hutto v. Finney*, 437 U.S. 678, 691 (1978)). It is not intended to reward VLSI as a prevailing party, as OpenSky seems to imply, but to punish OpenSky for its abusive conduct. *Cf. id.* ("the imposition of sanctions . . . depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation.")

By awarding attorney fees, I am acting pursuant to express statutory and regulatory authority. *See* 35 U.S.C § 316(a)(6); 37 C.F.R. § 42.12. 35 U.S.C. § 316 directly empowers the Director to prescribe regulations setting forth sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding. 35 U.S.C. § 316(a)(6); *see* Paper 119, 1–2. Acting pursuant to that authority, the United States Patent and Trademark Office ("USPTO" or "Office") promulgated Rule 42.12, which expressly authorizes the Patent Trial and Appeal Board ("PTAB" or "Board") to issue sanctions to punish and deter a wide range of misconduct. 37 C.F.R. § 42.12. Those sanctions include, among others, an award of "compensatory

IPR2021-01064
Patent 7,725,759 B2

expenses, including attorney fees." 37 C.F.R. § 42.12(b)(6). The Court of
Appeals for the Federal Circuit has recognized this regulatory power to
award attorney fees as a "means for regulating litigation misconduct." *See
Amneal Pharmaceuticals LLC v. Almirall, LLC*, 960 F.3d 1368, 1372 n.*
(Fed. Cir. 2020) ("§ 42.12 allows the Board to impose sanctions including
'attorney fees'"). Accordingly, there is both statutory and regulatory
authority to apply attorney fees as a sanction in this case. *See also Apple
Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020) (affirming
the Board's sanction under § 42.12 and noting that it has the ability to "issue
sanctions not explicitly provided in the regulation.").

In its second argument as to why it cannot and should not be subject
to an attorney fees sanction, OpenSky argues that it was denied due process
required by the Constitution and the Administrative Procedure Act.
Paper 116, 12–16. OpenSky argues that it did not receive notice that the
Director review would consider abuse of process as a legal issue, and did not
receive notice of the factual basis for the abuse of process charge. *Id.* at 12–
14. More specifically, OpenSky argues that it was not provided with
"standards of what constituted abuse of process and meaningful opportunity
to respond to the serious allegation that it had committed an abuse of process
during the IPR proceeding." *Id.* at 13. Additionally, OpenSky argues that it
"was never apprised that the Director believed . . . that the filing of the IPR
Petition would be an abuse of process because of 'bad' motivation, that
OpenSky was being accused of extracting payments from multiple parties, or
that there was a charge of a lack of willingness to participate in the IPR." *Id.*
at 14 (citing Dec. 3, 43–44). Finally, OpenSky argues that because the
Director review Scheduling Order precluded new declaratory evidence,

IPR2021-01064
Patent 7,725,759 B2

OpenSky was deprived of a fair opportunity to submit evidence in its defense. *See id.* at 15–16 (citing Paper 47, 8, 11).

OpenSky's argument as to lack of notice and opportunity to respond is unavailing. *See* Paper 116, 12–16. My Scheduling Order unambiguously explained that I would be investigating VLSI's claims of abuse of process by OpenSky. *See* Paper 47, 7–8. My interrogatories specifically asked, "[d]oes the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the [America Invents Act] and, if so, which evidence and how should that evidence be weighted and addressed?" *Id.* at 8. OpenSky responded to this interrogatory by citing a single piece of evidence already of record (Ex. 2055), and offered no other supporting evidence. *See* Dec. 23.

Although my Scheduling Order did not permit new declaratory evidence, OpenSky did not request permission to file such evidence or raise an objection to the absence of new declaratory evidence, despite several opportunities to do so. *See* Papers 51 (Two-week extension to exchange Mandated Discovery), 52 (Addressing the scope of Mandated Discovery), 54 (OpenSky's Notice of Objections that did not object to the exclusion of new declaratory evidence). Not only did OpenSky not request permission to file new declaratory evidence, it also failed to produce responsive evidence that was already in its possession. *See* Dec. 21–25 (OpenSky failed to produce numerous communications between itself and VLSI or Intel). Accordingly, OpenSky was provided notice and opportunity to respond to VLSI's allegations of abuse of process, and I made my decision on Director review based on the briefs and evidence presented by the parties. *See Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 749 (Fed. Cir. 2012) ("[T]he

6

IPR2021-01064
Patent 7,725,759 B2

opportunity to submit written briefs may be sufficient to provide an opportunity to be heard.").

In its third argument as to why it cannot and should not be subject to an attorney fees sanction, OpenSky argues that the Decision "erred by applying a negative inference across the board without any plausible evidence that the allegedly missing documents had information relevant to the inferences made." Paper 116, 17. Specifically, OpenSky argues that "a negative or adverse inference based on the lack of production requires a showing . . . that the missing documents actually exist." *Id.* at 16 (citing *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-1702, 2021 WL 4033071, at *7 (D.D.C. Sept. 3, 2021)). OpenSky further argues that the Decision ruled on OpenSky's objection to providing a privilege log without giving OpenSky an opportunity to cure. *Id.* OpenSky argues that the lack of opportunity to cure is contrary to previous USPTO practices. *Id.* at 17–18 (citing *Ventex Co. Ltd. v. Columbia Sportswear No. Am., Inc.*, IPR2017-00651, Paper 98 at 5 (PTAB Nov. 19, 2018)).

OpenSky's arguments against the adverse inferences taken in my Decision fail for several reasons. First, OpenSky filed its objections to the Mandated Discovery on the day it was due, despite having had the opportunity to object previously. *See* Paper 54. Thus, OpenSky's late objection eliminated any period for curing. Second, and more importantly, OpenSky indicated that it did not intend to produce a privilege log *regardless* of any ruling on its objections. *See* Paper 91, 20. Third, at least some of the missing documents existed, as they were produced by VLSI and Intel. *See* Dec. 40–42. Finally, I specifically warned OpenSky that I might draw adverse inferences based on the failure to comply with my order. *See*

IPR2021-01064
Patent 7,725,759 B2

Paper 52, 4. Despite that explicit warning, OpenSky chose noncompliance. *See* Dec. 19–25. For at least these reasons, OpenSky's arguments are unavailing.

### B. OpenSky's Misconduct Harmed VLSI

OpenSky separately argues that its misconduct did not harm VLSI, and, therefore, attorney fees are not an appropriate sanction. Paper 116, 18–23. First, OpenSky argues that the *Noerr-Pennington* doctrine precludes "awarding attorney's fees to compensate VLSI for defending against OpenSky's compelling, meritorious IPR challenge." *Id.* at 18–20. OpenSky argues that because the Petition itself was not "objectively baseless," there should be no sanctions, despite its "impermissible motive." *Id.* at 20 (citing *BE&K Construction Co. v. National Labor Relations Board*, 536 U.S. 516, 519–20, 522, 524, 536 (2002)). OpenSky then broadly argues that "[m]onetary sanctions cannot be levied against a party who files a meritorious IPR Petition (even if it had a profit motive)." Paper 120, 6–7.

OpenSky's argument for blanket immunity from sanctions for filing a meritorious Petition mischaracterizes the nature of the sanctions and would negate the purpose of imposing sanctions for misconduct before the Board as expressly provided in 35 U.S.C. § 316(a)(6). As an initial matter, OpenSky's argument ignores one of the congressional intents that undergirds the America Invents Act ("AIA") itself—"the integrity of the patent system"—which considers interests broader than just patentability. *See* 35 U.S.C. § 316. Accordingly, OpenSky's litigation misconduct cannot be excused simply because the Petition itself, which was substantively prepared by Intel, was meritorious. Case law further supports imposing sanctions for litigation misconduct, despite a meritorious suit. *See BE&K Construction*,

IPR2021-01064
Patent 7,725,759 B2

536 U.S. at 537 ("[N]othing in our holding today should be read to question the validity of common litigation sanctions imposed by courts themselves—such as those authorized under Rule 11 of the Federal Rules of Civil Procedure."); *see also* 37 C.F.R. § 42.11(c) (Board counterpart to Rule 11). More importantly, OpenSky's argument for blanket immunity mischaracterizes the basis for these attorney fee sanctions. I am not sanctioning OpenSky based on whether it filed a meritorious Petition. I am imposing sanctions because of the manner in which OpenSky conducted itself after the Petition was filed, as explained further below.

OpenSky contends that its misconduct—offering to undermine the IPR (what it calls "settlement negotiations") and failing to comply with Mandated Discovery—did not harm VLSI. Paper 116, 20–23. VLSI responds that "OpenSky's actions caused extraordinary harm to VLSI, the Office, and the patent system. OpenSky abused the IPR process for the sole purpose of attempting to extort money from VLSI and Intel." Paper 119, 9–10 (citing Dec. 43). More specifically, VLSI argues that "OpenSky's misconduct caused VLSI massive harm by forcing it to spend extraordinary amounts of time and money." Paper 117, 8. As to the damage to the Office and the patent system, VLSI argues that "OpenSky's violation of the Director's orders and its non-responsive and misleading interrogatory responses are alone sufficient to justify a fee award." *Id.* at 10. Accordingly, VLSI argues that "[a]n award of attorneys' fees and costs is necessary to deter future misconduct by OpenSky and its like." *Id.* at 11.

OpenSky responds that:

If OpenSky had filed the same meritorious IPR Petition, but not as an "attempt to extract payment" and had not sent the February 23 e-mail, VLSI would have incurred the exact same attorneys'

IPR2021-01064
Patent 7,725,759 B2

> fees and costs. Those expanded [sic] were not "solely" caused
> by the misconduct and cannot be awarded as monetary sanctions.

Paper 120, 4.

OpenSky ignores that VLSI raised arguments against OpenSky's misconduct—even apart from its motives in filing its petition—throughout the proceeding and that the entire Director review process was brought about due to that misconduct. *See* Paper 9, 1–29; Paper 16, 1–7; Paper 20, 1–10; Paper 45. My review was not limited solely to OpenSky's intent in filing the Petition, but instead considered whether to revisit the institution decision based on the totality of OpenSky's conduct and a number of factors. *See* Dec. 36–43. As a result, I concluded that OpenSky abused the IPR process. *Id.* at 43–44. As I explained:

> Seeking an AIA trial for the primary purpose of extorting money, while being willing to forego or sabotage the adversarial process, does not comport with the purpose and legitimate goals of the AIA and is an abuse of process. Opportunistic uses of AIA proceedings harm the IPR process, patent owners, the Office, and the public. To safeguard the proper functioning of the patent system, and the confidence therein, it is incumbent on me and the USPTO to protect against that harm.

*Id.* at 44 (internal citations omitted). My conclusion and related sanctions were based on the totality of OpenSky's conduct. That its intent informed my analysis does not make its intent the basis of these sanctions. Instead, it was just one of many factors that I considered in reaching my decision to impose sanctions for OpenSky's behavior in this proceeding. *See* Dec. 36–43. But even if I were to set aside OpenSky's improper motive in filing its petition to institute this IPR, I would reach the same decision based solely on

IPR2021-01064
Patent 7,725,759 B2

its misconduct revealed and committed in the course of my review of that institution decision.

In addition, OpenSky's failure to comply with Mandated Discovery further harmed VLSI during the Director review. I explained that "[a]s a result of OpenSky's failure to comply with my ordered Mandated Discovery provisions, I, VLSI, and Intel do not have a complete record to fully examine OpenSky's assertion that it has not committed an abuse of the IPR process, or to evaluate whether its allegation of 'harassment' is supported." *Id.* at 27.

OpenSky further seeks to excuse its discovery misconduct by arguing that the Director review is "ancillary to the Board's consideration of the Petition on its merits" and "[a]ttorneys' fee recoveries are not permitted for ancillary litigation, such as the process of sanctioning." Paper 116, 22 (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990)). Contrary to OpenSky's argument, the Director review process is not ancillary to the IPR process; it is an exercise of the Director's unilateral authority over the institution phase of that process. The Court in *Cooter*, cited by OpenSky, determined that Rule 11 sanctions were limited to actions at the trial level and did not apply to expenses incurred defending the award on appeal, because Federal Rule of Appellate Procedure 38 separately provided for appellate fees. *See* 496 U.S. at 407. *Cooter* is inapposite because it addressed successive phases of litigation, before separate levels of Article III courts, governed by different sets of federal rules. Here, Director review regarding whether to reverse the initial institution decision is central to the IPR process, as well as to investigating whether allegations of misconduct warrant such a reversal.

IPR2021-01064
Patent 7,725,759 B2

### C. OpenSky's Misconduct Took Place Throughout the Proceeding and Was the Basis for Director Review

OpenSky argues that "sanctions must be tied to harm 'solely' caused by the misconduct and may not be based on temporal limitations alone." Paper 116, 23–24 (citing *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017)). OpenSky identifies two specific periods of misconduct identified by the Decision. *Id.* at 24–25. The first is the nine-day period starting with the February 23, 2022, email from OpenSky's counsel to VLSI's counsel (Ex. 2055) and ending with VLSI's rejection of OpenSky's offer on March 2, 2022 (Ex. 2094). *Id.* at 24. The second is the "sixty-one-day period between when the Mandated Discovery was due and when the Director issued sanctions precluding OpenSky from further participating in the IPR: from August 4, 2022 to October 4, 2022." *Id.* (citing Paper 51, 4; Paper 102, 4).

As discussed above, OpenSky's misconduct was not so limited. *See supra.* Indeed, VLSI raised objections to OpenSky's misconduct throughout the proceeding. *See* Paper 9, 1–29; Paper 16, 1–7; Paper 20, 1–10; Paper 45; *see also Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1369 (Fed. Cir. 2013) ("[T]he litigation misconduct finding by the district court was not of isolated instances of unprofessional behavior by O2 Micro. Rather, O2 Micro's extensive misconduct was enough to comprise an abusive 'pattern' or a vexatious 'strategy' that was 'pervasive' enough to infect the entire litigation."). And the Director review process was initiated to examine OpenSky's misconduct and determine whether to reverse the institution decision. *See* Paper 47. But for OpenSky's misconduct, VLSI

IPR2021-01064
Patent 7,725,759 B2

would not have incurred the fees necessary to address OpenSky's misconduct in the case and upon Director review.

Accordingly, I determine that the appropriate sanction is for OpenSky to compensate VLSI for the reasonable attorney fees incurred in addressing the issue of OpenSky's misconduct during the proceeding, and for the Director review process in its entirety. I authorize VLSI to file a Motion for Fees that includes specific information as to the total amount of fees requested, details regarding the tasks performed underlying those fees, and reasons why the amounts of those fees are reasonable. Any privileged information may be redacted from billing information submitted with the Motion. The Motion must be filed no later than two weeks after the entry of this Decision and is limited to twenty pages. Detailed billing statements may be filed as exhibits to the Motion and excluded from the page limit. OpenSky is authorized to file an Opposition to the specific fees requested that is limited to twenty pages and must be filed no later than two weeks after the date on which VLSI files its Motion. The same parameters regarding privileged information and exhibits provided for VLSI's Motion apply to any filed Opposition.

### D. Sanctions Are Limited to This Proceeding

VLSI also seeks attorney fees as they relate to all three IPRs filed by OpenSky (i.e., IPR2021-01056, IPR2021-01064, and IPR2022-00645) and the IPRs with requests to join OpenSky's -1064 Petition (i.e., IPR2022-00366 (Intel) and IPR2022-00480 (Patent Quality Assurance, LLC ("PQA"))). Paper 117, 13. VLSI argues "[b]ut for OpenSky's filings and the PQA IPR it potentially inspired, Intel would not have been able to file

IPR2021-01064
Patent 7,725,759 B2

joinder petitions and attack VLSI's patents yet again nor could PQA have sought to join the present IPR." *Id.*

As discussed above, I distinguish the merits of this proceeding from the misconduct of OpenSky. *See supra.* This distinction between the merits and misconduct applies to the joinder requests. For example, IPR2022-00366 deals entirely with the merits, and there is no evidence of misconduct by Intel. *See* IPR2021-01064, Paper 43. Rather, Intel appears to be another target of OpenSky's misconduct. *See* Dec. 48. Accordingly, fees relating to IPR2022-00366 are not included in this sanction. I apply the same analysis to IPR2022-00480 (now terminated) in which PQA sought to join this IPR on the merits. *See* IPR2022-00480 Papers 2, 3. PQA's alleged misconduct in IPR2021-01229 is the subject of a different Director review. *See* IPR2021-01229, Paper 31. Accordingly, fees relating to IPR2022-00480 also are not included in this sanction.

OpenSky's other two Petitions may raise misconduct issues similar to this case. For example, in IPR2021-01056 (institution denied), OpenSky's failure to engage the expert on whom its petition relied may suggest that OpenSky was attempting to file a petition with the lowest possible cost in an effort to generate leverage against VLSI, but without the intent or expectation of litigating the proceeding through trial. *See* Dec. 43. OpenSky's Petition in IPR2022-00645 was dismissed before institution. *See* IPR2022-00645, Paper 13. Nevertheless, neither of these cases was raised in the Director review, and thus I exercise my discretion to limit the sanctions order to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

### E. Sanctions Are Assessed Against OpenSky

VLSI argues that "OpenSky's attorneys were directly responsible for OpenSky's misconduct and should be found jointly and severally liable with OpenSky for VLSI's fees and costs." Paper 117, 15. VLSI argues that "[c]ourts have routinely held a party's attorneys jointly and severally liable for the sanctionable conduct of their clients when they have assisted in advancing the sanctionable conduct." *Id.* at 16–17. VLSI further argues that OpenSky's attorneys repeatedly misrepresented OpenSky's motives, conducted OpenSky's improper negotiations with VLSI and Intel, and blocked inquiries into the true relationship between OpenSky and its counsel. *Id.* at 17–20.

At this time, I decline to resolve VLSI's request to hold OpenSky's attorneys "jointly and severally liable" for VLSI's attorney fees. The Board's authority extends to both "a party," 37 C.F.R. § 42.12(a), and to "individuals involved in the proceeding," *Id.*, § 42.11(a). The latter "individuals" expressly includes "any attorney [or] registered practitioner" appearing before it. *Id.*, § 42.11(d). Consistent with that regulation, the Director review process examined OpenSky's misconduct as a party to the proceeding. *See* Paper 47, 7–9. I did not examine, however, whether OpenSky's counsel individually committed misconduct, and I reserve judgment on that issue. *See* Dec. 4. Accordingly, I decline to sanction OpenSky's counsel individually at this time.

## IV.    ORDER

Accordingly, based on the foregoing, it is:

ORDERED that OpenSky is restored as a petitioner;

IPR2021-01064
Patent 7,725,759 B2

FURTHER ORDERED that VLSI is awarded reasonable fees incurred in this proceeding in raising issues of misconduct by OpenSky before the Board, and the Director review process in its entirety;

FURTHER ORDERED that VLSI is authorized to file a Motion for Fees, in accordance with my instructions herein. Any such Motion must be filed no later than two weeks after the entry date of this Order and is limited to twenty pages;

FURTHER ORDERED that OpenSky is authorized to file an Opposition to VLSI's Motion for Fees. Any Opposition must be filed no later than two weeks after the date on which VLSI files it Motion, and is limited to twenty pages.

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Matthew K. Blackburn
Evan Boetticher
SULLIVAN BLACKBURN PRATT LLC
mblackburn@sullivanblackburn.com
eboetticher@sullivanblackburn.com

David Boundy
POTOMAC LAW GROUP, PLLC
dboundy@potomaclaw.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com

IPR2021-01064
Patent 7,725,759 B2

hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT L

Trials@uspto.gov                                              Paper 135
571-272-7822                                        Entered: May 12, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

INTEL CORPORATION,
OPENSKY INDUSTRIES, LLC,
Petitioner,[*]

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————————

IPR2021-01064
Patent 7,725,759 B2

———————————

Before THOMAS L. GIANNETTI, BRIAN J. MCNAMARA, and
JASON W. MELVIN, *Administrative Patent Judges.*

MELVIN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

———————————

[*] Intel Corporation, which filed a petition in IPR2022-00366, has been
joined as a party to this proceeding. Paper 43.

IPR2021-01064
Patent 7,725,759 B2

# I.   INTRODUCTION

OpenSky Industries, LLC filed a Petition (Paper 2, "Pet.") requesting institution of *inter partes* review of claims 1, 14, 17, 18, 21, 22, and 24 ("the challenged claims") of U.S. Patent No. 7,725,759 B2 (Ex. 1001, "the '759 patent"), owned by VLSI Technology LLC ("Patent Owner").

After preliminary briefing, we instituted review. Paper 17 ("Institution Decision" or "Inst."). Following institution, Intel Corporation filed a petition for *inter partes* review and a Motion for Joinder in IPR2022-00366, requesting that Intel be joined as a petitioner to this proceeding. IPR2022-00366, Papers 3, 4. We instituted trial in IPR2022-00366, granted the Motion for Joinder, and added Intel as a petitioner here. *Id.*, Paper 14. A copy of that decision was entered into the record of this proceeding. Paper 43. Thus, OpenSky and Intel are, collectively, "Petitioner" here.

Patent Owner filed a Response (Paper 40 ("PO Resp.")), Petitioner filed a Reply (Paper 49 ("Pet. Reply")), and Patent Owner filed a Sur-Reply (Paper 85 ("PO Sur-Reply")). We held oral argument on September 22, 2022. Paper 105 ("Tr.").

Additionally, Patent Owner filed a Motion to Exclude two expert declarations filed by Petitioner. Paper 88 ("PO Mtn. Exclude"). Petitioner Opposed (Paper 94) and Patent Owner replied (Paper 95).

We have jurisdiction under 35 U.S.C. § 6(b). This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons set forth below, we find Petitioner has demonstrated by a preponderance of evidence that the challenged claims are unpatentable. We deny Patent Owner's Motion to Exclude.

IPR2021-01064
Patent 7,725,759 B2

## A.   Related Matters

The parties both identify the following matter related to the '759 patent: *VLSI Technology LLC v. Intel Corporation*, No. 6:19-cv-00254-ADA (consolidated as 1:19-cv-00977) (W.D. Tex.) (trial concluded with jury verdict). Pet. 5; Paper 5. Patent Owner identifies the following additional matters: *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00057 (W.D. Tex.); *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00299 (W.D. Tex.); *Intel Corp. v. VLSI Tech. LLC*, IPR2020-00498 (PTAB) (on appeal to Federal Circuit, No. 21-1617); *Intel Corp. v. CLSI Tech. LLC*, IPR2020-00106 (PTAB) (on appeal to Federal Circuit, No. 21-1614). Paper 5.

## B.   Real Parties in Interest

Petitioner OpenSky identifies only itself as the real party in interest. Pet. 5. Petitioner Intel identifies only itself as the real party in interest. *See* Paper 42, 4. Patent Owner identifies VLSI Technology LLC and CF VLSI Holdings LLC as real parties in interest. Paper 5.

## C.   The '759 Patent

The '759 patent is titled "System and Method of Managing Clock Speed in an Electronic Device." Ex. 1001, code (54). It describes a method of monitoring a plurality of master devices coupled to a bus, receiving an input from a master device that is a request to increase the bus clock frequency, and increasing the bus clock frequency in response to the request. *Id.*, code (57). The '759 patent's Figure 1 is reproduced below:

IPR2021-01064
Patent 7,725,759 B2



**FIG. 1**

Figure 1 is a block diagram depicting electronic system 100 with first master device 120 and second master device 122 coupled to bus 102, which is also coupled to arbiter 110. *Id.* at 2:58–3:3. Clock controller 150 is coupled to arbiter 110, clock 140, CPU 104, first master device 120, and second master device 122. *Id.* at 3:3–10.

The '759 patent describes that, in an illustrative embodiment, "clock controller 150 can output a high speed clock 152 having a variable clock frequency to the bus 102 via the arbiter 110 and another high speed clock output to the CPU 104." *Id.* at 3:32–35. Bus devices may generate trigger outputs indicating a request to change the high-speed clock frequency. *Id.* at 3:64–4:17. Then, "clock controller 150 controls and/or adjusts the high

4

IPR2021-01064
Patent 7,725,759 B2

speed clock 152 by changing the clock frequency in response to the plurality of trigger signal inputs." *Id.* at 4:22–24. The '759 patent also describes that, "[i]n a particular embodiment, the clock controller 150 may determine that a change in the high speed clock 152 may not be desired" and, would therefore not change the clock frequency. *Id.* at 4:58–62.

D.    CHALLENGED CLAIMS

Challenged claim 1 is reproduced below:

1.    A method, comprising:

monitoring a plurality of master devices coupled to a bus;

receiving a request, from a first master device of the plurality of master devices, to change a clock frequency of a high-speed clock, the request sent from the first master device in response to a predefined change in performance of the first master device, wherein the predefined change in performance is due to loading of the first master device as measured within a predefined time interval; and

in response to receiving the request from the first master device:

providing the clock frequency of the high-speed clock as an output to control a clock frequency of a second master device coupled to the bus; and

providing the clock frequency of the high-speed clock as an output to control a clock frequency of the bus.

Ex. 1001, 7:66–8:15. Claims 14 and 18 are independent and recite limitations similar to claim 1. *Id.* at 8:50–9:4, 9:19–40. Each of the other challenged claims depends from one of the independent claims.

IPR2021-01064
Patent 7,725,759 B2

E.  Prior Art and Asserted Grounds

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 14, 17 | 103 | Shaffer[1], Lint[2] |
| 18, 21, 22, 24 | 103 | Shaffer, Lint, Kiriake[3] |
| 1, 14, 17 | 103 | Chen[4], Terrell[5] |
| 18, 21, 22, 24 | 103 | Chen, Terrell, Kiriake |

Pet. 7. Petitioner relies also on the Declarations of Dr. Bruce Jacob.
Exs. 1002, 1046, 1055.

II.  ANALYSIS

A.  Claim Construction

1.  *"request"*

Petitioner proposes that we apply the plain and ordinary meaning to each term of the claims. Pet. 17. According to Patent Owner "[t]he plain meaning of 'request' is to ask for something." PO Resp. 4. Patent Owner submits that Shaffer does not disclose the claimed "request" because a "request" does not encompass a command that mandates action, whereas Shaffer acts on the identified signals without assessment. *Id.* at 4–5, 9–14. Petitioner asserts that "nothing in the challenged claims excludes the scenario in which requests must be followed." Reply 5. Thus, we consider

---

[1] US 6,298,448 B1, issued Oct. 2, 2001 (Ex. 1005).
[2] US 7,360,103 B2, issued Apr. 15, 2008 (Ex. 1006).
[3] US 2003/0159080 A1, published Aug. 21, 2003 (Ex. 1028).
[4] US 5,838,995, issued Nov. 17, 1998 (Ex. 1003).
[5] US 2004/0098631 A1, published May 20, 2004 (Ex. 1004).

IPR2021-01064
Patent 7,725,759 B2

whether "request" implies a negative limitation that excludes a signal, e.g., a command or instruction, acted upon without assessment.

According to Patent Owner, the specification of the '759 patent, supports its claim construction because "the decision-making for frequency control resides in the PCC, *not* the master device."[6] PO Resp. 4; *accord id.* at 9 ("[T]he PCC has an embedded computer program with instructions 156 that decides whether to grant or ignore the request." (citing Ex. 1001, 3:3–6, 5:4–15)). Despite that position, which could be viewed as addressing a capability of the PCC itself rather than the request received by the PCC, Patent Owner asks us to construe "request" as excluding a command. *See* Tr. 50:16–18. Indeed, in distinguishing its claims over Shaffer based on a "request," Patent Owner does not address apparatus claims 14 and 18 separately from method claim 1, although the apparatus claims both recite a "programmable clock controller" that receives a request, whereas method claim 1 does not. *See* PO Resp. 4–14. Thus, we consider whether "request" excludes a signal that is acted on without assessment.

Claim 1 does not include a limitation that requires assessing whether to act on an incoming request. Claim 1 merely recites "receiving a request" from a first master device and, "in response to receiving the request," providing the clock frequency to control a second master device's clock frequency and the bus's clock frequency. Claim 1's language recites only that the claimed outputs are provided "in response to receiving the

---

[6] "PCC" refers to programmable clock controller, a term in claim 14 and the specification. *See* Ex. 1001, 2:41–50, 5:4–21, 8:59–61.

IPR2021-01064
Patent 7,725,759 B2

request"—claim 1 does not require an intervening assessment of any kind be performed.[7]

Patent Owner relies heavily on the specification to argue that the '759 patent's described "PCC need not grant 'requests.'" PO Resp. 11. The specification describes a PCC that receives a request and independently assesses whether to act on the request. Ex. 1001, 5:55–56 ("Moving to decision step 204, the controller determines whether to enable the request to increase the bus speed."). But the specification indicates that this approach is "[i]n a particular embodiment." *Id.* at 5:48–49. It also describes alternative embodiments in which a controller determines whether to set flags indicating high-frequency operation and then increases clock frequency if flags are set. *See id.* at 6:1–7:14.

We do not read the specification's disclosure of alternative embodiments as establishing that the claimed "request" mandates deciding whether to act on the request. Nothing in the specification describes a request that itself requires independent assessment. Stated otherwise, although any given "request" could be evaluated to determine what, if any, action to take in response, any such evaluation does not depend on the nature of the request. The claims do not include language restricting how a request is processed, but instead read on systems or methods in which a certain

---

[7] As noted, Patent Owner hinges its arguments on construing "request." *See* Tr. 50:16–18. Independent claim 14's programmable clock controller includes instructions to perform a method that, like claim 1's method, receives the request provided by the first master device and provides the claimed outputs without reciting any intervening assessment of the request. Independent claim 18 similarly recites that a clock controller coupled to an arbiter is configured to adjust a variable clock frequency of the bus in response to receiving the request from the first master device, without reciting any intervening assessment of the request.

IPR2021-01064
Patent 7,725,759 B2

action is taken in response to a request. At least one example disclosed in the specification is consistent with a system that makes no independent assessment of a request. The example states that "[t]he clock controller can output a variable clock frequency that varies in response to one or more inputs from the at least one master device." *Id.* at 2:38–40. This exemplary embodiment supports Petitioner's contention that we should not construe "request" as requiring independent assessment before acting on the request.

  The prosecution history further supports an understanding of the claimed "request" as not requiring assessment before acting. Original application claim 1 recited "receiving an input . . . wherein the input is to request an increase to the clock frequency." Ex. 1010, 18.[8] Original application claim 2, which depended from original application claim 1, recited "determining whether to enable the request to increase the clock frequency of the bus." Ex. 1010, 18 (original claim 2). Thus, the application for the '759 patent included claims that differentiated between requesting an increase in clock frequency with no further assessment of the request (e.g., original application claim 1) and claims that required determining whether to enable the request (e.g., original application claim 2). During prosecution, original application claim 2 and others reciting "determining" steps in connection with a request were cancelled. *See id.* at 18–20; Ex. 1019, 5 (canceling claims 1–29). Accordingly, the prosecution history shows that the applicant intentionally cancelled claims limited to determining whether a request to change the clock frequency should be enabled, i.e., the applicant

---

[8] Unless noted otherwise, our citations refer to the exhibit's page number, rather than the page numbers of the original documents in the exhibit.

IPR2021-01064
Patent 7,725,759 B2

understood the possibility of claiming the distinction now sought, but decided not to limit the claims in that manner.

Finally, Petitioner points out prior art that uses the terms "command," "instruction," and "request" synonymously, suggesting that "request" did not carry the special meaning for which Patent Owner now argues. *See* Pet. Reply 7 (citing Ex. 1055, ¶¶29–32; Ex. 1006, 3:16–17 ("the OS makes a request to set the P-state"), 4:40–44, 5:47–49 ("when the OS specifies a first P-state via SET_PSTATE command"), 9:16–20 ("the OS communicates with the processor to instruct … the new P-state")).

Based on the claim language, the examples in the specification, and the prosecution history, we decline to infer the additional limitation on the term "request" as urged by Patent Owner. Accordingly, we find that the intrinsic evidence supports a construction of "request" that does not require assessing the request before acting in response to the request. We further find that such a construction is consistent with Petitioner's extrinsic evidence of typical usage of the term in the relevant art, i.e. that the challenged claims do not expressly require a determination before acting on the request.

Considering the record as a whole, we conclude that the claims do not require assessing whether to act on a request.

### 2. *"master device"*

According to Patent Owner, "[w]hile offering no construction of 'master device,' Petitioner argues that Shaffer's controllers are 'master devices' because they 'could initiate communications like those of the '759 patent.'" PO Resp. 19 (citing Pet. 23); *see* Pet. Reply 11. Patent Owner

10

IPR2021-01064
Patent 7,725,759 B2

submits that "master devices can make clock frequency change requests, while [the '759 patent's] slave devices cannot." PO Resp. 23.

Method claim 1 recites "receiving a request, from a first master device of the plurality of master devices, to change a clock frequency" and, in response to receiving that request, "providing the clock frequency . . . as an output to control a clock frequency of a second master device coupled to the bus." Thus, the claim language requires only that the first master device be able to request clock-frequency changes. The only feature of a master device recited in independent claims 1, 14, and 18 is that a first master device sends a request to change the clock frequency in response to a predefined change in its performance caused by loading during a predetermined interval. *See, e.g.,* Ex. 1001, 8:1–8. The claims do not otherwise limit a master device. None of the claims recites a "slave" device.

The specification describes an embodiment in which two master devices are each coupled to a bus, a clock controller, and an arbiter. Ex. 1001, 2:66–3:5, 3:8–10, Fig. 1. The specification also states that "[t]he first master device 120 may initiate communication with the first slave device 130 by requesting an access token from the arbiter 110 to communicate over the bus 102." *Id.* at 3:12–15. The specification contrasts "slave" devices: "The first slave device 130 may receive data but may not initiate communication with a master." *Id.* at 3:15–17; *accord id.* at 3:17–19 ("That is, the first slave device 130 is disabled to initiate communication."). The patent thus distinguishes "master" from "slave" devices based on the ability to initiate bus communication.

The specification also discloses an embodiment in which "[e]ach of the plurality of devices coupled to the bus 102 provide[s] a corresponding trigger output" where "the trigger output is indicative of a request to change

IPR2021-01064
Patent 7,725,759 B2

the clock frequency of the high speed clock 152." *Id.* at 3:64–65, 4:15–17 ("[t]he generation of the trigger output is indicative of a request to change the clock frequency of the high speed clock 152"). That functionality—using trigger outputs to request speed changes—is agnostic as to whether a device is a "master" or "slave" device. Stated otherwise, although the particular embodiment describes master devices that can request frequency changes, the slave devices can also request frequency changes because the specification states that "each" device provides a trigger output. Thus, the specification does not support Patent Owner's assertion that the ability to request clock speed changes distinguishes "master devices" from "slave devices."

We construe master devices as those devices that can initiate communications with other devices but need not be able to send requests to a clock module.

### 3.   *"clock frequency of a second master device"*

Contesting whether Chen discloses providing an "output to control a clock frequency of a second master device coupled to the bus," Patent Owner asserts that "the separate clock frequency of the second master device in the claims refers to the internal clock frequency of the master device, not to an I/O bus frequency." PO Resp. 52. Petitioner replies that receiving a clock frequency for bus transactions satisfies the claim language, regardless of whether a device has a separate internal clock. Pet. Reply 21.

We agree with Petitioner that nothing in the claim language requires that "a clock frequency of a second master device" refer to the "internal clock frequency" of the second master device. *See* Pet. Reply 21 ("[I]t is irrelevant whether [Chen's master] devices could also have other clocks

IPR2021-01064
Patent 7,725,759 B2

within them."). Rather, the phrase "a clock frequency" is generic and does not limit whether the provided clock controls bus communications or another aspect of a second master device. Nor has Patent Owner directed us to the specification's disclosures that would limit the term beyond a specific embodiment. Patent Owner's reference to Dr. Conte's declaration (PO Resp. 52 (citing Ex. 2065 ¶ 186)), cites testimony that simply asserts that skilled artisans "would understand that the I/O bus clock in Chen has nothing to do with the internal clock of the I/O device." Ex. 2065 ¶ 186. This testimony does not address the proper understanding of "a clock frequency." On the other hand, Petitioner's expert, Dr. Jacob, discusses the claims' broad language. *See* Ex. 1055 ¶¶ 95–96.

We discuss Patent Owner's implicit claim construction in more detail below. *See infra* at 38 (§ II.D.2).

### B. Obviousness over Shaffer and Lint (Claims 1, 14, and 17)

Shaffer discloses a CPU speed control system that provides "the CPU and other system buses in the device with a variable clocking frequency based on the application or interrupt being executed by the device." Ex. 1005, code (57). Shaffer's Figure 1 is reproduced below:

IPR2021-01064
Patent 7,725,759 B2



FIG. 1

Figure 1 is a block diagram showing intelligent programmable clock module 50 that provides CPU 20 with a clocking signal and informs CPU 20 of the frequency through line 51. *Id.* at 3:8–23. Additionally, clock module 50 supplies a clocking signal to memory controller 22 through memory clock control line 23 and to peripheral bus controller 24 (also referred to as system bus controller 24) through system bus clock control line 25. *Id.* at 4:26–29. Schaffer discloses that its speed control system "provide[s] a programmable variable clock frequency to the other controllers and buses in the system" such that "data and commands will travel through the data/command bus 21 at a proportionally slower speed" along with CPU 20 operating at the slower speed. *Id.* at 4:15–25.

Shaffer discloses "a multiprocessor system" in which "a single clock module 50 may drive all the processor clocks." *Id.* at 6:2–5. Petitioner

IPR2021-01064
Patent 7,725,759 B2

contends that each of the multiple CPUs in a multiprocessor system "are master devices, per the '759 patent." Pet. 23.

Shaffer discloses "a CPU utilization application that dynamically monitors the level of CPU usage." Ex. 1005, 4:53–54; *see id.* 4:50–5:20. That application provides CPU utilization values to the operating system, OS 32, which may then generate "an interrupt to the clock module 50 instructing it to raise or lower the clocking frequency provided to the CPU 20." *Id.* at 5:5–8.

Petitioner relies on Schaffer for most limitations of claim 1, further relying on Lint as teaching the limitation that a "predefined change in performance is due to loading of the first master device as measured within a predefined time interval." Pet. 22–31. Petitioner first asserts that Shaffer teaches this limitation by disclosing that "the CPU 20 operates at a lower speed when the OS 32 determines that no processing is occurring or has not occurred for a predetermined amount of time." *Id.* at 27 (quoting Ex. 1005, 4:6–8). Petitioner relies on Lint as an alternative to Shaffer's teachings in that regard, submitting that Lint discloses "changing the 'performance state . . . based in part on the data representing the average performance over the previous period of time.'" *Id.* (quoting Ex. 1006, 3:1–7). Petitioner reasons (1) that Shaffer describes a "CPU utilization percentage," (2) that Lint discloses a way of calculating the utilization percentage that would allow Shaffer's system "to better interface with processor chips featuring hardware coordination of [performance]-states" by saving power, and (3) that doing so would amount to nothing more than using a known technique to improve similar devices in the same way. *Id.* at 27–30 (citing Ex. 1006, 3:2–7, 2:33).

15

IPR2021-01064
Patent 7,725,759 B2

### 1.     *"request"*

Petitioner identifies Shaffer's "instructions via lines 19 and 49" as requests from CPU 20 to change a clock frequency of clock module 50. Pet. 23–24 (citing Ex. 1005, 3:8–22 ("CPU 20 in turn can instruct through line 49 the clock module 50 to increase or decrease the output frequency as needed"), 4:50–54 ("OS 32 is used to control the frequency of the clock module 50 in response to a CPU utilization application that dynamically monitors the level of CPU usage.")). Patent Owner argues that Shaffer's instruction is not a "request" because "Shaffer's clock module may not reject these commands; it simply does as it's told." PO Resp. 5–14. As discussed above, however, we do not construe "request" as requiring independent assessment of whether to act on the request. *See supra* at 6 (§ II.A.1). Accordingly, we find that Shaffer teaches a request as claimed.

### 2.     *"monitoring a plurality of master devices"*

Petitioner asserts that Shaffer discloses "monitoring a plurality of master devices coupled to a bus" because CPU 20, memory controller 22, bus controller 24, and another CPU are coupled to data/command bus 21. Pet. 22 (citing Ex. 1005, Fig. 1, 6:2–5). As to "monitoring," Petitioner cites Shaffer's "CPU utilization application that dynamically monitors the level of CPU usage." Ex. 1005, 4:53–54. As to the memory and bus controllers, Petitioner asserts that skilled artisans "would have understood that Shaffer's 'controllers' could initiate communications, like those of the '759 patent." Pet. 23. Petitioner's expert, Dr. Jacob, testifies that CPU 20, memory controller 22, and peripheral bus controller 24 are master devices, as claimed, because "they are all on the system bus, a shared bus organization." Ex. 1055 ¶ 51; *see also id.* ¶ 46 (asserting that a shared bus supports multiple

IPR2021-01064
Patent 7,725,759 B2

masters and requires each to "make its own decisions about when and how to access the shared bus").

Patent Owner argues that Shaffer does not teach or suggest monitoring controllers 22 or 24. PO Resp. 15. According to Patent Owner, because those controllers have no ability to signal a speed change, "there would be no reason to monitor their utilization." *Id.* Additionally, Patent Owner reasons that those devices are much slower than CPU 20, because "the most cost effective method to reduce power consumption is to vary the CPU 20 clock speed." *Id.* (quoting Ex. 1005, 6:12–14). Petitioner replies that skilled artisans would have understood Shaffer's controllers 22 and 24 are monitored. Pet. Reply 9 (citing Ex. 1055 ¶¶ 104–107).

Shaffer discusses "monitoring" in several ways. First, Shaffer describes its clock module as responding to OS-generated signals and gives an example of an idle signal indicating whether the CPU is in an idle state. Ex. 1005, 3:27–59. Shaffer also discloses that the clock module may respond to interrupts indicating user activity like mouse movement or keyboard input. *Id.* at 3:60–4:14. Shaffer further describes that OS signals may be generated by "a CPU utilization application that dynamically monitors the level of CPU usage." *Id.* at 4:51–5:20. Finally, Shaffer describes controlling the clock frequency "in response to the particular application or task being executed by the system." *Id.* at 5:21–47. Dr. Jacob testifies that skilled artisans would have understood Shaffer to disclose monitoring its controllers along with the CPU, explaining that:

> monitoring software typically monitors all of a system's activity, including network traffic, memory traffic, disk traffic, etc. Shaffer's memory controller 22 and peripheral bus controller 24 would be monitored, even if the devices

17

IPR2021-01064
Patent 7,725,759 B2

> consumed little power themselves, because the data traffic
> through them could very well add up to a significant amount.

Ex. 1055 ¶ 106.

Considering the record as a whole, we are not persuaded that Shaffer discloses monitoring devices beyond CPUs. Although Dr. Jacob asserts that Shaffer's memory controller and peripheral bus controller "would be monitored," Shaffer discloses monitoring through interrupts and a "CPU utilization application," as described above. Petitioner does not explain, through Shaffer's disclosures or Dr. Jacob's testimony, how either a CPU utilization application or interrupt monitoring would include monitoring memory controller 22 or peripheral bus controller 24. Petitioner's assertion that "typical" monitoring software would have included network, memory, and disk traffic, even if true, is insufficient to show that Shaffer's monitoring is consistent with that assertion.

Petitioner, however, relies additionally on Shaffer's disclosure of a multiprocessor system. Pet. 23 ("Shaffer discloses multiple CPUs. These CPUs are master devices, per the '759 patent.") (citations omitted). Petitioner relies also on Shaffer's "CPU utilization application" as monitoring the CPUs. *Id.*

Patent Owner incorrectly asserts that the Petitioner relied "*solely* on Shaffer monitoring *single* CPU 20." PO Sur-Reply 11 (citing Pet. 22–23). The Petition states "[a] POSA would have found it obvious that other CPUs disclosed by Shaffer would have been coupled to the bus." Pet. 23 (citing Ex. 1002 ¶¶ 228–233). The Petition also identifies "another CPU" as one of the plurality of master devices and identifies Shaffer's "CPU utilization application" as monitoring the master devices. Pet. 22–23 (citing, e.g. Ex. 1005, 6:2–5 ("in a multiple processor system (not shown), a separate

IPR2021-01064
Patent 7,725,759 B2

clock module 50 may be used for each processor, or a single clock module may drive all the processor clocks").

Patent Owner asserts that "Shaffer does not teach monitoring multiple CPUs in its vague reference to a multi-CPU configuration." PO Sur-Reply 12; *accord* PO Resp. 15–16 ("Shaffer does not provide any details of how such a [multiprocessor] system would operate" and therefore "does not disclose monitoring each CPU in Shaffer's multiprocessor embodiment."). Patent Owner emphasizes Dr. Jacob's statement that "I don't really know what it would do" because Shaffer does not disclose its algorithm "in a multiprocessor scenario." PO Sur-Reply 12 (quoting Ex. 2066, 41:13–42:5). That statement, however, relates to the particular algorithm that Shaffer would apply to make clock-speed changes in a multiprocessor system. Ex. 2066, 41:25–42:1. The challenged claims are not directed to the particular algorithm that would be used in such a multiprocessor system, and therefore, Dr. Jacob's testimony cited by Patent Owner does not diminish Shaffer or Dr, Jacob's opinion that Shaffer's CPU monitoring would include multiple CPUs in a multiprocessor system. Ex. 1055 ¶¶ 105–106; *see also* Pet. Reply 9 (citing Ex. 2066, 89:5–10).

We are persuaded that Shaffer discloses monitoring "CPU utilization" including multiple CPUs in a multiprocessor system. Shaffer's disclosures are not limited to monitoring a single CPU, but rather consider "CPU utilization" generally. Ex. 1005, 4:51–54. Thus, in Shaffer's multiprocessor embodiment, an application that "dynamically monitors the level of CPU usage" would monitor multiple CPUs. This conclusion is further supported by Shaffer's claims, which recite a computer system comprising "one or more CPUs," "a CPU resource utilization monitor to determine the amount of CPU resources being used by the computer system," and "an intelligent

IPR2021-01064
Patent 7,725,759 B2

clock module to provide a variable operating frequency to said one or more CPUs." Ex. 1005, 8:10–26.

### 3.     *"control a clock frequency of a second master device"*

Petitioner asserts that Shaffer discloses, in response to a request from CPU 20 executing OS 32, providing a signal from its clock module 50 to control a clock frequency of another CPU coupled to bus 21.[9] Pet. 30; Ex. 1005, 6:2–5 ("[A] single clock module 50 may drive all the processor clocks")).

Patent Owner asserts "Shaffer does not teach or suggest that CPU 20 would change the clock frequency of a second CPU." PO Resp. 17 (citing Ex. 2066, 39:12–19 (Dr. Jacob's testimony about Shaffer's disclosures with two clock modules)). We, however, base our conclusion on Shaffer's discussion of a *single* clock module, and Dr. Jacob's testimony about Shaffer's two-clock-module embodiment is inapposite. Patent Owner submits it would be "contrary to Shaffer's principle of operation and stated goal" to operate both CPUs at the same clock rate despite different utilizations. PO Resp. 17–18. We do not agree, as Shaffer discloses both CPUs operating with a single clock module. Moreover, we credit Dr. Jacob's testimony that symmetric multiprocessor arrangements, in which two processors share in running OS and application tasks, were more common at the time of the invention and more broadly applicable than the single instruction, multiple data (SIMD) arrangement cited by Patent Owner's expert, Dr. Conte, in which two processors perform the same task

---

[9] Because we determine above that Shaffer does not disclose monitoring its memory controller 22 or peripheral bus controller 24, we do not address Petitioner's further contentions that rely on those elements and focus instead on Shaffer's multiprocessor embodiment.

IPR2021-01064
Patent 7,725,759 B2

simultaneously. Ex. 1055 ¶¶ 56–57. Dr. Jacob testifies that SIMD architecture is "a very narrow type of accelerator architecture in computer design," and is "used in very specific application areas that can exploit such an arrangement (e.g., graphics processing and some high-performance computing)." Ex. 1055 ¶ 57.

Shaffer discloses speed-control systems for personal computers targeting, for example, savings when computers "are left on for extended periods of time, even when not being actively used." Ex. 1005, 1:15–28. Shaffer discloses that its invention is applicable to a broad range of "microprocessor-based devices and/or battery powered intelligent devices that need to conserve battery power, such as PCS, cellular phones, personal digital assistants (PDA), and battery backed-up systems like private branch exchange (PBXs) or medical equipment." *Id.* at 2:55–62. We therefore find Shaffer's disclosures are broadly applicable to multiple architectures, and are not limited to the particular processor arrangement that Dr. Conte proposes. In a multiprocessor system using a single clock module, as Shaffer discloses, the single clock frequency is provided to control the clock frequency of all CPUs (i.e., control a clock frequency of a second master device). *See* Pet. 23 (citing Ex. 1002 ¶ 232 ("As the system uses a shared-bus organization, a person of ordinary skill would understand that any additional CPUs, if present, would be attached to the system bus 21 in the same manner as CPU 20.")).

Shaffer's system operating as Petitioner describes would not be "contrary to Shaffer's principle of operation," as Patent Owner alleges, because Shaffer seeks "to ensure that the CPU is operating at the most power efficient level for *any* given task." Ex. 1005, 2:26–30 (emphasis added). Seeking optimum performance in Shaffer necessarily occurs within the

IPR2021-01064
Patent 7,725,759 B2

constraints of a hardware system, and even if a system with two clock modules could achieve higher efficiency in certain situations, that would nonetheless permit an approach using one clock module to control two CPUs performing different tasks. Thus, we find that Shaffer discloses reducing power consumption by reducing system clock speed when the processing workload allows, and discloses doing so in a multiprocessor system with one clock module. Ex. 1005, 4:51–54, 5:5–8, 6:2–5.

4.   *"output to control a clock frequency of the bus"*

Petitioner relies on Shaffer's clock module 50 providing a clock signal to Shaffer's system bus. Pet. 31 (citing Ex. 1005, 2:17–19, 4:15–25, 5:66–6:2). Patent Owner contends that Petitioner relies on different buses for different limitations, by pointing to Shaffer's "data/command bus 21" as the bus connecting the asserted master devices, but pointing to Shaffer's "system bus" as receiving the clock signal. PO Resp. 25–28. Patent Owner acknowledges that Petitioner treats the "data/command bus 21" and "system bus" as one and the same, but asserts that Shaffer consistently describes the two separately and assigns a reference numeral to only the data/command bus 21. *Id.* at 26–27.

We find that Shaffer discloses its clock module 50 providing a clock signal to data/command bus 21, the same bus that Petitioner relies on for other limitations. That conclusion arises from Shaffer's disclosures that show its data/command bus 21 is the described system bus. Shaffer's Summary of the Invention refers to "the CPU and other system buses" without mentioning any more-specific bus. Ex. 1005, 2:17–19; accord *id.*, code (57). Shaffer also discloses that the "CPU speed control system 18" provides the clock frequency "to the other controllers and buses in the

IPR2021-01064
Patent 7,725,759 B2

system" and specifically mentions the "data/command bus 21." *Id.* at 4:15–25. Figure 1 shows that "data/command bus 21" connects CPU 20 with memory controller 22 and peripheral bus controller 24. *Id.* Fig. 1. Finally, Shaffer discloses that "the clock module 50 drives the entire system bus (as mentioned above) and thereby reduces power requirements for the processor, related chipsets, memory, controllers and the like." *Id.* at 5:66–6:2. Those disclosures demonstrate that Shaffer's clock module 50 provides an output to control a clock frequency of data/command bus 21, because that bus connects the processor, memory, and peripheral controller.

### 5. *Objective indicia of nonobviousness*

Patent Owner asserts that objective indicia of nonobviousness show that the claimed invention would not have been obvious. PO Resp. 56–61. Patent Owner alleges the existence of commercial success and that the '759 patent proceeded contrary to conventional wisdom. *Id.*

As to commercial success, Patent Owner relies on the jury's verdict awarding damages of $675 million against Intel. *Id.* at 57 (citing Ex. 1027, 6). To establish a nexus between Intel's alleged commercial success and the '759 patent's claims, Patent Owner asserts that the jury was "instructed to determine damages solely based upon the value of the patented inventions apart from any unpatented features." PO Resp. 58 (citing Ex. 2067, 1544:14–16, 1545:13–1546:9); PO Sur-reply 20 (noting that the district court rejected Intel's post-trial motions and entered final judgment).

When the evidence shows that a product includes "the invention disclosed and claimed in the patent," we presume that any commercial success of the product is due to the patented invention. *PPC Broadband v. Corning Optical Commc'ns,* 815 F. 3d 734, 746–747 (Fed. Cir. 2016). Such

IPR2021-01064
Patent 7,725,759 B2

a presumed nexus requires not only that a commercial product embodies the claims, but also that it is coextensive with them. *See Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) ("[P]resuming nexus is appropriate 'when the patentee shows that the asserted objective evidence is tied to a specific product and that product embodies the claimed features, and is coextensive with them." (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018))).

Petitioner notes that the jury infringement verdict is on appeal and does not apply to all of the challenged claims. Pet. Reply 22–23, n. 8. According to Petitioner, notwithstanding Patent Owner's citation to "cases in support of the proposition that a jury verdict can form part of a commercial success analysis, those cases don't excuse [Patent Owner's] burden on the elements that it must prove." *Id.* at 22–23 (citing *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) ("Of course the record must show a sufficient nexus between this commercial success [of the infringing product] and the patented invention.").

Petitioner contends that Patent Owner fails to provide meaningful explanation of its commercial success allegations and fails to show nexus between the claimed features and the alleged commercial success. *Id.* at 22. Petitioner argues that the challenged claims were not the basis for customer demand of the accused products. *Id.* at 23 (citing Ex. 1058, 811:13–812:24 (Intel employee Adam King testifying that Intel's customers care about numerous technical attributes, including graphics performance for video editing, camera quality for video conferencing and power efficiency for laptops)).

Other than the jury verdict, Patent Owner's sole argument that the infringing product's alleged commercial success arose from features claimed

IPR2021-01064
Patent 7,725,759 B2

in the '759 patent cites Intel's article in an IEEE publication promoting its "Speed Shift" technology. PO Resp. 58 (citing Ex. 2068, 54); PO Sur-reply 20–21. Patent Owner asserts that the IEEE paper describes a "revolutionary" approach in which a device called a PCU, functioning as a programmable clock controller, improves performance over operating-system-based approaches. *Id.* (citing Ex. 2068, 54, Ex. 2065 ¶¶ 72–73).

The IEEE article cited by Patent Owner is not sufficient evidence to demonstrate the requisite nexus. Intel's employee testified that it takes years and thousands of engineers to build a new generation of processors because such devices include thousands of features and enhancements. Ex. 1058, 811:2–12. Petitioner notes that Patent Owner accused only the Speed Shift feature of infringing the '759 patent and that Patent Owner's damages expert, Dr. Sullivan, "conceded that many of the thousands of other features 'have nothing to do with what [Patent Owner] accuses.'" Pet. Reply 23 (quoting Ex. 1057, 690:19–691:24). Petitioner additionally points out that, in a subsequent trial, Patent Owner's expert agreed that Intel would have sold the accused products regardless of the alleged infringement. *Id.* (citing Ex. 1061, 771:13–22 (testifying that Intel would have made the same sales, even if the jury found the products not to infringe)).

The record before us does not show that Intel's product or products underlying the infringement verdict are coextensive with "the invention disclosed and claimed." *See Fox Factory*, 944 F.3d at 1373, 1377; *see Facebook, Inc. v. Express Mobile Inc.*, IPR2021-01457 Paper 38 at 76–80 (PTAB March 14, 2023) (concluding an infringement verdict was insufficient to establish nexus). Rather, the record shows that the accused products contained many features beyond those relevant to the '749 patent. Ex. 1057, 690:19–691:24; Ex. 1058, 815:16–816:21.

IPR2021-01064
Patent 7,725,759 B2

Other than the jury verdict, Patent Owner has not provided financial information that would allow us to weigh the extent of Intel's commercial success based on the alleged sales of products infringing the claimed invention. In particular, the record does not reflect whether the infringing device represented an increase in market share over a prior, noninfringing device or any other aspect that would allow us to place the verdict's amount in context. *See, e.g.*, *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) ("An important component of the commercial success inquiry in the present case is determining whether Applied had a significant market share."). On this record we do not find evidence of commercial success sufficient for purposes of establishing non-obviousness.

As to proceeding contrary to accepted wisdom, Patent Owner submits that, prior to the '759 patent, skilled artisans used the operating system to make speed changes. PO Resp. 59. In Patent Owner's view, the '759 patent instead "uses a request mechanism in which the decision-making for speed changes resides in another component, *e.g.*, the programmable clock controller 150." *Id.* at 60–61. Patent Owner's argument depends on our adopting Patent Owner's construction of "request," which we decline to do. *See supra* at 6 (§ II.A.1); Pet. Reply 24. Accordingly, we do not agree with Patent Owner's assertions that the '759 patent proceeded contrary to accepted wisdom, as the prior art disclosed a "request mechanism" under our construction.

Having considered Patent Owner's assertions regarding objective indicia of non-obviousness, we conclude the evidence of record does not persuasively show success of the infringing products with a nexus to the challenged claims or that the claims proceeded contrary to accepted wisdom.

IPR2021-01064
Patent 7,725,759 B2

### 6.    *Conclusion*

We have considered the full record, including evidence and arguments presented by Petitioner and Patent Owner on whether Shaffer and Lint teach or suggest claim 1's limitations, whether there was a reason that skilled artisans at the time would have combined Shaffer and Lint as asserted, and whether objective indicia indicate the claims would not have been obvious. Based on the full record, we conclude that Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious over Shaffer and Lint.

### 7.    *Claim 14*

For claim 14, Petitioner relies mainly on its claim 1 contentions, additionally addressing the language in claim 14 that differs from claim 1. Pet. 31–33. Patent Owner separately addresses claims 14 and 18, which recite systems rather than claim 1's method. PO Resp. 19–25.

As discussed above, we agree with Patent Owner that Shaffer does not disclose monitoring its memory controller 22 and peripherical bus controller 24. *See supra* at 16 (§ II.B.2) (discussing claim 1's "monitoring a plurality of master devices"). Claims 14 and 18 recite a first and second master device and a programmable clock controller that interacts with the master devices, but, unlike claim 1, claims 14 and 18 do not require monitoring multiple master devices. Ex. 1001, 8:50–9:4. Thus, our conclusion regarding claim 1's "monitoring" limitation—that Shaffer does not disclose monitoring its memory and peripheral bus controllers (*see supra* at 16 (§ II.B.2)—does not apply to claims 14 or 18.

Other than the "monitoring" aspect, Patent Owner's arguments against Petitioner's analysis of claims 14 and 18 parallel those made for claim 1.

IPR2021-01064
Patent 7,725,759 B2

PO Resp. 14–18 (addressing claim 1's limitations reciting "master devices" and "second master device"), 19–25 (addressing claim 14 and 18's "master devices" and "second master device"). As discussed above, we do not agree that claim construction requires a "second master device" that can request speed changes from the clock controller. *See supra* at 10 (§ II.A.2). Thus, we do not agree with Patent Owner that Shaffer's memory controller and peripheral bus controller cannot be the claimed "second master device" in claims 14 and 18. *See* PO Resp. 20–24 ("Thus, Petitioner fails to prove that a POSITA would have understood Shaffer's controllers 22 and 24 to be master devices within the meaning of the '759."). We conclude that the "second master device" claim language in claims 14 and 18 reads on Shaffer's controllers 22 and 24 as Petitioner asserts. *See* Pet. 30–31, 33. This conclusion is consistent with our construction for "master device," as discussed above. *See supra* at 10 (§ II.A.2).

Patent Owner challenges also whether Shaffer discloses claim 14's requirement that the clock controller controls the clock frequency of a second mater device based on Shaffer's multiple-CPU embodiment. PO Resp. 25 (citing *id.* at 16–18). For the reasons discussed above, we find that Shaffer's multiple-CPU embodiment discloses a single clock controller controlling the clock frequency of a second master device (a second CPU) coupled to the bus. *See supra* at 20 (§ II.B.3). This conclusion is independent of our construction of "master device," as Patent Owner does not argue Shaffer's additional CPU's could not request speed changes.

Considering the full record, including Patent Owner's asserted objective indicia discussed above, we conclude that Petitioner has shown by a preponderance of the evidence that claim 14 would have been obvious over Shaffer and Lint.

IPR2021-01064
Patent 7,725,759 B2

8.    *Claim 17*

Petitioner relies on Shaffer as disclosing the additional limitations of claim 17, which depends from claim 14. Pet. 31, 33. Patent Owner does not challenge those contentions. We have reviewed Petitioner's contentions and determine that Petitioner has shown claim 17 would have been obvious over Shaffer and Lint.

C.    OBVIOUSNESS OVER SHAFFER, LINT, AND KIRIAKE
(CLAIMS 18, 21–22, 24)

For independent claim 18, Petitioner relies on its claim 1 contentions, addressing the differences in the language between claims 1 and 18, and asserting that Kiriake discloses both master devices and the claimed arbiter. Pet. 34–38. For claims 21, 22, and 24, each of which depends from claim 18, Petitioner points to Shaffer's additional disclosures that teach or suggest the additional limitations recited in those claims. Pet. 38–39. Other than as discussed above regarding claim 1, Patent Owner does not dispute Petitioner's contentions. We have reviewed the record, including Patent Owner's asserted objective indicia of nonobviousness, and determine that Petitioner has shown claims 18, 21, 22, and 24 would have been obvious over Shaffer, Lint, and Kiriake.

D.    OBVIOUSNESS OVER CHEN AND TERRELL
(CLAIMS 1, 14, 17)

Relying on Chen for most limitations of claim 1, Petitioner submits that Terrell teaches requesting a clock speed change "in response to a predefined change in performance of the first master device" and that the predefined change "is due to loading of the first master device as measured within a predefined time interval." Pet. 40–49.

IPR2021-01064
Patent 7,725,759 B2

Chen discloses an extension to an input/output ("I/O") bus and bridge chip that allows higher-speed operation. Ex. 1003, code (57), 1:6–8. To that end, Chen discloses a system "for switching between different data transfer speeds." *Id.* at 1:61–62. Chen's host bridge "interconnects a system bus with an I/O bus" and includes control logic to allow "bus transactions at both a high frequency and a lower frequency." *Id.* at 2:1–6.

Chen's Figure 1 is reproduced below:



IPR2021-01064
Patent 7,725,759 B2

Figure 1 depicts CPU 10 connected to system bus 12, which connects to host bridge 20, which interconnects system bus 12 with I/O bus 40 that communicates with devices 34 and 36. *Id.* at 2:50–3:4. Device 36 is a "soldered device" while device 34 is a "pluggable device" in slot 32. *Id.* at 3:1–3. Devices 34 and 36 have speed requesting circuits 38 and 35, respectively, that communicate with clock gate logic circuit 24, which causes the frequency of bus 40 to be dynamically changed through unique clock lines 27. *Id.* at 3:4–22.

Terrell discloses a system and method for controlling the frequency of a common clock shared by a number of processing elements. Ex. 1004, code (57). Terrell states that "it is desirable to be able to reduce the frequency of a shared clock to the minimum frequency that allows the processing elements to function correctly while using the least amount of power." *Id.* ¶ 5. Terrell states that its goal would be desirable in "[a]n on-chip bus that hosts two or more bus masters, all of which share a common bus clock." *Id.* ¶ 8.

To implement its approach, Terrell discloses "two basic steps":

1. Over a sample period, measure how many clock cycles are being used by each processing element that is attached to the shared clock.

2. Adjust the system clock frequency to provide the minimum number of clock cycles required by the processing element that is using the largest number of clock cycles.

*Id.* ¶¶ 25–27.

### 1.    *Reason to combine*

Petitioner asserts that Chen's master devices 34 and 36 send requests to change a clock frequency, and that skilled artisans would have had reason

31

IPR2021-01064
Patent 7,725,759 B2

to modify Chen's master devices so that they send requests in response to a predefined change in their performance. Pet. 42–47. Petitioner submits that "it was well-known, desirable, and taught by Terrell to save power." *Id.* at 44 (quoting Ex. 1004 ¶ 5 ("[I]t is desirable to be able to reduce the frequency of a shared clock to the minimum frequency that allows the processing elements to function correctly while using the least amount of power.")). Petitioner contends further that Chen teaches embodiments relevant to "a cost-oriented solution and/or low-frequency operations for saving power." *Id.* at 44 (citing Ex. 1003, 5:21–24, 4:36–39, 3:25–29, 3:42–44).

We agree that Chen discloses operating at lower speeds for certain circumstances. For example, Chen discloses using increased frequency for only memory read and write operations, while using lower frequency for bus arbitration and other operations. Ex. 1003, 4:24–36. Chen notes further that the system could use its high-frequency mode for all operations if the "additional cost and complexity is not a factor." *Id.* at 4:36–39. As Patent Owner points out, however, "this increased cost and complexity is fixed at the time of design regardless of whether the bus is run at higher or lower speed." PO Resp. 35–36. Thus, we find that Chen discloses the reduced fixed cost of components that operate only at a lower frequency, but does not disclose reduced power consumption when operating at a lower frequency.

While Chen does not expressly disclose power savings, the record supports a finding that skilled artisans would have understood power savings as an important consideration. *See* Ex. 1056, 386:2–4 (Patent Owner's expert, Dr. Conte, testifying in the litigation that "power savings in designing a processor" is "extremely important"). Indeed, Terrell discloses

IPR2021-01064
Patent 7,725,759 B2

that "it is desirable to be able to reduce the frequency of a shared clock to the minimum frequency that allows the processing elements to function correctly while using the least amount of power." Ex. 1005 ¶ 5. We conclude therefore that the prospect of achieving power savings would have motivated skilled artisans to operate Chen's system at a reduced clock frequency when not required by performance demands. *See Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) ("'[U]niversal' motivations known in a particular field to improve technology provide 'a motivation to combine prior art references even absent any hint of suggestion in the references themselves.'" (quoting *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 797–99 (Fed. Cir. 2021))).

Patent Owner contends that Chen and Terrell have opposite goals because Chen focuses on increasing frequency for performance while Terrell focuses on reducing frequency for power savings. PO Resp. 32–37. Petitioner, however, explains how the teachings would work together to "select a clock frequency that increases the devices' frequency only when needed, to reduce power consumption, even if the devices can use higher speeds." Pet. 45. Such a combination is consistent with Chen's teachings of increasing frequency for certain operations, and also consistent with Terrell's teachings of reducing frequency when possible. In this way, we credit Dr. Jacob's testimony that the combination would have balanced "the inherent trade-off between highest performance at the highest cost, and lower (but perhaps still acceptable) performance at a lower cost." Ex. 1055 ¶ 112. Thus, the combined system Petitioner asserts would have been able to operate at reduced frequency (conserving power) in low-activity times and increased frequency when the system required higher performance. *Id.* ¶ 117.

33

IPR2021-01064
Patent 7,725,759 B2

Because the asserted combination would have been able to satisfy a performance demand, we do not agree with Patent Owner that the combination defeats Chen's intended purpose. *See* PO Resp. 37–42. Patent Owner's interpretation, that Chen requires maximum speed at all times, is implausible in light of Terrell's recognition that systems may spend time in an idle state (Ex. 1004 ¶ 54), and Chen's disclosure of operating devices below their maximum speed (Ex. 1003, 3:42–43 ("I/O devices which normally operate at 66 M[H]z can be operated at 50 M[H]z.")). We conclude that Chen's "principle of operation and stated goal" are preserved by the asserted combination, in which bus speed is reduced when performance needs allow and then increased to the limit of a device's capabilities when required.

Patent Owner argues additionally that the asserted combination would have required modifying devices to support reduced speed, and that the required modifications would increase cost and complexity such that skilled artisans would not have made the combination. PO Resp. 42–47. Petitioner responds, on the other hand, that devices with thousands of transistors were commonplace at the time of the '759 patent's invention. Pet. Reply 18 (citing Ex. 1055 ¶¶ 118–119). We agree with Petitioner that the added complexity required by the asserted combination would not have risen to a level that skilled artisans would have been dissuaded from making the combination. In particular, we agree that, by 2005, when the application resulting in the '759 patent was filed, Terrell's approach did not present a significant technological obstacle to a skilled artisan seeking to modify Chen's system. *See* Pet. Reply 18. We credit Dr. Jacob's testimony that technology had advanced considerably following Chen's mid-1990s disclosure such that the modification would have imposed a modest

34

IPR2021-01064
Patent 7,725,759 B2

challenge. *See* Ex. 1055 ¶ 118–119. That same technological progress likewise would minimize any challenge skilled artisans would have had with modifying Chen's master devices. *See* PO Resp. 42–43. Those devices would have required only modest changes to work with the modified system, and skilled artisans implementing Chen's system in 2005 would have done so with integrated devices, thus eliminating Patent Owner's asserted need to modify a host of disparate devices. *See* Ex. 1055 ¶¶ 119, 132–137.

Patent Owner further challenges Petitioner's reliance on Terrell's statement that its teachings apply to "[a]n on-chip bus that hosts two or more bus masters, all of which share a common bus clock." Ex. 1004 ¶¶ 6, 8; PO Resp. 47–48 (citing Pet. 46). Patent Owner points out that Chen's bus 40 is a peripheral, off-chip bus and implicates different design constraints. *Id.* Petitioner contends that, regardless of whether Chen's bus is itself an on-chip bus, technological progression after Chen resulted in master devices moving on-chip and using an on-chip bus. Pet. Reply 19 (citing Ex. 1055 ¶¶ 132–137). Notwithstanding Dr. Jacob's testimony that Chen's system would be implemented differently by the time of the '759 patent, the dispute does not change our determination because, as discussed above, Petitioner has shown that skilled artisans would have made the asserted combination, aside from Terrell's statement about on-chip buses. Terrell's statement of particular applicability to on-chip buses does not undermine its separate statement regarding the desirability of reducing power consumption by reducing clock frequency when possible. Ex. 1004 ¶ 5. That express teaching shows that skilled artisans understood the possibility of reducing power by reducing frequency.

We conclude that skilled artisans had reason to arrive at the asserted combination.

IPR2021-01064
Patent 7,725,759 B2

>    2.    *"providing the clock frequency . . . as an output to control*
>          *a clock frequency of a second master device"*

Petitioner contends that, in Chen, when the first master device requests a clock-frequency change, Chen's clock gate logic 24 provides the high-speed clock on clock line 27 as an output to control a clock frequency of a second master device coupled to the bus. Pet. 48. Because the master devices may conduct "peer to peer transactions," when both indicate they support high-speed communications, they both receive the same clock frequency. Ex. 1003, 5:13–24 ("With the PCI, and some other I/O bus specifications, each device is required to receive its own unique clock signal."), 5:25–29 ("[E]ach device receives its own unique clock line which will be clocked at the appropriate frequency."), 5:59–65 (discussing peer-to-peer transfer).

Further, Petitioner contends Chen provides that same frequency to the bus to facilitate the communication. Pet. 49 (citing Ex. 1003, 2:8–14 ("In response to" a signal indicating high-frequency capability, "control logic in the bridge chip causes the higher frequency clock in the bridge chip to be activated such that the host bridge, bus and I/O device are all then operating at the higher frequency.")).

Patent Owner responds that Chen does not disclose providing the clock frequency as an output to control a clock frequency of a second master device because Chen discloses controlling only the bus frequency, not the master device frequency itself. PO Resp. 48–56. Patent Owner points to Chen's disclosure that "[c]lock gate circuit 24 causes the frequency of bus 40 to be dynamically changed (gated) by transmitting the appropriate device unique clock lines 27." *Id.* at 49–50 (quoting Ex. 1003, 3:20–22). In Patent Owner's view, Chen's clock lines 27 can serve to control the bus

IPR2021-01064
Patent 7,725,759 B2

frequency *or* the master devices' frequencies, but not both. *Id.* at 49. Patent Owner reasons that Chen's I/O devices "included an internal clock, separate and apart from the PCI bus clock," and thus cannot satisfy the claim language. *Id.* at 50. For support, Patent Owner cites "the OTI Sound/Fax Card," which Patent Owner views as an exemplary device from Chen. *Id.* at 50–52; PO Sur-Reply 18 (citing Ex. 1003, 1:18–22).

Chen states in its discussion of the background that "many I/O devices, such as . . . sound cards, and the like still operate at frequencies ranging from 33 M[H]z to 66 M[H]z." Ex. 1003, 1:18–22. Although Patent Owner argues the OTI Sound/Fax Card is an exemplary sound card contemporaneous with Chen, Patent Owner does not establish that all I/O devices compatible with Chen would have had internal clocks such that Chen did not provide a clock output to its I/O devices. We agree with Dr. Jacob, who testifies that Chen indicates the opposite—that its bus devices did not necessarily have separate, internal clocks. Ex. 1055 ¶ 124–126. Dr. Jacob explains that because Chen discloses distinct bus clock lines for each bus device, Chen suggests that the bus clock *does* run the devices' internal circuitry. *Id.* On Chen's shared bus, devices not involved in an active communication would have no need for their bus interfaces to remain active, so there would be no point to sending them a clock signal different from the active bus clock. If, instead, those devices were relying on the bus clock for more than bus communication—i.e., to run their internal circuity— then sending the distinct clock signal at a frequency different from active bus communication would allow those devices to remain operational while bus communication occurs with other devices. *Id.* Because multiple distinct clock lines come at a cost, Chen's designers would only include those clock lines if they provided a benefit. *Id.* Based on the record, we agree with

37

IPR2021-01064
Patent 7,725,759 B2

Petitioner and find that at least some of Chen's bus devices use the bus clock
to control their internal operations.

Moreover, we do not agree with Patent Owner's implicit claim
construction that "providing the clock frequency . . . to control a clock
frequency of a second master device" refers only to "the internal clock
frequency of the master device, not to an I/O bus frequency" PO Resp. 52
(citing Ex. 2065 ¶ 186). To assert that Chen does not teach providing the
clock to control a clock frequency of a second master device, Patent Owner
relies on the testimony of Dr. Conte. Dr. Conte explains that in the
exemplary OTI Sound/Fax Card, "the LCLK is an input clock – the PCI
clock – that would allow the OTI Sound/Fax Card to communicate over the
PCI bus" and "is separate from and has nothing to do with an internal clock
source (MCLKSR) of the OTI Sound/Fax Card." Ex. 2065 ¶ 186. Dr. Conte
concludes that skilled artisans "would understand that the I/O bus clock in
Chen has nothing to do with the internal clock of the I/O device (such as the
OTI Sound/Fax Card's MCLKSR clock)." *Id.* Dr. Conte does not explain
why "a clock frequency of a second master device" is restricted as a matter
of claim construction to an internal clock frequency separate from the
commanded bus frequency. Without a sound basis in the intrinsic record—
which Patent Owner has not explained—we decline to limit "a clock
frequency of a second master device" as a matter of claim construction to
"an internal clock separate and apart from the bus clock" as Patent Owner
seeks. PO Resp. 50–52 (distinguishing I/O devices with "an internal clock
. . . separate and apart from the PCI clock"); Pet. Reply 21; Ex. 1055 ¶ 94–
96 (explaining that controlling "a clock frequency" includes "controlling the
device's data-interface frequency"); *see supra* at 12 (§ II.A.3). Accordingly,
we agree with Petitioner that "Chen's master devices and bus would be

IPR2021-01064
Patent 7,725,759 B2

clocked to the same frequency when conducting transactions over the bus" and that, therefore, "it is irrelevant whether such devices could also have other clocks within them." Pet. Reply 21.

Relatedly, Patent Owner argues that Chen's "clock line 27 output by clock gate logic 24" can satisfy only one of the limitations that require both (1) an output to the second master device and (2) an output to the bus. PO Resp. 53–55. We do not agree, in light of Chen's disclosure that "control logic in the bridge chip causes the higher frequency clock in the bridge chip to be activated such that the host bridge, bus and I/O device are all then operating at the higher frequency." Ex. 1003, 2:8–14; *accord id.* at 4:63–5:5 ("Clock gate logic 24 will then enable the high frequency clock 26 and drive bus 40 at 100M[H]z."). Chen's disclosures support that clock gate logic 24 provides the clock frequency to both the bus itself (via the bridge chip) and the bus devices (via the distinct device clock lines).

In view of the foregoing, we find that Chen discloses providing the clock frequency of the high-speed clock as an output to control a clock frequency of a second master device coupled to the bus and as an output to control a clock frequency of the bus.

### 3.  *Conclusion*

We have considered the full record, including evidence and arguments presented by Petitioner and Patent Owner on whether Chen and Terrell teach or suggest claim 1's limitations, whether there was a reason that skilled artisans at the time would have combined Chen and Terrell as asserted, and whether objective indicia indicate the claims would not have been obvious. Based on the full record, we conclude that Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious over

IPR2021-01064
Patent 7,725,759 B2

Chen and Terrell. Patent Owner's arguments discussed above apply to claims 1 and 14. *See* PO Resp. 48–49. We conclude that Petitioner has shown by a preponderance of the evidence that claim 14 would have been obvious over Chen and Terrell. Pet. 49–52.

Petitioner relies on Chen and Terrell as disclosing the additional limitations of claim 17, which depends from claim 14. Pet. 52–53. Patent Owner does not challenge those contentions. We have reviewed Petitioner's contentions and determine that Petitioner has shown claim 17 would have been obvious over Chen and Terrell.

### E.  OBVIOUSNESS OVER CHEN, TERRELL, AND KIRIAKE (CLAIMS 18, 21, 22, 24)

For independent claim 18, Petitioner relies on its claim 1 contentions, additionally addressing the unique claim language and asserting that Kiriake discloses both master devices and the claimed arbiter. Pet. 54–59. For claims 21, 22, and 24, each of which depends from claim 18, Petitioner points to Chen's additional disclosures that render obvious the additional limitations. Pet. 59–60. Patent Owner does not challenge those contentions. We have reviewed Petitioner's contentions and determine that Petitioner has shown claims 18, 21, 22, and 24 would have been obvious over Chen, Terrell, and Kiriake.

### F.  PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude Dr. Jacob's Declarations (Ex. 1002 and Ex. 1046, "Original Declarations") as inadmissible hearsay under Federal Rules of Evidence 801 and 802. Paper 88 ("PO Mtn. Exclude"). Patent Owner argues that the Original Declarations were not "executed in connection with the current proceeding, and therefore were not made 'while

IPR2021-01064
Patent 7,725,759 B2

testifying at the current trial or hearing.'" PO Mtn. Exclude, 2–3; Fed. R. Evid. 801(c)(1).[10] Patent Owner asserts that the Board was incorrect in the Institution Decision when we concluded that cross-examination would address hearsay concerns. *Id.* at 4. Finally, Patent Owner contends that no hearsay exceptions apply, citing Fed. R. Evid. 804(b)(1), 803(18).

Petitioner argues that Dr. Jacob's Original Declarations are not inadmissible hearsay. Paper 94 ("Pet. Opp. Mtn. Exclude"), 11. Petitioner points to 37 C.F.R. § 42.53(a), which states "[u]ncompelled direct testimony must be submitted in the form of an affidavit." *Id.* Despite that the Original Declarations were prepared for another proceeding, Petitioner argues that they are not hearsay because (1) they were submitted as sworn witness statements in lieu of live testimony in this proceeding, (2) Dr. Jacob reaffirmed them in the joinder proceeding (IPR2022-00366, Ex. 1049), and (3) Dr. Jacob was subject to cross-examination on the contents of the Original Declarations in this proceeding. *Id.* at 12–13. Indeed, during cross-examination, Dr. Jacob confirmed that the Original Declarations set forth his opinions regarding the '759 patent. Ex. 2066, 69:12–17 (identifying Ex. 1002), 72:11–21 (identifying Ex. 1046), 73:4–10 (confirming the declarations set forth his opinions).

We agree with Petitioner and deny Patent Owner's motion because Dr. Jacob's cross-examination and his confirmation of the declarations in this proceeding address Patent Owner's hearsay concern.[11] IPR testimony is

---

[10] Petitioner does not dispute that Dr. Jacob's Original Declarations are offered "to prove the truth of the matter asserted." PO Mtn. Exclude 3; Fed. R. Evid. 801(c)(2).

[11] Patent Owner's argument that OpenSky did not contact Dr. Jacob before filing its Petition with Dr. Jacob's Declarations is not persuasive in light of his willingness to testify in this proceeding. PO Mtn. Exclude 6–10.

IPR2021-01064
Patent 7,725,759 B2

different from that in district courts. Notably, the Board's rules generally do
not allow an expert to "testify" in person at an IPR hearing. *See* 37 C.F.R.
§ 42.53 (a)–(b)(1); 35 U.S.C. § 316(a)(5); 35 U.S.C. § 23. Testimony is
instead submitted as evidence in the form of affidavits and deposition
transcripts. *See* 37 C.F.R. §§ 42.53, 42.63. Our rules, therefore, contemplate
that declarants in IPRs do not "testify" in the traditional sense of giving live
testimony in a courtroom.

 As other Board decisions have noted, "[w]ithout exception, the Board
accepts the filing of sworn witness declarations in lieu of live testimony in
administrative patent trials." *Grünenthal Gmbh v. Antecip Bioventures II
LLC*, PGR2018-00062, Paper 32 at 15 (PTAB Oct. 29, 2019). Our
procedures adopt that practice for its efficiency and ensure fairness by
allowing cross-examination. *See id.*; 37 C.F.R. § 42.51(b)(ii). Dr. Jacob has
made himself available for cross-examination and confirmed that the
declarations express his opinions here, in this proceeding. Thus, in these
respects, the Original Declarations are no different than the other testimony
relied on by the parties, and are not hearsay subject to exclusion.

 Indeed, during his cross-examination, Dr. Jacob confirmed that the
Original Declarations set forth his opinions regarding the '759 patent.
Ex. 2066, 69:12–17 (identifying Ex. 1002), 72:11–21 (identifying Ex. 1046),
73:4–10 (confirming the declarations set forth his opinions). In Intel's
proceeding asserting the same grounds and seeking joinder, Dr. Jacob filed a
declaration reaffirming his Original Declarations and confirming that he
would appear for cross-examination. IPR2022-00366, Ex. 1049. We noted
that Dr. Jacob's reaffirming declaration and availability for cross-
examination allayed concerns about hearsay. Paper 43 (joinder decision), 15.
While the reaffirming declaration is not of record in this proceeding,

42

IPR2021-01064
Patent 7,725,759 B2

Dr. Jacob's deposition in this proceeding and statements confirming his opinions serve the same role. Patent Owner has suffered no prejudice from Dr. Jacob's Original Declarations.

We have considered Patent Owner's other arguments (Paper 95) and find them just as unavailing. The fact that the Jacob declarations were prepared for another proceeding is immaterial in this case because Dr, Jacob has expressly adopted them for *this* proceeding. *Id.* at 1–3. Nor is a hearsay exception necessary, as the reaffirmance of the prior testimony by Dr. Jacob and his cross-examination *in this proceeding* overcomes any plausible hearsay argument or the necessity for a hearsay exception. *Id.* at 3–5. Finally, there is no merit to Patent Owner's suggestion (*id.* at 5) that reliance on Dr. Jacob's reply declaration is somehow contrary to our procedures, which specifically provide for replies by the petitioner (including new declarations). *See* USPTO Consolidated Trial Practice Guide 73 (Nov. 2019).[12]

For the reasons given, we deny Patent Owner's Motion to Exclude.

## III.   CONCLUSION[13]

For the reasons discussed and based on the entire record, Petitioner has shown by a preponderance of the evidence that claims 1, 14, 17, 18, 21,

---

[12] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of

IPR2021-01064
Patent 7,725,759 B2

22, and 24 are unpatentable. Patent Owner has not shown that we should

exclude Exhibits 1002 and 1046.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 14, 17 | 103 | Shaffer, Lint | 1, 14, 17 | |
| 18, 21, 22, 24 | 103 | Shaffer, Lint, Kiriake | 18, 21, 22, 24 | |
| 1, 14, 17 | 103 | Chen, Terrell | 1, 14, 17 | |
| 18, 21, 22, 24 | 103 | Chen, Terrell, Kiriake | 18, 21, 22, 24 | |
| **Overall Outcome** | | | 1, 14, 17, 18, 21, 22, 24 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown by a preponderance of the

evidence that claims 1, 14, 17, 18, 21, 22, and 24 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude

(Paper 88) is denied; and

FURTHER ORDERED that, because this is a Final Written Decision,

parties to the proceeding seeking judicial review of the decision must

comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

any such related matters in updated mandatory notices. *See* 37 C.F.R.
§ 42.8(a)(3), (b)(2).

IPR2021-01064
Patent 7,725,759 B2


PETITIONER:

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

Matthew K. Blackburn
Evan Boetticher
SULLIVAN BLACKBURN PRATT LLC
mblackburn@sullivanblackburn.com
eboetticher@sullivanblackburn.com

David Boundy
POTOMAC LAW GROUP, PLLC
dboundy@potomaclaw.com


PATENT OWNER:

Baback Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com

IPR2021-01064
Patent 7,725,759 B2

hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT M

Director_PTABDecision_Review@uspto.gov      Paper 138
571-272-7822      Dated: June 27, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

—————————

IPR2021-01064[1]
Patent 7,725,759 B2

—————————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER
Admonishing Patent Owner and
Granting Petitioner's Motion to Seal

———————————

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has been joined as a party to this proceeding. Paper 43.

IPR2021-01064
Patent 7,725,759 B2

## I.    INTRODUCTION

On December 22, 2022, I issued my decision denying a Rehearing Request (Paper 113 ("Req. Reh'g")) by Patent Owner VLSI Technology LLC ("VLSI") for Director rehearing of the Board's determination (Paper 107) that the Petition presented a compelling, meritorious challenge. Paper 121 ("Rehearing Decision" or "Reh'g Dec.").  In my Rehearing Decision, I determined that VLSI made several misleading statements of law or fact over the course of this proceeding, including in its Rehearing Request, in its Request for Reconsideration of my October 4, 2022 decision on Director review (Paper 106 ("Req. Recon.")), and in its Preliminary Response (Paper 9 ("Prelim. Resp.")).  Reh'g Dec. 3–4.  Specifically, I found the following portions of VLSI's papers to be misleading: (1) VLSI's discussion of the Institution Decision (Paper 17) (*see* Req. Reh'g 4–8, 9; Reh'g Dec. 7–8); (2) VLSI's discussion of Federal Circuit case law on secondary indicia of nonobviousness (*see* Prelim. Resp. 69–70; Req. Reh'g 10; Reh'g Dec. 8–9); and (3) VLSI's discussion of Federal Circuit and Supreme Court case law on due process (*see* Req. Recon., 11–15; Reh'g Dec. n.2 (citing Paper 114, 7–10)).

Accordingly, I ordered VLSI "to show cause as to why it should not be ordered to pay [Petitioner] Intel the reasonable attorney fees they incurred responding to VLSI's Rehearing Request."  Reh'g Dec. 4.  I further ordered VLSI and Intel to "address[] whether an award of attorney fees is appropriate as a sanction for VLSI's misleading statements of law and fact." *Id.*  I ordered Intel to "identify its attorney fees incurred in responding to VLSI's Rehearing Request" and permitted Intel to "submit such evidence as necessary to support that identification."  *Id.*

IPR2021-01064
Patent 7,725,759 B2

On January 5, 2023, VLSI and Intel submitted briefs pursuant to my Order.  Paper 122 (Intel); Paper 124 (VLSI).  With its brief, Intel also submitted a Motion to Seal.  Paper 123.  The parties submitted reply briefs on January 12, 2023.  Paper 125 (Intel); Paper 126 (VLSI).  For the reasons set forth below, I determine that VLSI has negligently and carelessly advanced arguments before me and the Board.  Nevertheless, given VLSI's explanations of its behavior, I do not award attorney fees as a sanction under Rule 42.11.  Rather, I strongly admonish VLSI and warn it to use substantially greater caution in its arguments and citations to case law before me or the Board.  Also, for the reasons set forth below, I grant Intel's Motion to Seal.

## II.    ANALYSIS

### A.  Legal Standards

In my Rehearing Decision, I ordered, under 37 C.F.R. § 42.11(d)(3), VLSI to show cause as to why I should not authorize attorney fees as a sanction for its misleading statements of law and fact.  Reh'g Dec. 4; *see* 81 Fed. Reg. 18750, 18761 (the United States Patent and Trademark Office ("Office") responding that "the proposed rule[] . . . concerns the duty of candor and motions for sanctions").

Rule 42.11 incorporates Rule 11.18's certification requirements that an attorney, registered practitioner, or party who presents papers to the Board certifies that those papers include, to the best of their knowledge "formed after an inquiry reasonable under the circumstances," legal arguments "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of

3

IPR2021-01064
Patent 7,725,759 B2

new law," and factual arguments that "have evidentiary support."  37 C.F.R.
§§ 42.11(c), 11.18(b)(2).

Rule 42.11 refers to Rule 42.12, which describes types of misconduct
that may warrant sanctions.  37 C.F.R. §§ 42.11(d)(4), 42.12(a).  In
particular, Rule 42.11 states that "[a] sanction imposed under this rule must
be limited to what suffices to deter repetition of the conduct or comparable
conduct by others similarly situated and should be consistent with § 42.12."
37 C.F.R. § 42.11(d)(4).  Rule 42.12 authorizes the Patent Trial and Appeal
Board ("Board") to issue sanctions for misconduct including, among others,
"[a]dvancing a misleading or frivolous argument or request for relief" or
"[m]isrepresent[ing]. . . a fact."  37 C.F.R. § 42.12(a)(2), (3).

VLSI argues it should not be subject to an attorney fees sanction.
Paper 124, 1–5; Paper 126, 1–3.  VLSI asserts that it advanced arguments in
this proceeding in good faith and with the belief that its arguments were
reasonable and not frivolous.  Paper 124, 1, 3–5.  VLSI further argues that
the attorney fees sanction would be an extraordinary remedy for "debatably
characterized legal argument[s]," "rooted in an arguable application of the
cited cases."  *Id.* at 4–5.

In interpreting Rule 42.11, the Office considers court decisions
involving Federal Rule of Civil Procedure Rule 11.  *See* 81 Fed. Reg. 18750,
18760–18761 (indicating that Rule 42.11 was amended consistent with
Rule 11 and to "include a Rule 11-type certification for papers filed with the
Board"); *Precision Specialty Metals, Inc. v. U.S.*, 315 F.3d 1346, 1353 (Fed.
Cir. 2003) (where the Court of International Trade Rule 11 was identical to,
and taken from, the federal rule, "it therefore is appropriate to look to

4

IPR2021-01064
Patent 7,725,759 B2

decisions under the [federal rule] in interpreting and applying the identical rule of the Court of International Trade" (citation omitted)).

Rule 42.11 obligates parties to provide complete and accurate information to the Board. *See PAM, S.p.A. v. U.S.,* 582 F.3d 1336, 1339 (Fed. Cir. 2009) ("Parties and attorneys filing documents with the Department of Commerce have an obligation to provide complete and correct information. The duty is not unlike that of an attorney appearing before the Court of International Trade or any federal district court." (citing Ct. Int'l Trade R. 11(b); Fed. R. Civ. P. 11(b))). The Federal Circuit has held that a party violates these requirements when it doctors quotations from existing law to "distort[] what the opinions state[] by leaving out significant portions of the citations or cropping one of them, and fail[ing] to show that [the party] and not the court has supplied the emphasis in one of them." *Precision*, 315 F.3d at 1356–1357 (citing Ct. Int'l Trade R. 11); *see also id.* at 1355 (approving of the Court of International Trade's Rule 11 sanction and proper characterization of the party's misconduct as "violat[ing] Rule 11 because [the party] 'signed a brief before this court which omitted directly relevant language from what was represented as precedential authority, which effectively changed the meaning of at least one quotation, and which intentionally or negligently misled the court'").

### B. VLSI's General Arguments Against Sanctions

VLSI argues that it "did not intend to mislead anyone" and that its arguments were made in good faith. Paper 124, 1. Although a party's good faith may be relevant, neither Rule 42.11 nor Rule 42.12 requires a finding of bad faith or intent to mislead. 37 C.F.R. §§ 42.11, 42.12.

IPR2021-01064
Patent 7,725,759 B2

VLSI adds that its "patents have been in nearly 40 IPRs, and its counsel of record collectively have been counsel in nearly 700 PTAB cases with a spotless disciplinary history." Paper 124, 1 n.1 (citation omitted). Intel responds that, "in making those claims, VLSI ignores the Director's related finding that '[t]his is not the first time VLSI has made misleading statements of law or fact in an attempt to mislead me or the Board.'" Paper 125, 1–2 (citing Reh'g Dec. 3, n.2; Paper 114, 7–10) (alteration in original). VLSI's counsel's disciplinary history prior to this proceeding does not change the conduct at issue. Accordingly, the disciplinary history in other matters is not relevant to this proceeding.

### C. VLSI's Prior Misleading Statements and Misrepresentations

In response to my order to show cause, VLSI revises its previous arguments and assertions in an attempt to explain why they were not frivolous or misleading. Paper 124, 1–4. Intel states that I have already identified "multiple 'misleading statements of law and fact'" over the course of this IPR. Paper 122, 1–2; Paper 125, 2. Accordingly, Intel argues that "an award of reasonable attorneys' fees would be an appropriate sanction to hold VLSI and its counsel accountable for the Director's finding of misconduct and also to deter similar conduct by VLSI and others in the future." Paper 122, 1.

I address VLSI's arguments in detail below.

### 1. VLSI Mischaracterized the Institution Decision

VLSI's Rehearing Request asserted that the Board "found the record 'unclear'" and indicated a factual dispute appropriate for trial. Req. Reh'g 5, 9; Reh'g Dec. 7–8. The quoted portion of the Board's Institution Decision actually rejected one of VLSI's arguments, stating: "It is unclear, however,

IPR2021-01064
Patent 7,725,759 B2

what providing a clock frequency to a device would do besides control its frequency." Dec. Inst. 25–26; Reh'g Dec. 7. The Institution Decision later continues that VLSI did "not explain [its argued] distinction [relating to clock frequency] or why that would be the case." Dec. Inst. 26. VLSI contends it "t[ook] [the Institution Decision's] language as identification of issues for development at trial" and as "calling for development of the trial record." Paper 124, 2. VLSI further contends that its counsel's "experience with institution decisions led them to take this language as identification of issues for development at trial." *Id.*

Although VLSI seeks to justify its prior argument, the argument itself was misleading. Specifically, VLSI's original characterization that the Board "found the record 'unclear'" was misleading because it omitted language that made clear the Board did not agree with VLSI's argument. Req. Reh'g 5; Dec. Inst. 25–26. VLSI's quotation that the record was "unclear" creates the impression that the Petition presented a weak case, when the Board actually rejected VLSI's arguments. In fact, any weakness or lack of clarity was in *VLSI's own position* and therefore would not undercut a finding of compelling merits. Thus, VLSI's initial argument distorted the Institution Decision's analysis to support its illusion that the Board found VLSI's argument meritorious, when in fact the Board rejected VLSI's argument.

VLSI's Rehearing Request further stated that the Board's Institution Decision had "found 'Patent Owner has raised **reasonable** questions regarding Chen's operation.'" Req. Reh'4. The Board's Institution Decision actually states that "[w]hile Patent Owner has raised reasonable questions regarding Chen's operation, *at most those questions identify*

IPR2021-01064
Patent 7,725,759 B2

*factual issues appropriate for resolution through trial.*"  Dec. Inst. 26 (emphasis added); Reh'g Dec. 7.  VLSI explains that it "took [the portion of the Institution Decision it quoted] to mean those questions were insufficient to show the 'reasonable likelihood' standard was not met.  And VLSI's point that the Panel failed to ***revisit*** those 'reasonable questions' under the compelling-merits standard was not misleading."  Paper 124, 1–2.

I disagree that VLSI's selective quotation was not misleading because the "at most" clause provided essential context for the Board's statement.  VLSI's omission of this key contextual language leads readers to wrongly believe that the Board considered VLSI's arguments to be wholly favorable when, rather, the Board cabined its determination by stating that, "*at most*," the questions VLSI raised were factual issues to be resolved at trial.  VLSI's omission therefore overstated its claim that the Petition did not present compelling merits because it created the impression that the Board found the issue to be closer than it actually did.

In sum, VLSI distorted the record by deleting or omitting critical language, and thus wasted the time of this tribunal and opposing counsel.  *See Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1486 (Fed. Cir. 1984) ("Distortion of the record, by deletion of critical language in quoting from the record, reflects a lack of the candor . . . wastes the time of the court and of opposing counsel, and imposes unnecessary costs on the parties . . . .").  VLSI's multiple misleading arguments "force[] the [tribunal] to expend extra time and effort in carefully double-checking every reference to the record and opposing counsel's briefs, lest we be misled," thereby "threaten[ing] the integrity of the judicial process and increas[ing] the waste of resources."  *Romala Corp. v. United States*, 927 F.2d 1219, 1224 (Fed.

8

IPR2021-01064
Patent 7,725,759 B2

Cir. 1991), *superseded on other grounds by rule*, Fed. R. App. P. 38
(requiring notice and a reasonable opportunity to respond before imposing
sanctions for a frivolous appeal).

Nevertheless, I accept VLSI's explanations that these arguments were
not entirely frivolous but were instead an attempt to highlight factual issues
at the institution stage. *See* Paper 124, 1–3. For this reason, I do not find
VLSI's misleading statements to be sanctionable under Rule 42.11.
However, I strongly caution VLSI against selectively quoting the record
while omitting key contextual language, particularly when representing the
Board's position.

### 2. VLSI's Citations to Case Law

I previously determined that VLSI had misrepresented Federal Circuit
and Supreme Court cases to support its due process argument. Reh'g
Dec. n.2 (citing Req. Recon. 11–15; Paper 114, 7–10). I also determined
that VLSI had misrepresented Federal Circuit and Board case law to support
its argument regarding a jury verdict as evidence of nexus for commercial
success. *Id.* at 9 (citing Prelim. Resp. 69–71; Req. Reh'g 10); *Brown &
Williamson Tobacco Corp. v. Phillip Morris, Inc.*, 229 F.3d 1120, 1130
(Fed. Cir. 2000); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed.
Cir. 2016); *RTI Surgical, Inc. v. LifeNet Health*, IPR2019-00571,
Paper 75, 46–47 (PTAB Aug. 4, 2020)).

VLSI has not requested that I reconsider my previous determination
that it misrepresented Federal Circuit and Supreme Court case law to support
its due process argument. *See generally* Paper 124, Paper 126.
Accordingly, I do not reconsider my previous determination. *See* Reh'g
Dec. n.2; Paper 114, 7–10.

IPR2021-01064
Patent 7,725,759 B2

VLSI, however, does now provide further explanation for its citations to *Brown*, *WBIP*, and *RTI Surgical*. *See* Paper 124, 3–4.[2] Nevertheless, VLSI's initial characterizations of the cases failed to offer sufficient context and push the envelope of zealous advocacy. Citing cases without adequately explaining their relevance leaves the tribunal to connect dots in a manner that may be unclear and so increases the burden on the tribunal and parties, which does not further the interests of justice.

On the facts of this proceeding, I do not sanction VLSI on the basis of its initial characterizations of these cases. VLSI's argument that these cases found objective indicia of non-obviousness based on "an infringement verdict," though carelessly presented in a manner susceptible to multiple interpretations, was not so misleading as to rise to the level of sanctionable conduct. VLSI is cautioned, however, that its failure to adequately explain the relevance and context of these cases can lead to some of the same harms as an affirmative misrepresentation—increased burden on the other parties and the tribunal.

### D. Conclusion on Sanctions

I am persuaded by VLSI's arguments that its conduct did not rise to a violation of Rule 42.11 and thus does not warrant a sanction of attorney fees. However, I do not entirely excuse VLSI's actions and strongly admonish

---

[2] Explaining that "*Brown* may be reasonably interpreted to mean that the success of products found to infringe by a jury may be evidence of 'commercial success' having the nexus to 'the claimed invention'"; *WBIP* established a presumption of nexus based on specific products (Patentee's products and the accused infringer's products) that were embodiments of the claimed invention; and *RTI Surgical* cited evidence showing nexus that included a jury verdict.

IPR2021-01064
Patent 7,725,759 B2

VLSI for making arguments distorting the Board's prior statements and carelessly citing case law. I anticipate that this admonishment will suffice to deter repetition of similar misconduct in this proceeding and in future practice by counsel before the PTAB. *See* 37 C.F.R. § 42.11(d)(4).

## III.    INTEL'S MOTION TO SEAL

Intel filed a motion to seal Exhibit 1537, which "identifies attorneys' fees that Intel incurred for its outside counsel of record to respond to VLSI's rehearing request (for the period between October 31, 2022, when VLSI filed its rehearing request, and November 7, 2022, when Intel responded)." Paper 123, 1. Intel "requests that this document be treated under the Modified Protective Order, Ex. 3011, entered by the Director in this proceeding, Paper 48." *Id.*

Intel asserts "[t]he *Argentum* factors support granting" its motion. Paper 123, 2 (citing *Argentum Pharmaceuticals LLC v. Alcon Research, Ltd.*, IPR2017-01053, Paper 27, 3 (PTAB Jan. 19, 2018) (informative)). Specifically, Intel asserts that Exhibit 1537 "contains information relating to confidential Intel information, including rates and fees that Intel pays to its attorneys in connection with this proceeding." *Id.* at 1–2. Intel further asserts that not sealing Exhibit 1537 "would create a substantial risk of serious harm that could not be avoided by less restrictive means" and "could expose the manner by which Intel conducts business, including with respect to litigation." *Id.* at 3. Intel argues that my order to show cause created "a genuine need to rely on the material that Intel has identified as confidential." *Id.* Finally, Intel argues that "the interest in maintaining confidentiality outweighs the strong public interest in having an open record for the reasons under [*Argentum* Factors] (1) and (2)." *Id.*

11

IPR2021-01064
Patent 7,725,759 B2

I find that Exhibit 1537 contains confidential information; that a concrete harm would result if Exhibit 1537 did not remain confidential; that there exists a genuine need to rely on the information contained therein; and that public policy favors allowing fees paid by a party to its counsel to remain confidential. Accordingly, I grant the motion to seal.

## IV.    ORDER

Accordingly, based on the foregoing, it is:

ORDERED that VLSI is strongly admonished for its misconduct in this proceeding;

FURTHER ORDERED that no attorney fees are awarded; and

FURTHER ORDERED that Intel's motion to seal (Paper 123) is granted.

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Matthew K. Blackburn
Evan Boetticher
SULLIVAN BLACKBURN PRATT LLC
mblackburn@sullivanblackburn.com
eboetticher@sullivanblackburn.com

David Boundy
POTOMAC LAW GROUP, PLLC
P.O. Box 590638
Newton, MA 02456
dboundy@potomaclaw.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com

IPR2021-01064
Patent 7,725,759 B2

hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

# EXHIBIT N

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

————————

Case IPR2021-01064[*]
Patent 7,725,759

————————

**PATENT OWNER VLSI TECHNOLOGY, LLC'S NOTICE OF APPEAL**

via PTACTS
Patent Trial and Appeal Board

via Priority Mail Express
Director
Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

via CM/ECF
United States Court of Appeals for the Federal Circuit

————————

[*] Intel Corporation, which filed a petition in IPR2022-00366, has been joined as a party to this proceeding.

Pursuant to 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3(a), Rule 4(a) of the Federal Rules of Appellate Procedure, and 28 U.S.C. § 1295(a)(4)(A), Patent Owner VLSI Technology LLC hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 135, Attachment A) entered May 12, 2023 by the Patent Trial and Appeal Board and all other underlying and related findings, orders, decisions, rulings, opinions, or other determinations merged into that Decision.

For the limited purpose of providing the Director with the information requested in 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner further indicates that the issues on appeal may include, but are not limited to:

(i)    The Board's judgment that claims 1, 14, 17, 18, 21, 22, and 24 of the '759 Patent are unpatentable, including any underlying questions of law or fact, including, for avoidance of doubt, any questions regarding the power to reach the judgment and the process of reaching it;

(ii)   The Board's improper grant of Intel's joinder motion;

(iii)  The Board's denial of Patent Owner's Motion to Terminate as to Intel;

(iv)   The Board's improper reliance on hearsay evidence;

(v)    The Director's violation of 35 U.S.C. § 6(c), as modified by *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), by acting unilaterally in the first instance rather than only through rehearing;

1

(vi)   The assignment of a single Board panel to issue both a final written decision and a decision on compelling merits after the trial concluded, which denied Patent Owner due process;

(vii)  The Board's improper adjustment of the time period to issue a Final Written Decision retroactively;

(viii) Violations of the Administrative Procedure Act and VLSI's due-process rights; and

(ix)   Any other Board and/or Director finding, determination, judgment, or order on any issue decided adversely to, Patent Owner.

Patent Owner intends to seek appellate review of any adverse sanctions rulings made in connection with this case, including but not limited to rulings declining to terminate the *inter partes* review as a sanction or otherwise grant sanctions requested by Patent Owner.  Those rulings are not yet appealable because the amount of monetary sanctions remains "unquantified."  *Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.*, 905 F.3d 1311, 1315 (Fed. Cir. 2018), *vacated on other grounds*, 140 S. Ct. 2711 (2020), *on remand*, 825 F. App'x 773, 782-83 (Fed. Cir. 2020).  Insofar as any sanctions rulings nonetheless may be found to have merged into the final written decision or otherwise become appealable at this time, however, Patent Owner appeals those rulings to the extent

necessary to preserve appellate review of those rulings (while preserving all appeal rights with respect to unresolved sanctions issues and rulings).

Patent Owner is concurrently filing true and correct copies of this Notice of Appeal, along with the required fees, with the United States Court of Appeals for the Federal Circuit, and with the Patent Trial and Appeal Board.

Respectfully submitted,

/ Kenneth J. Weatherwax /
Kenneth J. Weatherwax, Reg. No. 54,528
LOWENSTEIN & WEATHERWAX LLP
*Counsel for Patent Owner*

Date:  July 13, 2023

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.    The filing has been prepared using a proportionally-spaced typeface and includes 5,191 words.

2.    The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

August 17, 2023