Case Nos. 23-2158, 23-2159

# United States Court of Appeals
# for the Federal Circuit

VLSI TECHNOLOGY LLC,

*Patent Owner-Appellant*,

v.

OPENSKY INDUSTRIES, LLC,

*Petitioner-Cross-Appellant*,
and

INTEL CORPORATION,

*Petitioner-Appellee*, and

COKE MORGAN STEWART, Acting Under Secretary of Commerce for
Intellectual Property and Acting Director of the United States Patent
and Trademark Office,

*Intervenor*.

Appeal from the United States Patent & Trademark Office,
Patent Trial and Appeal Board, Proceeding No. IPR2021-01064

## NONCONFIDENTIAL PRINCIPAL AND RESPONSIVE BRIEF
## OF CROSS-APPELLANT OPENSKY INDUSTRIES, LLC

February 3, 2025

David E. Boundy

POTOMAC LAW GROUP, PLLC
P.O. Box. 590638
Newton, MA 02459
Tel. 646.472.9737
DavidBoundyEsq@gmail.com

*Counsel for Cross-Appellant
OpenSky Industries, LLC*

## EXEMPLARLY PATENT CLAIM

1. A method comprising:

monitoring a plurality of master devices coupled to a bus;

receiving a request, from a first master device of the plurality of master devices, to change a clock frequency of a high-speed clock, the request sent from the first master device in response to a predefined change in performance of the first master device, wherein the predefined change in performance is due to loading of the first master device as measured within a predefined time interval; and

in response to receiving the request from the first master device:
providing the clock frequency of the high-speed clock as an output to control a clock frequency of a second master device coupled to the bus; and

providing the clock frequency of the high-speed clock as an output to control a clock frequency of the bus.

Appx00251-52

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellant OpenSky certifies the following:

1.  **Represented Entities.** The full name of every entity represented by undersigned counsel in this case:

    OpenSky Industries, LLC

2.  **Real Party in Interest.** The names of the real parties in interest represented by me are as named in 1.

3.  **Parent Corporations and Stockholders.** All parent corporations and any publicly held companies that own 10 percent or more of the stock of any entity represented by me are: None

4.  **Legal Representatives.** The names of all law firms, partners, and associates that have appeared for the represented entities in the trial court or agency or are expected to appear in this court, and have not already entered an appearance in this court, are:

    AMIN, TUROCY & WATSON LLP, Andrew T. Oliver, Vinay V. Joshi

    SULLIVAN BLACKBURN PRATT LLP, LEWIS & ROCA LLP, AND WOMBLE BOND DICKINSON (US) LLP, Matthew K. Blackburn and Evan E. Boetticher

5.  **Related Cases** that meet the criteria of Fed. Cir. R. 47.4(a)(5): None.

6.  This is neither a criminal case with organizational victims, nor a bankruptcy.

Date: February 3, 2025          /s/ David E. Boundy
                                David E. Boundy
                                *Counsel    for    Cross-Appellant*
                                *OpenSky    Industries,    LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ....................................................................... v

JURISDICTIONAL STATEMENT .......................................................... xiii

STATEMENT OF RELATED CASES ..................................................... xiii

INTRODUCTION .................................................................................... 1

ISSUES PRESENTED ............................................................................ 2

STATEMENT OF THE CASE ................................................................. 3

SUMMARY OF THE ARGUMENT ........................................................ 16

ARGUMENT .......................................................................................... 18

   I.   Standard of Review ................................................................... 18

   II.  The Director's Decision Should be Set Aside as "In Excess of Statutory Authority" Because Congress Did Not Authorize Award of Attorney Fees ............................................................. 20

      A. 35 U.S.C. § 316 Lacks the "Specific and Explicit" Statutory Authorization Required for an Award of Attorneys Fees ............ 20

      B. There is no Evidence Congress Intended to Authorize Attorney Fee Awards for IPRs ..................................................... 24

      C. Regulations and Nonbinding Dicta Do Not Allow the Director to Bootstrap Authority Congress Never Provided ........................ 29

      D. The Director Has No Inherent Power to Award Attorney Fees .. 33

      E. Reversal will Not Defang the Director's or the Board's Ability to Police IPRs ............................................................................... 35

      F. Conclusion ................................................................................... 36

   III.  Clash with the *Noerr-Pennington* Doctrine Renders the Director's Sanctions "Contrary to Constitutional Right" ............ 36

      A. OpenSky's Conduct Is Protected by the *Noerr-Pennington* Doctrine ........................................................................................ 38

B. The Director's Attempts to Explain Away *Noerr-Pennington* are Faulty ....................................................... 41

IV. The Sanction Award Conflicts with Supreme Court Precedent Governing Non-Punitive Fees ................... 45

A. The Director Applied the Wrong Standard ................. 45

B. For Each Time Bucket, the Director Failed to "Cogently Explain" the Required Causal Connection ............... 49

C. Conclusion ...................................................... 53

V. The Director's Abuse-of-Process Determination Trampled the APA and Basic Fairness ............................ 53

A. Introduction and Legal Standards ......................... 53

B. Order No. 47 Was Ultra Vires ................................ 55

    1. The Director Lacked Authority to Propound Discovery ........... 55

    2. The Director's Restrictions on How OpenSky Could Respond to the Interrogatories were "Short of Statutory Right" and "Without Observance of Procedure" ....................... 57

    3. The Director Lacked Authority to Demand a Privilege Log .... 58

C. The Director Ignored Key Evidence and Relied on Contradictory Adverse Inferences ......................... 59

D. The Director's Abuse of Process Finding Was Not in Accordance with Law, and Arbitrary and Capricious ................ 63

E. The Director's Shifting Rationale for Sanctions Violates the APA's Notice and Reasoned Decision-Making Requirements ..... 67

F. Conclusion: Reversal, Not Remand, Is the Only Appropriate Remedy ..................................... 70

CONCLUSION ...................................................... 71

CERTIFICATE OF COMPLIANCE ............................... 72

ADDENDUM ...................................................... 73

**CONFIDENTIAL MATERIAL OMITTED**

Material has been redacted from the Addendum (but not from any motion, petition, response, reply, or brief). Pages Appx00209-39 are an order of the Director from which appeal is taken. Pages Appx00234 and Appx00236 omit information reflecting hourly billing rates of VLSI's counsel. Pages Appx00209-39 reflect the Director's redaction of a confidential-information header, which does not itself contain confidential information.

# TABLE OF AUTHORITIES

## Cases

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001)....................................................................................41

*Abbott Laboratories v. Brennan*, 952 F.2d 1346 (1991).........................38

*Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y*, 421 U.S. 240 (1975)...................................................................................21, 24, 32

*Amneal Pharmaceuticals LLC v. Almirall, LLC*, 960 F.3d 1368 (Fed. Cir. 2020) ....................................................................29, 30, 31

*ANR Storage Co. v. Federal Energy Regulatory Comm'n*, 904 F.3d 1020 (D.C. Cir. 2018) ............................................................20

*Apple Inc. v. Fintiv, Inc.*, 2020 WL 2126495 (PTAB Mar. 20, 2020) (precedential) .........................................................................................4

*Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316 (Fed. Cir. 2020).....20, 29

*B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527 (9th Cir. 2022)...........39

*Baker Botts, L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) ............ passim

*BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002) ....... 38, 40, 43, 44

*Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015) .........................................54, 68, 69, 70

*Blixseth v. Yellowstone Mountain Club LLC*, 854 F.3d 626 (9th Cir. 2017)...............................................................................45, 49, 50

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................29

# TABLE OF AUTHORITIES
(continued)

*Brock v. Roadway Exp. Inc.*, 481 U.S. 252 (1987)..................................54

*BTG Int'l Inc. v. Bioactive Labs.*, No. 15-4885, 2016 WL 3519712
(E.D. Pa. June 28, 2016) .....................................................66

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)......20

*Carucel Investments L.P. v. Vidal*, 2023 WL 8888644 (Fed. Cir.
2023) (nonprecedential) ......................................................12

*Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224 (9th Cir. 2020).........21, 34

*Coalition for Affordable Drugs VI, LLC v. Celgene Corp.*,
IPR2015-01092, Paper 19 (PTAB Sep. 25, 2015) ..........................65, 67

*Content Extraction and Transmission LLC v. Wells Fargo Bank,
Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014) .........................................39

*Cooter & Gell v. Hartmarx*, 496 U.S. 384 (1990) .................. 14, 19, 49, 50

*Dragon Intell. Prop., LLC v. DISH Network L.L.C.*,
No. 13-cv-2066-RGA, 2021 WL 5177680 (D. Del. Nov. 8, 2021) .........31

*DynCorp Int'l, LLC v. United States*, 10 F.4th 1300 (Fed. Cir.
2021)..........................................................................55

*Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 980 F.3d
1117 (7th Cir. 2020) ..........................................................62

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)................................29

*Exelon Generation Co. v. Local 15, IBEW*, 676 F.3d 566 (7th Cir.
2012)..........................................................................56

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ... 20, 56, 67, 70

- vi -

## TABLE OF AUTHORITIES
(continued)

*Fox v. Vice*, 563 U.S. 826 (2011) .............................................................. 46

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
    167 F.R.D. 90 (D. Colo. 1996) .......................................... 62

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)......... passim

*Hyatt v. Hirshfeld*, 16 F.4th 855 (Fed. Cir. 2021).................................... 21

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000) ....................................... 13

*In re Stepan Co.*, 660 F.3d 1341 (Fed. Cir. 2011) .................................... 13

*Industrial Models, Inc. v. SNF, Inc.*, 716 Fed.Appx. 949 (Fed. Cir.
    2017)................................................................................... 41

*Intellectual Ventures I LLC v. Capital One Financial Corp.*, 280
    F.Supp.3d 691 (D. Md. 2017) ............................................... 39

*Kearney v. Foley & Lardner, LLP*, 590 F.3d 638 (9th Cir. 2009) ........... 43

*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-cv-1702
    (RC), 2021 WL 4033071 (D.D.C. Sep. 3, 2021) ................... 61

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................ 19

*Merck & Co. v. Kessler*, 80 F.3d 1543 (Fed. Cir. 1996) ........................... 19

*Metro. Area EMS Authority v. Sec'y of Veterans Affairs*,
    122 F.4th 1339 (Fed. Cir. 2024)........................................... 32

*Mine Workers v. Pennington*, 381 U.S. 657 (1965) ................................. 38

*Monolithic Power Sys. Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359
    (Fed. Cir. 2013) ............................................................ 47, 48

# TABLE OF AUTHORITIES
(continued)

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................................ passim

*Patent Quality Assurance, LLC v. VLSI Technology LLC,* IPR2021-01229, Paper 131 (Aug. 3, 2023) ......................................... 69

*Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987 (Fed. Cir. 2017) ......................................................................................... 18, 19

*Peter v. NantKwest, Inc.*, 589 U.S. 23 (2019) ....................... 16, 20, 21, 31

*Princeton Vanguard, LLC v. Frito-Lay North America, Inc.*, 786 F.3d 960 (Fed. Cir. 2015) ............................................................. 60, 61

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49 (1993) ................................................................................ 39

*Reis v. Walker*, 491 F.3d 868 (8th Cir. 2007) ......................................... 65

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co,* 856 F.3d 1019 (Fed. Cir. 2017) ........................................................... 68

*Russello v. United States*, 464 U.S. 16 (1983) ........................................ 25

*Schaeffler Grp. USA, Inc. v. United States,* 786 F.3d 1354 (Fed. Cir. 2015) ........................................................... 18

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .......................................... 20

*Singh v Bd. of Immigration Appeals*, 253 Fed. Appx. 91 (2d Cir. 2007) .................................................................................................. 62

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ............... 40, 41, 43

*Trapp v. U.S.*, 668 F.2d 1114 (10th Cir. 1977) ...................................... 34

# TABLE OF AUTHORITIES
(continued)

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................60

*Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358 (Fed. Cir. 2003).....58

*Wisconsin Central Ltd. v. U.S.*, 585 U.S. 274 (2018)..............................26

*Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592
   (E.D. Pa. 2018) ................................................................................65, 66

*Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71 (2d Cir. 2006) ...............55


**Statutes**

11 U.S.C. § 330 .......................................................................................23

15 U.S.C. § 77z-1 ....................................................................................25

15 U.S.C. § 78u-4 ....................................................................................25

19 U.S.C. § 1337 ........................................................................26, 27, 36

28 U.S.C. § 1912 .....................................................................................23

28 U.S.C. § 1927 .....................................................................................45

28 U.S.C. § 2412 .....................................................................................45

28 U.S.C. § 361 .......................................................................................22

35 U.S.C. § 145 .......................................................................................22

35 U.S.C. § 285 ........................................................................25, 30, 45, 48

35 U.S.C. § 311 ....................................................................................1, 39

# TABLE OF AUTHORITIES
(continued)

35 U.S.C. § 316 ............................................................... passim

35 U.S.C. § 317 .......................................................................6

35 U.S.C. §§ 311-319 ...................................................... 26, 31

42 U.S.C. § 1973*l* ................................................................24

42 U.S.C. § 7413 ..................................................................24

42 U.S.C. §§ 1320a-7a .........................................................25

42 U.S.C. §§ 1320a-8 ...........................................................25

5 U.S.C. § 504 .....................................................................45

5 U.S.C. § 552 ................................................................55, 59

5 U.S.C. § 554 .............................................................. passim

5 U.S.C. § 556 .............................................................. passim

5 U.S.C. § 706 .............................................................. passim

## Rules

Federal Rule of Civil Procedure 11 .......................... 25, 26, 44, 45

Federal Rule of Civil Procedure 37 .................................. 25, 26

# TABLE OF AUTHORITIES
(continued)

## Regulations

37 C.F.R. § 1.616 ................................................................ 31, 32

37 C.F.R. § 42.11 .............................................................. 44, 45

37 C.F.R. § 42.12 .............................................................. passim

37 C.F.R. § 42.5 ................................................................ 55, 56

37 C.F.R. §§ 42.51-42.53 .......................................................... 55

## Other Authorities

H.R. Rep. 95-294 (May 12, 1977) ............................................ 24

H.R. Rep. No. 110-314 (2007) .................................................. 27

H.R. Rep. No. 112-98 (2011) ................................................... 27

Henry Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267
   (1975) ........................................................................ 13

Patent and Trademark Office, *Patent Appeal and Interference
   Practice*, 60 Fed. Reg. 14488 (Mar. 17, 1995) ...................... 32

Patent and Trademark Office, *Rules of Practice for Trials Before
   the Patent Trial and Appeal Board and Judicial Review of
   Patent Trial and Appeal Board Decisions; Final Rule*, 77 Fed.
   Reg. 48611 (Aug. 12, 2012) ...................................... 8, 32, 58

Pub.L. 95-95, 91 Stat. 704, 777, 785, amending 42 U.S.C. § 7413,
   7607, 7622 ................................................................... 24

# TABLE OF AUTHORITIES
(continued)

Restatement (Third) of Torts § 24...........................................................64

Restatement (Third) of Torts § 25...........................................................64

Restatement (Third) of Torts § 26.....................................................63, 64

S.Rep. 94-295 (Jul. 22, 1975)..................................................................24

## JURISDICTIONAL STATEMENT

Cross-appellant OpenSky concurs with VLSI's jurisdictional statement (ECF 54 at 3).

## STATEMENT OF RELATED CASES

No appeal from this *inter partes* review ("IPR") proceeding has previously been before this Court or any other court.

This appeal may affect or be directly affected by the following cases: VLSI asserted the '759 patent (among others) in *VLSI Tech. LLC v. Intel Corp.,* Nos. 1:19-cv-00977, 6:19-cv-00254, 6:21-cv-00057, and 6:21-cv-00299 (W.D. Tex.) and *VLSI Tech. LLC v. Intel Corp.,* No. 1:19-cv-00426 (D. Del.). The following *inter partes* review proceedings also have involved the '759 patent: *Intel Corp. v. VLSI Tech. LLC*, No. IPR2020-00106, *Intel Corp. v. VLSI Tech. LLC*, No. IPR2020-00498, *Intel Corp. v. VLSI Tech. LLC*, No. IPR2022-00366; and *Patent Quality Assurance, LLC v. VLSI Tech. LLC*, No. IPR2022-00480. In addition, there have been several prior appeals to this Court relating to the '759 patent, including *VLSI Tech. LLC v. Intel Corp.*, No. 22-1906 (Fed. Cir.), *Intel Corp. v. VLSI Tech. LLC*, No. 21-1614 (Fed. Cir.), and *Intel Corp. v. VLSI Tech. LLC*, No. 21-1617 (Fed. Cir.).

# INTRODUCTION

Everyone—*everyone*—who comes to the USPTO seeks to improve their economic station. IPR petitioners too. Congress has granted everyone (other than the patent owner) the right to request review of issued patents. 35 U.S.C. § 311. Several creative business models have been developed to attempt to profit from asserting this right. This includes a member-based organization that challenges patents that could be asserted against its members, and a short-seller hedge fund who used IPRs to manipulate the stock market. Often, such IPR petitioners explain a social benefit from their actions, such as invalidating "bad" patents or lowering drug prices. OpenSky found and pursued another potentially profitable business model, reviving meritorious petitions unfairly denied under *Fintiv*. Whatever one thinks of this business model, OpenSky did nothing more than aggressively assert its legal rights. It broke no laws and did nothing to sabotage the IPR trial here.

At least two Senators appear to dislike OpenSky's business model. They are entitled to their opinions, and legislation has been introduced to add a standing requirement to IPRs to curb whatever problem they perceive.  But under the current statute, opinions of individual

legislators do not empower the Director to shirk the constraints of the
Administrative Procedure Act ("APA") and the constitution. But that is
exactly what happened here. The Director succumbed to political
pressure to punish OpenSky and ran roughshod over the APA and the
constitution to impose hefty fines on OpenSky for daring to attempt to
profit from filing a meritorious IPR petition.

## ISSUES PRESENTED

1.    Did the Director act in excess of statutory authority by
awarding VLSI attorney fees in IPR2021-01064 where the statute does
not "specifically and explicitly" authorize an attorney fee award, as
required by the "American Rule" and governing Supreme Court
precedent?

2.    Was the Director's award of sanctions "arbitrary and
capricious" or "contrary to constitutional right or immunity," 5 U.S.C.
§ 706(2)(A) or (B), because the award penalizes an objectively-
reasonable petition immunized under the *Noerr-Pennington* doctrine?

3.    Was the Director's sanction award an abuse of discretion or
contrary to law, because it failed to make showings of "sole," "but for"
causal links between wrongful conduct and costs, as required by
*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)?

4.    Were the Director's determination of abuse of process and award of attorney fees contrary to constitutional right or immunity, short of statutory right, arbitrary and capricious, or unsupported by substantial evidence, for failure to provide OpenSky with notice and opportunity to present its case, failure to observe requirements for an agency's receipt of substantial evidence, and failure to provide the "cogent explanation" required by the APA?

## STATEMENT OF THE CASE

According to Intel, this case began with a scheme of two foreign-owned companies: a multi-billion-dollar hedge fund named Fortress Investment Group LLC ("Fortress"), owned by Japanese investment bank Softbank, and NXP Semiconductor, a Dutch competitor to Intel. Fortress agreed to acquire hundreds of NXP's patents and assert them through its VLSI subsidiary for many billions of dollars against Intel across multiple different actions in Texas, Delaware, and California, with Fortress effectively acting as a profiteering stalking horse for Intel's Dutch competitor. Appx01677.

Intel filed timely IPR petitions against the '759 patent. Appx01679. But the Board denied Intel's petitions without reaching the unpatentability merits, citing *Apple Inc. v. Fintiv, Inc.*, 2020 WL

2126495 (PTAB Mar. 20, 2020) (precedential). Appx17159-17173;
Appx18168-18179.

In March 2021, a Texas jury found infringement of the '759 patent
and awarded VLSI $675 million in damages, and $1.5 billion in
damages for infringement of another patent. Appx4798-4803.

On June 7, 2021, OpenSky filed petitions challenging both patents
found infringed in Texas. Appx00044-45; *OpenSky Indus., LLC v. VLSI
Tech. LLC*, IPR2021-01056, Paper 2 (June 7, 2021). The petitions copied
Intel's prior petitions, reused the same exhibits and expert declarations,
and were filed without contacting Intel's experts to avoid creating real
party in interest issues. Appx00044-45. As OpenSky explained to the
Director, it filed the petitions to highlight issues with the *Fintiv*
doctrine and address the injustice of a U.S. chipmaker facing over $2
billion in damages for patents the Board refused to review. Appx01713-
14.

On July 7, 2021, Patent Quality Assurance (PQA) filed a petition
copied from Intel's petition on the other Texas-asserted patent, but
unlike OpenSky, PQA contacted Intel's experts beforehand and inked a
supposedly exclusive agreement with at least one expert to prevent the
expert from testifying in any trial based on OpenSky's petition. *Patent*

*Quality Assurance, LLC v. VLSI Tech. LLC*, IPR2021-01229, Paper 1 (July 7, 2021).

On August 6, 2021, VLSI contacted OpenSky about settling the two IPRs filed by OpenSky. Appx01704. On August 30, 2021, VLSI and OpenSky entered into a confidentiality agreement to discuss settlement. Appx10982-87. On or around September 2, VLSI and OpenSky discussed potentially settling their dispute. Appx10988. OpenSky made no offers at this time. *Id.* And then nothing else happened until the Board rendered its institution decisions.

In late December, the Board found substantive merit in OpenSky's copied petitions but instituted trial only on the '759 patent, declining the other due to PQA's representation that its exclusive retainer agreement barred an expert from testifying for OpenSky. Appx01216; *OpenSky Indus., LLC v. VLSI Tech. LLC*, IPR2021-01056, Paper 18, 4-9 (PTAB Dec. 23, 2021). Trial was instituted on PQA's petition for the second patent. *Patent Quality Assurance, LLC v. VLSI Tech. LLC*, IPR2021-01229, Paper 10, 2 (PTAB Jan. 26, 2022).

After trial was instituted, VLSI proposed settling OpenSky's IPR for up to $750,000—$250,000 upon agreement to terminate and $500,000 if termination occurred without joinder. Appx01771. A few

weeks later, OpenSky made a counter-proposal to VLSI. Appx10355-59.

If VLSI had agreed to this plan, it was always OpenSky's intention to

document every facet of the agreement in a written settlement

agreement that would be filed pursuant to 35 U.S.C. § 317. Appx01709.

But VLSI did not respond to this counter proposal.

Instead, in violation of the written NDA covering all settlement

communications, VLSI publicly filed OpenSky's email as an exhibit to

one of VLSI's papers in a parallel proceeding. *OpenSky Indus., LLC v.

VLSI Tech. LLC*, IPR2022-00645, Paper 8, Exhibit 2029. The email and

VLSI's hyperbolic characterizations of it were soon spread far and wide

by media and bloggers. Appx10367-89. It also led to scrutiny from

Senators Hirono and Tillis. Appx10352; Appx10955-57. Citing the

confidential email, the Senators pushed the Director to sanction

OpenSky. Appx10955-57. Succumbing to this pressure, on June 7, 2022,

Director Vidal *sua sponte* ordered Director Review of the institution

decision. Appx01449.

On July 7, 2022, in Paper 47, the Director explained the

background leading to Director Review: VLSI had requested rehearing

and a Precedential Opinion Panel review. Appx01449. The Director

acknowledged that she "discern[ed] no error in the Board's decision to

institute review of [OpenSky's] meritorious Petition." Appx00029. This marked the second time OpenSky's petition was found meritorious.

Because "existing regulations do not attempt to specify what acts constitute an abuse of process," Appx00065, Paper 47 solicited rule-making type feedback. There were "questions of first impression" about how to handle "allegations of abuse of process" or "conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA." Appx00030. Accordingly, Paper 47 invited the parties and amici to help shape the standard by briefing (1) the actions the Director or Board should take when facing such conduct, and (2) how to determine whether it qualifies as an abuse. Appx00030-32. Paper 47 stressed that these questions concern "the Office in fulfilling its mission" and "the patent community at large," signaling that no shared understanding existed at the time and, for all intents and purposes, calling for input on future policy. Appx00031.

Paper 47 also ordered the parties to produce documents and answer several interrogatories. Appx00031-33. Paper 47 required that answers to the interrogatories cite "supporting documentary" evidence while simultaneously prohibiting the parties from introducing new "declaratory evidence." Appx00031, Appx00034. Paper 47 did not

explain any exception to the APA's guarantee that "a party is entitled to present [their] case or defense by oral or documentary evidence," 5 U.S.C. § 556(d), or the corresponding guarantee of Fifth Amendment due process. Paper 47 also required that the parties submit a privilege log and "file" with the "Office" any document another party identifies for *in camera* inspection. Appx00034. Paper 47 did not identify any exception to the assurance that the PTAB had given in promulgating its regulations in 2012, discovery of "anything … protected by legally recognized privileges" would not be required. *Contrast* Appx00055 *against* Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions; Final Rule, 77 Fed. Reg. 48611, 48637 (Aug. 12, 2012)

On October 4, 2022, after the parties and amici submitted the requested briefs, the Director issued Paper 102 regarding abuse of process. Appx00038-89. Paper 102 is striking: it is simultaneously the indictment, the first paper to set forth the Director's specific fact and legal contentions, and the jury form stating the verdict. In Paper 102, the Director first examined OpenSky's objections and responses to the discovery mandated by Paper 47. Without giving notice or opportunity

to be heard, and without allowing for cure, the Director determined OpenSky had engaged in "discovery misconduct." Appx00052-65.

The Director sanctioned OpenSky for the alleged discovery misconduct by holding "disputed facts as established against OpenSky." Appx00064. In addition, the Director leapt to adverse inferences for facts that were *not* in dispute, including that OpenSky had initiated settlement discussions. Appx00067.

Based on the adverse inferences, Paper 102 decided liability: OpenSky "abused the IPR process by filing this IPR in an attempt to extract payment from VLSI and joined Petitioner Intel" and that "OpenSky engaged in abuse of process and unethical conduct by offering to undermine and/or not vigorously pursue this matter in exchange for a monetary payment." Appx00040. Paper 102 is the first time the Director gave notice of specific facts at issue in the abuse of process inquiry.

Paper 102 never actually identifies and proves up the elements of the supposed abuse of process. Instead, Paper 102 recites a variety of standard IPR-related actions—such as filing a petition despite not being sued for infringement, Appx00073, filing a so-called "copycat" petition, Appx00079-80, and timing the filing after a large jury verdict.

Appx00076. The Director expressly notes that none of these acts is, by itself, inherently improper, and, more importantly, Paper 102 does not identify them as components of "abuse of process." Instead, Paper 102 points to each as evidence of OpenSky's supposed "improper purpose." Appx00072-80. Ultimately, there are only two acts that Paper 102 connects to "abuse of process": (1) "filing this IPR in an attempt to extract payment" and (2) "offering to undermine and/or not vigorously pursue this matter in exchange for a monetary payment." Appx00040, Appx00080-81; *see also* Appx00104 (OpenSky "abused the *inter partes* review ('IPR') process by filing an IPR in an attempt to extract payment …, and expressing a willingness to abuse the process in order to do so").[1]

The Director "remanded" the matter to the Board to determine whether the merits of the petition were compelling. Paper 102 also

---

[1] Paper 102 fails to note that OpenSky fulfilled all of the traditional responsibilities of an IPR petitioner. OpenSky produced its technical expert for deposition. Appx10528. OpenSky paid for the expert's time preparing and testifying. Appx10546 19:17-20. OpenSky took the deposition of VLSI's technical expert witness. Appx05767-68. OpenSky filed the Petitioner Reply on July 11, 2022. Appx01525-56.

demoted OpenSky to a "silent understudy," elevated Intel to the primary petitioner, and precluded OpenSky from any further filings, unless in direct response to an order from the Director. Appx00084.

Paper 102 also ordered OpenSky to "show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse of process." Appx00087-88. Notably, the abuse of process findings in Paper 102 excluded the alleged discovery misconduct, treating it as a distinct violation warranting adverse inferences, but *not* monetary sanctions.[2] The terms of the "order to show cause" as to attorney's fees were limited to just the finding of abuse of process, and did not include the alleged discovery misconduct. Appx00087-88.[3]

_____

[2] The Director's analysis of discovery misconduct is confined to the "FAILURE TO COMPLY" section of Paper 102. Appx00052-65. The only adjudication of discovery misconduct was the application of adverse inferences against OpenSky. Appx00064 ("I determine that **the** proper sanction is to hold disputed facts as established against OpenSky.") (emphasis added).

[3] *Cf. Patent Quality Assurance, LLC v. VLSI Technology LLC*, IPR2021-01229, Paper 131 at 43 (Aug. 3, 2023) (ordering PQA to "show cause" why the Director should not award attorneys fees for refusing to comply with the mandated discovery).

Paper 102 also gagged OpenSky's ability to defend the sanctions proceeding, particularly as the Director changed theories and raised new issues paper-to-paper: "OpenSky will be prevented from presenting or contesting any particular issue; … filing any additional papers; … unless specifically authorized to do so…."). Appx00084. In Paper 109, the Director further restricted OpenSky's ability to present its case, stating that OpenSky was not allowed to "reply" to Paper 102 but was "limited to briefing on a narrow issue, i.e., whether OpenSky should be ordered to pay compensatory expenses, including attorney fees and, if so, how such fees should be determined. OpenSky's brief must respond to those questions only." Appx02665.  The Director never explained how these orders are consistent with the right to adduce evidence and to be heard provided by 5 U.S.C. § 554(c), § 556(d), and the Fifth Amendment's due process clause.[4]

_____

[4] This Court has not yet decided whether Director Review is "formal adjudication" governed by §§ 554 and 556. *Carucel Investments L.P. v. Vidal*, 2023 WL 8888644, at *10 (Fed. Cir. 2023) (nonprecedential). However, first, the Director insisted that Director Review is "central" to the IPR process, Appx00136, and therefore is governed by the law that governs IPRs.  IPRs are "formal adjudication."  *Belden*, 805 F.3d at

On October 14, 2022, the Board issued its decision on remand finding that OpenSky's petition was a compelling, meritorious challenge. Appx00100. This marked the third time OpenSky's petition was found meritorious.

OpenSky filed its response to Paper 102 on November 17, 2022, Appx02740-72, and filed its reply to VLSI's response on December 5, 2022. Appx02841-55 Among other things, OpenSky explained that the statute does not confer authority to order attorney fee sanctions, that sanctioning a meritorious petition violated the *Noerr-Pennington* doctrine, that the APA and constitutional due process had been violated, and that the Director had not made showings to meet the "but

---

1080. Second, this Court has held that due process rights of § 554 apply even in informal adjudications such as reexaminations. *In re Stepan Co.*, 660 F.3d 1341, 1345 (Fed. Cir. 2011). Fourth, the rights under § 554 and 556 invoked in this brief have parallel rights under Fifth Amendment due process, Henry Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1281 (1975), and the "substantial evidence" requirement of *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

for" causation standard of *Goodyear*, 581 U.S. 101 (2017) and *Cooter & Gell v. Hartmarx*, 496 U.S. 384 (1990).

On December 22, 2022, the Director affirmed the Board's compelling merits decision. Appx00119-120. This marked the fourth time OpenSky's petition was found meritorious.

On February 3, 2023, the Director issued Paper 127, which awarded attorney fees against OpenSky and authorized VLSI to file a motion to quantify its fees. Appx00126-41. Perhaps recognizing that *Noerr-Pennington* precluded finding that OpenSky "abused the IPR process by filing this IPR" with an intent deemed improper, this order recharacterizes the basis for the Director's findings in Paper 102 and pivots to an amorphous "totality" of conduct rationale. The Director stated that "I am not sanctioning OpenSky based on whether it filed a meritorious Petition, I am imposing sanctions because of the manner in which OpenSky conducted itself after the petition was filed" and that "[m]y conclusion and related sanctions were based on the totality of OpenSky's conduct." Appx00134-35. But as detailed above, Paper 102 only ordered OpenSky to "show cause why it should not be ordered to pay compensatory expense, including attorney fees, to VLSI as a further sanction for its abuse of process." Appx00087-88.

The Director responded to OpenSky's challenge to her statutory authority by pointing to a regulation, Appx00129, without addressing the statutory construction issue presented, and without explaining how a regulation can confer authority that a statute withheld. The Director responded to OpenSky's APA and constitutional due process issues by stating that OpenSky had not objected in a separate paper, Appx00131, without explaining why these protections have to be requested instead of honored by the adjudicator as a matter of course.

On May 12, 2023, the Board issued its final written decision. Appx00163-206. That decision found all challenged claims to be unpatentable. Appx00206. This marked the fifth time that OpenSky's petition was found meritorious.

On February 27, 2023, VLSI filed its motion for fees. Appx02940-73. This was VLSI's first motion on any issues relating to seeking attorney's fees from OpenSky for an alleged abuse of process. From Paper 47 until this point, the Director had inserted herself as an adversary, exercising the powers of a party—injecting new issues into the proceeding, requesting discovery and the like—while simultaneously acting as the adjudicator.

Finally, on December 15, 2023, after receiving further briefing
from all parties regarding the amount of attorney fees to award, the
Director issued an order awarding VLSI $413,264.15 in attorney fees
from OpenSky. Appx00209-37. Paper 147 refuses to consider a
challenge to several of the Director's previous legal findings.
Appx00211. Paper 147 also declines to apply the Supreme Court's "but
for" causation rule for calculation of attorney fees. Appx00224.

## SUMMARY OF THE ARGUMENT

1. The Director has no authority to award attorney fees against
OpenSky. This is because "specific and explicit" statutory authorization
is required for an award of attorneys' fees. *Peter v. NantKwest, Inc.*, 589
U.S. 23, 30 (2019). And there is no such authority in 35 U.S.C.
§ 316(a)(6), the relevant statute here. Section 316(a)(6) only says that
"[t]he Director shall prescribe regulations … prescribing sanctions for
abuse of discovery, abuse of process, or any other improper use of the
proceeding." Section 316(a)(6) says nothing of "attorney fees." Bare
reference to "sanctions" without any reference to attorney fees does not
provide the specific and explicit authority that settled precedent
demands. Nor is there evidence of Congressional intent to have
provided such authority. If anything, similar statutes suggest that

Congress intended to withhold such authority. Nor can the USPTO's rules, the Director's desire to "punish" OpenSky, or the Director's inherent authority bootstrap authority to the Director that the statute does not provide.

2. The Director's sanctions against OpenSky penalize conduct protected under the *Noerr-Pennington* doctrine, which shields petitioning activity and "ancillary" litigation conduct from liability unless it qualifies as "sham litigation." The Director improperly conflated lawful non-sham petitioning with alleged improper motives.

3. In 2017, the Supreme Court's *Goodyear* decision clarified procedural requirements and substantive limitations on attorney fee sanctions: attorney fees are only awardable for costs that were "solely," "but for" caused by sanctionable conduct. *Goodyear*, 581 U.S. at 104. The Director's Decisions (a) concede that no conduct at issue was sanctionable, but stood only as evidence of "intent" or "motivation," (b) fail to offer any explanation of causal connection, and (c) instead the Director coins hitherto-unknown tests.

4. The Administrative Procedure Act, in 5 U.S.C. §§ 554 and 556, and the due process clause of the Fifth Amendment, set certain procedural minima for agency adjudication: a party must be given

notice of "prompt notice of issues controverted in fact or law," is entitled to present evidence and arguments of the party's choice, etc., and decisions must be based on substantial evidence. In this case, the Director improvised procedures, imposed gag orders, and employed fact-finding procedures that are well below statutory and constitutional guarantees.

## ARGUMENT

### I.   Standard of Review

Agency actions, findings, and conclusions must be set aside if "arbitrary, capricious, an abuse of discretion," "otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory … authority," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (B), (C), (E); *see also Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017).

When assessing whether the Director's actions are contrary to constitutional right, power, privilege, or immunity, the review is *de novo. See, e.g., Schaeffler Grp. USA, Inc. v. United States*, 786 F.3d 1354, 1358 (Fed. Cir. 2015).

When assessing whether the Director's actions are not in accordance with law, statutory interpretation is a matter of law reviewed *de novo*. *Merck & Co. v. Kessler*, 80 F.3d 1543, 1549 (Fed. Cir. 1996); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority ...."). Application of an incorrect legal standard is an abuse of discretion, *Cooter & Gell*, 496 U.S. at 405 (1990). 5 U.S.C. § 706(2)(A).

A Director's decision "must articulate logical and rational reasons" for that decision. *Personal Web Techs.*, 848 F.3d at 992 (cleaned up). The Director's Decision is "arbitrary and capricious" if the agency failed to explain a "rational connection between the facts found and the choice made," or "if the agency has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Personal Web Techs.*, 848 F.3d at 992. An agency decision is "arbitrary and capricious" if the reasoning is internally inconsistent, for example if two sets of findings rely on incompatible underlying bases, *ANR Storage Co. v. Federal Energy Regulatory Comm'n*, 904 F.3d 1020, 1024, 1026 (D.C.

Cir. 2018), and if inconsistent with past decisions without explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *ANR Storage*, 904 F.3d at 1024-25. Sanctions decisions that are "clearly unreasonable, arbitrary, or fanciful," rest on legal or clear factual error, or are unsupported by "evidence on which the [agency] could rationally base its decision," must be overturned. *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1322-23 (Fed. Cir. 2020).

Agency action may be affirmed only on the same basis articulated by the agency itself. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

## II. The Director's Decision Should be Set Aside as "In Excess of Statutory Authority" Because Congress Did Not Authorize Award of Attorney Fees

### A. 35 U.S.C. § 316 Lacks the "Specific and Explicit" Statutory Authorization Required for an Award of Attorneys Fees

The "American Rule" is that each litigant pays their own attorneys' fees "unless a statute or contract provides otherwise." *NantKwest*, 589 U.S. at 28. Departures require a "specific and explicit" indication from Congress that Congress intends to overcome the American Rule's presumption against awards of attorney fees.

*NantKwest*, 589 U.S. at 30 (quoting *Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y*, 421 U.S. 240, 260 (1975)). This "specific and explicit" bar is "high." *Hyatt v. Hirshfeld*, 16 F.4th 855, 858 (Fed. Cir. 2021). The American Rule binds administrative agencies, too. *See Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1232 (9th Cir. 2020) (when attorneys' fees not "expressly addressed" in statute, they are not authorized for agency proceedings).

Section 316 does not expressly mention "attorney fees." The Director attempts to overcome this deficiency by arguing this award was a permissible "sanction" under § 316. Appx00129. That is not enough. The requirement for "specific and explicit" Congressional authorization for attorney fee awards is strictly applied and the Supreme Court has repeatedly declined to find authority to award attorney fees in general language. *See NantKwest*, 589 U.S. at 31-32; *Baker Botts, L.L.P. v. ASARCO LLC*, 576 U.S. 121, 131-32 (2015). "Mere generalized commands" do not authorize attorney fee awards. *Key Tronic Corp. v. United States*, 511 U.S. 809, 815 (1994) (cleaned up).

Recent Supreme Court precedents confirm that broad general words are insufficient to authorize attorney fees specifically. In *NantKwest*, the government argued that requiring the applicant to pay

"[a]ll the expenses of the proceedings" when bringing civil actions challenging PTO decisions under 35 U.S.C. § 145 included the PTO's attorneys' fees. 589 U.S. at 30-31. The Court rejected that reading, finding that "even though the term 'expenses' was capacious enough to include attorney's fees," the statute "does not invoke attorney's fees with the kind of 'clarity we have required to deviate from the American Rule.'" *Id.* at 31 (quoting *Baker Botts*, 576 U.S. at 128). And while some statutes awarded attorney fees as a subset of expenses through phrases like "reasonable expenses, including attorneys' fees," the use of the broader term "expenses" alone does not convey authority to award attorney fees. *Id.* at 31-32 (quoting 28 U.S.C. § 361).

OpenSky has not found any case or statute that authorizes attorney fees via language as generic as "sanctions." A 2009 Congressional Research Service Report cataloging some four hundred statutes that expressly or impliedly authorize attorney fees didn't either. *See* Congressional Research Service, *Awards of Attorneys' Fees by Federal Courts and Federal Agencies*, CRS Report 94-970 update of

Oct. 22, 2009, at 57-117.[5] In nearly every single statute catalogued in that report, the language chosen by Congress is "attorney fees" or "compensation of counsel" or "value of the attorney's time" or something similarly "specific and explicit," or a cross-cite to another statute with such language. *Id.* The only arguable exception uses the term "damages." 28 U.S.C. § 1912 (allowing an award of "just damages"). But this statute also appears to be a codification of the long-standing "bad faith" exception to the American rule, which is "unquestionably [an] assertion[] of inherent power of the courts." *See Aleyska* at 257-259.

*Baker Botts* reinforces this conclusion. There, 11 U.S.C. § 330(a)(1) allowed "reasonable compensation" for attorneys in bankruptcy cases—language that expressly addressed attorney compensation. 576 U.S. at 125. That statute indisputably covers attorney fees for the attorneys hired to assist the trustee in the principal case. *Id.* 128. Even so, the Court refused to stretch the text of that statute to cover fees incurred in litigating disputes over the amount of fees owed, because the statute did not provide specific and explicit authorization for such fees-on-fees. *Id.*

---

[5] Available at https://www.everycrsreport.com/reports/94-970.html.

at 127-129, 131-32. If even language envisioning payment to attorneys
was not specific and explicit enough to allow fee-on-fee awards, then the
far more generic reference to "sanctions" in § 316(a)(6) cannot authorize
it here.

Under the "American Rule" principle of statutory construction, the
word "sanctions" in § 316 is insufficiently "specific and explicit" to
authorize attorney fees.

## B.    There is no Evidence Congress Intended to Authorize Attorney Fee Awards for IPRs

Congress has long understood the importance of clear statutory
authorizations. After *Alyeska* required "specific and explicit" indication
of Congressional intent to award attorney fees, Congress revisited
dozens of statutes to add specific and explicit language authorizing
attorney fee awards, citing *Alyeska* as the reason. Pub.L. 95-95, 91 Stat.
704, 777, 785, amending 42 U.S.C. § 7413, 7607, 7622; H.R. Rep. 95-294
(May 12, 1977) (citing *Alyeska* as the reason for the amendment);
Pub.L. 94-73, 89 Stat 404, amending 42 U.S.C. § 1973*l*(e), S.Rep. 94-
295, at 42-43 (Jul. 22, 1975) (same). In several statutes, Congress
juxtaposes the words "sanctions" or "penalty" against "attorney fees,"
indicating that Congress knows that the naked word "sanctions" does
not imply "attorney fees," which must be separately authorized. *See,*

*e.g.*, 42 U.S.C. §§ 1320a-7a(c)(4)(G) and 1320a-8(b)(4)(G) (listing possible "sanctions" including "attorneys fees"); 15 U.S.C. §§ 77z-1(c)(3)(A) and § 78u-4(c)(3)(A) ("sanctions … in accordance with Rule 11 [includes an award] of the reasonable attorneys' fees").

The fact that Congress expressly authorized attorney fees in other provisions of the Patent Act (like 35 U.S.C. § 285), but not § 316, strongly suggests Congress did not intend to authorize them in § 316. This is because when Congress authorizes attorney fees in one section of a statute but not another, it is presumed Congress did so intentionally. *See Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Baker Botts*, 576 U.S. at 129 (refusing to award certain attorneys' fees based on broad language in 11 U.S.C. § 330(a)(1) where "other provisions of the Bankruptcy Code" expressly required paying "reasonable attorneys' fees and costs").

When Congress means to empower an agency or tribunal to impose attorney fees as a sanction, Congress says so. For example, Congress empowered the International Trade Commission to "prescribe sanctions for abuse of discovery and abuse of process to the extent authorized by Rule 11 and Rule 37 of the Federal Rules of Civil

Procedure," both of which expressly list "attorney fees" as one possible sanction. 19 U.S.C. § 1337(h); Fed. R. Civ. P. 11, 37.

The contrast between § 1337 and § 316 is particularly telling. Both the ITC and the USPTO are administrative agencies who Congress has empowered to investigate the invalidity of issued patents. *See* 19 U.S.C. § 1337(a)(1)(B); 35 U.S.C. §§ 311-319. Congress also empowered both agencies to promulgate rules or regulations prescribing sanctions for "abuse of discovery" and "abuse of process." 19 U.S.C. § 1337(h); 35 U.S.C. § 316(a)(6). But Congress only expressly allowed the ITC—not the Director—to sanction such conduct "to the extent authorized by Rule 11 and Rule 37 of the Federal Rules of Civil Procedure." *Id.* Courts usually "presume differences in language like this convey differences in meaning," and that presumption is higher when the two statues "handle much the same task." *Wisconsin Central Ltd. v. U.S.*, 585 U.S. 274, 279 (2018). The similarities of these statutes and that crucial difference suggest that Congress knew how to authorize attorney fees when it wanted to and that it did not want to here.

Moreover, before enactment of the AIA, § 1337 appears to be the only statute that empowered any tribunal to levy sanctions for "abuse of

discovery" or "abuse of process." It would have been a simple matter for Congress to simply copy § 1337(h) into the AIA. Doing so would not have affected any other statutes regulating administrative agencies because there were no other such statutes to affect. And yet, Congress chose not to. This choice is strong evidence that "sanctions" in § 316 does not include the power to award attorney fees.

The legislative history of the AIA does not support the Director's position either. It was argued below that Congress "recognized the Director may "may impose sanctions in the form of monetary fines (or payments to other parties) ...." Appx02830 (citing H.R. Rep. No. 110-314, at 73 (2007)). But that report related to an earlier legislative proposal in a different Congress that was never enacted. The only committee report pertaining to the AIA from the Congress that passed it—H.R. Rep. No. 112-98 (2011)—does not mention attorney fee or monetary awards of any kind in connection with § 316. H.R. Rep. No. 112-98 at 76 (2011). No one pointed to any of the Senate's legislative history below. The silence of H.R. Rep. No. 112-98 and no apparent statements regarding attorney fees from the Senate further confirms that Congress had no intention of providing the power the Director now claims to wield.

Further evidence of the lack of Congressional intent to allow for attorney fee awards in IPRs can be found from the lack of procedures and enforcement mechanisms for any such awards. When Congress intends agencies to award attorney fees, it enacts comprehensive schemes delineating eligibility, application procedures, and enforcement. For instance, the Equal Access to Justice Act (EAJA) explicitly provides for attorneys' fees in agency proceedings, specifying who qualifies, how to apply, under what circumstances fees are awarded, and how a prevailing party may seek judicial enforcement of the agency's determination. 5 U.S.C. § 504; 28 U.S.C. § 2412(d). Similarly, the Commodity Exchange Act includes provisions for fee awards and contemplates enforcement of those awards in district court. 7 U.S.C. § 18.

No such structure exists in the AIA. The AIA and its implementing regulations contain no procedures for requesting attorneys' fees, no mechanism for enforcement, and no standard for judicial review. This stark silence speaks volumes. Congress's choice to leave the USPTO unequipped with a framework to make attorney fee awards enforceable is dispositive evidence that Congress did not intend to authorize attorney fee awards in IPRs.

- 28 -

### C.   Regulations and Nonbinding Dicta Do Not Allow the Director to Bootstrap Authority Congress Never Provided

OpenSky squarely raised this as a statutory construction issue. Appx02755-58. In response, the Director relies only on the naked word "sanctions" in the statute. Appx00129-30. The Director doesn't even acknowledge that a statutory construction issue is in play, let alone respond, address any of the canons of statutory construction, or provide any other justification for disregarding the usual requirement for "specific and explicit" statutory language to displace the American Rule.

Instead, the Director relies on a USPTO regulation, 37 C.F.R. § 42.12(b)(6), and passing references in Federal Circuit decisions to justify the fee award. Appx00129-30. But a regulation cannot exceed the scope of its authorizing statute. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Since § 316(a)(6) does not explicitly allow fee awards, no regulation can supply that missing authority.

Equally unavailing is the Director's reliance on dicta in *Voip-Pal.com*, 976 F.3d at 1323 and *Amneal Pharmaceuticals LLC v. Almirall, LLC*, 960 F.3d 1368, 1372 n.* (Fed. Cir. 2020). Neither of

- 29 -

these cases even purport to address whether *Congress* authorized the
PTAB to award attorney's fees as a sanction.

In *Apple v. Voip-Pal.com*, the question presented was whether a
PTAB sanction decision exceeded its authority under Rule 42.12(b)
because the awarded sanction (allowing a new panel to preside over a
petition for rehearing) was not explicitly provided for in that rule. *Id.* at
1323. The panel held that Rule 42.12(b) "does not limit the [PTAB] to
the eight listed sanctions." *Id.* No attorney fee was at issue in the case.
Accordingly, *Apple* never addresses whether Rule 42.12(b)(6) permits an
attorney fee award in light of the absence of explicit authorization in
§ 316.

*Amneal* is equally inapt. The Director relies on dicta in a footnote
acknowledging the existence of Rule 42.12 for regulating party
misconduct. Appx00130 (citing 960 F.3d at 1372 n.*). However,
*Amneal*'s holding was that § 285 does not permit courts to award
attorney fees for IPR proceedings and related appeals. 960 F.3d at 1370-
73. Further, *Amneal* noted that the presumption against awarding
attorney fees applied to administrative proceedings as well as court
litigation and it was unaware of any case that would support awarding
fees incurred before the Board. *Id.* at 1371-72. Therefore, *Amneal*

makes no holding whether Congress authorized Rule 42.12(b)(6), and its only relevant findings to this case find no authority for the Board to award attorney fees.[6]

Further evidence that *Amneal* does not say what the Director thinks it does is a lower court decision that, in responding to an *Amneal*-based argument, cited *NantKwest*, and stated there "are no fee-shifting provisions in Chapter 31 of Title 35 [i.e., §§ 311-319]—which specifically relates to IPR proceedings. The absence of a fee-shifting provision in this chapter shows a lack of congressional intent to permit the award of attorneys' fees in IPR proceedings." *Dragon Intell. Prop., LLC v. DISH Network L.L.C.*, No. 13-cv-2066-RGA, 2021 WL 5177680 at *3 n. 5 (D. Del. Nov. 8, 2021), *aff'd on other grounds*, 101 F.4th 1366, 1372 (Fed. Cir. 2024).

The Director also points to a prior regulation, 37 C.F.R. § 1.616(a)(5) (1995), in which the USPTO authorized itself to award compensatory attorney fees in patent interference proceedings.

---

[6] The Director relying on *dictum* while overlooking holding suggests a failure of "reasoned decisionmaking."

Appx02830 (citing 60 Fed. Reg. 14488). OpenSky has been unable to find any decision reviewing whether the attorney fee aspect of this prior regulation had statutory authority. And there is considerable doubt it had any because the PTO's Final Rule discussion for § 1.616 conceded "absence of express statutory authority" for attorney fee sanctions. 60 Fed. Reg. at 14495.

In fact, far from justifying the attorney fees aspect of § 42.12, the PTO's admission that prior regulation § 1.616 lacked statutory authority to award attorney fees further confirms that the attorney fee aspect of 42.12 is invalid. Neither the 1995 Final Rule for § 1.616 (60 Fed. Reg. at 14494-96) nor the Final Rule for § 42.12 (77 Fed. Reg. at 48630) address the American Rule or case law such as *Alyeska*. The PTO's failure to "consider an important aspect of the problem" renders § 42.12 arbitrary and capricious, *State Farm*, 463 U.S. at 43. This also demonstrates the PTO's failure to meet its "affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule." *Metro. Area EMS Authority v. Sec'y of Veterans Affairs*, 122 F.4th 1339, 1344 (Fed. Cir. 2024).

At bottom, the Director's reliance on one unauthorized regulation to bootstrap another is literally claiming that two wrongs make a right.

The Director's own rationale demonstrates that § 42.12 must be set aside. 5 U.S.C. § 706(2)(A) and (C).

### D.    The Director Has No Inherent Power to Award Attorney Fees

Next, the Director improperly attempts to borrow authority from Article III courts, which do have inherent authority to award attorney fees to police bad faith conduct. *See* Appx00129. (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991), in turn citing several other cases). The Director doesn't explain how these cases are relevant to the specific issues OpenSky challenged. None of them provide the inherent power the Director desires.

First, the Director apparently failed to appreciate the difference between Article III courts and agencies. *Chambers* is inapplicable because it only speaks to the "inherent power" that Article III "federal courts" have "to assess attorney's fees against counsel." *Chambers*, 501 U.S. at 45. *Chambers* expressly distinguishes "inherent power" sanctions from statutory (or Federal Rules) sanctions. *Id.* at 46-47. But the USPTO is not an Article III court exercising inherent judicial powers. It is an executive agency with authority limited to what Congress explicitly grants. *HTH Corp. v. NLRB,* 823 F.3d 668, 679

(D.C. Cir. 2016) (agencies are "creature[s] of statute" with "only those powers conferred … by Congress.").

Agencies lack inherent authority to impose attorney fee sanctions for bad faith conduct. *HTH*, 823 at 679 (except for three narrow and "statutorily implicit" exceptions, "it is wrong to speak of agencies as having *any* inherent authority"); *Ethicon v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988) ("The [Director] … has no inherent authority, only that which Congress gives."). To award attorney fees, agencies need express statutory authorization. *Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1232 (9th Cir. 2020); *Trapp v. U.S.*, 668 F.2d 1114, 1115-16 (10th Cir. 1977) ("Agencies may not award attorney's fees without express statutory authority. … Where Congress has spoken to authorize an award of attorney's fees, it has done so in no uncertain terms."). The "inherent power" rationale of *Chambers* is, thus, inapplicable to an agency's authority to impose attorney fee sanctions. The Director must stand or fall on her claim of statutory authority, and *Chambers* offers her no support.

Third, the Director attempts to justify the fee award by a desire to "punish" OpenSky. Appx00129 (noting the fee award was "to punish OpenSky for its abusive conduct."). The Director's desire to punish a

party does not provide authority that Congress did not grant. Further, even if the Director's justification that the fee award is "intended … to punish OpenSky," Appx00129, were an exception to the American Rule—which it is not—it would still not allow an attorney fee award. This is because the USPTO's own rules only authorize the Director to award "compensatory expenses." 37 C.F.R. § 42.12(b)(6). So even if the Director or Board has some authority to issue attorney fee awards— which they do not—that authority is confined to sanctions that are "compensatory rather than punitive in nature." *Goodyear*, 581 U.S. at 108. Because the fees awarded here are admittedly punitive, not compensatory, the Director has no authority to award them.

Without statutory language conferring authority to award attorney fees, the Director cannot invoke an Article III court's inherent sanctioning power.

### E.    Reversal will Not Defang the Director's or the Board's Ability to Police IPRs

This Court need not worry that granting a reversal will induce future misconduct. The Director and Board will still have authority to police misconduct. 37 C.F.R. § 42.12(b) lists seven other categories of sanctions—several that the Director imposed against OpenSky—that would still be available against future parties.

**F.    Conclusion**

In sum, the Director's award of attorney fees lacks any statutory basis. Supreme Court precedent squarely rejects attempts to infer fee-shifting authority from general terms. The general word "sanctions" in § 316 does not suffice, especially in view of the contrast between the powers granted to the ITC in § 1337, but not to the Director in § 316. Neither regulatory references, nonbinding dicta, nor the Director's punishment rationale can grant authority Congress withheld. Nor does the Director have inherent authority to award attorney fees. Absent explicit statutory language and a procedural framework to enforce attorney fee awards, like in § 1337, the Director's order represents an impermissible extension of agency power. It must be reversed.

## III.    Clash with the *Noerr-Pennington* Doctrine Renders the Director's Sanctions "Contrary to Constitutional Right"

The sanctions are "contrary to constitutional right or immunity," § 5 U.S.C. 706(2)(B), because they penalize conduct protected under the First Amendment ("Congress shall make no law … abridging ... the right … to petition the Government for a redress of grievances") as implemented by the *Noerr-Pennington* doctrine. *Noerr-Pennington* shields petitioning activity—including IPR filings, settlement negotiations, and related litigation conduct—from liability unless it

qualifies as "sham litigation." This exception was nullified at least when the Director agreed that OpenSky's petition was "meritorious," (Appx00029-30; Appx00119-120). The Director's ability to impose sanctions was, thus, cabined by *Noerr-Pennington*.

The Director proposed two remarkably different theories for award of attorney fees. Initially, Paper 102 found abuse of process solely based on OpenSky's "motivation" in filing the IPR petition and sending settlement communications purportedly reflecting a willingness to "undermine and/or not vigorously pursue this matter" in exchange for money rather than primarily to challenge patent validity (Appx00040-41, 66-81). OpenSky showed that the Director's decision in Paper 102 failed on *Noerr-Pennington* grounds (Appx02765-67). In Paper 127, the Director responded by shifting to an amorphous "totality of conduct" theory,[7] throwing in alleged discovery misconduct and other post-filing

---

[7] As explained at page 11, Paper 102 did not identify or give notice of any intent to issue an award of attorney's fees for the alleged discovery misconduct, instead issuing evidentiary sanctions as "the" sanction for that alleged misconduct. Appx00052-65.  Cf. *Patent Quality Assurance, LLC v. VLSI Technology LLC*, IPR2021-01229, Paper 131 at 43 (Aug. 3, 2023).

activities "throughout the proceeding" (Appx00128-33; Appx00137-38). Neither of the Director's theories addresses *Noerr-Pennington* immunity for meritorious filings and subsequent litigation-adjacent conduct.

This Court should vacate the attorney fee sanctions and reaffirm that protected petitioning activity cannot justify punitive agency action.

### A.  OpenSky's Conduct Is Protected by the *Noerr-Pennington* Doctrine

The right to petition the government is one of the most precious liberties in the Bill of Rights. For this reason, the Supreme Court has found that *Noerr-Pennington* immunity shields "effort[s] to influence public officials regardless of intent or purpose." *BE&K Construction Co. v. NLRB*, 536 U.S. 516, 525 (2002) (quoting *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)). The doctrine originated in antitrust law, but its reach has been extended to other areas of law, and to agencies. For example, the NLRB may not sanction an employer for a retaliatory lawsuit against a union, if that lawsuit was objectively reasonable, no matter the motivation or intent. *BE&K*, 536 U.S. at 535-37. *Noerr-Pennington* applies to immunize claims of abuse of process in the Patent Office. *Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1356-57 (1991). Courts routinely grant *Noerr-Pennington* immunity to parties that initiate suit solely for extraction of money, as long as the suit is

objectively reasonable. *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 534, 539 (9th Cir. 2022) (*Noerr-Pennington* immunity protects a case brought for "the wrongful subjective purpose of extorting money from businesses" unless sham exception applies); *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1350 (Fed. Cir. 2014) (non-practicing entity suit was not objectively baseless); *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 280 F.Supp.3d 691, 714-15 (D. Md. 2017). A narrow "sham exception" is limited to a party whose filing is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" regardless of the intent of the filer. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993).

OpenSky's right to file a meritorious IPR petition is firmly grounded in this protection. Section 311(a) of the America Invents Act (AIA) explicitly provides that "a person who is not the patent owner" may file an IPR petition, reflecting Congress's intent to facilitate broad access to this patent validity mechanism. The filing of an IPR petition, therefore, constitutes protected petitioning activity under the First Amendment and *Noerr-Pennington*. OpenSky's Petition is not a sham—

it has been found meritorious five separate times. Appx01243-44; Appx00029-30; Appx00100; Appx00119-120; Appx00205-06.

After OpenSky pointed out the *Noerr-Pennington* flaw in the Director's sanctions (Appx02765-67), the Director pivoted to a new theory, in which the Director extends the scope of conduct beyond that set forth in Paper 102 to include the "totality of OpenSky's conduct," including OpenSky's petition, intent, copying Intel's petition, filing an IPR without fear of infringement, the settlement offer, and discovery misconduct (for which the Director still gave no opportunity to cure). Appx00133-36.[8]

But the Director's salvage attempt can't evade *Noerr-Pennington*. The doctrine provides "breathing space" around exercise of the right to petition. *BE&K*, 536 U.S. at 531. This "breathing space" extends to litigation-adjacent and conduct incidental to litigation unless the litigation itself is a sham. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006). "Incidental" conduct includes settlement

---

[8] The Directors' failure to give notice of the pivot, and failure to give opportunity to be heard, is discussed below at § V.E *infra* starting at page 67.

communications as long as the underlying litigation is not a sham.
*Industrial Models, Inc. v. SNF, Inc.*, 716 Fed.Appx. 949, 957 (Fed. Cir.
2017) ("routine … offers to settle" are "attendant upon" litigation, and
therefore within *Noerr-Pennington*, even when the offer is "invitation to
collude"); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
263 F.3d 239, 253 (3d Cir. 2001); *Sosa*, 437 F.3d at 935-37 ("*Noerr-Pennington* immunity applies to claims based on conduct incidental to
litigation … unless the litigation itself is a sham"—settlement demands
are "incidental" to litigation and therefore within *Noerr-Pennington*
immunity). The Director has never asserted that OpenSky's petition is a
sham, nor that the settlement was not "incidental" and likewise
immune, or made any other relevant showing.

## B. The Director's Attempts to Explain Away *Noerr-Pennington* are Faulty

The Director never responds in any meaningful sense to *Noerr-Pennington* immunity. The word "sham" appears *nowhere* in Paper 127.
Appx00126-43.  Nor does Paper 127 suggest the petition was
"objectively baseless." Appx00133. The Director directly mutinies
against the basic premise of *Noerr-Pennington*: "OpenSky's litigation
misconduct cannot be excused simply because the Petition itself … was
meritorious." Appx00133. Instead, Paper 127 goes off on a Gish gallop of

irrelevancies and previously unknown exceptions. Appx00133-36. None of them hold water.

In her *Noerr-Pennington* discussion, the only facts identified by the Director are that "primary purpose of extorting money, while being willing to forego or sabotage the adversarial process," "motive," harm to VLSI, and "failure to comply with Mandated Discovery" Appx00135-36. None of these have any relevance to whether the litigation was "sham" or not.

Paper 127 mischaracterizes *Noerr-Pennington* as a "blanket immunity." Appx00133. OpenSky made no such claim; this is Director hyperbole. All OpenSky argued is that *Noerr-Pennington* immunizes *non-sham* petitioning activity and activity incidental thereto—and the Director offers no basis to disagree.

Next, the Director appeals to "congressional intent[ ] that undergirds the [AIA] the integrity of the patent system." Appx00133-34. The Director misunderstands the foundations of American Law. *Noerr-Pennnigton* is grounded in the First Amendment right to petition. "Congressional intent" must confirm to constitutional boundaries, not the other way around. For example, in *BE&K*, the Court adopted a

statutory construction that avoided the constitutional problem. 536 U.S. at 535-36.

Paper 127 makes no showing that the incidental conduct at issue—the settlement offer and discovery nonproduction—were exceptions to the "breathing space" principle. "Breathing space" applies to all conduct incidental to objectively reasonable litigation. *BE&K*, 536 U.S. at 531; *Sosa*, 437 at 934-35. The right to present "offers of settlement" is guaranteed by statute, 5 U.S.C. § 554(c)(1), and within the "breathing space" and "incidental" conduct immunized by *Noerr-Pennington*. *Sosa*, 437 F.3d at 935-37; *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 646 (9th Cir. 2009). The Director never engages with the issue sufficiently to disagree.[9]

Paper 127 cites *BE&K Construction*, 536 U.S. at 537, Appx00133-34, as allowing sanctions for litigation misconduct in an otherwise meritorious suit:

---

[9] The pivot in paper 127 is the first time that discovery misconduct is in the mix for attorney fees, rather than the discovery sanctions of paper 102. Appx00062-65. It cannot be included for reasons discussed in § V, *infra*.

Case law further supports imposing sanctions for litigation misconduct, despite a meritorious suit. *See BE&K Construction*, 536 U.S. at 537 ("[N]othing in our holding today should be read to question the validity of common litigation sanctions imposed by courts themselves—such as those authorized under Rule 11 of the Federal Rules of Civil Procedure."); *see also* 37 C.F.R. § 42.11(c) (Board counterpart to Rule 11).

Appx00133-34. This argument, too, is off the mark.

First, the portion of *BE&K Construction* cited by the Director is pure *dictum*: as was Justice O'Connor's habit, *BE&K* ends with a paragraph explaining what the decision does *not* hold, 536 U.S. 536-37, and that's all that Paper 127 cited. The *dictum* distracts the Director from the holding of *BE&K*: a lawsuit brought with bad intent—in *BE&K*, retaliation for union organizing—and its "breathing space" are still immunized, if objectively reasonable. 536 U.S. at 532.

Second, the sentence cited by the Director relates to district court sanctions under Fed. R. Civ. P. 11. 536 U.S. at 537. That has no relevance to an IPR proceeding: the Director is an agency official, not an Article III court. The Director lacks the inherent authority that undergirds Rule 11. And she did, Rule 11 has various procedural prerequisites before sanctions may issue, prerequisites that the Director did not observe.

The Director's invocation of Rule 42.11(c) is especially faulty. First, the Director did not award fees under this provision, so it is simply irrelevant. Moreover, by its own terms, this Rule applies only to "an attorney, registered practitioner, or unrepresented party." This rule cannot authorize sanctions of any kind against a represented party like OpenSky. And of course, a regulation cannot carve a hole in the constitution.

## IV. The Sanction Award Conflicts with Supreme Court Precedent Governing Non-Punitive Fees

### A. The Director Applied the Wrong Standard

American law recognizes two different kinds of fee awards. *Blixseth v. Yellowstone Mountain Club LLC*, 854 F.3d 626, 629 (9th Cir. 2017). One class includes "whole case" fee-shifting awards, such as patent law's "exceptional case" statute (35 U.S.C. § 285), the Equal Access to Justice Act (5 U.S.C. § 504 and 28 U.S.C. § 2412), and various environmental and civil rights statutes. The other class includes sanctions for misconduct, such as Rule 11, vexatious litigation under 28 U.S.C. § 1927 and other statutes and regulations providing for compensatory attorney fees. The two are subject to different standards. *Blixseth*, 854 F.3d at 629-630.

For "whole case" awards, there's no need to analyze which costs arise from which actions.

In contrast, for misconduct sanctions the tribunal must show "solely," "but for" causation between specific costs and specific misconduct, "asses[ing] and allocate[ing] specific litigation expenses." *Goodyear*, 581 U.S. at 108-09, 113. Section 42.12 sanctions are not fee shifting sanctions, but are explicitly limited to "compensatory expenses," 37 C.F.R. § 42.12(b)(6) ("providing for compensatory expenses"), and as such must follow this rule. Thus, the tribunal "must determine which fees were incurred because of, and solely because of, the misconduct at issue." *Id* at 113. Further, an agency is obligated to "cogently explain" a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 48. This is necessary to assure that the sanctions redress only losses sustained solely because of the misbehavior, so that the resultant sanctions do not "cross[ ] the boundary from compensation to punishment." *Goodyear*, 581 U.S. at 108. When costs result from a mix of sanctionable conduct and non-sanctionable conduct, those costs may not be included in a sanctions award. *Goodyear*, 581 U.S. at 109 (citing *Fox v. Vice*, 563 U.S. 826, 836 (2011)). The causation must be "sole," "but for." *Id.* at 110. While the

conduct-cost-causation showings need not achieve "auditing perfection,"
the "but for" causation analysis must be set forth and explained. The
Director's "rough justice" (Appx03346) still requires avoiding the
*injustice* of an unexplained decision or "punitive" sanctions. *Id.* at 108.

Under political pressure demanding that the Director punish
OpenSky, the Director overlooks the difference, and applies the wrong
standard. Because of that wrong standard, the Director has not made—
and cannot make—the underlying factual findings for the fees awarded.

OpenSky explained at least twice that *Goodyear* precluded
monetary sanctions. Appx02767-70; Appx02987-03001 (explaining lack
of causation). The Director specifically declined to make the necessary
conduct-cost-causation findings. Instead, she pounced on *Monolithic
Power Sys. Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013), to
support a conclusion of "misconduct throughout the proceeding"
(Appx00137-38) and refused to address specifics when asked
(Appx00224). The Director's failure to engage is "abuse of discretion" or
"contrary to law" in several respects.

First, the Director squarely concedes that her sanctions are
intended "to punish OpenSky." Appx00129. The Director's later

decisions never backpedal from that "intent." With that, the Director's authority to impose "compensatory" sanctions evaporates.

Second, *Monolithic* is a § 285 "exceptional case" whole-case fee-shifting case. 726 F.3d at 1361. But this is a sanctions case, so *Goodyear* applies, not *Monolithic*. Further, *Monolithic* was decided by this court in 2013, before the Supreme Court's *Goodyear* decision clarified procedural requirements and substantive limitations on attorney fee sanctions in 2017. The Director's reliance on *Monolithic* doesn't excuse her failure to address the conduct-cost-causation showings of *Goodyear* in 2023.

Third, in *Goodyear*, the misconduct was failure to disclose evidence establishing Goodyear's liability. Goodyear withheld that evidence for *years*, until it came to light in a different litigation. 581 U.S. at 104-05. The district court surmised that the litigation would have ended years earlier, and "disclaimed the usual need to find a causal link between misconduct and fees when the sanctioned party's behavior was bad enough … when it rose to a truly egregious level." *Goodyear*, 581 U.S. at 112 (cleaned up). In this case, the Director specifically *declines* to offer *any* explanation, not even plausible surmise, that VLSI's attorney fees were the "but for" consequence of any

specifically identified misconduct. Appx00137-38. The Director's "misconduct throughout the proceeding" rationale is exactly one of the errors corrected in *Goodyear*.

### B.    For Each Time Bucket, the Director Failed to "Cogently Explain" the Required Causal Connection

The Director bucketized the case into six "time buckets" and awarded fees for five: "Precedential Opinion Panel ('POP') Request for Review" (Appx00227-28), "Settlement Negotiations" (Appx00228-29), "Ethical Research" (Appx00229), "Director Review Process" (Appx00230-31), and "Attorney Fees Briefing" (Appx00232).

First, the Director's buckets are defined by time, not conduct-cost-causation. This "time-bucket" approach is one of the exact errors the Supreme Court reversed in *Goodyear*. *Goodyear* expressly rejects "temporal limitations" as "wide of the mark." 581 U.S. at 113. *When* the fees were incurred is neither here nor there. The required bucketizing and showing are "but for" causation, not time. *Id.*

Second, none of the fees incurred during the Director's review are compensable because fees incurred in litigating a fee motion, appellate-style review, or similar ancillary proceedings do not flow but for from prior misconduct but instead arise from that discretionary review itself. *Cooter & Gell*, 496 U.S. at 406-07; *Blixseth*, 854 F.3d at 630-31 (denying

sanctions-based fees for preparing a fee motion). This Director Review was *de facto* an appellate proceeding: the Director repeatedly uses quintessentially appellate terminology. Appx01449 (Director Review instituted *sua sponte* to "review … the Board's Institution Decision"); Appx00039 ("review"); Appx00041-42 ("remand" for "compelling, meritorious" review); Appx00115, 119-20 ("affirming" a Board "Decision on Remand"); Appx00136 ("Director review regarding whether to reverse the initial institution decision"). These are classic appellate terms. Because the Director Review here was effectively an "appeal" of the Board's institution decision, the chain of causation is broken for any fees incurred. *Cooter & Gell*, 496 U.S. at 406-07 (appeal of sanction not caused by the sanctioned conduct). This means the "Director Review Process" bucket of fees is not compensable. Similarly, the "Attorney Fees Briefing" bucket (Appx00232) is not compensable because those fees are for preparing an ancillary fee motion, which breaks causation. *See Blixseth*, 854 F.3d at 630-31.

Third, for four of the five buckets, the Director coined new, hitherto-unknown substitutes for conduct-cost-causation: "relevant to Director Review" (Appx00228), "relevant to OpenSky's abuse of process" (Appx00229), "unusual and serious" (Appx00229), "numerous novel and

complex issues" (Appx00231). None of these tests have anything to do with conduct-cost-causation; they're all "wide of the mark." *Goodyear*, 581 U.S. at 113.

Fourth, for *none* of the five buckets does the Director identify specific misconduct, let alone explain how costs were the "but for" consequence of that conduct. For none of the five buckets does the Director explain how she *avoided* rolling in costs from OpenSky's meritorious initial filing, and similar costs that would have arisen "even had [OpenSky] behaved immaculately in every respect." *Goodyear*, 581 U.S. at 114. The initial petition was not "misconduct," as even the Director concedes (Appx00134, "I am not sanctioning OpenSky based on whether it filed a meritorious Petition"). Yet the Director's "misconduct throughout the proceedings" rationale (Appx00128-38) and the buckets she awarded (Appx00227-32) assume the misconduct started with the initial filing.

The failure to identify conduct-cost-causation is even more stark in the Director's handling of those acts labeled "misconduct." For example, the Director points to the February 23 "settlement negotiations" email, the alleged copying of Intel's petition, minimal effort in preparing the IPR, not engaging the expert before filing, and

objecting and refusing to provide a privilege log. Appx00066-81. But those aren't the buckets the Director uses, and nowhere does the Director make a conduct-cost-causation showing connecting specific conduct as the "sole," "but for" cause of any incremental fees. Even if each of these acts were "bad" in some abstract sense (which the Director concedes, by and large, they are not, e.g., Appx00067-80), *Goodyear* demands that the Director *explain* a link between the supposed wrongdoing and incremental attorney work that would not otherwise have been performed. It was the Director's burden to "determine which fees were incurred because of, and solely because of, the misconduct at issue" and "cogently explain" the causal connection. *Goodyear*, 581 U.S. at 113; *State Farm*, 463 U.S. at 43, 48. But the Director offers no explanation beyond "I am persuaded… to include the time," Appx00232.

Both VLSI's evidence and the Director's decisions only address the existence of *some* harm and the lodestar calculation, and ignore any *Goodyear* showing of conduct-cost-causation to connect *each* cost to specific conduct. Appx02823-39; Appx00133-38; Appx11525-608; Appx2940-73; Appx00227-32. The Director was not required to achieve "auditing perfection," but she was required to give sufficient explanation to demonstrate awareness of the legal requirement for

conduct-cost-causation. *Goodyear*, 581 U.S. at 110. Failure to "cogently explain" the necessary connections was arbitrary and capricious. *State Farm*, 463 U.S. at 43, 48. Further, because VLSI offered no relevant evidence on causation, the issue is waived and cannot be addressed on remand. *Goodyear*, 581 U.S. at 114-15.

## C.     Conclusion

The Director's failure to address the relevant legal issues was arbitrary and capricious and abuse of discretion that warrants reversal. The record is closed to any do-over on remand.

## V.    The Director's Abuse-of-Process Determination Trampled the APA and Basic Fairness

### A.     Introduction and Legal Standards

The Director's sanctions order flouts bedrock principles of administrative law and due process by depriving OpenSky of fair notice, arbitrarily prohibiting key evidence, and shifting rationales midstream. The APA requires agencies to provide adequate notice of the legal and factual bases for proposed actions, 5 U.S.C. § 554(b)(3), to allow parties the entitlement to present evidence of their choice, to base sanctions decisions on "reliable, probative, and substantial evidence," 5 U.S.C. § 556(d), and to avoid "arbitrary and capricious" decision-making. *See*

*State Farm*, 463 U.S. at 42-43. Likewise, constitutional due process demands a meaningful opportunity to present relevant evidence and respond to allegations. *Brock v. Roadway Exp. Inc.*, 481 U.S. 252, 264 (1987); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015) ("The indispensable ingredients of due process are notice and an opportunity to be heard by a disinterested decision-maker," and reminding of the obligations of §§ 554 and 556).

Here, the Director prevented OpenSky from using declaratory evidence, imposed discovery obligations never contemplated by the IPR regulations, and otherwise denied OpenSky an opportunity to defend itself. These actions contravene the APA and the PTO's own rules, requiring reversal. As explained below, each step of the Director's proceeding—and each negative inference she derived—rested on *ultra vires* demands and inadequate evidence, culminating in a sanctions order that is procedurally and substantively unsupportable. And because the sanctions were ultimately based on "the totality" of OpenSky's conduct, each of these errors renders the sanctions invalid.

**B.    Order No. 47 Was Ultra Vires**

**1.    The Director Lacked Authority to Propound Discovery**

In Paper 47, the Director ordered that OpenSky respond to six interrogatories and produce seven categories of documents (Appx00031-34)—despite no statutory or regulatory basis for such discovery. The IPR statutes and regulations sharply restrict discovery, emphasizing it must be obtained by agreement, by motion, or through a party's fact assertions, not at the Director's *sua sponte* order. 35 U.S.C. § 316(a)(5); 37 C.F.R. §§ 42.51-42.53.  The interrogatories were especially improper because the IPR regulations authorize only document requests, depositions, and declarations—not interrogatories. 37 C.F.R. §§ 42.51-42.53. The Director had no authority to impose this discovery. *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) ("an agency has no discretion to disregard binding regulations"). Interpretations in the Federal Register bind against agency personnel until the agency formally adopts new interpretations. *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 80 (2d Cir. 2006) ("An interpretative rule binds an agency's employees," cleaned up); 5 U.S.C. § 552(a)(1)(D).

The Director invoked 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.5(a) to justify her order, Appx00053, but neither supports the Director's

discovery order. Section 316(a)(5) is not self-executing—the authority it confers is bounded by the regulations the Director prescribes. Section 316(a)(5) obligates the Director to prescribe regulations, not ignore them. *Fox Television*, 556 U.S. at 515 ("An agency may not … simply disregard rules that are still on the books."). And 37 C.F.R. § 42.5(a), which allows the Board to "determine a proper course of conduct" in uncovered situations, gives the PTAB authority to regulate *party* conduct, but not to jump into the fight as a party by injecting new issues and demanding discovery. Similarly, § 42.5(a) cannot be read to negate the regulatory limits on discovery that the PTO negotiated during notice-and-comment. An agency that wishes to reinterpret its rules must do so via the same formalities used to adopt them, not by targeting a single party with *ad hoc* procedures. *See Exelon Generation Co. v. Local 15, IBEW*, 676 F.3d 566, 577-78 (7th Cir. 2012) (to reverse a prior position the agency must exercise at least the level of procedural formality used to adopt it initially). OpenSky objected to this *ultra vires* discovery (Appx01578-85) (while still producing over 240 MB of documents), but the Director dismissed those objections. Appx00053-55, Appx00057.

Because the Director had no authority to mandate discovery, she likewise had no authority to sanction OpenSky for alleged noncompliance.

### 2.    The Director's Restrictions on How OpenSky Could Respond to the Interrogatories were "Short of Statutory Right" and "Without Observance of Procedure"

The interrogatories demanded information regarding OpenSky's formation, motives, and business activities. Appx00031-33.   OpenSky explained that as a single-member LLC, "internal documents" and "internal communications" simply did not exist in many instances. Appx02172-73. Yet the Director simultaneously barred "[n]ew declaratory evidence" Appx00034, leaving OpenSky with no practical means of responding.

This one-two punch—prohibiting declaratory evidence while demanding documentary proof—deprived OpenSky of a fair opportunity to respond. The APA guarantees an "entitlement" to present oral or documentary evidence as the party chooses. 5 U.S.C. § 556(d). This is particularly true for questions related to intent and motivations that inherently lack pre-existing documentation. But, without ever finding that such documents actually existed, the Director found OpenSky's

interrogatory responses insufficient for failing to cite sufficient documentary evidence all the same. Appx00058-62.

Not only was the bar on declaratory evidence *ultra vires*, the subsequent sanctions are precisely the type of unfair and arbitrary enforcement condemned by due process: "Obviously sanctions cannot be based on the failure to produce a document that did not exist." *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364-65 (Fed. Cir. 2003). The Director contends that some non-produced documents exist (Appx00132) (but without identifying specifics) but nowhere considers whether unproduced documents existed to support *each* negative inference. By insisting on documents that did not exist while forbidding the only feasible alternative (affidavits or declarations), the Director trapped OpenSky into noncompliance, resulting in a procedurally unfair and arbitrary sanction.

### 3.    The Director Lacked Authority to Demand a Privilege Log

The Director lacked authority to demand a privilege log to be used to identify documents for *in camera* inspection. Appx00033-34.

In promulgating the IPR regulations, the PTO promised that it would not require discovery of "anything … protected by legally recognized privileges." 77 Fed. Reg. at 48639. The PTO is bound by

interpretations of its own regulations that it states in its Federal Register notices. *Yale-New Haven Hosp.*, 470 F.3d at 80; 5 U.S.C. § 552(a)(1)(D). Privileged documents are not discoverable, and the Director can't change the rules on the fly.

The Director's explicit purpose of the privilege log was to identify documents for *in camera* review. Appx00034. OpenSky reminded the Director of case law holding that disclosure of privileged documents to an agency waives privilege. Appx01584-85. Logging protected materials for the sole purpose of potential *in camera* review would, thus, be superfluous. Appx01585. Paper 102 did not address that case law, non-authority to require a privilege waiver, or the PTO's assurance that it would not require discovery of privileged documents. Appx00055. Instead, Paper 102 ruled that not providing a log was sanctionable conduct, with no opportunity to cure. Appx00056-57.

## C.    The Director Ignored Key Evidence and Relied on Contradictory Adverse Inferences

Sanctions may only issue when "supported by and in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d). "Substantial evidence" review requires that an agency decision must take into account whatever evidence fairly detracts from the agency's conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474,

488 (1951). An agency must explain its view of contrary evidence.
*Princeton Vanguard, LLC v. Frito-Lay North America, Inc.*, 786 F.3d
960, 970 (Fed. Cir. 2015).

The Director's findings of abuse of process relied heavily on
adverse inferences, which served as the foundation for her sanctions
and ultimate conclusions. Appx00066-81. However, these findings fail
the agency's substantial evidence test because the Director failed to
consider and explain significant contrary evidence provided by
OpenSky. By disregarding this evidence, the Director violated the
APA's requirement that agency decisions be supported by "reliable,
probative, and substantial evidence" (5 U.S.C. § 556(d)) and failed to
meet the agency's obligation to provide a reasoned explanation for its
findings. This omission renders the Director's abuse of process
determination unsound.

For example, the Director explained that the "proper sanction is to
hold *disputed* facts as established against OpenSky," Appx00064
(emphasis added), but went far beyond that. Paper 102 drew an adverse
inference that OpenSky initiated settlement negotiations, Appx00067.
But VLSI never disputed that it had initiated settlement discussions,
and this fact was confirmed in evidence from both parties. Evidence

included an email where OpenSky stated that it had "considered" and "declined" VLSI's "suggestion" to make a settlement offer, as well as voicemails from VLSI proposing settlement discussions. Appx06131-32; Appx01704; Appx02162-63. VLSI's own brief stated "VLSI proposed settling OpenSky's IPR for up to $750,000—$250,000 upon agreement to terminate and $500,000 if termination occurred without joinder." Appx01771. This evidence established that OpenSky's settlement-related actions were reactive, not instigative, and directly contradicted the Director's adverse inference that OpenSky initiated settlement discussions for improper purposes Appx00066-67. The Director does not cite any factual dispute on this issue or address this evidence at all, violating the APA's requirement to consider and explain the whole record, including significant contrary evidence before reaching a conclusion. 5 U.S.C. § 556(d); *Princeton Vanguard*, 786 F.3d at 970. The Director repeatedly relied on this "fact" to establish whether OpenSky had abused the process. Appx00067; Appx00077.

Further, the Director's adverse inferences are not the "substantial evidence" required by § 556(d), unless (a) the documents actually exist, *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-cv-1702 (RC), 2021 WL 4033071, at *7 (D.D.C. Sep. 3, 2021), (b) the tribunal explains

some nexus between the inference and the lost evidence, *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 105 (D. Colo. 1996) (c) the inference is supported by some corroborating or circumstantial evidence, *Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 980 F.3d 1117, 1136 (7th Cir. 2020), and (d) the tribunal explains its reasons for rejecting the party's alternative explanations. *Singh v Bd. of Immigration Appeals*,

253 Fed. Appx. 91, 92-93 (2d Cir. 2007). The Director never explained how her adverse inferences—supported by no more than non-production under objection—were consistent with law.

In maintaining her adverse inferences, the Director responds to only one of these defects—that *some* documents were produced by VLSI. Even here, the Director makes no attempt to show missing documents for *all* adverse inferences, gives none of the required explanations for nexus or for rejecting OpenSky's alternatives, cites no corroborating evidence, and gives no opportunity to cure. Appx00132-33. Adverse inferences may only "plug evidentiary holes," not "hold all the water." *Epic*, 980 F.3d at 1136. Throughout, Papers 102 and 127 are notably thin on cites to record evidence; almost the entire case is built on adverse inferences.

By failing to consider and explain significant contrary evidence—including evidence that directly rebutted key adverse inferences—the Director distorted the record and failed to meet the substantial evidence standard. These errors infected her findings of abuse of process and render her conclusions unsupported. This selective and improper approach violates the APA's mandate to consider the "whole record" (5 U.S.C. § 556(d)) and renders her findings arbitrary and capricious.

## D. The Director's Abuse of Process Finding Was Not in Accordance with Law, and Arbitrary and Capricious

In Paper 102, the Director writes "The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law." Appx00040. However, like any other tort, abuse of process has multiple elements. Paper 102 ignored at least two elements of that tort: (1) the tort requires formal court "process" (i.e., an order by which the tribunal asserts jurisdiction or compels action), and (2) an improper, collateral purpose.

The Restatement (Third) of Torts § 26, comment (b), confirms that "process" has a strict legal meaning—namely, "instruments by which courts assert their jurisdiction and command others." *Id.* Abuse of process therefore arises only if a tribunal issues an order that was wrongfully procured; mere misconduct by a party is insufficient. *Id.*

Indeed, comment (b) admonishes against the naïve layman's meaning of "process." Yet in Papers 102 and 127, the Director invoked exactly that lay understanding by claiming OpenSky "abused the IPR process." Appx00052–54, Appx00066–81; Appx00127; Appx00135. Nowhere did the Director notify the parties that this informal definition would override the formal meaning set out in the Restatement, or show how OpenSky's conduct met the threshold requirement that a court (or here, a tribunal) must have actually issued process that was misused.

Perhaps the Director confuses abuse of process with the related tort of Wrongful Use of Civil Proceedings, from the Restatement §§ 24 and 25.  But that tort only applies if a case-initiating paper is "without probable cause," §§ 24, 25.  The Director conceded that point multiple times.

Second, as the Director notes, an abuse of process claim requires some ulterior or collateral purpose. Appx00040 ("The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law"). But Paper 102 only finds that OpenSky's purpose was to obtain money from VLSI, Intel, or both. The Director fails to meet her burden to explain how such a purpose shows an ulterior or collateral purpose. Nor could she. Most if not all commercial litigation is

filed in pursuit of economic gain, and this is certainly true of patent
proceedings. PTAB precedent recognizes that it is *not* an abuse of
process to file an IPR for such a reason: "[p]rofit is at the heart of …
nearly every *inter partes* review" and "an economic motive for
challenging a patent claim does not itself raise abuse of process issues."
*Coalition for Affordable Drugs VI, LLC v. Celgene Corp.*, IPR2015-
01092, Paper 19 at 2 (PTAB Sep. 25, 2015). Courts have routinely
rejected the idea that pursuing a monetary settlement for the asserted
claim meets the "collateral purpose" requirement. *Reis v. Walker*, 491
F.3d 868, 870 (8th Cir. 2007) ("commencing a lawsuit or adding a claim
to gain leverage for a settlement, or in the expectation of a settlement,
is not an abuse of that process.").

Even the cases the Director cites demonstrates that there was no
abuse of process. In *Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F.
Supp. 3d 592 (E.D. Pa. 2018), the defendant alleged that plaintiff's
settlement offer was an abuse of process because it would have caused
violations of federal law and interfered with the attorney client
relationships. *Id.* at 606. The court dismissed the claim, holding that
"the fact that Plaintiff made demands that Defendant deemed
objectionable and contrary to its federal mandate does not rise to the

level of an abuse of process." *Id.* Instead, the court noted that "Plaintiff's primary purpose in making those demands was to present an opening offer to settle this case—the very purpose for which the settlement process was designed." *Id.* Thus, even if the *Woods* plaintiff had "bad intentions," the settlement negotiation was carried out to its authorized conclusion—that is "Defendant rejected Plaintiff's settlement letter and the contested demands are no longer at issue." *Id.* The Director never explains why a rejected settlement offer is "no longer at issue" in the case she cites, but abuse of process in this case.

The Director also cites *BTG Int'l Inc. v. Bioactive Labs.*, No. 15-4885, 2016 WL 3519712 (E.D. Pa. June 28, 2016), implying that seeking monetary compensation in an IPR may be "abuse of process." Appx00069. But that case, too, supports OpenSky. There, the alleged abuse arose because the petitioner used the IPR for the collateral purpose of extracting leverage over an *entirely unrelated* defamation dispute—demanding multi-million-dollar compensation and public concessions for alleged libel. *Id.* at *3-*4. That was the "classic example" of exploiting a legal tool (an allegedly frivolous IPR) to coerce settlement of a completely different, pre-existing claim.

By contrast, all settlement discussions here related to the patent itself, and the record shows that OpenSky's petition had sufficient merit to withstand any contention of frivolousness. A request for financial compensation to dismiss a legitimate patent challenge is not an unrelated or extortionate act; it is a typical feature of patent litigation, as both courts and the PTAB acknowledge. See *Affordable Drugs*, IPR2015-01092, Paper 19 at 2.

The Director's failure to explain why OpenSky's economic rationale is different from all others, and her unexplained change in policy relative to *Affordable Drugs*, are contrary to law and arbitrary and capricious. *Fox Television*, 556 U.S. at 515-16; *State Farm*, 463 U.S. at 43.

## E.    The Director's Shifting Rationale for Sanctions Violates the APA's Notice and Reasoned Decision-Making Requirements

The Director's sanction order violates the APA because it shifts the grounds for sanctions midstream, denying OpenSky fair notice and depriving it of a meaningful opportunity to defend itself.

Paper 102 framed the abuse of process finding around OpenSky's alleged intent in filing the IPR petition and engaging in settlement discussions. Appx00066-81. Paper 102 specifically identified two actions

as sanctionable: the filing of the petition and the February 23, 2022, settlement email. *Id.* Paper 102 did not rely on alleged discovery misconduct or post-filing conduct as a basis for abuse of process or monetary sanctions. *Id.*

Even more striking, Paper 102 is the first time the Director gave notice of the specific conduct of concern, the first notice of the specific legal theory to be applied, and simultaneously a "determination" that abuse of process had occurred. Appx00065-81. Adequate notice requires "attention being called to" specific facts.  5 U.S.C. § 554(b)(3); *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co*, 856 F.3d 1019, 1029 (Fed. Cir. 2017); *Belden*, 805 F.3d at 1080 ("The indispensable ingredients of due process are notice and an opportunity to be heard"). The Director's papers 41 and 47 identified no "matters of fact and law asserted," 5 U.S.C. § 554(b)(3), other than the naked words "abuse of process," and gave no mention of the specific facts that later emerge as basis for the "determination." Appx01449-50, Appx00030-32. The Director never gave opportunity to be heard on the specific issue "determined" in paper 102.

Then, in Paper 127, after OpenSky raised *Noerr-Pennington* immunity, the Director changed course again. Instead of relying solely

on OpenSky's intent behind filing the petition and settlement discussions, Paper 127 changed the rationale to include alleged discovery misconduct and a broad "totality of conduct" standard. Appx00135. The Director threw in additional facts that had not heretofore been at issue for abuse of process. Appx00064. Discovery misconduct had been treated as a separate issue in Paper 102, but Paper 102 never discussed it as a basis for abuse of process or awarding attorney's fees. Appx00052-65 (addressing alleged discovery misconduct); Appx00065-81.[10] This shift deprived OpenSky of fair notice by imposing sanctions based on allegations that were not clearly articulated in Paper 102.

An agency may not change theories in midstream without giving respondents reasonable notice of the change and the opportunity to present argument under the new theory. *Belden*, 805 F.3d at 1080. The

---

[10] This contrasts to the Director's orders in the PQA matter. There, the Director ordered PQA to "show cause" why the Director should not award attorneys fees for refusing to comply with the mandated discovery. *Patent Quality Assurance, LLC v. VLSI Technology LLC*, IPR2021-01229, Paper 131 at 43 (Aug. 3, 2023).

- 69 -

APA prohibits arbitrary and capricious decision-making, requiring agencies to articulate a consistent and rational basis for their actions. *Fox Television*, 556 U.S. at 515; *State Farm*, 463 U.S. at 43. By first asserting one basis for sanctions and later expanding it to include unrelated conduct, the Director moved the goalposts, denying OpenSky the ability to meaningfully defend itself. The shift from an intent-based theory in Paper 102 to an undefined "totality of conduct" rationale in Paper 127 is a textbook violation of the APA's notice and reasoned decision-making requirements.

### F.    Conclusion: Reversal, Not Remand, Is the Only Appropriate Remedy

The Director's sanctions order stands on a procedurally and legally untenable foundation. From banning declarations while demanding proof of subjective motivations, to concocting two new "abuse of process" standards, to shifting the conduct supporting the "abuse of process" sanction, the Director violated fundamental APA and constitutional due process guarantees.

Under *Belden*, 805 F.3d at 1080, and *Fox Television*, 556 U.S. at 515-16, an agency cannot "move the goalposts" and then blame a regulated party for failing to meet newly minted rules. Where, as here, the Director's entire sanctions framework hinges on unsupported

factual inferences, undisclosed standards, and a misapplication of law, the appropriate remedy is **reversal, not remand**. Remanding would only permit another round of *ad hoc* rationalizations. This Court should therefore reverse the Director's sanctions order in its entirety, vindicating the APA's core requirement of fair notice and reasoned decision-making.

## CONCLUSION

This Court should set aside the Director's decisions awarding attorneys' fees to VLSI from OpenSky.

Dated: February 3, 2025          Respectfully submitted,

/s/ David E. Boundy
_____

David E. Boundy
POTOMAC LAW GROUP, PLLC
P.O. Box 590638
Newton, MA 02459
Tel. 646.472.9737
dboundy@potomaclaw.com

*Counsel for Petitioner-Cross-*
    *Appellant OpenSky Indus., LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1), because:

1.     Excluding the exempted portions of the document, as provided in Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2)) this brief contains 13,651 words.

2.     This brief has been prepared using Microsoft Word 2003 in 14-point Century Schoolbook, a proportionally spaced typeface that complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). As permitted by Federal Rule of Appellate Procedure 32(g)(2), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: February 3, 2025          /s/ David E. Boundy

David Boundy

**ADDENDUM**

**TABLE OF CONTENTS**

Statutes, Rules, Regulations, and Federal Register notices ................. 74

Decision Determining Abuse of Process, Issuing Sanctions, and
    Remanding to Patent Trial and Appeal Board Panel for Further
    Proceedings (Oct. 4, 2022) (Paper 102) ........................ Appx00038-89

Order Restoring OpenSky as a Party, Awarding Reasonable Fees as
    Sanctions Against Petitioner, and Authorizing Patent Owner To File
    Motion for Fees (Feb. 3, 2023) (Paper 127) ................. Appx00126-43

Order Granting Motion for Fees (Dec. 15, 2023) (Paper 141)
    .................................................................................. Appx00209-39

## 5 U.S.C. §554 Adjudications

(b) Persons entitled to notice of an agency hearing shall be timely informed of— …

(3) the matters of fact and law asserted.

When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. …

(c) The agency shall give all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

## 5 U.S.C. § 556 Hearings; presiding employees; powers and duties; burden of proof; evidence; record as basis of decision

(d) … Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. … A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts.

## 5 U.S.C. § 706  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and

determine the meaning or applicability of the terms of an agency action. The reviewing court shall— …

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute…

## 35 U.S.C. § 316 - Conduct of inter partes review

(a) *Regulations.*—The Director shall prescribe regulations— …

(4) establishing and governing inter partes review under this chapter and the relationship of such review to other proceedings under this title;

(5) setting forth standards and procedures for discovery of relevant evidence, including that such discovery shall be limited to—

(A) the deposition of witnesses submitting affidavits or declarations; and

(B) what is otherwise necessary in the interest of justice;

(6) prescribing sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding, such as to harass or to cause unnecessary delay or an unnecessary increase in the cost of the proceeding; …

## 19 U.S.C. § 1337 - Unfair practices in import trade

## (h) Sanctions for abuse of discovery and abuse of process

The Commission may by rule prescribe sanctions for abuse of discovery and abuse of process to the extent authorized by Rule 11 and Rule 37 of the Federal Rules of Civil Procedure.

## Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

(c) Sanctions.

(1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

...

(4) Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) Limitations on Monetary Sanctions. The court must not impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(6) Requirements for an Order. An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) Inapplicability to Discovery. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

## Rule 37. Failure to Make Disclosures or to Cooperate in Discovery; Sanctions

(a) Motion for an Order Compelling Disclosure or Discovery.

(1) *In General.* On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

(3) *Specific Motions.*

(A) *To Compel Disclosure.* If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions.

(4) *Evasive or Incomplete Disclosure, Answer, or Response.* For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.

(5) *Payment of Expenses; Protective Orders.*

(A) *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).* If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

(B) *If the Motion Is Denied.* If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

(b) Failure to Comply with a Court Order.

(2) *Sanctions Sought in the District Where the Action Is Pending.*

(A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent … fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

        (v) dismissing the action or proceeding in whole or in part;

        (vi) rendering a default judgment against the disobedient party; or

        (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination. …

    (C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

  (c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.

  (1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

    (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

    (B) may inform the jury of the party's failure; and

    (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

## 37 C.F.R. § 42.11 Duty of candor; signing papers; representations to the Board; sanctions

  (c) *Representations to the Board.* By presenting to the Board a petition, response, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney, registered practitioner, or unrepresented

party attests to compliance with the certification requirements under § 11.18(b)(2) of this chapter.

## 37 C.F.R. § 42.12 Sanctions

(a) The Board may impose a sanction against a party for misconduct, including:

(1) Failure to comply with an applicable rule or order in the proceeding; …

(5) Abuse of discovery;

(6) Abuse of process; …

(b) Sanctions include entry of one or more of the following:

(a) An order holding facts to have been established in the proceeding;

(2) An order expunging or precluding a party from filing a paper;

(3) An order precluding a party from presenting or contesting a particular issue;

(4) An order precluding a party from requesting, obtaining, or opposing discovery;

(5) An order excluding evidence;

(6) An order providing for compensatory expenses, including attorney fees;

(7) An order requiring terminal disclaimer of patent term; or

(8) Judgment in the trial or dismissal of the petition.

## 37 C.F.R. § 42.51 Discovery.

(a) *Mandatory initial disclosures.*

(1) *With agreement.* Parties may agree to mandatory discovery requiring the initial disclosures set forth in the Office Patent Trial Practice Guide.

(i) The parties must submit any agreement reached on initial disclosures by no later than the filing of the patent

owner preliminary response or the expiration of the time period for filing such a response. The initial disclosures of the parties shall be filed as exhibits.

(ii) Upon the institution of a trial, parties may automatically take discovery of the information identified in the initial disclosures.

(2) *Without agreement.* Where the parties fail to agree to the mandatory discovery set forth in paragraph (a)(1), a party may seek such discovery by motion.

(b) *Limited discovery.* A party is not entitled to discovery except as provided in paragraph (a) of this section, or as otherwise authorized in this subpart.

(1) *Routine discovery.* Except as the Board may otherwise order:

(i) Unless previously served or otherwise by agreement of the parties, any exhibit cited in a paper or in testimony must be served with the citing paper or testimony.

(ii) Cross examination of affidavit testimony prepared for the proceeding is authorized within such time period as the Board may set.

(iii) Unless previously served, a party must serve relevant information that is inconsistent with a position advanced by the party during the proceeding concurrent with the filing of the documents or things that contains the inconsistency. This requirement does not make discoverable anything otherwise protected by legally recognized privileges such as attorney-client or attorney work product. This requirement extends to inventors, corporate officers, and persons involved in the preparation or filing of the documents or things.

(2) *Additional discovery.*

(i) The parties may agree to additional discovery between themselves. Where the parties fail to agree, a party may move for additional discovery. The moving party must show that such additional discovery is in the interests of

justice, …. The Board may specify conditions for such additional discovery.

(ii) When appropriate, a party may obtain production of documents and things during cross examination of an opponent's witness or during authorized compelled testimony under § 42.52.

(c) *Production of documents.* Except as otherwise ordered by the Board, a party producing documents and things shall either provide copies to the opposing party or make the documents and things available for inspection and copying at a reasonable time and location in the United States.

## 37 C.F.R. § 42.52 Compelling testimony and production.

(a) *Authorization required.* A party seeking to compel testimony or production of documents or things must file a motion for authorization. The motion must describe the general relevance of the testimony, document, or thing, and must:

(1) In the case of testimony, identify the witness by name or title; and

(2) In the case of a document or thing, the general nature of the document or thing.

## 37 C.F.R. § 42.53 Taking testimony.

(a) *Form.* Uncompelled direct testimony must be submitted in the form of an affidavit. All other testimony, including testimony compelled under 35 U.S.C. 24, must be in the form of a deposition transcript. Parties may agree to video-recorded testimony, but may not submit such testimony without prior authorization of the Board. In addition, the Board may authorize or require live or video-recorded testimony.

## 37 C.F.R. § 42.57 Privilege for patent practitioners.

(a) *Privileged communications*. A communication between a client and a USPTO patent practitioner or a foreign jurisdiction patent practitioner that is reasonably necessary and incident to the scope of the practitioner's authority shall receive the same protections of privilege under Federal law as if that communication were between a between a client and an attorney authorized to practice in the United States, including all limitations and exceptions.

**DEPARTMENT OF COMMERCE**

**Patent and Trademark Office**

**37 CFR Part 1**

**[Docket No. 950207044–5044–01]**

**RIN 0651–AA71**

**Patent Appeal and Interference Practice**

**AGENCY:** Patent and Trademark Office, Commerce.

**ACTION:** Final rule.

**SUMMARY:** The Patent and Trademark Office (PTO) is amending the rules of practice in patent cases relating to patent appeal and interference proceedings. The changes include amendments to conform the interference rules to new legislative requirements and a number of clarifying and housekeeping amendments.

**EFFECTIVE DATE:** This document is effective April 21, 1995, except § 1.11(e) which is effective March 17, 1995.

**FOR FURTHER INFORMATION CONTACT:** Fred E. McKelvey by telephone at (703) 603–3361 or by mail marked to the attention of Fred E. McKelvey at P.O. Box 15647, Arlington, Virginia 22215.

**SUPPLEMENTARY INFORMATION:** A Notice of Proposed Rulemaking was published in the **Federal Register** (59 FR 50181) on October 3, 1994, and in the Official Gazette of the Patent and Trademark Office (1167 Off. Gaz. Pat. Office 98) on October 25, 1994. In response to a request for written comments, twenty-six written comments were received. A public hearing was held on December 7, 1994, at which four witnesses testified. The written comments and the suggestions made at the public hearing represent the views of fifteen individuals and corporations and three patent law associations, namely, the Committee on Interferences of the American Bar Association, the Interference Committee of the American Intellectual Property Law Association and the Japan Intellectual Property Association. These comments and suggestions are addressed below in the discussion of the rule changes to which they pertain. A number of suggested rule changes, though meritorious, cannot be adopted at this time because they are believed to be outside the scope of the present rulemaking. Accordingly, those suggestions will be the subject of a future rulemaking.

The provisions of the rules, as amended, will be applied in pending interferences to the extent reasonably possible. However, it is the desire of PTO to avoid applying the rules, as adopted, to pending interferences where substantial prejudice would result. For example, generally speaking, in cases where the periods for filing preliminary motions and preliminary statements have been set, the current preliminary motion and preliminary statement rules will apply, although parties are free to voluntarily comply with the rules as amended. Generally speaking, in cases where the testimony periods have been set, the current testimony and record rules will apply. The question of whether substantial prejudice will result in a particular case is a matter within the discretion of the administrative patent judge or the Board.

## I. Amendments Responsive to Adoption of Public Laws 103–182 and 103–465

As indicated in the Notice of Proposed Rulemaking, several of the amendments to the interference rules (i.e., 37 CFR 1.601 *et seq.*) are responsive to Public Law 103–182, 107 Stat. 2057 (1993) (North American Free Trade Agreement Implementation Act, hereinafter NAFTA Implementation Act), which amended 35 U.S.C. 104 to permit an applicant or patentee, with respect to an application filed on or after December 8, 1993, to rely on activities occurring in a ''NAFTA country'' to prove a date of invention no earlier than December 8, 1993, except as provided in 35 U.S.C. 119 and 365. On December 8, 1994, which was subsequent to publication of the Notice of Proposed Rulemaking, Public Law 103–465, 108 Stat. 4809 (1994) (Uruguay Round Agreements Act) was signed into law, which further amended 35 U.S.C. 104 to permit an applicant or a patentee, with respect to an application filed on or after January 1, 1996, to rely on activities occurring in a WTO member country to prove a date of invention no earlier than January 1, 1996, except as provided in 35 U.S.C. 119 and 365. Section 104, as amended by Public Law 103–465, reads as follows:

*Section 104. Invention made abroad.*

(a) IN GENERAL.—

(1) PROCEEDINGS.—In proceedings in the Patent and Trademark Office, in the courts, and before any other competent authority, an applicant for a patent, or a patentee, may not establish a date of invention by reference to knowledge or use thereof, or other activity with respect thereto, in a foreign country other than a NAFTA country or a WTO member country, except as provided in sections 119 and 365 of this title.

(2) RIGHTS.—If an invention was made by a person, civil or military—

(A) while domiciled in the United States, and serving in any other country in connection with operations by or on behalf of the United States,

(B) while domiciled in a NAFTA country and serving in another country in connection with operations by or on behalf of that NAFTA country, or

(C) while domiciled in a WTO member country and serving in another country in connection with operations by or on behalf of that WTO member country,

that person shall be entitled to the same rights of priority in the United States with respect to such invention as if such invention had been made in the United States, that NAFTA country, or that WTO member country, as the case may be.

(3) USE OF INFORMATION.—To the extent that any information in a NAFTA country or a WTO member country concerning knowledge, use, or other activity relevant to proving or disproving a date of invention has not been made available for use in a proceeding in the Patent and Trademark Office, a court, or any other competent authority to the same extent as such information could be made available in the United States, the Commissioner, court, or such other authority shall draw appropriate inferences, or take other action permitted by statute, rule, or regulation, in favor of the party that requested the information in the proceeding.

(b) DEFINITIONS.—As used in this section—

(1) the term 'NAFTA country' has the meaning given that term in section 2(4) of the North American Free Trade Agreement Implementation Act; and

(2) the term 'WTO member country' has the meaning given that term in section 2(10) of the Uruguay Round Agreements Act.

Section 2(4) of the NAFTA Implementation Act is codified at 19 U.S.C. 3301; § 2(10) of the Uruguay Round Agreements Act is codified at 19 U.S.C. 3501.

The Notice of Proposed Rulemaking proposed adding a new paragraph (r) to § 1.601 defining ''NAFTA country'' to mean ''NAFTA country'' as defined in section 2(4) of the NAFTA Implementation Act and ''non-NAFTA country'' to mean a country other than a NAFTA country. One comment questioned whether ''NAFTA country'' should be defined in the rules to include the United States. The answer is no. ''NAFTA country'' as used in 35 U.S.C. 104 has the meaning given that term in section 2(4) of the NAFTA Implementation Act, which refers to only Canada and Mexico. Another comment observed that the proposed terms ''NAFTA country'' and ''non-NAFTA country'' do not appear to contemplate that inventive acts may occur in a foreign place that is not part of any ''country'' and suggested either using the phrase ''outside the United States or a NAFTA country'' instead of ''non-NAFTA country'' or else defining ''non-NAFTA country'' to mean ''a *place* other than the United States or a NAFTA country.'' The comment is well

**14494**    **Federal Register** / Vol. 60, No. 52 / Friday, March 17, 1995 / Rules and Regulations

is yes. One purpose of 35 U.S.C. 104 is to ensure that evidence for interferences is available in foreign countries in essentially the same manner that it is available in the United States. If the evidence is not available, then the appropriate inference provisions of 35 U.S.C. 104 shall be applied by PTO.

After the Notice of Proposed Rulemaking was published, it became apparent that the term ''ordered'' in the phrase ''to the extent that any information under the control of an individual or entity located in a NAFTA country or a WTO member country * * * has been ordered to be produced by an administrative patent judge or the Board'' may not be appropriate. Neither an administrative patent judge nor the Board can order testimony or production of documents and things in a foreign country from a witness who, or an entity that, is neither a party nor under the control of a party. Instead, an administrative patent judge or the Board can only authorize a party to seek to compel testimony or production in a foreign country from a witness or entity not under the control of a party. Accordingly, § 1.616(c) as adopted reads instead as follows:

(c) To the extent that an administrative patent judge or the Board has authorized a party to compel the taking of testimony or the production of documents or things from an individual or entity located in a NAFTA country or a WTO member country concerning knowledge, use, or other activity relevant to to proving or disproving a date of invention (§ 1.671(h)), but the testimony, documents or things have not been produced for use in the interference to the same extent as such information could be made available in the United States, the administrative patent judge or the Board shall draw such adverse inferences as may be appropriate under the circumstances, or take such other action permitted by statute, rule, or regulation, in favor of the party that requested the information in the interference, including imposition of appropriate sanctions under paragraph (a) of this section.

As proposed in the Notice of Proposed Rulemaking, § 1.647, which currently requires a party who relies on a non-English language document to provide an English-language translation and an affidavit attesting to its accuracy, is revised to extend these requirements to any non-English language documents that a party is required to produce via discovery. One comment expressed the concern that the proposed amendment might impose an unnecessary financial burden on a non-U.S. party by requiring translations of compelled documents that are very long and have little or no relevance. The concern is believed to be misplaced. First, discovery in interferences, like discovery under the

Federal Rules of Civil Procedure, is limited to evidence that is relevant. Second, as to relevant evidence, the scope of discovery under the interference rules is considerably narrower than the discovery available under the Federal Rules of Civil Procedure. Another comment stated that the general practice is that a party proffering a document is responsible for the cost of translation. The comment nevertheless suggested that in the case of documents offered to be produced during discovery, including cross-examination discovery pursuant to § 1.687(b), the documents be produced in the foreign language, with the recipient then indicating which documents it wishes to have translated and costs to be borne equally by the parties. The suggestion is not being adopted. In implementing practice under 35 U.S.C. 104, as amended, it is PTO's initial view that a correct policy is the one which the commentator says is the ''general practice.'' Whether a different policy might be appropriate at some future time is something that will be tested with experience.

## II. Compensatory Attorney Fees and Expenses

Section 1.616, in addition to the amendments discussed above, also is revised by redesignating current paragraphs (a) through (e) as paragraphs (a)(1) through (a)(4) and (a)(6) and adding new paragraphs (a)(5) and (b).

Section 1.616(a)(5), as amended, authorizes the award of compensatory (as opposed to punitive) expenses and/or compensatory attorney fees as a sanction for failing to comply with the rules or an order. This sanction shall apply only to conduct occurring in an interference on or after the effective date of § 1.616 as amended. It is believed that there may be occasions when an award of compensatory expenses and/or compensatory attorney fees would be more commensurate in scope with the infraction than the sanctions that are currently authorized.

There are administrative decisions which seemingly hold that the tribunals of PTO do not have authority to award expenses and attorney fees. *See, e.g., Driscoll* v. *Cebalo,* 5 USPQ2d 1477, 1481 (Bd. Pat. Int. 1982) (the rules do not provide us with the jurisdiction to award expenses and we know of no authority which does), *aff'd in part, rev'd in part,* 731 F.2d 878, 221 USPQ 745 (Fed. Cir. 1984); *Clevenger* v. *Martin,* 1 USPQ2d 1793, 1797 (Bd. Pat. App. & Int. 1986) (we do not have authority under the rules to award attorney's fees); *MacMillan Bloedel, Ltd.* v. *Arrow-M Corp.,* 203 USPQ 952, 953

(TTAB 1979) (the TTAB is without authority to award expenses and attorney's fees); *Fisons, Ltd.* v. *Capability Brown, Ltd.,* 209 USPQ 167, 171 (TTAB 1980) (request for attorney's fees denied because good cause not shown and the TTAB has no authority to grant such requests); *Jonergin Co.* v. *Jonergin Vermont, Inc.,* 222 USPQ 337, 340–41 (Comm'r Pat. 1983) (TTAB did not err in refusing to award reasonable expenses and attorney's fees under 37 CFR 2.116(a), 2.120 and Fed. R. Civ. P. 37(a)(4)); *Anheuser-Busch, Inc.* v. *Major Mud & Chemical Co.,* 221 USPQ 1191, 1195 n.9 (TTAB 1984) (request for costs and attorneys fees was denied, inter alia, on the ground that the TTAB had no authority to award such fees and costs); *Luehrmann* v. *Kwik Kopy Corp.,* 2 USPQ2d 1303, 1305 n.4 (TTAB 1987) (the TTAB has no authority to grant monetary relief); *Fort Howard Paper Co.* v. *G.V. Gambina, Inc.,* 4 USPQ2d 1552, 1554 (TTAB 1987) (the TTAB has no authority to order costs or attorney's fees); *Paolo's Associates Ltd. Partnership* v. *Bodo,* 21 USPQ2d 1899, 1904 n.3 (Comm'r Pat. 1990) (the TTAB was correct in holding that 37 CFR 2.127(f) denies the TTAB authority to either award attorney's fees or costs to any party in a cancellation and opposition proceeding); *Nabisco Brands, Inc.* v. *Keebler Co.,* 28 USPQ2d 1237, 1238 (TTAB 1993) (the TTAB held, inter alia, that it did not have authority to award fees under 37 CFR 2.127(f)).

None of the decisions mentioned above provide any reasoned analysis or rationale to explain why the Commissioner lacks authority to promulgate a rule which would authorize imposition of monetary sanctions in appropriate cases. In view of the existence of the decisions, however, it is believed that a discussion of the Commissioner's authority to promulgate a rule authorizing the Board to award compensatory monetary sanctions is appropriate.

The Commissioner has been delegated the authority by the Congress to ''establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office.'' 35 U.S.C. 6(a).

The U.S. Court of Appeals for the Federal Circuit upheld the authority of the Commissioner to issue regulations imposing sanctions in interference cases. In *Gerritsen* v. *Shirai,* 979 F.2d 1524, 24 USPQ2d 1912 (Fed. Cir. 1992), the Federal Circuit noted that 37 CFR 1.616 was a permissible exercise of the Commissioner's authority under 35 U.S.C. 6(a) and complied with the limitation on sanctions of the

Administrative Procedure Act. The court stated (979 F.2d at 1527 n.3, 24 USPQ2d at 1915 n.3):

35 U.S.C. § 6(a) (1988) permits the Commissioner of Patents and Trademarks to "establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office." Congress thus delegated plenary authority over PTO practice, including interference proceedings, to the Commissioner. On its face, 37 CFR § 1.616 represents a permissible exercise of that authority. Since the decision to impose a sanction * * * was authorized by law, it comports with the Administrative Procedure Act, 5 U.S.C. § 558(b) (1988).

In *Gerritsen*, the Federal Circuit held that the particular rule violation was sanctionable, but that the specific sanction chosen by the Board was too severe. Accordingly, the sanction was vacated and the case was remanded to the Board for imposition of a more appropriate sanction.

In *Abrutyn* v. *Giovanniello*, 15 F.3d 1048, 1050, 29 USPQ2d 1615, 1617 (Fed. Cir. 1994), the Federal Circuit again upheld the authority of the Board or an administrative patent judge to impose sanctions, including imposition of the most severe sanction, granting judgment against one of the parties:

The Board or EIC [Examiner-in-Chief, now administrative patent judge] may impose an appropriate sanction, including granting judgment in an interference, against a party who fails to comply with the rules governing interferences, including filing deadlines. 37 CFR § 1.616 (1993).

*Gerritsen* and *Abrutyn* judicially establish that the Commissioner has authority under 35 U.S.C. 6(a) to promulgate regulations which impose a spectrum of sanctions, including imposition of the ultimate sanction of judgment or dismissal.

As a general matter, agencies are given broad authority in the selection of an appropriate sanction. The choice of sanction within agency statutory limits will be upheld unless it constitutes an abuse of discretion. *Butz* v. *Glover Livestock Comm'n Co.*, 411 U.S. 182 (1973); *Lawrence* v. *Commodity Futures Trading Comm'n*, 759 F.2d 767, 774 (9th Cir. 1985). Current § 1.616 authorizes an administrative patent judge or the Board to impose a spectrum of sanctions. The sanctions range from holding certain facts established for purposes of the interference (37 CFR § 1.616 (a)) to granting judgment against the party who violated a regulation or an order (37 CFR § 1.616(e)). As indicated above, the Federal Circuit has upheld the Commissioner's authority to promulgate § 1.616 and impose the specified sanctions (*Gerritsen*, 979 F.2d at 1527 n.3, 24 USPQ2d at 1915 n.3), including

granting judgment against a party (*Abrutyn*, 15 F.3d at 1050, 29 USPQ2d at 1617). Judgment and dismissal are the most severe forms of sanction. See *National Hockey League* v. *Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976); *Poulis* v. *State Farm Fire and Casualty Co.*, 747 F.2d 863, 867 (3d Cir. 1984); *Cine Forty-Second St. Theatre Corp* v. *Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979). Consistent with these cases, the Federal Circuit has held that a holding by the Board that a party is not entitled to a patent directed to certain claims is an extreme sanction. *Gerritsen*, 979 F.2d at 1532 n.12, 24 USPQ2d at 1919 n.12.

The imposition of monetary sanctions is manifestly a lesser sanction than judgment or dismissal. Indeed, reimbursement of expenses incurred as a result of inappropriate action by the opposing party has been held to be a mild form of sanction. *Cine Forty-Second St.*, 602 F.2d at 1066. More stringent sanctions include orders striking out portions of a pleading, orders prohibiting the introduction of evidence on a particular point, and orders deeming a disputed issue determined adversely to the position of a disobedient party. *Id.*

Since the imposition of a monetary sanction is a lesser sanction than judgment against a party, the inclusion of an "appropriate" monetary sanction in § 1.616, as adopted, is not outside the Commissioner's rulemaking authority and would not be inconsistent with the sanctions already present in § 1.616.

Whether a monetary sanction is appropriate depends on the purpose of the sanction. Civil sanctions may be categorized as penal and remedial. One is not to be subjected by an agency to a penal sanction unless the words of the statute plainly authorize imposition of a penal sanction. *Commissioner* v. *Acker*, 361 U.S. 87, 91 (1959). Thus, a statute must plainly authorize an agency's power to impose penalties. *Pender Peanut Corp.* v. *United States*, 20 Civil Court 447, 453–55 (1990). Agencies have no inherent authority, based solely on their enabling statute, to impose penal sanctions. That authority must be expressly given in the statute. *Pender Peanut Corp.*, 20 Cl. Ct. at 453–55 (1990); *Gold Kist, Inc.* v. *Department of Agriculture*, 741 F. 2d 344, 348 (11th Cir. 1984); Koch, *Administrative Law and Practice* § 6.81 (1985). A penal sanction has been defined as one which inflicts a punishment. *United States* v. *Frame*, 885 F.2d 1119, 1142 (3d Cir. 1989).

On the other hand, an explicit grant of power from Congress need not underpin each exercise of agency

authority. See *Zola* v. *Interstate Commerce Commission*, 889 F.2d 508, 516 (3d Cir. 1989), *citing Amoskeag Co.* v. *Interstate Commerce Commission*, 590 F.2d 388, 392 (1st Cir. 1979). Where the enabling statute authorizes the agency to make such rules and regulations as may be necessary to carry out the provisions of an act—the regulation will be sustained so long as it is reasonably related to the purpose of the act. *Mourning* v. *Family Publications Service, Inc.*, 411 U.S. 356, 369 (1973). Under its enabling legislation, an agency has inherent power to impose administrative sanctions that are not "penalties" as long as the sanctions are reasonably related to the purpose of the enabling statute. *Gold Kist*, 741 F.2d at 348. Accordingly, in evaluating whether the imposition of a sanction is within an agency's inherent powers, it is necessary to determine whether the sanction is remedial or punitive. *Frame*, 885 F.2d at 1142. Remedial sanctions may be within the agency's inherent powers if reasonably related to the purpose of enabling legislation. A remedial sanction is one whose purpose is not to stigmatize or punish wrongdoers. *Frame*, 885 F.2d at 1143.

Thus, in the absence of express statutory authority, the Commissioner's authority to impose monetary sanctions is limited to sanctions which are remedial in nature rather than punitive. In addition, the sanctions must be reasonably related to the purpose of enabling statute under which PTO operates. Under these guidelines, the Commissioner would appear to be without authority to issue a regulation which permits a penal sanction to be imposed against a party or an attorney for violation of a rule or order. Fines payable to Government, including PTO, are manifestly intended to punish wrongdoing and are thus punitive in nature. Assessment to redress an injury to the public is in the nature of a penalty. *Republic Steel Corp. v. National Labor Relations Board*, 311 U.S. 7, 12–13 (1940). On the other hand, the imposition of costs or expenses, including attorneys' fees, incurred by an opposing party due to the violation of a rule or order, may properly be considered remedial. Imposing costs or attorneys' fees serves to defray the expenses actually incurred by the opposing party for the violation of a rule or order by an opponent. See *Poulis*, 747 F.2d at 869 (non-dilatory party will not have to bear the brunt of the attorney's delay). Monetary sanctions would enhance the Board's ability to protect the integrity of its proceedings. See *Zola*, 889 F.2d at 516 (ICC justified in

imposing monetary sanctions in acting to protect the integrity of its jurisdiction). Monetary sanctions would also allow the Board to maintain control of its docket to maximize the use of limited resources. *See Griffin & Dickson v. United States,* 16 Cl. Ct. 347, 351 (1989) (case management responsibilities require broad inherent authority to impose [non-penal] sanctions). Imposition of monetary sanctions is the only sanction both mild enough and flexible enough to use in day-to-day enforcement of orderly and expeditious litigation. *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 567, (3d Cir. 1985) (in banc). Thus, monetary sanctions are reasonably related to the Commissioner's plenary authority to promulgate regulations for the conduct of proceedings, including interference proceedings in PTO.

Section 1.616(b), as proposed to be amended, would have authorized the imposition of a sanction, including a sanction in the form of compensatory expenses and/or attorney fees, against a party for taking or maintaining a frivolous position. A number of comments were received opposing the authorization of sanctions for taking or maintaining frivolous positions (§ 1.616(b)). Several comments suggested that the question of what is "frivolous" is inherently highly subjective and will therefore be frequently raised, substantially increasing costs and delaying decisions on more substantive issues. PTO believes, however, consistent with other comments received during the comment period, that inasmuch as a groundless motion for sanctions would itself be grounds for sanctioning the movant for taking or maintaining a frivolous positions, it is expected that motions for sanctions will only be filed in clear cases. One comment suggested that § 1.616(b) be reworded to parallel Rule 11 of the Federal Rules of Civil Procedure so that sanctions would only be imposed upon motion by an opponent, subject to a twenty-one day "safe harbor" withdrawal provision, and would explicitly apply only to frivolous positions taken in writing. Another comment, while supportive of the proposed amendment on the ground that it should reduce the number of frivolous papers, cautioned against treating as frivolous "that which is simply born of ignorance." The suggestion to have § 1.616(b) authorize sanctions imposed only on motion by a party is not being adopted. There may be situations in which the Board believes it would be appropriate to award compensatory fees or expenses

even in the absence of a motion by a party. The suggestion that Fed. R. Civ. P. 11 permits sanctions only upon motion is believed to be incorrect; for example, Fed. R. Civ. P. 11(c)(1)(b) authorizes sanctions on the court's initiative. The suggestion to use the "safe harbor" approach of Fed. R. Civ. P. 11(c)(1)(A), which provides that a motion for sanctions shall be served but not filed unless, within 21 days after service of the motion, the challenged position is not withdrawn or appropriately corrected, is not being adopted. The administrative patent judge and the Board should know the reason why a party has withdrawn or corrected a position. Nevertheless, in order to make it clear that sanctions will not be imposed for mistakenly taking an erroneous position that is withdrawn or corrected as soon as the error becomes apparent, the proposed phrase "for taking *or* maintaining a frivolous position" in changed to "for taking *and* maintaining a frivolous position."

The suggestion that § 1.616(b) sanctions be limited to frivolous positions taken in writing is based on the Advisory Committee Note on the 1993 amendments to Fed. R. Civ. P. 11. The Note states in pertinent part: "The rule applies only to assertions contained in papers filed with or submitted to the court. It does not cover matters arising for the first time during oral presentations to the court, when counsel may make statements that would not have been made if there had been made if there had been more time for study and reflection." For the reason given in the Advisory Committee Note, the suggestion is being adopted. Accordingly, § 1.616(b) as adopted is limited to a frivolous position taken and maintained in papers filed in the interference and shall apply only to frivolous positions taken and maintained after the effective date of § 1.616 as amended.

Other comments questioned how the Board intends to handle proof of amounts of compensatory expenses and/or attorney fees and expressed the hope that attorney fee awards will not be *de facto* discriminatory as between highly paid outside counsel and in-house counsel without fees or billing records. The matter of how to prove amounts of compensatory expenses and/or attorney fees will be handled on a case-by-case basis.

Another comment suggested that an administrative patent judge or the Board be required to issue an order to show cause prior to imposing a sanction, since a party may be able to explain why a sanction should not be imposed. The suggestion is presumably based on

Fed. R. Civ. P. 11(c)(1)(B) and directed to cases in which an administrative patent judge or the Board on its own initiative determines that a sanction is appropriate. The suggestion is being adopted and implemented in a new paragraph, § 1.616(d). In addition, paragraph (d) expressly provides that a party may file a motion (§ 1.635) requesting the imposition of sanctions, the drawing of adverse inferences or other action under paragraph (a), (b) or (c) of § 1.616.

## III. Certificates of Prior Consultation

Section 1.637(b) currently requires that a miscellaneous motion under § 1.635 contain a certificate stating that the moving party has conferred with all opponents in a good faith effort to resolve by agreement the issues raised by the motion and indicating whether any other party plans to oppose the motion. In the Notice of Proposed Rulemaking, it was proposed to amend paragraph (b) to extend the requirement for such a certificate to preliminary motions filed under § 1.633 and other motions filed under § 1.634. It also was proposed to require the certificate to indicate that the reasons and facts in support of the motion were discussed with each opponent and, if an opponent has indicated that it will oppose the motion, to identify the issues and/or facts believed to be in dispute.

The rationale offered in the Notice of Proposed Rulemaking for the amendment was an expectation that consultation would result in a reduction in the number of issues raised by motions under §§ 1.633–34, as well as a reduction in the number of motions filed under those rules. All but one of many comments received in response to the proposal urged that the proposed rule not be adopted. In support, it was said that the proposed rule would unnecessarily increase the time and costs required to file motions under §§ 1.633–34, particularly preliminary motions. PTO, upon reflection, agrees with the comments. Accordingly, the proposal to extend the consultation requirement of § 1.637(b) to §§ 1.633–34 motions is withdrawn. The withdrawal of the proposed rule, however, should not be interpreted as precluding an administrative patent judge from holding a conference call prior to the date preliminary motions are due for the purpose of discussing which preliminary motions the parties plan to file or from entering an order requiring prior consultation as to a particular motion.

Several comments, citing experience with the consultation requirement for § 1.635 motions, suggested that

patent judge shall exercise control over the interference such that the pendency of the interference before the Board does not normally exceed two years.

(d) An administrative patent judge may hold a conference with the parties to consider simplification of any issues, the necessity or desirability of amendments to counts, the possibility of obtaining admissions of fact and genuineness of documents which will avoid unnecessary proof, any limitations on the number of expert witnesses, the time and place for conducting a deposition (§ 1.673(g)), and any other matter as may aid in the disposition of the interference. After a conference, the administrative patent judge may enter any order which may be appropriate.

(e) The administrative patent judge may determine a proper course of conduct in an interference for any situation not specifically covered by this part.

14. Section 1.611 is amended by redesignating paragraph (c)(8) as paragraph (c)(9); adding a new paragraph (c)(8); and revising paragraphs (b), (c)(6), (c)(7), and (d) to read as follows:

**§ 1.611    Declaration of interference.**

*    *    *    *    *

(b) When a notice of declaration is returned to the Patent and Trademark Office undelivered, or in any other circumstance where appropriate, an administrative patent judge may send a copy of the notice to a patentee named in a patent involved in an interference or the patentee's assignee of record in the Patent and Trademark Office or order publication of an appropriate notice in the *Official Gazette.*

(c) *    *    *

(6) The count or counts and, if there is more than one count, the examiner's explanation why the counts define different patentable inventions;

(7) The claim or claims of any application or any patent which correspond to each count;

(8) The examiner's explanation as to why each claim designated as corresponding to a count is directed to the same patentable invention as the count and why each claim designated as not corresponding to any count is not directed to the same patentable invention as any count; and

*    *    *    *    *

(d) The notice of declaration may also specify the time for:

(1) Filing a preliminary statement as provided in § 1.621(a);

(2) Serving notice that a preliminary statement has been filed as provided in § 1.621(b); and

(3) Filing preliminary motions authorized by § 1.633.

*    *    *    *    *

15. Section 1.612 is amended by revising paragraph (a) to read as follows:

**§ 1.612    Access to applications.**

(a) After an interference is declared, each party shall have access to and may obtain copies of the files of any application set out in the notice declaring the interference, except for affidavits filed under § 1.131 and any evidence and explanation under § 1.608 filed separate from an amendment. A party seeking access to any abandoned or pending application referred to in the opponent's involved application or access to any pending application referred to in the opponent's patent must file a motion under § 1.635. See § 1.11(e) concerning public access to interference files.

16. Section 1.613 is amended by revising paragraphs (c) and (d) to read as follows:

**§ 1.613    Lead attorney, same attorney representing different parties in an interference, withdrawal of attorney or agent.**

*    *    *    *    *

(c) An administrative patent judge may make necessary inquiry to determine whether an attorney or agent should be disqualified from representing a party in an interference. If an administrative patent judge is of the opinion that an attorney or agent should be disqualified, the administrative patent judge shall refer the matter to the Commissioner. The Commissioner will make a final decision as to whether any attorney or agent should be disqualified.

(d) No attorney or agent of record in an interference may withdraw as attorney or agent of record except with the approval of an administrative patent judge and after reasonable notice to the party on whose behalf the attorney or agent has appeared. A request to withdraw as attorney or agent of record in an interference shall be made by motion (§ 1.635).

17. Section 1.614 is amended by revising paragraphs (a) and (c) to read as follows:

**§ 1.614    Jurisdiction over interference.**

(a) The Board acquires jurisdiction over an interference when the interference is declared under § 1.611.

*    *    *    *    *

(c) The examiner shall have jurisdiction over any pending application until the interference is declared. An administrative patent

judge may for a limited purpose restore jurisdiction to the examiner over any application involved in the interference.

18. Section 1.615 is revised to read as follows:

**§ 1.615    Suspension of ex parte prosecution.**

(a) When an interference is declared, ex parte prosecution of an application involved in the interference is suspended. Amendments and other papers related to the application received during pendency of the interference will not be entered or considered in the interference without the consent of an administrative patent judge.

(b) Ex parte prosecution as to specified matters may be continued concurrently with the interference with the consent of the administrative patent judge.

19. Section 1.616 is revised to read as follows:

**§ 1.616    Sanctions for failure to comply with rules or order or for taking and maintaining a frivolous position.**

(a) An administrative patent judge or the Board may impose an appropriate sanction against a party who fails to comply with the regulations of this part or any order entered by an administrative patent judge or the Board. An appropriate sanction may include among others entry of an order:

(1) Holding certain facts to have been established in the interference;

(2) Precluding a party from filing a paper;

(3) Precluding a party from presenting or contesting a particular issue;

(4) Precluding a party from requesting, obtaining, or opposing discovery;

(5) Awarding compensatory expenses and/or compensatory attorney fees; or

(6) Granting judgment in the interference.

(b) An administrative patent judge or the Board may impose a sanction, including a sanction in the form of compensatory expenses and/or compensatory attorney fees, against a party for taking and maintaining a frivolous position in papers filed in the interference.

(c) To the extent that an administrative patent judge or the Board has authorized a party to compel the taking of testimony or the production of documents or things from an individual or entity located in a NAFTA country or a WTO member country concerning knowledge, use, or other activity relevant to proving or disproving a date of invention (§ 1.671(h)), but the testimony, documents or things have

not been produced for use in the interference to the same extent as such information could be made available in the United States, the administrative patent judge or the Board shall draw such adverse inferences as may be appropriate under the circumstances, or take such other action permitted by statute, rule, or regulation, in favor of the party that requested the information in the interference, including imposition of appropriate sanctions under paragraph (a) of this section.

(d) A party may file a motion (§ 1.635) for entry of an order imposing sanctions, the drawing of adverse inferences or other action under paragraph (a), (b) or (c) of this section. Where an administrative patent judge or the Board on its own initiative determines that a sanction, adverse inference or other action against a party may be appropriate under paragraph (a), (b) or (c) of this section, the administrative patent judge or the Board shall enter an order for the party to show cause why the sanction, adverse inference or other action is not appropriate. The Board shall take action in accordance with the order unless, within 20 days after the date of the order, the party files a paper which shows good cause why the sanction, adverse inference or other action would not be appropriate.

20. Section 1.617 is amended by revising paragraphs (a), (b), (d), (e), (g) and (h) to read as follows:

### § 1.617 Summary judgment against applicant.

(a) An administrative patent judge shall review any evidence filed by an applicant under § 1.608(b) to determine if the applicant is *prima facie* entitled to a judgment relative to the patentee. If the administrative patent judge determines that the evidence shows the applicant is *prima facie* entitled to a judgment relative to the patentee, the interference shall proceed in the normal manner under the regulations of this part. If in the opinion of the administrative patent judge the evidence fails to show that the applicant is *prima facie* entitled to a judgment relative to the patentee, the administrative patent judge shall, concurrently with the notice declaring the interference, enter an order stating the reasons for the opinion and directing the applicant, within a time set in the order, to show cause why summary judgment should not be entered against the applicant.

(b) The applicant may file a response to the order, which may include an appropriate preliminary motion under § 1.633 (c), (f) or (g), and state any reasons why summary judgment should

not be entered. Any request by the applicant for a hearing before the Board shall be made in the response. Additional evidence shall not be presented by the applicant or considered by the Board unless the applicant shows good cause why any additional evidence was not initially presented with the evidence filed under § 1.608(b). At the time an applicant files a response, the applicant shall serve a copy of any evidence filed under § 1.608(b) and this paragraph.

*    *    *    *    *

(d) If a response is timely filed by the applicant, all opponents may file a statement and may oppose any preliminary motion filed under § 1.633 (c), (f) or (g) by the applicant within a time set by the administrative patent judge. The statement may set forth views as to why summary judgment should be granted against the applicant, but the statement shall be limited to discussing why all the evidence presented by the applicant does not overcome the reasons given by the administrative patent judge for issuing the order to show cause. Except as required to oppose a motion under § 1.633 (c), (f) or (g) by the applicant, evidence shall not be filed by any opponent. An opponent may not request a hearing.

(e) Within a time authorized by the administrative patent judge, an applicant may file a reply to any statement or opposition filed by any opponent.

*    *    *    *    *

(g) If a response by the applicant is timely filed, the administrative patent judge or the Board shall decide whether the evidence submitted under § 1.608(b) and any additional evidence properly submitted under paragraphs (b) and (e) of this section shows that the applicant is *prima facie* entitled to a judgment relative to the patentee. If the applicant is not *prima facie* entitled to a judgment relative to the patentee, the Board shall enter a final decision granting summary judgment against the applicant. Otherwise, an interlocutory order shall be entered authorizing the interference to proceed in the normal manner under the regulations of this subpart.

(h) Only an applicant who filed evidence under § 1.608(b) may request a hearing. If that applicant requests a hearing, the Board may hold a hearing prior to entry of a decision under paragraph (g) of this section. The administrative patent judge shall set a date and time for the hearing. Unless otherwise ordered by the administrative patent judge or the Board, the applicant and any opponent will each be entitled

to no more than 30 minutes of oral argument at the hearing.

21. Section 1.618 is amended by revising paragraph (a) to read as follows:

### § 1.618 Return of unauthorized papers.

(a) An administrative patent judge or the Board shall return to a party any paper presented by the party when the filing of the paper is not authorized by, or is not in compliance with the requirements of, this subpart. Any paper returned will not thereafter be considered in the interference. A party may be permitted to file a corrected paper under such conditions as may be deemed appropriate by an administrative patent judge or the Board.

*    *    *    *    *

22. Section 1.621 is amended by revising paragraph (b) to read as follows:

### § 1.621 Preliminary statement, time for filing, notice of filing.

*    *    *    *    *

(b) When a party files a preliminary statement, the party shall also simultaneously file and serve on all opponents in the interference a notice stating that a preliminary statement has been filed. A copy of the preliminary statement need not be served until ordered by the administrative patent judge.

23. Section 1.622 is amended by revising paragraph (b) to read as follows:

### § 1.622 Preliminary statement; who made invention; where invention made.

*    *    *    *    *

(b) The preliminary statement shall state whether the invention was made in the United States, a NAFTA country (and, if so, which NAFTA country), a WTO member country (and, if so, which WTO member country), or in a place other than the United States, a NAFTA country, or a WTO member country. If made in a place other than the United States, a NAFTA country, or a WTO member country, the preliminary statement shall state whether the party is entitled to the benefit of 35 U.S.C. 104(a)(2).

24. Section 1.623 is amended by revising the section heading and paragraph (a) introductory text to read as follows:

### § 1.623 Preliminary statement; invention made in United States, a NAFTA country, or a WTO member country.

(a) When the invention was made in the United States, a NAFTA country, or a WTO member country, or a party is entitled to the benefit of 35 U.S.C. 104(a)(2), the preliminary statement



# FEDERAL REGISTER

| | |
|---|---|
| Vol. 77 | Tuesday, |
| No. 157 | August 14, 2012 |

Part II

Department of Commerce

Patent and Trademark Office

37 CFR Parts 1, 42 and 90
Rules of Practice for Trials Before the Patent Trial and Appeal Board and
Judicial Review of Patent Trial and Appeal Board Decisions; Final Rule

## DEPARTMENT OF COMMERCE

### Patent and Trademark Office

### 37 CFR Parts 1, 42 and 90

[Docket No. PTO–P–2011–0082]

RIN 0651–AC70

### Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Final rule.

**SUMMARY:** The United States Patent and Trademark Office (Office or USPTO) is revising the rules of practice to implement the provisions of the Leahy-Smith America Invents Act ("AIA") that provide for trials before the Patent Trial and Appeal Board (Board). This final rule provides a consolidated set of rules relating to Board trial practice for *inter partes* review, post-grant review, the transitional program for covered business method patents, and derivation proceedings. This final rule also provides a consolidated set of rules to implement the provisions of the AIA related to seeking judicial review of Board decisions.

**DATES:** *Effective Date:* The changes in this final rule take effect on September 16, 2012.

**FOR FURTHER INFORMATION CONTACT:** Michael P. Tierney, Lead Administrative Patent Judge, Scott R. Boalick, Lead Administrative Patent Judge, Robert A. Clarke, Administrative Patent Judge, Joni Y. Chang, Administrative Patent Judge, Thomas L. Giannetti, Administrative Patent Judge, Board of Patent Appeals and Interferences, by telephone at (571) 272–9797.

**SUPPLEMENTARY INFORMATION:** *Executive Summary: Purpose:* On September 16, 2011, the AIA was enacted into law (Pub. L. 112–29, 125 Stat. 284 (2011)). The purpose of the AIA and this final rule is to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs. The preamble of this notice sets forth in detail the procedures by which the Board will conduct trial proceedings. The USPTO is engaged in a transparent process to create a timely, cost-effective alternative to litigation. Moreover, the rulemaking process is designed to ensure the integrity of the trial procedures. *See* 35 U.S.C. 316(b), as amended, and 35 U.S.C. 326(b). This final rule provides a consolidated set of

rules relating to Board trial practice for *inter partes* review, post-grant review, the transitional program for covered business method patents, and derivation proceedings. *See* 35 U.S.C. 316(b), as amended, and 35 U.S.C. 326(b).

*Summary of Major Provisions:* Consistent with sections 3, 6, 7, and 18 of the AIA, this final rule sets forth: (1) The evidentiary standards, procedure, and default times for conducting trial proceedings; (2) the fees for requesting reviews; (3) the procedure for petition and motion practice; (4) the page limits for petitions, motions, oppositions, and replies; (5) the standards and procedures for discovery of relevant evidence, including the procedure for taking and compelling testimony; (6) the sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding; (7) the procedure for requesting oral hearings; (8) the procedure for requesting rehearing of decisions and filing appeals; (9) the procedure for requesting joinder; and (10) the procedure to make file records available to the public that include the procedures for motions to seal, protective orders for confidential information, and requests to treat settlement as business confidential information.

*Costs and Benefits:* This rulemaking is *not* economically significant, but is significant, under Executive Order 12866 (Sept. 30, 1993), as amended by Executive Order 13258 (Feb. 26, 2002) and Executive Order 13422 (Jan. 18, 2007).

*Background:* To implement the changes set forth in sections 3, 6, 7, and 18 of the AIA that are related to administrative trials and judicial review of Board decisions, the Office published the following notices of proposed rulemaking: (1) *Rules of Practice for Trials before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions,* 77 FR 6879 (Feb. 9, 2012), to provide a consolidated set of rules relating to Board trial practice for *inter partes* review, post-grant review, derivation proceedings, and the transitional program for covered business method patents, and judicial review of Board decisions by adding new parts 42 and 90 including a new subpart A to title 37 of the Code of Federal Regulations (RIN 0651–AC70); (2) *Changes to Implement Inter Partes Review Proceedings,* 77 FR 7041 (Feb. 10, 2012), to provide rules specific to *inter partes* review by adding a new subpart B to 37 CFR part 42 (RIN 0651–AC71); (3) *Changes to Implement Post-Grant Review Proceedings,* 77 FR 7060 (Feb. 10, 2012), to provide rules specific

to post-grant review by adding a new subpart C to 37 CFR part 42 (RIN 0651–AC72); (4) *Changes to Implement Transitional Program for Covered Business Method Patents,* 77 FR 7080 (Feb. 10, 2012), to provide rules specific to the transitional program for covered business method patents by adding a new subpart D to 37 CFR part 42 (RIN 0651–AC73); (5) *Transitional Program for Covered Business Method Patents— Definition of Technological Invention,* 77 FR 7095 (Feb. 10, 2012), to add a new rule that sets forth the definition of technological invention for determining whether a patent is for a technological invention solely for purposes of the transitional program for covered business method patents (RIN 0651–AC75); and (6) *Changes to Implement Derivation Proceedings,* 77 FR 7028 (Feb. 10, 2012), to provide rules specific to derivation proceedings by adding a new subpart E to 37 CFR part 42 (RIN 0651–AC74).

Additionally, the Office published a Patent Trial Practice Guide for the proposed rules in the **Federal Register** to provide the public an opportunity to comment. *Practice Guide for Proposed Trial Rules,* 77 FR 6868 (Feb. 9, 2012) (Request for Comments) ("Practice Guide" or "Office Patent Trial Practice Guide"). The Office envisions publishing a revised Patent Trial Practice Guide for the final rules. The Office also hosted a series of public educational roadshows, across the country, regarding the proposed rules for the implementation of AIA.

In response to the notices of proposed rulemaking and the Office Patent Trial Practice Guide notice, the Office received 251 submissions offering written comments from intellectual property organizations, businesses, law firms, patent practitioners, and others, including a United States senator who was a principal author of section 18 of the AIA. The comments provided support for, opposition to, and diverse recommendations on the proposed rules. The Office appreciates the thoughtful comments, and has considered and analyzed the comments thoroughly. The Office's responses to the comments are provided in the 228 separate responses based on the topics raised in the 251 comments in the Response to Comments section *infra.*

In light of the comments, the Office has made appropriate modifications to the proposed rules to provide clarity and to take into account the interests of the public, patent owners, patent challengers, and other interested parties, with the statutory requirements and considerations, such as the effect of the regulations on the economy, the

*Comment 39:* Several comments were directed to clarifying the roles of lead and back-up counsel. One comment contained a proposal for multiple back-up counsel or that additional attorneys receive access to communications.

*Response:* The comment suggesting multiple back-up counsel is not adopted. Based on the experience of the Office in contested cases, designating one lead counsel and one back-up counsel by each party should result in more efficient and effective case management. The Office expects that lead counsel will, and back-up counsel may, participate in all hearings and conference calls with the Board and will sign all papers submitted in the proceeding. In addition, the role of back-up counsel is to conduct business with the Office on behalf of lead counsel when lead counsel is not available. Actions not conducted before the Office (*e.g.*, taking of depositions) may be conducted by lead or back-up counsel. In response to one comment, for efficiency, it is expected that all communications from the Office will be directed to lead counsel only, unless informed in advance that lead counsel is not available, in which case communications will be with back-up counsel. The Office envisions that lead and back-up counsel may provide access to the electronic records to other practitioners representing their client. It is also envisioned that the access granted to the other practitioners by the lead or back-up counsel may also be rescinded by the lead or back-up counsel without consultation with the Board.

*Comment 40:* Several comments were directed to disqualifications and withdrawals under § 42.10(d) and (e), and sought clarification of those provisions in the rules.

*Response:* The comment is noted, but not adopted. It is important in contested proceedings that the public record reflect who is acting as counsel for the parties. Thus, under § 42.10(b) a power of attorney must be filed designating counsel not already of record in the prosecution. The withdrawal provision is applicable to lead counsel, back-up counsel, and all other counsel of record. The Office understands the concerns of one comment regarding the impact of disqualification on the proceedings. Motions to disqualify opposing counsel are disfavored because they cause delay and are sometimes abused. However, should disqualification of a party's counsel be necessary, it is expected that the Board will adopt reasonable measures to protect the party during the transition to new counsel.

*Comment 41:* One comment requested that situations where counsel would be disqualified pursuant to § 42.10(d) be provided in the MPEP or other material.

*Response:* The determination whether to disqualify counsel is based on the facts and circumstances of the case, including any response by counsel to the allegation. Some situations, however, are likely to trigger consideration of whether to disqualify a counsel, *e.g.*, egregious misconduct.

*Comment 42:* One comment suggested that § 42.10(e) requires an attorney to invent circumstances requiring disqualification in order to be permitted to withdraw from representation.

*Response:* Section 42.10(e) does not require that an attorney be disqualified by the Board in order for the Board to authorize withdrawal. Authorization of attorney withdrawal under § 42.10 would be based on the facts in the case including the time remaining for a response, the ability of new counsel to complete the proceeding competently and timely, and desire of the real party in interest to be represented by new counsel.

*Duty of Candor (§ 42.11)*

*Comment 43:* Several comments expressed concern about the scope of the proposed rule in comparison to § 1.56 and §§ 1.555 and 1.933. Specifically, the lack of nexus between the proceeding and individuals with a duty of candor and good faith was questioned.

*Response:* The comment is adopted. Section 42.11, as adopted, imposes a duty of candor and good faith only if an individual is involved in the proceeding. The scope of the duty is comparable to the obligations toward the tribunal imposed by Rule 11 of the Federal Rules of Civil Procedure.

*Comment 44:* One comment suggested that it was unclear how violations of the duty by the petitioner would be enforced, particularly when the violation is discovered after the proceeding has terminated.

*Response:* During the proceeding, an appropriate sanction under § 42.12 may be sought and at any time, including after the final written decision, the matter may be submitted to the Office of Enrollment and Discipline, or an appropriate sanction under § 42.12 may be sought as the Board has both statutory and inherent authority to enforce its protective order. 35 U.S.C. 316(a)(6), as amended, and 35 U.S.C. 326(a)(6).

*Sanctions (§ 42.12)*

*Comment 45:* One comment expressed agreement with the Board's using its

sanction authority when necessary to curb abuses in proceedings.

*Response:* The rule provides that the Board may impose a sanction on a party for abusing the proceeding. The Office hopes that such a sanction is rarely needed.

*Comment 46:* One comment asked for guidance regarding sanctions including how the sanctioned party can appeal such a sanction, the basis for the Office's authority to take patent term from a patent owner (either through a mandatory disclaimer or a judgment) absent a decision on the merits of a petition, the basis for the Office's authority to cause estoppel to attach to a petitioner absent a decision on the merits of a petition, and under what circumstances the Office will impose sanctions. The comment suggested that the Office consider additional sanctions directed to an attorney and/or firm responsible for the misconduct.

*Response:* Section 42.12 identifies types of misconduct and sanctions for misconduct. Sections 90.1, 90.2 and 90.3 provide for judicial review of decisions by the Patent Trial and Appeal Board. If appropriate, the misconduct may be reported to the Office of Enrollment and Discipline for consideration of a sanction directed to the attorney or firm. Based on past experience, the Board expects such instances to be rare. Authority for the Board's sanctions include 35 U.S.C. 316(a)(6), as amended, and 35 U.S.C. 326(a)(6).

*Citation of Authority (§ 42.13)*

*Comment 47:* Several comments were critical of the requirements of citing decisions to the United States Reports and West Reporter System, and suggested that proposed §§ 42.13(a) and (b) be modified as a preference.

*Response:* The comment is adopted.

*Comment 48:* A few comments recommended that the requirement for a copy of the cited non-binding authority be eliminated because it is a burden and such an authority is electronically accessible.

*Response:* This comment is not adopted. Non-binding authority should be used sparingly. The Office cannot assume that a cited non-binding authority is readily accessible electronically. A party who wishes to cite a non-binding authority would already have a copy, and therefore providing the Office with a copy should not be a burden.

*Public Availability (§ 42.14)*

*Comment 49:* The comments generally supported proposed § 42.14. One comment, however, suggested special

was anticipated that the Office would be conservative in its grants of discovery due to the time deadline constraints on the proceedings. 154 CONGRESSIONAL RECORD S9988–9, (daily ed. Sept. 27, 2008) (statement of Sen. Kyl); see also 157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) (incorporating prior 2008 statement). Consistent with the statutory provisions and the legislative history, the Office's rules provide that additional discovery will be ascertained on a case-by-case basis taking into account the special circumstances of the proceeding.

*Comment 98:* Several comments expressed support for the limited discovery provided for in the proposed rules to avoid the time-consuming and costly discovery battles that are typical of district court litigation. Other comments suggested that discovery was too limited and that a limited number of automatic discovery mechanisms should be put forth in the rules.

*Response:* The comments are adopted in part. The Office has considered the comments favoring additional automatic discovery against those cautioning against the increased costs and delays associated with broader discovery. 35 U.S.C. 316(a)(5), as amended, and 35 U.S.C. 326(a)(5) require the Office to promulgate standards and procedures for the limited discovery of relevant evidence. 35 U.S.C. 316(a)(6), as amended, and 35 U.S.C. 326(a)(6) require sanctions will be provided for abuse of discovery, which cautions against overly broad discovery. Further, the legislative history states that the Office is anticipated to be conservative in its grants of discovery due to time constraints on the proceedings. On balance, the Office believes that the rules provide the proper standards for discovery where the parties fail to agree amongst themselves as to additional discovery but the Office acknowledges the benefits to providing additional discovery where the parties are in agreement. Accordingly, although the Office does not adopt a specific number of automatic interrogatories, production requests and depositions due to concerns over imposing costs and potential delays upon a party desiring a quicker, lower cost alternative to district court litigation, the Office has rewritten the rules to provide for mandatory initial disclosures and additional discovery where the parties agree to such discovery. Further, additional discovery will be available even in the event that the parties do not agree to the scope of the additional discovery, but such requests will be handled on a case-by-case basis taking into account the specific facts presented.

*Comment 99:* One comment suggested that the Office promulgate a rule that parties may use conference calls with the Board to resolve disputes regarding their discovery obligations in a timely way.

*Response:* The comment is adopted in part. A party seeking relief other than by petition is to request relief via a ''motion,'' which can be as simple as arranging a conference call with the Board. § 42.20. The Board envisions handling joint conference calls in an expeditious manner, especially for discovery disputes where the parties need resolution in order to continue development of their respective cases. In particular, the Board expects to resolve many issues via conference calls so as to ensure the timely resolution of the proceeding in a cost-effective manner.

*Comment 100:* One comment asked for clarification that the Board will uphold all recognized privileges and immunities against disclosure of otherwise discoverable information.

*Response:* The comment is adopted, although no change to the rule is required. The Board intends to recognize privileges and immunities normally available under the Federal Rules of Evidence. *See* § 42.62.

*Comment 101:* Several comments requested that patent owners be assured of at least three months of discovery once review is instituted.

*Response:* The comments are adopted. The rules of practice for *inter partes* review and post-grant review have been modified to provide patent owners with a default time of three months after institution to file a patent owner response. §§ 42.120(b) and 42.220(b). The Office envisions patent owners taking discovery during the three months after institution so that they may prepare and file their patent owner response.

*Comment 102:* Several comments requested that discovery commence immediately upon institution of the proceedings.

*Response:* The comments are adopted in part. The Office envisions that a Scheduling Order will be entered concurrent with a decision to institute a proceeding. The Scheduling Order will set due dates for the proceeding taking into account the complexity of the proceeding, but ensuring that the trial is completed within one year of institution. The Office envisions that the Scheduling Order will authorize the patent owner to begin taking routine discovery immediately of the petitioner's witnesses submitting affidavits or declarations. The Office, however, does not incorporate a specific time for the commencement of discovery as there may be certain cases where discovery would be taken prior to commencement, *e.g.*, additional discovery may be authorized prior to institution, where patent owner raises sufficient concerns regarding the petitioner's certification of standing.

*Comment 103:* Several comments were directed to the sequencing of discovery as between the petitioner and the patent owner. Certain comments spoke favorably of sequencing, whereas another comment opposed sequencing expressing the view that sequencing would unnecessarily complicate proceedings by requiring the Board to police multiple discovery deadlines.

*Response:* The comments favoring sequencing are adopted in part. The Office Patent Trial Practice Guide contains a proposed Scheduling Order that utilizes sequenced discovery whereby parties can conduct meaningful discovery before they are required to submit their respective motions and oppositions. In choosing to provide sequenced discovery in the proposed Scheduling Order, the Office took into account public commentary identifying the benefits associated with such a procedure. In particular, sequenced discovery allows for convergence of the issues as the trial progresses, and therefore, reduces the burdens on the parties and the Board. Rather than including this in the rules, however, the Office has elected to provide for sequencing in the Scheduling Order so that the parties may, where appropriate, agree to another schedule for discovery.

*Comment 104:* Several comments suggested that certain information appearing in the Practice Guide for Proposed Trial Rules be incorporated into the rules. Examples of this are the use of conference calls and the concept of sequenced discovery.

*Response:* The Office Patent Trial Practice Guide is intended to advise the public on the general framework of the regulations. The guide will be updated to reflect the final rules. Providing general guidance in a practice guide, as opposed to the rules themselves, allows for flexibility for efficient case management and is consistent with the considerations identified in 35 U.S.C. 316(b), as amended, and 35 U.S.C. 326(b) that the rules take into account the efficient operation of the Office and the ability to complete the proceedings in a timely manner. The Office expects that the Board will make liberal use of joint conference calls coupled with expeditious decision making on procedural issues to ensure the timely completion of the proceedings.

*Comment 105:* A comment asked for clarification whether § 1.56 applied during a proceeding.

*Response:* Proceedings, not being applications for patents, are not subject to § 1.56.

*Comment 106:* Several comments addressed the interplay between the Office's discovery rules and the statutory estoppel for the proceedings. One comment asked for guidance in the rules as to how such provisions would apply where a party was unable to discover evidence or bring a claim because discovery was limited by the Board or the applicable rules.

*Response:* 35 U.S.C. 315(e)(1), as amended, and 35 U.S.C. 325(e)(1) provide for petitioner estoppel on issues raised or those that reasonably could have been raised during the proceeding. Where an issue reasonably could not have been raised during a proceeding, no estoppel would occur.

*Comment 107:* One comment stated that live testimony on inequitable conduct is not to be considered in a trial.

*Response:* This comment is adopted in part. Inequitable conduct is not a basis for seeking the institution of a trial before the Board. However, 35 U.S.C. 316(a)(6), as amended, and 35 U.S.C. 326(a)(6) provide that the Office may determine and is allowed to prescribe sanctions for misconduct, such as abuse of process, or any other improper use of the proceeding, such as to harass or cause unnecessary delay or an unnecessary increase in the cost of the proceeding.

*Comment 108:* Several comments requested that the Office provide for the presentation of rebuttal evidence at the oral hearing and provide guidance with respect to the interplay between the rebuttal evidence and hearing under the Administrative Procedures Act.

*Response:* Generally, rebuttal evidence will be submitted prior to the hearing such that an opponent will have sufficient time to identify and brief admissibility challenges to the rebuttal evidence. As such, hearings typically will reflect an oral argument explaining arguments already made and supported in the existing record. Occasionally, where requested, the Board may order live witness testimony before an administrative patent judge, when it is necessary to resolve discovery disputes or where witness demeanor is particularly important, but it is envisioned that such live testimony will occur prior to the hearing, rather than during the hearing. In an appropriate case, however, where an appropriate showing has been made, live testimony

would be taken at a hearing before the Board.

*Comment 109:* Several comments recommended setting discovery limits by way of rule or in a Standing Order.

*Response:* The comments are adopted in part. The Office has modified several discovery rules to provide additional default limits on discovery. Further, the Office envisions providing guidance on discovery in the Office's Scheduling Order, which would accompany a decision to institute a proceeding.

*Comment 110:* Several comments expressed concern that the mechanism for obtaining additional discovery was too cumbersome, requiring authorization from the Board.

*Response:* The comments are adopted in part. The Office has modified the proposed rule. Section 42.51, as adopted in this final rule, permits parties to agree to certain mandatory initial disclosures, from which the parties would then automatically take discovery of the information identified in the initial disclosures. Additionally, § 42.51, as adopted, allows parties to agree to additional discovery between themselves at any time. By allowing the parties to agree to certain mandatory initial disclosures and additional discovery, the final rule seeks to streamline the discovery process and reduces the need for Board involvement on issues where the parties are in agreement.

*Comment 111:* Several comments suggested that certain discovery procedures under the Federal Rules of Civil Procedure should be available in the new procedures. In particular, several comments specifically identified Rule 30(b)(6) of the Federal Rules of Civil Procedure.

*Response:* The comments are adopted in part. Additional discover under § 42.51 which is consistent with 35 U.S.C. 316(a)(5), as amended, and 35 U.S.C. 326(a)(5), is limited. As discussed previously, § 42.51, as adopted in this final rule, allows parties to agree to mandatory initial disclosures and additional discovery, thereby allowing the parties flexibility in their approach to discovery.

*Comment 112:* Several comments urged the adoption of mandatory initial disclosures, and automatic discovery mechanisms without having to receive authorization from the Board. Other comments however, urged the Office to avoid the use of automatic disclosures as it would complicate the Office's ability to complete the proceedings within one year.

*Response:* The comments are adopted in part. Additional disclosure under § 42.51 which is consistent with 35

U.S.C. 316(a)(5), as amended, and 35 U.S.C. 326(a)(5), is limited. Accordingly, providing for mandatory initial disclosures in all cases, including those where the parties do not consent to such disclosures, is not consistent with the statute, or with legislative intent in enacting the AIA as a less expensive and more efficient alternative to infringement litigation in Federal court. In any event, § 42.51, as adopted in this final rule, provides a new provision in paragraph (a), which permits mandatory initial disclosures by agreement of the parties. Furthermore, under the revised rule, the parties may agree to additional discovery at any time. Additionally, where only one party seeks mandatory initial disclosure, the party may file a motion requesting such initial disclosures upon a showing that such disclosures are in the interests of justice for *inter partes* review and for good cause in post-grant review. *See* 35 U.S.C. 316(a)(5), as amended, and 35 U.S.C. 326(a)(5).

*Comment 113:* Several comments expressed concern that in cases involving public use and on-sale issues or objective evidence of non-obviousness, it might be appropriate to require initial disclosures of all relevant documents and all persons with knowledge of the facts and other special discovery procedures.

*Response:* The comment is adopted in part. The final rule provides a new provision in § 42.51(a), which permits mandatory initial disclosures by agreement of the parties. Section 42.51(a), as adopted in this final rule, further provides that where the parties fail to agree to mandatory initial disclosures, a party may seek such disclosures by motion. The party would first arrange for a conference call with the Board to have the issue resolved in an expeditious manner. A party seeking such initial disclosures would be required to identify the sought-after discovery and explain the need for the disclosures, *e.g.,* why the disclosures were necessary in the interests of justice or good cause, as appropriate, and the party opposing the request would be provided an opportunity to respond. When determining whether to grant such a motion, the Office will take into account the nature of the specific disclosures requested (*e.g.,* public use, on sale, and objective evidence of non-obviousness), as well as the party's access to the information sought (*e.g.,* public versus non-public information). While the Office declines to adopt a *per se* rule regarding disclosures of specific categories of information, as fact patterns will vary from case-to-case, the Office does require the disclosure of

Director_PTABDecision_Review@uspto.gov                    Paper No. 102
571-272-7822                                              Date: October 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064[1]
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

DECISION
Determining Abuse of Process, Issuing Sanctions, and Remanding to Patent
Trial and Appeal Board Panel for Further Proceedings

_____

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

## I.     INTRODUCTION

On December 23, 2021, the Patent Trial and Appeal Board ("PTAB" or "Board") issued a Decision granting institution of an *inter partes* review ("IPR") of claims 1, 14, 17, 18, 21, 22, and 24 ("challenged claims") of U.S. Patent No. 7,725,759 B2 ("the '759 patent"), based on a Petition filed by OpenSky Industries, LLC ("OpenSky").  Paper 17 ("Institution Decision"). VLSI Technology LLC ("VLSI" or "Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 20 ("Req. Reh'g"); Ex. 3002.  I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 41.  Concurrent with my Order, the POP dismissed the rehearing and POP review requests. Paper 42.  On June 8, 2022, the Board joined Intel as a Petitioner in this case.  Paper 43.

I explained that Director review would address questions of first impression as to what actions the Director, and by delegation the Board, should consider when addressing allegations of abuse of process or conduct that otherwise thwarts the goals of the United States Patent and Trademark Office ("USPTO" or "Office") and/or the America Invents Act ("AIA"). Paper 47, 7.  Due to the importance of the issues to the Office in fulfilling its mission, I ordered the parties to respond to interrogatories and to exchange information ("Mandated Discovery") to assist me in evaluating these issues of first impression.  *Id.* at 8–11; *see also* Paper 51.

For the reasons below, I determine that OpenSky has engaged in discovery misconduct by failing to comply with my Order for interrogatories and Mandated Discovery.  *See* Paper 47, 8–11.  Failure to comply with an order is sanctionable.  37 C.F.R. § 42.12(a)(1).  Accordingly, when

2

IPR2021-01064
Patent 7,725,759 B2

analyzing whether OpenSky's conduct amounted to an abuse of process, I apply a negative inference and hold facts to have been established adverse to OpenSky. *See* 37 C.F.R. § 42.12(b)(1) (providing that sanctions may include "[a]n order holding facts to have been established in the proceeding"); Paper 47, 10 ("Any attempt to withhold evidence based on a narrow interpretation of the requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable."); Paper 52, 4 ("As highlighted in the Scheduling Order, failure to comply with my Order may be sanctionable. . . . For example, and without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding.'").

Based on the evidence of record and the facts held to have been established, I determine that OpenSky, through its counsel, abused the IPR process by filing this IPR in an attempt to extract payment from VLSI and joined Petitioner Intel, and expressed a willingness to abuse the process in order to extract the payment. OpenSky's behavior in this proceeding is entirely distinguishable from conventional settlement negotiations that take place in an adversarial proceeding. I also find that OpenSky engaged in abuse of process and unethical conduct by offering to undermine and/or not vigorously pursue this matter in exchange for a monetary payment. *See Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592, 606 (E.D. Pa. 2018) ("The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law."). Each aspect of OpenSky's conduct—discovery misconduct, violation of an express order, abuse of the IPR process, and unethical conduct—taken alone, constitutes sanctionable conduct. 37 C.F.R. § 42.12(a)(6). Taken together,

the behavior warrants sanctions to the fullest extent of my power.  Not only are such sanctions proportional to the conduct here, but they are necessary to deter such conduct by OpenSky or others in the future.  *See* 37 C.F.R. § 42.11(d)(4).

Given OpenSky's conduct, from this day forward OpenSky and their counsel are precluded from actively participating in the underlying proceeding.  The conduct of the individual attorneys in this case might also rise to the level of an ethical violation under the rules of their respective bars.  OpenSky is precluded from filing further papers into the record or presenting further argument or evidence in the underlying proceeding or on Director review unless expressly instructed to do so by me or the Board.  *See* 37 C.F.R. §§ 42.12(b)(2–4) (providing that sanctions include "[a]n order expunging or precluding a party from filing a paper"; "[a]n order precluding a party from presenting or contesting a particular issue"; and "[a]n order precluding a party from requesting, obtaining, or opposing discovery").

Moreover, I order OpenSky to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding.  I further order OpenSky to address the appropriate time period for which any fees should be assessed.  *See* 37 C.F.R. § 42.12(b)(6) (providing that sanctions include "[a]n order providing for compensatory expenses, including attorney fees").  As set forth below, I order briefing from OpenSky and VLSI on this issue.

Lastly, as to the underlying proceeding, for the reasons articulated below, I am remanding for the Board to determine, within two weeks of the date of this Order, whether OpenSky's Petition, based only on the record before the Board prior to institution, presents a compelling, meritorious

4

IPR2021-01064
Patent 7,725,759 B2

challenge. I recognize that the record in this proceeding has progressed through oral hearing. Nevertheless, as discussed in more detail below, the Board is to confine its compelling-merits analysis to the record that existed prior to institution, consistent with the June 21, 2022, Director's Memorandum ("Memorandum") and my additional direction below.[2] If the Board finds that OpenSky's Petition presented compelling merits, the underlying proceeding to determine whether the '759 patent should be canceled will, in the interest of the public, continue. If the Board finds the Petition does not rise to this standard, the Board will dismiss the IPR. As explained in more detail below, requiring the Board to assess whether the Petition presents a compelling-merits case based on the record before the Board prior to institution balances the interests of patent owners, including practicing entities and small to medium-sized enterprises, in reliable patent rights, with the public interest in canceling invalid patents, clearing the path for future innovation, and removing the tax on society caused by the litigation and licensing of invalid patents.

## II.    BACKGROUND

The dispute over the challenged patent has a long and complex history, starting with VLSI's complaint against Intel for infringing the '759 patent, filed in the Waco Division of the United States District Court for the Western District of Texas on April 22, 2019.

---

[2] Available at www.uspto.gov/sites/default/files/documents/interim _proc_discretionary_denials_aia_parallel_district_court_litigation_memo_2 0220621_.pdf.

IPR2021-01064
Patent 7,725,759 B2

### A. *Intel's Prior Petitions and Litigation*

After being sued by VLSI, Intel filed two petitions for IPR,
challenging claims of the '759 patent. IPR2020-00106, Paper 3; IPR2020-
00498, Paper 4. Considering the factors set forth in the Board's precedential
decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar.
20, 2020) (precedential) ("the *Fintiv* factors"), the Board exercised
discretion to deny institution of both proceedings. IPR2020-00106,
Paper 17, 13; IPR2020-00498, Paper 16, 10. In particular, the Board
highlighted "the advanced stage of the Western District of Texas litigation, a
currently scheduled trial date approximately seven months before the would-
be deadline for a final written decision, and the overlap between the issues."
IPR2020-00106, Paper 17, 13; *see* IPR2020-00498, Paper 16, 6, 10. The
Board did not address the merits of the Petition, other than determining "that
the merits of the Petition[s] do not outweigh the other *Fintiv* factors."
IPR2020-00106, Paper 17, 13. Notably, the Board issued these decisions
prior to the issuance of the Memorandum, which clarifies that "the PTAB
considers the merits of a petitioner's challenge when determining whether to
institute a post-grant proceeding in view of parallel district court litigation"
and that "compelling, meritorious challenges will be allowed to proceed at
the PTAB even where district court litigation is proceeding in parallel."
Memorandum at 4–5.

Intel requested POP review of the Board's decisions, which was
denied. IPR2020-00106, Papers 19 and 20; IPR2020-00498, Papers 19 and
20. The trial in the Western District of Texas began on February 22, 2021,
months after the date that was presented to the Board for the discretionary
denial analysis. *See* Ex. 2025; *cf.* Memorandum at 8 ("A court's scheduled

6

IPR2021-01064
Patent 7,725,759 B2

trial date [] is not by itself a good indicator of whether the district court trial will occur before the statutory deadline for a final written decision."). The trial resulted in a jury verdict finding that Intel neither literally nor willfully infringed the '759 patent, but did infringe claims 14, 17, 18, and 24 under the doctrine of equivalents. Ex. 1027, 2–4. The jury also found that Intel had not proven by clear and convincing evidence that claims 14, 17, 18, and 24 were invalid as anticipated. *Id.* at 5. The invalidity basis presented to the jury during the trial did not overlap with the grounds for unpatentability in Intel's Petitions. Institution Decision 8. The jury awarded VLSI $675 million in damages for infringing the '759 patent.[3] *Id.* at 6. Intel appealed to the Federal Circuit, and that appeal is currently pending as *VLSI Technology LLC v. Intel Corporation*, No. 22-1906 (Fed. Cir. June 15, 2022). The appeal will not resolve the patentability issues pending before the Board.

### B.    OpenSky's Petition

On June 7, 2021, OpenSky filed the Petition for IPR in this proceeding, challenging claims 1, 14, 17, 18, 21, 22, and 24 of the '759 patent. Paper 2 ( "Pet."). OpenSky also filed a Petition for IPR, challenging claims 1–3, 5, 6, 9–11, and 13 of U.S. Patent No. 7,523,373 B2 ("the '373 patent"). IPR2021-01056, Paper 2. OpenSky copied extensively from Intel's two earlier petitions. Ex. 2024 (redline comparison of portions of the Petition in this IPR with portions of Intel's petitions in IPR2020-

---

[3] Concurrently, the jury found that Intel had also infringed U.S. Patent No. 7,523,373 B2 ("the '373 patent"), owned by VLSI, and awarded VLSI $1.5 billion in damages. Ex. 1027, 6. The '373 patent is the subject of IPR2021-01229.

IPR2021-01064
Patent 7,725,759 B2

00106 and IPR2020-00498). OpenSky further refiled Intel's supporting

declarations of Dr. Bruce Jacob, without his knowledge. *See* Exs. 1002,

2097, 1046.[4]

In its Petition, OpenSky argued that the Board should not exercise

discretion to deny institution under 35 U.S.C. §§ 314(a) or 325(d). Pet. 7–

10. In addressing the *Fintiv* factors, OpenSky argued:

> the Board needs to institute review to maintain the integrity of
> the patent system, because a jury found that this patent is worth
> at least $675 million ($675,000,000), yet no judge or jury (or
> PTAB proceeding) has ever double-checked the validity of the
> '759 patent. The *Fintiv* analysis is designed to determine
> whether the integrity of the system would be furthered by
> instituting review. *Apple v. Fintiv*, IPR2020-00019, Paper 11,
> p. 6 ("the Board takes a holistic view of whether efficiency and
> integrity of the system are best served by denying or instituting
> review."). The integrity of the entire patent system is
> threatened whenever a patent owner constructs a set of
> proceedings in which no one ever checks the validity of a patent
> found to be worth over six hundred million dollars. The denial
> of invalidity review cannot be proper; OpenSky urges the Board
> to find that this factor weighs strongly in favor of institution.

*Id.* at 9–10.

VLSI filed a Patent Owner Preliminary Response on September 24,

2021, explaining that this was the third IPR Petition filed against the '759

patent. Paper 9, 1 (noting discretionary denial of Intel's petitions in

IPR2020-00106 and IPR2020-00498). VLSI argued that this Petition should

---

[4] OpenSky also filed identical copies of declarations of Intel's other expert,
Dr. Hall-Ellis, without change. Paper 17, 5. Dr. Hall-Ellis is a librarian who
proffered testimony regarding the prior art status of certain references relied
on in Intel's previous petitions. *See* Ex. 1040.

IPR2021-01064
Patent 7,725,759 B2

be denied, alleging that "[s]hortly after the widely-reported Verdict" finding that Intel infringed the '759 and '373 patents, "OpenSky formed in Nevada on April 23, 2021. OpenSky's only apparent business activity is the filing of two IPR petitions against VLSI." *Id.* at 5 (citation omitted). VLSI also noted that "OpenSky fashioned this Petition by copying and then stitching together portions of the rejected Intel Petitions. Rather than provide its own expert testimony, OpenSky just refiled Intel's declarations without even changing the cover pages."[5] *Id.* at 1–2, 6. Moreover, VLSI noted that "[j]ust one week after OpenSky filed its petitions, yet another new entity was created, to file yet another petition against the '373 patent using a similar approach." *Id.* at 1–2 (identifying IPR2021-01229, filed by Patent Quality Assurance, LLC).

In this proceeding, the Board reviewed the evidence and arguments in the Petition, Patent Owner Preliminary Response, Preliminary Reply, and Preliminary Sur-reply, and instituted the requested IPR on December 23, 2021. Institution Decision 30. Specifically, the Board found that the *Fintiv* factors did not weigh in favor of discretionary denial, in large part because the district court jury trial did not resolve the unpatentability issues presented in this proceeding. *Id.* at 8–9. Because the Board did not reach the merits of the prior Intel petitions, the Board disagreed with VLSI's arguments that institution should be denied because the Petition presents the

---

[5] Such practice has become known as "copycat" petition practice and, to date, has not been held to be improper any more than copying claims to invoke interference proceedings, which have likewise not been found to be improper.

IPR2021-01064
Patent 7,725,759 B2

same challenges as the prior Intel petitions.[6] *Id.* at 10, 12 (relying on factors set forth in *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (Sept. 6, 2017) (precedential) ("the *General Plastic*" factors)). *See Code200, UAB v. Bright Data Ltd.*, IPR2022-00861, Paper 18, 5 (PTAB Aug. 23, 2022) (precedential) ("Where the first-filed petition under factor 1 was discretionarily denied or otherwise was not evaluated on the merits, factors 1–3 only weigh in favor of discretionary denial when there are 'road-mapping' concerns under factor 3 or other concerns under factor 2. . . . '[R]oad-mapping' concerns are minimized when, as in this case, a petitioner files a later petition that raises unpatentability challenges substantially overlapping with those in the previously-filed petition and the later petition is not refined based on lessons learned from later developments.").

The Board then, for the first time, discussed the merits of the Petition. Institution Decision 15–29. The Board instituted the underlying proceeding, concluding that the "Petitioner has shown a reasonable likelihood it will prevail with respect to unpatentability of claim 1 over Shaffer and Lint—Petitioner's showing justifies institution." *Id.* at 21. The Board likewise concluded that because the "Petitioner has shown a reasonable likelihood it will prevail with respect to unpatentability of claim 1 over Chen and Terrell—Petitioner's showing justifies institution." *Id.* at 29.

On January 6, 2022, VLSI sought to challenge the institution decision, filing requests for rehearing and for POP review. In the rehearing request,

---

[6] In IPR2021-01056, however, the Board denied institution of an IPR due to the unavailability of another expert declarant on which OpenSky relied in its contentions in that case. IPR2021-01056, Paper 18, 10.

IPR2021-01064
Patent 7,725,759 B2

VLSI argued that "[t]he Board should not permit entities formed after the verdict and facing no infringement threat to treat these proceedings as leverage to extract ransom payments in exchange for withdrawing abusive attacks." Req. Reh'g 1, 3–4, 6–8. VLSI argued that such a proceeding advances no valid public interest and "fail[s] to weigh the overarching interests of fairness to the parties and the integrity of the patent system." *Id.* at 1, 9–10. VLSI also criticized the Board's reliance on two expert declarations, which VLSI contended constitute inadmissible hearsay. *Id.* at 11–15.

### C.     Intel's Motion for Joinder

Within a month of the Board instituting IPR in this proceeding, Intel timely filed its own Petition for IPR with a Motion for Joinder to this proceeding. IPR2022-00366, Papers 3 and 4. The Board joined Intel to this proceeding on June 8, 2022, determining that Intel's Petition warranted institution and declining to discretionarily deny institution under 35 U.S.C. §§ 314(a) and 325(d). Paper 43, 19–20. In considering discretionary denial, the Board determined that:

> [a]lthough Petitioner has directed this Petition to the same claims and relies on the same art as in its first two petitions, that the Board did not substantively address the merits of the prior Intel petitions, in our view, weighs against discretionary denial here. The district-court trial that led to the denial of its initial petitions is over and did not resolve the challenges presented here. Allowing Petitioner the opportunity to pursue a decision on the merits from the Board at this time—by joining OpenSky's substantially identical petition—best balances the desires to improve patent quality and patent-system efficiency against the potential for abuse of the review process by repeated attacks on patents.

11

*Id.* at 9–10 (citing *General Plastic*, Paper 19 at 16–17). The Board correctly identified that the statute expressly provides an exception to the 1-year time bar (set forth in 35 U.S.C. § 315(b)) for a request for joinder. *Id.* at 12 (citing 35 U.S.C. § 315(b)) ("The time limitation set forth . . . shall not apply to a request for joinder under subsection (c)"). VLSI requested POP review of the Board's decision to join Intel to the proceeding, and that request was denied. Paper 53. On August 30, 2022, the Board authorized VLSI to file a Motion to Terminate Intel from the proceeding, setting forth VLSI's arguments on res judicata. Paper 86, 2. The Board authorized Intel to file an opposition to the motion. *Id.* VLSI filed the Motion to Terminate on September 27, 2022. Paper 99. Intel's opposition is pending.

### D.    *Director Review*

As noted above, I ordered a *sua sponte* Director review of the Board's institution decision in this proceeding on June 7, 2022, one day before the Board joined Intel as a Petitioner in this case. Paper 41. Concurrent with my Order, the POP dismissed the rehearing and POP review requests. Paper 42. Because I did not yet have all the facts before me, I did not stay the underlying proceeding.

On July 7, 2022, I issued a Scheduling Order for the Director review. Paper 47. The Scheduling Order defined the scope of my review, as I determined that "this proceeding presents issues of first impression" and "involves issues of particular importance to the Office, the United States innovation economy, and the patent community." *Id.* at 7–8. In particular, I identified the following issues as relevant:

> 1.    What actions the Director, and by delegation the Board, should take when faced with evidence of an abuse of process or

IPR2021-01064
Patent 7,725,759 B2

> conduct that otherwise thwarts, as opposed to advances, the
> goals of the Office and/or the AIA; and
>
> 2.    How the Director, and by delegation the Board, should
> assess conduct to determine if it constitutes an abuse of process
> or if it thwarts, as opposed to advances, the goals of the Office
> and/or the AIA, and what conduct should be considered as
> such.

*Id.* I directed the parties to address these questions and to support their

answers "in their briefing, including through new arguments and non-

declaratory evidence." *Id.* at 8. I also invited amici curiae briefing. *Id.*

To enable me to address those questions in the context of this Review,

my Scheduling Order also instructed the parties to answer interrogatories

and exchange certain categories of information as Mandated Discovery. *Id.*

at 8–11; 35 U.S.C. § 316(a)(5) ("The Director shall prescribe regulations

setting forth standards and procedures for discovery of relevant evidence . . .

otherwise necessary in the interest of justice"). My interrogatories ordered

the parties to address specific questions related to the "issues of particular

importance" in this Review. *Id.* at 8–9.

I ordered the Mandated Discovery "to allow all parties to answer the

questions" I set forth, and to give each party an opportunity to produce

evidence supporting its position. *Id.* at 9–10. The Mandated Discovery

included categories of documents relating to the formation and business of

OpenSky; documents and communications "relating to the filing, settlement,

or potential termination of this proceeding, or experts in this proceeding, not

already of record in the proceeding"; and "communications with any named

party relating to the filing, settlement, or potential termination of this

proceeding." *Id.* My Scheduling Order warned "that sanctions may be

considered for any misrepresentation, exaggeration, or over-statement as to

13

IPR2021-01064
Patent 7,725,759 B2

the facts or law made in the parties' briefing" (*id.* at 9), and that "[a]ny attempt to withhold evidence based on a narrow interpretation of the [discovery] requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable." *Id.* at 10.

On July 15, 2022, OpenSky requested an extension of the deadlines in the Scheduling Order. Ex. 3012. On July 21, 2022, I extended the deadlines for the parties to exchange information and accordingly extended the briefing deadlines: as extended, the parties' initial briefs and briefs of amici curiae were due on August 18, 2022,[7] and the parties' responsive briefs were due on September 1, 2022. Paper 51. In the Order granting a two-week extension, I reminded the parties that "as set forth in the Scheduling Order, a party may lodge legitimate, lawful grounds for withholding documents, and shall maintain a privilege log of documents withheld." *Id.*

On July 29, 2022, I issued a further Order addressing the scope of Mandated Discovery. Paper 52. I reminded the parties that "they are required to comply with the full scope of the Scheduling Order, including its

---

[7] Fourteen amici curiae briefs have been entered into the record of this proceeding, from the following: American Intellectual Property Law Association (Paper 55) ("AIPLA"); Association of Amicus Counsel (Paper 56); Naples Roundtable (Paper 57) ("Naples"); Ramzi Khalil Maalouf (Paper 64) ("Maalouf"); Engine Advocacy et al. (Paper 74) ("Engine"); High Tech Inventors Alliance (Paper 75) ("HTIA"); Robert Armitage (Paper 76); Computer and Communications Industry Association (Paper 77) ("CCIA"); BSA | The Software Alliance (Paper 78) ("BSA"); The Alliance of U.S. Startups et al. (Paper 79) ("USIJ"); Hon. Paul R. Michel (Paper 80); Unified Patents et al. (Paper 81) ("Unified"); Public Interest Patent Law Institute (Paper 82) ("PIPLI"); and Centripetal Networks, Inc. (Paper 83) ("Centripetal").

14

IPR2021-01064
Patent 7,725,759 B2

Mandated Discovery provisions now due to be exchanged by August 4, 2022," and "failure to comply with my Order may be sanctionable." *Id.* at 4. I explained that potential sanctions may include, for example, "[a]n order holding facts to have been established in the proceeding." *Id.* (quoting 37 C.F.R. § 42.12). The parties were further "reminded that legitimate, lawful grounds for withholding documents may be lodged and, if so, the party shall maintain a privilege log of documents withheld. No responsive document may be withheld without being included in such a privilege log." *Id.* (internal citations omitted). Thus, I provided specific notice of potential sanctions to the parties, in addition to the general notice provided by the Office's regulations.

As discussed in detail below, OpenSky did not comply with the Mandated Discovery as ordered. *See* Paper 84, 19–21.[8] It produced a minimal number of documents to the other parties and wholly inadequate answers to my interrogatories, and did not produce a privilege log. *See id.* In contrast, both VLSI and Intel produced responsive documents and detailed privilege logs, as ordered.

### III.    FAILURE TO COMPLY

As explained above, I initiated Director review to answer questions of first impression related to the IPR process. Paper 47, 7. Before proceeding to those questions, however, I must address OpenSky's deficient responses to the discovery required in my Scheduling Order.

---

[8] Paper 84 is the nonconfidential version of VLSI's Initial Brief in response to the Director review order; Paper 70 is the confidential version.

15

IPR2021-01064
Patent 7,725,759 B2

### A.    OpenSky's Objections to Mandated Discovery

The deadline for exchange of documents and communications contemplated by my Mandated Discovery order was August 4, 2022. Paper 51, 4. The deadline for the parties to submit briefs addressing the Director's interrogatories with supporting documentary evidence was August 18, 2022. *Id.* at 4; Paper 47, 8–10. The parties were repeatedly warned that no documents may be withheld without being included in a privilege log, and that any attempt to withhold evidence may be sanctionable. Paper 47, 10; Paper 52, 4.

On August 4, 2022, OpenSky filed a Notice of Objections to my Mandated Discovery. Paper 54. I find their objections have no merit. For example, OpenSky contends that the Order is inconsistent with 35 U.S.C. § 6(c) as modified by *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1987 (2021). Paper 54, 2. But OpenSky does not explain this assertion. OpenSky further contends that the Order exceeds the discovery permitted under 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.51. *Id.* at 2. OpenSky's argument on this point is not persuasive. 35 U.S.C. § 316(a)(5) provides that discovery may be sought where "necessary in the interest of justice," which is at the heart of the inquiry as to whether OpenSky has abused the IPR process. And 37 C.F.R. § 42.51 is not relevant to Director-ordered discovery, because that rule governs only discovery between the parties. Furthermore, in general, it is within my purview to "determine a proper course of conduct in a proceeding for any situation not specifically covered by [the other regulations]" and to "enter non-final orders," such as the Scheduling Order, "to administer the proceeding." 37 C.F.R. § 42.5(a).

16

IPR2021-01064
Patent 7,725,759 B2

OpenSky also argues that the Scheduling Order is inconsistent with Board procedures governing non-routine discovery. Paper 54, 2–3. For example, OpenSky contends that there is no evidence "tending to show beyond speculation that in fact something useful will be uncovered." *Id.* at 3 (quoting *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001 (PTAB Mar. 5, 2013) (Paper 26) (precedential)). Again, while Board procedures governing party conduct do not formally apply to the Director's inquiry into process abuses, my Scheduling Order makes plain the basis for the ordered discovery here. The Scheduling Order explains that the discovery would permit the parties to answer the questions I identified as germane to my inquiry into the circumstances surrounding OpenSky's formation and conduct—information about which is uniquely in the parties' (and specifically OpenSky's) possession. Paper 47, 7–10; 37 C.F.R. § 42.11(a) ("Parties and individuals involved in the proceeding have a duty of candor and good faith to the Office during the course of a proceeding.").

OpenSky's other arguments similarly lack merit. OpenSky contends that, in its judgment, certain categories of Mandated Discovery are not in dispute. *See, e.g.*, Paper 54, 3–4. That is not OpenSky's judgment to make. It is not appropriate for OpenSky to simply assert that something is undisputed and, on that basis, refuse to comply with my Order by failing to produce or log such materials. OpenSky's argument that the Order is not "easily understandable" is also not persuasive. *Id.* at 4. No other party indicated that they had any issue understanding the Order, nor did they have issues complying. OpenSky's argument that the discovery is overly burdensome (Paper 54, 4–5) fares no better. OpenSky could have sought to file a motion to revise the standing protective order (37 C.F.R.

17

IPR2021-01064
Patent 7,725,759 B2

§ 42.54(a)(1)), or at least have requested a second extension if it could demonstrate an actual burden, but instead chose noncompliance.

OpenSky submits that the Order violates its and its members' constitutional rights. Paper 54, 5–6. OpenSky cites no court case to support this proposition, and instead gestures to the First Amendment right to freedom of association and the Fourteenth Amendment's right to due process of law. OpenSky does not explain how complying with a discovery order results in a constitutional violation. Further, by choosing to file this IPR, OpenSky availed itself of my and the Board's jurisdiction and opened itself to questions regarding its members and purpose, among others.

OpenSky ends its objections with a series of similarly unpersuasive arguments. OpenSky opines that the Order is inconsistent with the purposes of the AIA. Paper 54, 6. OpenSky does not explain why it believes that to be the case, and the argument lacks merit for reasons explained below. Moreover, even if true, the argument does not provide sufficient basis for OpenSky to disregard my Order. OpenSky's argument that the Order is inconsistent with the guidelines for Director review rests on its contention that "the Order does not identify any issue of first impression." *Id.* at 7. OpenSky provides no citation for the claim that Director review is limited to issues of first impression. In any event, my Order indicated that the issues here are ones of first impression. *Id.* Finally, OpenSky contends that the Order would require it to waive privilege objections (*id.* at 7–8), but avoiding such waiver is the point of a privilege log, which OpenSky did not submit.

IPR2021-01064
Patent 7,725,759 B2

> B.    *OpenSky's Failure to Comply with Mandatory Discovery*

OpenSky failed to comply with the discovery requirements set forth in the Scheduling Order by:  (1) refusing to provide confidential documents to the other parties in the proceeding, or instead, a privilege log listing privileged documents withheld for in camera review; and (2) failing to respond in good faith to the interrogatories, including with supporting evidence.  Paper 47, 8–10.  Each of these failures to comply is independently sanctionable.  *Id.* at 10.

> 1.    *OpenSky refused to produce confidential documents under seal, or a privilege log of what was not produced*

As explained above, the deadline for the exchange of documents and communications was August 4, 2022.  On August 11, 2022, VLSI requested in camera review, as to the production made by OpenSky.  Paper 62.  VLSI asserts that it:

> cannot identify with specificity documents for in camera review in OpenSky's responsive documents, because OpenSky has (i) failed to produce internal documents; (ii) failed to produce any documents it deems either confidential or highly-confidential under the Director's modified direct protective order, Ex. 3011; and (iii) failed to provide any privilege log in this matter, each in violation of the Director's Orders (see Papers 47, 51, and 52).

*Id.* at 1.  VLSI asserts that "OpenSky produced approximately 170 documents, all 'nonconfidential,' largely consisting of public filings and correspondence already available to all parties."  *Id.* at 3.  VLSI contends that the produced non-public documents include only emails from OpenSky's lead counsel, Andrew Oliver, and "a single internal communication."  *Id.* at 3–4.  Notably, VLSI asserts that "OpenSky has not logged a single document."  *Id.* at 4.  VLSI argues that, due to OpenSky's

19

IPR2021-01064
Patent 7,725,759 B2

failure to produce documents, I should—again—order OpenSky to produce
"*all* withheld responsive documents in the seven categories of mandated
discovery." *Id.* at 8 (emphasis in original).

On August 18, 2022, OpenSky filed its initial brief in response to the
Director review order. Paper 71.[9] In the brief, OpenSky does not dispute
VLSI's assertions that OpenSky failed to produce internal or confidential
documents and failed to produce a privilege log of withheld evidence. *See
id.* In its responsive brief, filed September 1, 2022, OpenSky asserts that it
produced "over 240MB of responsive documents to VLSI and Intel, of
which more than half were nonconfidential and of which the others bore
either confidential or highly confidential designations." Paper 91, 19 (*see*
Exs. 1066, 1067)[10]. However, quantity does not substitute for quality.
OpenSky's new exhibits merely show the size of the files shared with
opposing counsel, not the contents of files. *See* Exs. 1066, 1067. Notably,
OpenSky did not file any of the documents as exhibits in this proceeding,
despite the existence of the Modified Default Protective Order. And directly
contradicting the Scheduling Order's requirements, OpenSky confirms that it
"will not be producing, filing, or lodging any privileged documents in this
proceeding; accordingly, OpenSky will not be producing a privilege log for
purposes of identifying documents for an *in camera* review that will not take
place." Paper 91, 20. OpenSky's refusal to comply with the requirements
set forth in the Scheduling Order is alone sanctionable conduct. *See*
Paper 47, 4.

---

[9] Paper 71 is the nonconfidential version of OpenSky's Initial Brief in
response to the Director review order; Paper 67 is the confidential version.

[10] OpenSky filed a corrected version of its responsive brief as Paper 101.

20

IPR2021-01064
Patent 7,725,759 B2

2.   *OpenSky's responses to the interrogatories are inadequate and lack evidentiary support*

In addition to its express refusal to comply with the Mandated Discovery, OpenSky failed to respond adequately to the interrogatories set forth in the Scheduling Order, which required the parties to respond with citation to supporting documentary evidence. Paper 47, 8. In its initial brief, OpenSky asserts that VLSI "has promoted a false narrative in which it portrayed itself as a victim of 'harassment' or a 'shakedown.'" Paper 71, 2. OpenSky presents its own version of the facts and refers to alleged communications between OpenSky and VLSI that purportedly show VLSI to be the bad actor. *See id.* at 2–6. However, throughout this portion of its brief, OpenSky fails to cite a single source of evidence to support its allegations of harassment, apart from a single citation to Exhibit 2055 (of record as of April 11, 2022), which is addressed below. *Id.* at 5.

In addition to its largely unsupported narrative, OpenSky's initial brief purports to address the interrogatories listed in the Scheduling Order but fails to do so adequately. *Id.* at 8–18. OpenSky refers to three sources of evidence previously of record to support its answers to the interrogatories, Exhibits 1048, 2055, and 2066. *See id.* As a result, many of the interrogatories remain unanswered or unsubstantiated by OpenSky.

For example, interrogatory (a) asked about OpenSky's formation and business. Paper 47, 8. To answer these questions, the Scheduling Order required OpenSky to provide the other parties with communications related to the formation of OpenSky and documents related to OpenSky's business plan. *Id.* at 9. OpenSky responds by stating that "OpenSky has not limited its business purpose" because "[a] Nevada Limited Liability Company is not

21

IPR2021-01064
Patent 7,725,759 B2

required to state a 'business' on formation." Paper 71, 9. This answer is non-responsive. In addition to its effective refusal to answer the interrogatory, OpenSky did not provide any required evidence that would allow me, VLSI, or Intel to consider OpenSky's position. *See* Paper 66, 10–11; Paper 84, 2–3.

Interrogatory (b) asked, "[o]ther than communications already in the record, what communications have taken place between OpenSky and each of the other parties?" Paper 47, 8. To answer this question, the Scheduling Order required OpenSky to provide the other parties with "all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record." *Id.* at 9. OpenSky admits that "the parties have had numerous communications," but asserts that "[t]he communications related to substance and procedure in this proceeding would be unduly burdensome to log and are not relevant to the topics of the Director's review." Paper 71, 10. OpenSky does not identify evidentiary support for these assertions and does not raise a good faith claim to withhold this evidence. *See id.* For example, OpenSky does not argue that the communications are privileged, or exchange a privilege log of the communications, as required by the Scheduling Order. *Id.* Rather, OpenSky impermissibly determines on its own that no evidence is relevant to topics of the Director review and withholds evidence on that basis. *Id.* Accordingly, OpenSky's answer is evasive and non-responsive to interrogatory (b).

Interrogatory (c) asked, "[c]ould OpenSky be subject to claims of infringement of the '759 patent," and "[d]oes OpenSky have a policy reason for filing the Petition that benefits the public at large beside any reasons

22

articulated in the already-filed papers?"  Paper 47, 8.  OpenSky asserts that
this question is "irrelevant," and states that "OpenSky has not attempted to
perform an infringement analysis."  Paper 71, 11.  OpenSky also asserts that
"it is possible" it could infringe the '759 patent *if* it has a computer product
containing an Intel product.  *See id.*  OpenSky lists a number of potential
policy reasons for filing the Petition, none of which are supported by
evidence showing OpenSky's intent at the time of filing.  *See id.*
Accordingly, OpenSky's answer is non-responsive to interrogatory (c).

Interrogatory (d) asked, "[d]oes the evidence in this proceeding
demonstrate an abuse of process . . . [and] if so, which evidence and how
should that evidence be weighted and addressed?"  Paper 47, 8.  To answer
this question, the Scheduling Order required OpenSky to provide the other
parties with "all communications with any named party relating to the filing,
settlement, or potential termination of this proceeding."  *Id.* at 10.  OpenSky
asserts that "[t]he evidence demonstrates abuse of process . . . only by VLSI.
No evidence demonstrates any such abuse by Intel or OpenSky."  Paper 71,
12.  OpenSky refers to a single piece of evidence already of record,
Exhibit 2055, and offers no other supporting evidence.  *See id.* at 13.  As to
other communications between the parties, OpenSky asserts that "parties'
discussions of potential settlement positions are not admissible evidence in
this proceeding," according to Rule 408 of the Federal Rules of Evidence.
*Id.* at 12–13.  OpenSky's argument is misplaced.

First, "Rule 408 does not warrant protecting settlement negotiations
from discovery.  On its face, the rule applies to the admissibility of evidence
at trial, not to whether evidence is discoverable."  *Phoenix Sols. Inc. v. Wells
Fargo Bank, N.A.*, 254 F.R.D. 568, 584 (N.D. Cal. 2008).  Second, Rule 408

23

IPR2021-01064
Patent 7,725,759 B2

does not bar the admission of settlement discussions for all purposes.
Rather, it only excludes certain settlement statements offered for the purpose
of "prov[ing] or disprov[ing] the validity or amount of a disputed claim or to
impeach by a prior inconsistent statement or a contradiction." Fed. R.
408(a). Settlement discussions may be admissible for other purposes. *See,
e.g.*, *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir.
2005) ("The district court has broad discretion to admit [408 settlement]
evidence for a purpose other than proving liability."); *BTG Int'l Inc. v.
Bioactive Labs.*, No. CV 15-04885, 2016 WL 3519712, at *8 (E.D. Pa. June
28, 2016) ("Rule 408 does not bar the introduction of settlement discussions
if offered for 'another purpose,' such as to show a party's knowledge or
intent."). Therefore, Rule 408 does not control, and OpenSky failed to
respond to interrogatory (d).

Interrogatory (e) asked, "[w]hat is the basis for concluding that there
are no other real parties in interest, beyond OpenSky," and "[a]re there
additional people or entities that should be considered as potential real
parties in interest?" Paper 47, 8–9. To answer this question, the Scheduling
Order required OpenSky to provide the other parties with "all documents
relating to OpenSky's business plan including its funding, its potential
revenue, and the future allocation of any of its profits." *Id.* at 9. OpenSky
asserts that "OpenSky acted entirely on its own and with its own funding in
bringing its Petition" and that it "did not have the support of any other
entity." Paper 71, 17. Again, OpenSky provides no evidence to support its
allegation. *See id.* For example, because OpenSky does not provide
evidence of its funding, it is not possible to ascertain whether or not
OpenSky merely acts as a shell for other entities seeking to challenge the

24

IPR2021-01064
Patent 7,725,759 B2

'759 patent.  And as a newly formed entity, seemingly created solely for filing this IPR, OpenSky must have some source of undisclosed funding. Accordingly, OpenSky's answer is evasive and non-responsive to interrogatory (e).

Interrogatory (f) asked, "[d]id OpenSky ever condition any action relating to this proceeding . . . on payment or other consideration by Patent Owner or anyone else?"  Paper 47, 9.  OpenSky asserts that it "has not conditioned any action relating to this proceeding on payment or other consideration."  Paper 71, 17.  OpenSky does not cite supporting evidence for this assertion, except to show that, at some point in time, OpenSky paid its expert.  *See id.* at 17–18 (citing Ex. 2066, 19:17–24).  By contrast, VLSI and Intel provide documentary evidence that contradicts OpenSky's assertion that it did not condition any action on payment or other consideration, as discussed in detail below.  Accordingly, OpenSky's answer is misleading and non-responsive to interrogatory (f).  *See* 37 C.F.R. § 42.11(a) ("Parties and individuals involved in the proceeding have a duty of candor and good faith to the Office during the course of a proceeding.").

### C.    *Sanctions for OpenSky's Failure to Comply*

OpenSky has identified no authority that would allow it to ignore the interrogatories and Mandated Discovery in my Order.  Therefore, I determine that OpenSky has failed to comply.  I further determine that it is appropriate to sanction OpenSky for its discovery misconduct.  *See* 37 C.F.R. § 42.12(b) (non-exhaustive list of sanctions).

25

IPR2021-01064
Patent 7,725,759 B2

The Director[11] has the authority to impose sanctions against a party for misconduct. 35 U.S.C. § 316(a); 37 C.F.R. § 42.12(a); *see Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020); *see also* AIPLA, 9; BAS, 6–7; Unified, 3–5, 12–17; Naples, 6. Though 37 C.F.R. § 42.12(a) uses the permissive language "may" ("The Board may impose a sanction against a party for misconduct"), the sanctity of practice before the Board is best preserved by imposing sanctions for misconduct as a matter of course absent extenuating circumstances.

Whether sanctions are appropriate is a highly fact-specific question, and the relevant considerations will vary from case to case. Prior sanction contexts have considered:

> (1) whether the party has performed conduct warranting sanctions;
>
> (2) whether that conduct has caused harm (to, for example, another party, the proceedings, or the USPTO); and
>
> (3) whether the potential sanctions are proportionate to the harm.

*See, e.g.*, *R.J. Reynolds Vapor Co. v. Fontem Holdings 1 B.V.*, IPR2017-01318, Paper 16 at 5 (PTAB Aug. 6, 2018). The Director may impose sanctions, for example, for "[f]ailure to comply with an applicable rule or order in the proceeding"; "[a]buse of discovery"; "[a]buse of process"; or "[a]ny other improper use of the proceeding, including actions that harass or cause unnecessary delay or an unnecessary increase in the cost of the proceeding." 37 C.F.R. §§ 42.12(a)(1), (5), (6), (7). Sanctions may include, for example, "[a]n order holding facts to have been established in the

---

[11] The Director of the USPTO, the Deputy Director of the USPTO, the Commissioner for Patents, the Commissioner for Trademarks, and the Administrative Patent Judges constitute the PTAB. 35 U.S.C. § 6(a). Accordingly, the Director may levy sanctions as a member of the Board.

26

IPR2021-01064
Patent 7,725,759 B2

proceeding"; "[a]n order precluding a party from filing a paper"; and "[a]n order providing for compensatory expenses, including attorney fees." *Id.* §§ 42.12(b)(1), (2), (6).  Additionally, the Director may issue sanctions not explicitly provided in 37 C.F.R. § 42.12(b).  *See Voip-Pal.com*, 976 F.3d at 1323–24.  Any sanction must be commensurate with the harm caused.  *See R.J. Reynolds*, IPR2017-01318, Paper 16 at 5.

As a result of OpenSky's failure to comply with my ordered Mandated Discovery provisions, I, VLSI, and Intel do not have a complete record to fully examine OpenSky's assertion that it has not committed an abuse of the IPR process, or to evaluate whether its allegation of "harassment" is supported.

OpenSky should not be allowed to profit from its discovery misconduct.  Accordingly, I determine that the proper sanction is to hold disputed facts as established against OpenSky.  37 C.F.R. § 42.12(b)(1); Paper 52, 4 (warning parties that "failure to comply with my Order may be sanctionable," and specifically warning that "without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding" under 37 C.F.R. § 42.12(b)(1)).  The Federal Circuit has approved this remedy of adverse inference in the context of district court litigation, stating that "when 'the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction.'"  *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1363 (Fed. Cir. 2017) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

27

IPR2021-01064
Patent 7,725,759 B2

In view of the record as discussed above, including OpenSky's response to interrogatory (f), I find that OpenSky was not only non-responsive to my interrogatories but that OpenSky was evasive in its responses, and engaged in egregious conduct. I further apply adverse inferences in my decisions on abuse of process below.

## IV.    ABUSE OF PROCESS

I initiated Director review in this proceeding to examine and address VLSI's allegations of abuse of process by OpenSky. *See* Paper 47. Under existing Office regulations, an abuse of process is sanctionable (i.e., it is "conduct that warrants sanctions"). 37 C.F.R. § 42.12(a)(6). Abuse of process is a fact-based inquiry, and existing regulations do not attempt to specify what acts constitute an abuse of process. Accordingly, I consider OpenSky's conduct to determine whether it demonstrates an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA.

### A.    Background Principles

Congress created the AIA to support the "important congressional objective" of "giving the Patent Office significant power to revisit and revise earlier patent grants," among other objectives. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272 (2016). Congress did not implement a standing requirement for petitioners; any party (other than the patentee) may seek such review. 35 U.S.C. § 311(a). AIA post-grant proceedings, and more specifically, the IPR proceedings at issue here, do not exist in isolation but are part of a larger patent and innovation ecosystem. Congress intended AIA proceedings to be a less-expensive alternative to district court litigation to resolve certain patentability issues. AIA proceedings were not, however,

28

IPR2021-01064
Patent 7,725,759 B2

intended to replace patent litigation, which remains a vital forum for determining patent validity.  Nor were they intended to be tools of patent owner harassment.  Congress expressed the intent of the AIA in the statute when it directed the Director, when prescribing regulations, to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." 35 U.S.C. § 316(b).  I consider this mandate not just when promulgating regulations, but in administering the AIA through guidance and decision-making.  Abuse of AIA proceedings undermines these important objectives, and the Office will not tolerate it.

### B.    OpenSky's Conduct

Although OpenSky's Petition stressed that granting IPR was necessary to maintain the "integrity of the patent system" (Pet. 8–9), OpenSky's conduct belies that statement.  OpenSky's subsequent conduct made clear that OpenSky was using the IPR process to extract payment from either Intel or VLSI without meaningfully pursuing unpatentability grounds.  See Exs. 2055; 1524–1529.  Again, this differs from typical settlement negotiations between adversaries during AIA proceedings, in which parties may offer payment or other consideration in return for settlement of the dispute.  Using AIA post-grant proceedings, including the IPR process, for the sole purpose of extracting payment is an abuse of process warranting sanctions.

After OpenSky filed its Petition and before institution, on August 28, 2021, OpenSky and VLSI entered into a "Confidential Discussions Agreement" for settlement negotiations.  Paper 84, 3 (citing Ex. 2081–2083).  Although OpenSky insists throughout its briefs that VLSI initiated

IPR2021-01064
Patent 7,725,759 B2

and pursued settlement negotiations, and not vice versa (*see* Paper 71, 13–16; Paper 91, 4–9 (*see* Exs. 1063, 1065)), I draw an adverse inference and find that OpenSky initiated settlement negotiations.  *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that" the evidence would have exposed facts unfavorable to the non-disclosing party.).  Typically, the query about who initiated settlement talks does not raise questions about abuse of the IPR process.  *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide ("Consolidated Practice Guide")[12] at 86 ("There are strong public policy reasons to favor settlement between the parties to a proceeding").  However, the adverse inference here that OpenSky initiated settlement negotiations is relevant to the larger question of whether OpenSky's pursuit of the IPR constitutes improper, abusive conduct.

After institution, OpenSky contacted Intel about collaborating in the IPR.  *See* Paper 84, 6 (citing Ex. 2095, 2096); Paper 66, 11–12 (citing Ex. 1520).  OpenSky's counsel told Intel's counsel that "VLSI has already reached out to OpenSky to discuss resolving the newly instituted IPR," but "[w]hile OpenSky remains open to discussing this matter with VLSI, OpenSky would prefer to discuss the matter directly with Intel." *Id.* (emphasis omitted). Specifically, OpenSky sought monetary payment from Intel in return for success in the IPR.  Paper 66, 12 (citing Exs. 1520, 1521).  "Intel rejected OpenSky's request and stated that it would not make

---

[12] Available at www.uspto.gov/TrialPracticeGuideConsolidated.

30

IPR2021-01064
Patent 7,725,759 B2

OpenSky any monetary offer, including to avoid any potential risk of becoming a real-party-in-interest in OpenSky's IPR." *Id.* (citing Ex. 1520).

Following Intel's rejection of OpenSky's offer, OpenSky reengaged with VLSI. *See* Paper 84, 4–5 (citing Ex. 2084–2087). The negotiations were now complicated by the joinder request of Patent Quality Assurance, LLC ("PQA") in IPR2022-00480, by which PQA sought to join this proceeding. *See id.* at 4 (citing Ex. 2090–2093). Intel also filed a Motion for Joinder to this proceeding in IPR2022-00366. Paper 43, 1.

VLSI asserts, and I find, that settlement negotiations between it and OpenSky culminated in a scheme proposed by OpenSky in an email dated February 23, 2022.[13] Paper 84, 4–5 (citing Ex. 2055). Specifically, OpenSky set forth a "construct of a proposed deal" that included the following terms (screen shot of email reproduced here):

- Parties agree to work together to secure dismissal or defeat of the petition.
- OpenSky agrees not to negotiate with Intel or PQA
- VLSI takes full three months to oppose PQA joinder
- VLSI files its patent owner response
- OpenSky refuses to pay expert for time at deposition so expert does not appear for deposition
- The day after VLSI files response, OpenSky and VLSI file motion to dismiss

---

[13] OpenSky contends that VLSI violated a confidentiality agreement with OpenSky (Ex. 1051) by bringing the email to the Board's attention and making the email public. Paper 71, 14–16. Although VLSI properly brought OpenSky's conduct to the Board's attention, VLSI should have filed the document confidentially with the Board only. *See* Ex. 2055 (filed as public material). My decision in this case should not be viewed as an endorsement of VLSI's behavior or of others potentially violating confidentiality agreements.

31

IPR2021-01064
Patent 7,725,759 B2

Ex. 2055, 1–2.  While OpenSky's email did not list monetary amounts, it did
make clear:  "First payment upon execution of agreement" and "Second
payment upon denial of both joinder petitions."  *Id.* at 2.  Moreover,
OpenSky agreed that if PQA's Motion for Joinder to the proceeding was
granted, OpenSky would not produce its expert, on whom PQA relied, for
deposition, creating "a potentially fatal evidentiary omission that PQA
would be unable to remedy."  *Id.* at 1.  OpenSky provided that, in that
situation, "[t]here could be an alternative second payment if joinder is
granted but claims are affirmed because of OpenSky's refusal to produce
witnesses."  *Id.* at 2.

In pressing the urgency of its proposal to VLSI, OpenSky pointed out
that any deal would "not benefit [VLSI] unless it ultimately leads to
dismissal of the petition, or affirmance of the claims."  *Id.*  OpenSky also
noted that "there is substantial value to VLSI in settling with OpenSky
before the Board takes up" either Intel's or PQA's "joinder petition[s]."  *Id.*
VLSI reported this scheme to the Board, and there were no further
negotiations between OpenSky and VLSI.  Ex. 2094.  Initiating a legal
proceeding to deliberately sabotage for money, including offering to violate
the duties of candor and good faith owed to the Board, amounts to an abuse
of process.  *See Woods Servs.*, 342 F. Supp. 3d at 605–606; *see also BTG
Int'l Inc. v. Bioactive*, 2016 WL 3519712 at *12 ("BTG has accordingly
alleged sufficient facts to demonstrate that Defendants were using the IPR
petition for an improper purpose—specifically, "as a threat and a club to
extort and coerce millions of dollars . . . from BTG").

After engaging in an abuse of process with regard to its conduct with
VLSI that did not prove fruitful to OpenSky, OpenSky continued its

IPR2021-01064
Patent 7,725,759 B2

discussions with Intel.  Indeed, after Intel was joined to this proceeding
(IPR2022-00366, Paper 43), it became clear that OpenSky had no interest in
meaningfully pursuing the unpatentability grounds in its Petition.[14]
Ex. 1524.  For example, OpenSky proposed that it might rest on "its initial
filings and may decide not to depose VLSI's expert or file a reply brief."  *Id.*
OpenSky allegedly offered Intel the leading role in the case, but only if Intel
compensated OpenSky "for its prior work in the IPR" as well as "additional
remuneration."  *Id.*  OpenSky did not notice VLSI's expert for deposition
until after Intel proposed going to the Board to seek a more active role.
Paper 44.  Even then, OpenSky's counsel noticed the deposition for July 7,
2022—a mere four days before its reply brief was due, leaving little time to
incorporate VLSI's expert testimony into the brief.  Ex. 1525.  In addition,
OpenSky's counsel indicated they were scheduled to be in trial between June
24–30, 2022, leaving little time to prepare the reply brief (or prepare for the
deposition).  *Id.*

　　Given OpenSky's representations, Intel offered to help "with Dr.
Conte's deposition and the petitioner's reply," and suggested that OpenSky
seek a two-week extension "to give more time to integrate the deposition
materials into the petitioner's reply."  Ex. 1526.  OpenSky's counsel
proceeded with Dr. Conte's deposition on July 7, 2022, with the benefit of

---

[14] To be clear, parties will make choices during the course of an IPR
regarding what arguments to make, papers to file, issues to pursue, etc.
Those kinds of judgment calls and tactical decisions do not reflect a failure
to "meaningfully pursue the merits."  As explained further below,
OpenSky's conduct here goes beyond ordinary strategic decisions and
reflects a failure to essentially take any steps to develop or otherwise pursue
an unpatentability case.

IPR2021-01064
Patent 7,725,759 B2

Intel's deposition outline. Ex. 1062. However, OpenSky declined to seek an extension to file its reply brief.

On Friday, July 8, 2022—three days before its reply brief was due—OpenSky's counsel initiated discussions with Intel in which OpenSky's counsel maintained that, as a result of the need to respond to the Scheduling Order (Paper 47), OpenSky intended to "refrain from considering or making further invalidity arguments and to file a reply on Monday [July 11, 2022] indicating that OpenSky believes that its original petition establishes invalidity and OpenSky rests on the arguments in that petition," and not file a reply. Ex. 1528.

At the same time, OpenSky "offered to let Intel write the reply on OpenSky's behalf in exchange for remuneration and indemnity against any lawsuit brought by VLSI against OpenSky based on the IPR proceeding." Ex. 1529. Intel declined OpenSky's offer but agreed to provide OpenSky with a fully complete reply brief with supporting expert declaration. *Id.* OpenSky agreed to "file it in full or in part" (*id.*), and did so two days later, as Paper 49 (July 11, 2022).

On August 11, 2022, VLSI requested oral argument. Paper 61. OpenSky did not request oral argument (the deadline passed August 11, 2022; Paper 18, 11) and did not meaningfully participate in the oral hearing.

### C.    Case-specific Considerations

#### 1.    Petitioner's interest in the proceeding

I am mindful that Congress did not itself include a standing requirement for IPRs. 35 U.S.C. § 311(a); *see Cuozzo*, 579 U.S. at 279 ("Parties that initiate [IPRs] need not have a concrete stake in the outcome; indeed, they may lack constitutional standing."); *see also* Engine, 13–14

34

IPR2021-01064
Patent 7,725,759 B2

("Congress created IPR so that any 'person who is not the owner of a patent' may file an IPR petition. . . . It would be improper for the PTO to supplant that choice.") (citations omitted).  Instead, Congress left it to the USPTO to prescribe regulations, to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings."  35 U.S.C. § 316(b).

   The Office has repeatedly instituted IPRs where the petitioner has not been sued for infringement.  *See, e.g.*, *Athena Automation Ltd. v. Husky Injection Molding Systems Ltd.*, IPR2013-00290, Paper 18, 12–13 (PTAB Oct. 25, 2013) (precedential) (declining to deny a petition based on assignor estoppel); *Fresenius Kabi USA, LLC, et al. v. Chugai Seiyaku Kabushiki Kaisha, Inc. et al.*, IPR2021-01336, Paper 27, 48 (PTAB Feb. 23, 2022).  In practice, however, there is commonly a high degree of interplay between IPR petitions/trials and Article III patent litigation.  *See, e.g.*, *The Patent and Trial Appeal Board:  Examining Proposals to Address Predictability, Certainty, and Fairness*, Hearing Before the S. Comm. on Intellectual Prop., 117th Cong. at 1:14:27–1:14:37 (June 22, 2022) (testimony of Tim Wilson, Head of Patents and Intellectual Property Litigation, SAS Institute, Inc.) (stating that IPR petitions are typically filed in response to a patent infringement lawsuit).

   Barring evidence to the contrary, there is little need to question the motives of a party sued for infringement.  However, where a petitioner has not been sued for infringement, and is a non-practicing entity, legitimate questions may exist regarding whether the petitioner filed the petition for an improper purpose or one that does not advance the goals of the AIA or this Office.  For example, an amici identifies a concern with petitioners who file

35

IPR2021-01064
Patent 7,725,759 B2

"petitions, filed for the primary purpose of obtaining a cash settlement" from patent owners in order to settle and terminate the proceeding. *See* Naples, 2. Not only would such a purpose not advance legitimate goals, but the PTAB proceedings under the AIA are not intended to be a tool for patent owner harassment.

To be clear, there is nothing *per se* improper[15] about a petitioner who is not a patent infringement defendant filing an IPR petition. For example, there may be circumstances in which a petitioner has not yet been sued, but believes it may be, or otherwise wants to make sure it has the freedom to operate. Alternatively, there may be circumstances in which a petitioner is planning to enter the field of technology that the patent protects and is trying to clear entry barriers. *See* Engine, 10–11. Or a petitioner may act on behalf of the public without having any research or commercial activities involving the challenged patent. *See Consumer Watchdog v. Wisconsin Alumni Rsch. Found.*, 753 F.3d 1258, 1260 (Fed. Cir. 2014).

Although it is not *per se* improper for a person not charged with infringement to file an IPR petition, the posture of a petitioner, in conjunction with other surrounding circumstances, could raise legitimate questions about whether the petition is reasonably designed to advance the beneficial aims of the AIA or this Office and whether, in addition, the filing amounts to an abuse of process.

So it is here. OpenSky has not been sued for infringing the '759 patent. Pet. 5. When I asked whether OpenSky could be sued for

---

[15] I address here only what conduct is improper and do not suggest that all conduct that is not improper warrants institution. Such decisions are better suited for guidelines and notice-and-comment rulemaking.

IPR2021-01064
Patent 7,725,759 B2

infringement (*see* Paper 47, 8), OpenSky merely indicated that it has not
performed an infringement analysis and that it uses products that may
incorporate accused Intel products, so it might be sued for infringement in
the future.  Paper 71, 11.  OpenSky has not substantiated this argument,
despite my Order providing it an opportunity to do so.  Thus, the lack of
evidence on this point is directly attributable to OpenSky's failure to follow
my Order, and I draw negative inferences from that failure.  *See Residential
Funding Corp.*, 306 F.3d at 110 (finding that intentional acts that hinder
discovery support an inference that the evidence was harmful to the non-
producing party).  Accordingly, I find the fact established that OpenSky does
not have a legitimate belief that it may be sued for patent infringement in the
future, and that fear of infringement did not motivate OpenSky to file its
Petition.

OpenSky maintains that its interest is in the integrity of the patent
system.  Paper 71, 11–12.  The record (and additional factors discussed
below) belies that representation.  Indeed, I ordered OpenSky to produce
documentation and answer interrogatories related to its business purpose,
and it has not done so.  In its briefing, for example, OpenSky says that it was
"not required to state a 'business' on formation," and therefore, "OpenSky
has not limited its 'business.'"  *Id.* at 9.  Again, the lack of evidence of
OpenSky's business is due to OpenSky's discovery misconduct, and
therefore, I find the fact established that OpenSky did not file this case for its
alleged purpose of testing patent quality or preserving the integrity of the
patent system.  Indeed, based on the record and adverse inferences, I find
that the sole reason OpenSky filed the Petition was for the improper purpose
of extracting money from either or both Intel and VLSI.

37

IPR2021-01064
Patent 7,725,759 B2

    *2.   Recent trial verdict awarding significant damages*

    The mere existence of a trial verdict (whether by jury or from the bench) does not automatically make the filing of a subsequent IPR on the involved patent(s) an abuse of process.  Indeed, patents are often asserted, either in demand letters or in litigation, against multiple entities in serial fashion.  Both those entities subject to current or future assertions, or potential assertions, and the public have a vested interest in canceling invalid patents.

    That said, an entity filing an IPR on the heels of a large jury verdict may, when combined with other facts, raise legitimate questions regarding the motivation behind the Petition.  *See* USIJ, 15–16 (discussing petitions filed after infringement verdicts).

    Such is the case here.  As the parties and amici are well aware, a jury in the Western District of Texas rendered a verdict of more than $2 billion against Intel for infringing two VLSI patents, including the '759 patent ($675 million in damages).  Ex. 1027.  OpenSky filed its Petition shortly after the infringement verdict and, as noted in section IV(C)(1) of this decision above, without any established fear that it would be subject to a subsequent assertion.  Together with the significant damages award, this suggests that the purpose of the IPR could be to extract a settlement from VLSI or payment from Intel.

    Notably, despite being given the opportunity, OpenSky has not provided adequate evidence that it had another purpose for filing this IPR.  As explained previously, OpenSky flouted Mandated Discovery by refusing to turn over documentation of the "purpose" for which OpenSky was formed.  Paper 47, 8.  Accordingly, per the sanction for OpenSky's

38

IPR2021-01064
Patent 7,725,759 B2

discovery misconduct, I find that it has been established that OpenSky filed its Petition for the purposes of extracting payment from VLSI or Intel.

### 3. *Proximity of petitioner's formation to jury award*

Large jury awards attract publicity and attention. When the evidence demonstrates that an IPR petitioner was formed from whole cloth soon after a damages award, and in particular a significant damages award, this suggests that the petitioner could be motivated to extract a financial windfall from the patent owner or the adjudicated infringer, rather than being motivated by any legitimate purpose.

Here, the evidence demonstrates that OpenSky was formed seven weeks after a jury found that Intel infringed the '759 patent, and awarded VLSI $675 million in damages. *Compare* Ex. 1027 (Jury Verdict Form dated March 2, 2021) *with* Ex. 2006 (OpenSky formation date of April 23, 2021). OpenSky refiled Intel's discretionarily denied IPR petitions six weeks after that. This timing, in the absence of contrary evidence from OpenSky, supports the finding that OpenSky was formed in an attempt to capitalize on that verdict. Moreover, and as explained in the previous factor, OpenSky has provided inadequate evidence that it was formed for another purpose, despite my Order giving it an opportunity to do so. As a sanction for that discovery violation, I find that it has been established that OpenSky was formed for the express and sole purpose of extracting payment from VLSI or Intel.

### 4. *Seeking compensation from both parties*

It is not unusual for parties to seek to settle their dispute; litigation is both risky and costly. Indeed, both this Office and the Federal Rules of Evidence encourage settlement. *See* Consolidated Practice Guide at 86. A

39

IPR2021-01064
Patent 7,725,759 B2

petitioner's agreement to dismiss a petition or terminate a proceeding in return for a payment from the patent owner may be the result of sound business judgment by both parties.

What is unusual, however, is a petitioner seeking compensation from *both the patent owner and another petitioner* in exchange for advocacy against whichever party does not pay. The problem with this behavior should be immediately apparent. For the purposes of the present analysis, however, such double-dealing suggests that a petition was filed purely to extract rents, in either direction, rather than for legitimate purposes.

The evidence against OpenSky here is both strong and concerning. As explained above, I find that OpenSky initiated early settlement talks with VLSI before institution. The evidence further demonstrates that following institution, OpenSky asked both VLSI and Intel for money in exchange for its cooperation in this IPR. Indeed, OpenSky contacted Intel on the very day that the Board granted institution (Ex. 1518) and communicated with VLSI both before and after the grant (Ex. 2083, 2084). That OpenSky, through its counsel, was willing to offer its advocacy to either side of this adversarial proceeding, depending on who was willing to pay, further suggests that its Petition was purely motivated by a wish to extract a quick settlement from either interested party in this proceeding. I am particularly concerned with OpenSky's counsel's proposal to VLSI (Ex. 2055) to intentionally undermine the proceeding and thereby violate the duty of good faith and candor to the Board. *See* 37 C.F.R. § 41.11. This behavior alone is sanctionable and will not be tolerated.

Moreover, OpenSky's predatory behavior did not end once it became clear that neither VLSI nor Intel was interested in paying OpenSky.

40

IPR2021-01064
Patent 7,725,759 B2

OpenSky also suggested that it lacked the resources to pursue this IPR and intimated that Intel should reimburse OpenSky for the predictable expenses associated with filing its Petition. *See, e.g.*, Ex. 1528 (email from OpenSky's counsel to Intel indicating that "OpenSky has been forced to reallocate its remaining funds to address the director's review," and therefore, "OpenSky has directed me to refrain from considering or making further invalidity arguments" and to "rest[] on the arguments in th[e] petition"); Ex. 1529 (email from OpenSky's counsel to Intel stating that "it is unfortunate that Intel is not willing to reimburse OpenSky for any of the considerable filing fees and legal fees that were incurred in filing this petition . . ."). Taken at face value, OpenSky's comments that it was running out of money indicate that it did not budget for litigating this proceeding throughout its expected life, to a final written decision. In other words, in the absence of contrary evidence due to its discovery misconduct, OpenSky's behavior and complaints about budgeting establish that it did not intend to pursue the patentability merits but instead intended to leverage the IPR's existence only to extract a payout from one side or the other.

### 5.    *Failure to meaningfully pursue the merits*

The evidence demonstrates that both before and after institution, OpenSky was focused on getting payment from VLSI or Intel as opposed to pursuing the merits of its patentability challenge. *See, e.g.*, Ex. 1518 (OpenSky email to Intel Dec. 23, 2021); Ex. 2084 (OpenSky email to VLSI Dec. 27, 2021).

Instead of vigorously litigating the IPR, as would be expected of a lead petitioner, OpenSky continued to seek payment from Intel. For example, OpenSky "offered to let Intel write the reply on OpenSky's behalf

IPR2021-01064
Patent 7,725,759 B2

in exchange for remuneration and indemnity against any lawsuit brought by VLSI against OpenSky based on the IPR proceeding." Ex. 1527. Intel refused. *Id.* OpenSky then lamented Intel's unwillingness "to reimburse OpenSky for any of the considerable filing and legal fees that were incurred in filing this petition" and stated that, nevertheless, it was "still willing to partner with Intel"—its *co-petitioner*, allegedly working toward the same goal—"moving forward." Ex. 1529. Despite Intel's refusal to pay, OpenSky filed a reply brief that Intel drafted and used Intel's deposition outline. Exs. 1527, 1529. Moreover, OpenSky did not request oral argument (the deadline passed August 11, 2022; Paper 18, 11) and did not meaningfully participate in the oral hearing.

This focus on settlement or reimbursement, rather than litigating the merits, further indicates that OpenSky's goal was to extract a payment rather than litigate the validity of VLSI's patent.

### 6.    *Filing a copycat petition*

As my Scheduling Order notes, filing a "copycat" petition is not inherently improper. Paper 47, at 4 n.3. For example, under the current joinder rules, a time-barred party may file a copycat petition when it is seeking joinder as provided by the AIA. *See* 35 U.S.C. § 315(c); 37 C.F.R. §§ 42.122(b), 42.101(b). There may be circumstances, however, in which the filing of a petition that copies a previously denied petition may suggest an abuse of process.

The present case provides an example. In addition to OpenSky filing what was essentially a copy of Intel's IPR petition, which had previously been denied based on the *Fintiv* factors, OpenSky also filed a copy of Intel's expert declaration, without OpenSky notifying that expert that it was doing

so, let alone confirming that his opinions had not changed.  Ex. 2097.
OpenSky had also not engaged the expert to testify in the case, negotiated a
rate for his services, or inquired as to his interest or availability.  *Id.*
Submitting a declaration in a proceeding, without securing the ability of the
declarant to be challenged, raises serious process concerns.  The lack of
control over a key witness puts the entire case in jeopardy, which is exactly
what happened in OpenSky's other IPR, which was denied because
OpenSky could not ensure that Intel's expert, Dr. Singh, would appear for
deposition.  *See* IPR2021-01056, Paper 18 (Dec. 23, 2021).  On these facts,
this conduct suggests that OpenSky was attempting to file a petition with the
lowest possible cost in an effort to generate leverage against VLSI, but
without the intent or expectation of litigating the proceeding through trial.

### D.    Conclusion

Viewed as a whole, OpenSky's conduct has been an abuse of the IPR
process, the patent system, and the Office.  The totality of OpenSky's
conduct evinces a singular focus on using an AIA proceeding to extort
money, from any party willing to pay, and at the expense of the adversarial
nature of AIA proceedings.  Despite being given the opportunity, OpenSky
failed to offer a verifiable, legitimate basis for filing its IPR Petition, which
was filed only after a district court awarded large monetary damages keyed
to the subject '759 patent.  And the Petition it filed was not generated by
OpenSky, but was a copy of Intel's earlier petition, filed without engaging
Intel's expert or confirming his opinions or willingness to participate.
Further, after filing the Petition, OpenSky did not conduct itself in a manner
consistent with the AIA's purpose of exploring patentability issues.
OpenSky's post-institution activity was dominated by attempts to extract

43

IPR2021-01064
Patent 7,725,759 B2

money from either Intel or VLSI instead of engaging with the patentability merits.

Seeking an AIA trial for the primary purpose of extorting money, while being willing to forego or sabotage the adversarial process, does not comport with the purpose and legitimate goals of the AIA and is an abuse of process. Opportunistic uses of AIA proceedings harm the IPR process, patent owners, the Office, and the public. Naples, 2; USIJ, 4.[16] To safeguard the proper functioning of the patent system, and the confidence therein, it is incumbent on me and the USPTO to protect against that harm.

## V.    REMEDY FOR ABUSE OF PROCESS

The AIA granted the Office broad authority to prescribe regulations aimed at sanctioning the "abuse of process, or any other improper use of the proceeding." 35 U.S.C. § 316(a)(6). Our existing regulations take full advantage of that authority and provide a broad range of potential sanctions to address such abuse, ranging from awarding "compensatory expenses" to "[j]udgment in the trial." 37 C.F.R. § 42.12(a)(6), (b). These enumerated sanctions are not exclusive. The Federal Circuit has held that § 42.12(b) "allows the Board to issue sanctions not explicitly provided in the regulation." *Voip-Pal.com*, 976 F.3d at 1323. Accordingly, the Office has robust powers to sanction the abuse of process where it occurs and to deter similar abuse. The Director will ensure that the remedy suits the

---

[16] This situation thus meaningfully differs from others in which a "profit motive" was arguably present but there was not otherwise an allegation or proof that the petitioner had failed to meaningfully pursue the patentability merits. *See, e.g.*, *Coalition for Affordable Drugs VI, LLC v. Celgene Corp.*, Case IPR2015-01092, Paper 18 (Sept. 25, 2015) (denying motions for sanctions for abuse of process).

44

IPR2021-01064
Patent 7,725,759 B2

wrongdoing, both in this specific case and more generally when faced with evidence of an abuse of process or conduct that thwarts, rather than advances, the goals of the Office and the AIA.

Here, in addition to any monetary sanctions I may levy (*see* below), I must decide whether to maintain or dismiss the underlying proceeding.

VLSI contends that the remedy for OpenSky's abuse should be termination of this IPR.  Paper 84, 21.  VLSI also argues that Intel should not be "allowed to take advantage of OpenSky's misconduct at VLSI's expense."  Paper 84, 24.  VLSI asserts that Intel was a time-barred party, and that the Board has previously terminated joined time-barred parties when finding that an IPR was improperly instituted.  *See id.* at 24–25 (citing *I.M.L. SLU v. WAG Acquisition, LLC*, IPR2016-01658, Paper 46, 3, 5 (PTAB Feb. 27, 2018); *Mylan Pharma Inc. v. Horizon Pharma USA, Inc.*, IPR2017-01995, Paper 71, 12–13 (PTAB Mar. 17, 2019); *Intel Corp. v. Alacritech, Inc.*, IPR2018-00234, Paper 66, 23 (PTAB June 4, 2019); *Sling TV, LLC v. Realtime Adaptive Streaming, LLC*, IPR2018-01331, Paper 39, 8 (PTAB Jan. 17, 2020).

Intel responds that, in "VLSI's cited cases, the IPRs were terminated because the ***original*** petitioner was ***statutorily barred*** from bringing the petition in the first instance," so the petition was void *ab initio*.  Paper 89, 12 (emphasis in original).  That reasoning, however, does not apply to the current proceeding.  As Intel correctly points out, in other cases, the Board has allowed a joined petitioner to step into an active role after the original petitioner was terminated from the proceeding.  *See id.* at 13 (citing *Apple Inc. v. Traxcell Techs., LLC*, IPR2021-01552, Paper 19, 2 (PTAB May 26, 2022); *AT&T Servs., Inc. v. Convergent Media Sols., LLC*, IPR2017-01237,

45

IPR2021-01064
Patent 7,725,759 B2

Paper 11, 26–28 (PTAB May 10, 2017); *Qualcomm Inc. v. Bandspeed, Inc.*, IPR2015-01577, Paper 12 at 2–3, 6, 8 (PTAB Nov. 16, 2015).

Amici recognize that I must "weigh the policy goals of the Office and the AIA" when facing abusive behavior because "the public has a clear interest in discouraging conduct that is abusive or otherwise thwarts Congress's goals in passing the AIA and the Office's goals in overseeing post-grant proceedings." AIPLA, 5–6. Many amici have pointed out that "[o]ur patent system is rooted in the fact that valid claims . . . support innovation, progress, and the public's interests" (Engine, 3), while "[i]nvalid patents unduly restrict innovation, competition, and access to knowledge" (PIPLI, 2). *See* CCIA, 2; HTIA, 7; BSA, 10. Accordingly, "ensuring that invalid patents do not remain in force [is] one of the core missions of the PTAB" (CCIA, 2), and "AIA trials thus broadly aim to 'protect the public's paramount interest in seeing that patent [rights] are kept within their legitimate scope'" (HTIA, 5 (quoting *Cuozzo*, 579 U.S. at 789–80)). *See* Unified, 5–6, Engine, 7–8. On the other hand, other amici highlight that "the patent system incentivizes inventors to publicly disclose innovations that advantage the public by granting an inventor a patent, upon which an 'exclusive enjoyment is guaranteed.'" Centripetal, 14; USIJ, 15; Maalouf, 6. Those amici point out that the legislative history of the AIA shows Congress recognized the importance of reliable patent rights. Maalouf, 6 (citing H.R. Rep. No. 112-98, pt. 1, at 48 (2011)); Centripetal, 13; USIJ, 15.

Going back to first principles, to further the objectives of this Office in promoting and protecting innovation for the greater good of the public, I must advance the goals of securing reliable patent rights and removing patents that do not support innovation. *See* Lamar Smith, *Don't Weaken the*

IPR2021-01064
Patent 7,725,759 B2

*Leahy-Smith America Invents Act*, Bloomberg Law (Mar. 30, 2022), at 3
("In the committee report on the AIA, we wrote about the importance to
inventors of having 'quiet title'—clear ownership that can't be challenged");
H.R. Rep. No. 112-98, pt. 1, at 40 (2011); 2011 U.S.C.C.A.N. 67, 69; S.
Rep. No. 110-259, at 20 (2008) (the congressional intent behind the AIA
was "to establish a more efficient and streamlined patent system that will
improve patent quality and limit unnecessary and counterproductive
litigation costs").

I recognize that OpenSky should not benefit from its abusive use of
the IPR process.  Accordingly, due to OpenSky's abuse of the process, I am
temporarily elevating Intel to an active party and am relegating OpenSky to
a silent understudy role for the duration of this proceeding.  Removing
OpenSky's control of the IPR removes its ability to leverage that control for
or against a particular party.  Therefore, for the duration of this case,
OpenSky will be prevented from presenting or contesting any particular
issue; requesting, obtaining, or opposing discovery; filing any additional
papers; or participating in oral argument, unless specifically authorized to do
so, for example, as detailed below in relation to an order to show cause.  37
C.F.R. §§ 42.12(b)(2–4).

On the issue of whether to terminate the proceeding, that sanction
could be the appropriate remedy here or in future proceedings reflecting an
abuse of process.  However, the unique dynamics of this case, coupled with
the public interest in evaluating patent challenges with compelling merits,
counsels for a different approach here by permitting this IPR to continue
only if the panel determines that the unpatentability merits were compelling
as of the time of institution and on the record as it existed at that time.

47

IPR2021-01064
Patent 7,725,759 B2

Predicating dismissal on the application of the compelling-merits standard best serves the competing interests here.

I recognize that some may believe that I am allowing Intel to benefit from OpenSky's wrongdoing by not immediately terminating the proceeding.[17] However, there is no evidence that Intel was complicit in OpenSky's abuse. I therefore focus on a principled, replicable approach that is in the best interest of the public and advances the USPTO and AIA goals to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." 35 U.S.C. § 316(b).

The circumstances of this particular case are unusual and are not likely to reoccur.[18] As discussed above, after being sued by VLSI, Intel filed its original IPR Petitions within the required time. 35 U.S.C. § 311(c)(1). At that time, the Board exercised discretion to deny institution based on the advanced state of a district court litigation that also involved the patent. IPR2020-00106, Paper 17, 13; IPR2020-00498, Paper 16, 6, 10. Consistent with how *Fintiv* was applied at that time, the Board did not address the

---

[17] Under the USPTO's rules, promulgated on August 14, 2012, and past practices, even though Intel would have been otherwise time barred, it was permitted to file a petition for joinder within one month of the institution decision. 35 U.S.C. § 315(b); 37 C.F.R. §§ 42.122(b), 42.101(b).

[18] Apart from the Memorandum that will require an earlier determination of compelling merits in future cases with similar fact patterns, the Board issued its Decisions several months before *Sotera* was designated precedential. *See Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 (issued Dec. 1, 2020, designated precedential Dec. 17, 2020) (applying *Fintiv* and instituting review after the Petitioner filed a broad stipulation to limit grounds in district court, addressing factor 4 in *Fintiv*).

48

IPR2021-01064
Patent 7,725,759 B2

merits of the Petition, except to state "that the merits of the Petition[s] do not outweigh the other *Fintiv* factors." IPR2020-00106, Paper 17, 13. Although I recognize that the "compelling merits" analysis would not normally apply where the *Fintiv* factors are not implicated (as the Board correctly determined here on OpenSky's petition), when determining whether to continue an IPR initially filed for improper purposes, I must consider the public interest, which compels the USPTO to evaluate unpatentability challenges that, at the institution stage, evidence compelling merits.[19]

I remand the decision to the Board to issue an order within two weeks on whether the record before the Board prior to institution indicates that the Petition presents a compelling, meritorious challenge as consistent with the Memorandum. In assessing compelling merits, the Board should apply the guidance set forth in my Memorandum. There, I explained that "[c]ompelling, meritorious challenges are those in which the evidence, if unrebutted at trial, would plainly lead to a conclusion that one or more claims are unpatentable by a preponderance of the evidence." *Id.* at 4.

To be clear, a compelling-merits challenge is a higher standard than the reasonable likelihood required for the institution of an IPR under 35 U.S.C. § 314(a). A challenge can only "plainly lead to a conclusion that one or more claims are unpatentable" (*id.*) if it is highly likely that the petitioner would prevail with respect to at least one challenged claim. I recognize that all relevant evidence likely will not have been adduced at the point of institution; trial should produce additional evidence that may support a

---

[19] My decision to conduct a compelling-merits determination here, per the Memorandum, is limited to the facts of this case and should not be treated as an endorsement of retroactive application of that Memorandum to institution decisions made before it issued.

49

IPR2021-01064
Patent 7,725,759 B2

determination in the Final Written Decision that unpatentability has not been adequately proven. Thus, a determination of "compelling" merits should not be taken as a signal to the ultimate conclusion after trial. The Board shall provide its reasoning in determining whether the merits are compelling.

In making its determination, the Board must analyze the evidence and the parties' arguments as they existed at the date of institution. Consistent with the ordinary course of institution, I do not authorize the parties to provide any additional briefing or argument on this issue.

Should the Board find that such a challenge was made prior to institution, the Board shall move forward with the proceeding with Intel as the active party.

Should the Board find that the Petition does not present a compelling, meritorious challenge prior to institution, the Board shall dismiss the Petition (filed by both OpenSky and Intel), subject to the Director, the Board, and the USPTO retaining jurisdiction over the issuance of sanctions.

## VI.    REQUESTS FOR IN CAMERA REVIEW

VLSI requested that I review in camera documents listed on Intel's privilege log and OpenSky's documents, generally. *See, e.g.*, Papers 62, 63. No other parties requested in camera review. For the reasons explained above, however, the evidence exchanged as Mandated Discovery is sufficient to resolve this Director review without resorting to in camera review. Accordingly, the request for in camera review is denied.

## VII.    SHOW CAUSE

Finally, for all the reasons discussed above, OpenSky also is ordered to show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse

50

IPR2021-01064
Patent 7,725,759 B2

of process.  37 C.F.R. § 42.12(b)(6).  Within two weeks of this Decision, OpenSky and VLSI shall each file a 10-page Paper addressing whether an award of attorney fees is appropriate, and if so, how such fees should be determined, e.g., the appropriate time frame for which fees should be assessed.

## VIII.  ORDER

For the foregoing reasons, it is hereby:

ORDERED that OpenSky is relegated to the silent understudy role in this proceeding and is precluded from presenting or contesting any particular issue; requesting, obtaining, or opposing discovery; or filing any additional papers, unless specifically directed to do so;

FURTHER ORDERED that Intel is elevated to an active party in the role of lead petitioner in this proceeding;

FURTHER ORDERED that the Board panel shall determine and issue an order, within two weeks, addressing whether the petition, based only on the record before the Board prior to institution, presents a compelling, meritorious challenge, and shall take the appropriate action to dismiss or maintain the underlying action as identified above based on its determination; and

FURTHER ORDERED that OpenSky and VLSI shall file a Paper responding to the show cause order for OpenSky, addressing whether compensatory expenses should be ordered as a further sanction for OpenSky's abuse of process.  Briefing shall be filed within two weeks of this decision and shall be limited to 10 pages.

51

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:
Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:
Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

Director_PTABDecision_Review@uspto.gov                    Paper 127
571-272-7822                                        Dated: February 3, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

———————

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————

IPR2021-01064[1]
Patent 7,725,759 B2

———————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

ORDER
Restoring OpenSky as a Party
Awarding Reasonable Fees as Sanctions Against Petitioner
Authorizing Patent Owner to File Motion for Fees

---

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding. Paper 43.

IPR2021-01064
Patent 7,725,759 B2

## I.     INTRODUCTION

On October 4, 2022, I issued my decision on Director review of the institution decision in this proceeding. Paper 102 ("Decision" or "Dec."). In my Decision, I determined that Petitioner OpenSky Industries, LLC ("OpenSky") abused the *inter partes* review ("IPR") process in an attempt to extract payment from both Patent Owner VLSI Technology LLC ("VLSI") and Petitioner Intel, who was joined to the proceeding. *Id*. at 3. I also determined that OpenSky engaged in discovery misconduct and unethical conduct, and violated my express orders in the Director review process. *Id*. at 2–4. Due to OpenSky's actions, I ordered "OpenSky to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding." *Id*. at 4. I further ordered "OpenSky to address the appropriate time period for which any fees should be assessed." *Id*.

On November 17, 2022, OpenSky and VLSI submitted briefs pursuant to my order to show cause. Paper 116 (OpenSky); Paper 117 (VLSI). The parties submitted reply briefs on December 5, 2022. Paper 119 (VLSI); Paper 120 (OpenSky). For the reasons set forth below, I determine that it is appropriate to award attorney fees to VLSI for the time spent addressing OpenSky's abusive behavior, including the Director review process in its entirety. I do not award attorney fees for responding to the merits of the case, as I have determined that compelling merits were presented in the Petition. *See* Paper 121.

2

IPR2021-01064
Patent 7,725,759 B2

## II.    RESTORING OPENSKY TO THE PROCEEDING

I previously dismissed OpenSky from this proceeding, subject to the Director, Board, and USPTO retaining authority over the issuance of sanctions. *See* Paper 121, 2–3. In IPR2021-01229, an ongoing proceeding challenging another patent owned by VLSI, I restored dismissed petitioner Patent Quality Assurance, LLC to the proceeding. *See Patent Quality Assurance, LLC v. VLSI Technology LLC*, IPR2021-01229, Paper 108, 4 (PTAB Jan. 27, 2023). Similarly, I vacate the portion of my decision (Paper 121) dismissing OpenSky from this proceeding. This restores OpenSky as a petitioner in this proceeding.

## III.    SANCTIONS ANALYSIS

OpenSky argues that: (1) it cannot and should not be subject to any attorney fees sanction in this proceeding; (2) the order to show cause does not show any harm to VLSI due to OpenSky's misconduct; and (3) compensatory fees, if any, must be limited to specific time periods during the proceeding. Paper 116, 1, 23–24. I disagree with the first two arguments and address the proper assessment of fees below.

### A. *OpenSky Is Subject to Attorney Fees in This IPR*

OpenSky raises a number of arguments as to why it cannot and should not be subject to an attorney fees sanction. Paper 116, 7–23. First, OpenSky argues that under the "American Rule," each litigant pays their own fees unless otherwise provided by statute. *Id*. at 7–11 (citing *Peter v. NantKwest*, 140 S. Ct. 365, 370 (2019)). OpenSky argues that no statute authorizes attorney fees during an IPR proceeding. *Id*. at 8–9. OpenSky further argues that the relevant statute regulating the conduct of IPRs (35 U.S.C. § 316(a))

3

IPR2021-01064
Patent 7,725,759 B2

"specifically delegates to the Director authority to 'prescribe sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding,' but does not mention attorneys' fees." *Id.* at 9.

OpenSky incorrectly refers to my order as "fee shifting." *Id.* at 8. The order to show cause is not directed to fee shifting; it is a sanction order. *Cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (stating that an exception to the American Rule is "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'") (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975)). The fees are commensurate with the harm caused by OpenSky's abuse. *Id.* at 53 ("'[t]he award of attorney's fees for bad faith serves the same purpose as a remedial fine . . .'" (quoting *Hutto v. Finney*, 437 U.S. 678, 691 (1978)). It is not intended to reward VLSI as a prevailing party, as OpenSky seems to imply, but to punish OpenSky for its abusive conduct. *Cf. id.* ("the imposition of sanctions . . . depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation.")

By awarding attorney fees, I am acting pursuant to express statutory and regulatory authority. *See* 35 U.S.C § 316(a)(6); 37 C.F.R. § 42.12. 35 U.S.C. § 316 directly empowers the Director to prescribe regulations setting forth sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding. 35 U.S.C. § 316(a)(6); *see* Paper 119, 1–2. Acting pursuant to that authority, the United States Patent and Trademark Office ("USPTO" or "Office") promulgated Rule 42.12, which expressly authorizes the Patent Trial and Appeal Board ("PTAB" or "Board") to issue sanctions to punish and deter a wide range of misconduct. 37 C.F.R. § 42.12. Those sanctions include, among others, an award of "compensatory

4

IPR2021-01064
Patent 7,725,759 B2

expenses, including attorney fees." 37 C.F.R. § 42.12(b)(6).  The Court of
Appeals for the Federal Circuit has recognized this regulatory power to
award attorney fees as a "means for regulating litigation misconduct." *See
Amneal Pharmaceuticals LLC v. Almirall, LLC*, 960 F.3d 1368, 1372 n.*
(Fed. Cir. 2020) ("§ 42.12 allows the Board to impose sanctions including
'attorney fees'").  Accordingly, there is both statutory and regulatory
authority to apply attorney fees as a sanction in this case.  *See also Apple
Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020) (affirming
the Board's sanction under § 42.12 and noting that it has the ability to "issue
sanctions not explicitly provided in the regulation.").

     In its second argument as to why it cannot and should not be subject
to an attorney fees sanction, OpenSky argues that it was denied due process
required by the Constitution and the Administrative Procedure Act.
Paper 116, 12–16.  OpenSky argues that it did not receive notice that the
Director review would consider abuse of process as a legal issue, and did not
receive notice of the factual basis for the abuse of process charge.  *Id.* at 12–
14.  More specifically, OpenSky argues that it was not provided with
"standards of what constituted abuse of process and meaningful opportunity
to respond to the serious allegation that it had committed an abuse of process
during the IPR proceeding." *Id.* at 13.  Additionally, OpenSky argues that it
"was never apprised that the Director believed . . . that the filing of the IPR
Petition would be an abuse of process because of 'bad' motivation, that
OpenSky was being accused of extracting payments from multiple parties, or
that there was a charge of a lack of willingness to participate in the IPR." *Id.*
at 14 (citing Dec. 3, 43–44).  Finally, OpenSky argues that because the
Director review Scheduling Order precluded new declaratory evidence,

5

IPR2021-01064
Patent 7,725,759 B2

OpenSky was deprived of a fair opportunity to submit evidence in its defense. *See id.* at 15–16 (citing Paper 47, 8, 11).

OpenSky's argument as to lack of notice and opportunity to respond is unavailing. *See* Paper 116, 12–16. My Scheduling Order unambiguously explained that I would be investigating VLSI's claims of abuse of process by OpenSky. *See* Paper 47, 7–8. My interrogatories specifically asked, "[d]oes the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the [America Invents Act] and, if so, which evidence and how should that evidence be weighted and addressed?" *Id.* at 8. OpenSky responded to this interrogatory by citing a single piece of evidence already of record (Ex. 2055), and offered no other supporting evidence. *See* Dec. 23.

Although my Scheduling Order did not permit new declaratory evidence, OpenSky did not request permission to file such evidence or raise an objection to the absence of new declaratory evidence, despite several opportunities to do so. *See* Papers 51 (Two-week extension to exchange Mandated Discovery), 52 (Addressing the scope of Mandated Discovery), 54 (OpenSky's Notice of Objections that did not object to the exclusion of new declaratory evidence). Not only did OpenSky not request permission to file new declaratory evidence, it also failed to produce responsive evidence that was already in its possession. *See* Dec. 21–25 (OpenSky failed to produce numerous communications between itself and VLSI or Intel). Accordingly, OpenSky was provided notice and opportunity to respond to VLSI's allegations of abuse of process, and I made my decision on Director review based on the briefs and evidence presented by the parties. *See Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 749 (Fed. Cir. 2012) ("[T]he

6

IPR2021-01064
Patent 7,725,759 B2

opportunity to submit written briefs may be sufficient to provide an
opportunity to be heard.").

In its third argument as to why it cannot and should not be subject to
an attorney fees sanction, OpenSky argues that the Decision "erred by
applying a negative inference across the board without any plausible
evidence that the allegedly missing documents had information relevant to
the inferences made." Paper 116, 17.  Specifically, OpenSky argues that "a
negative or adverse inference based on the lack of production requires a
showing . . . that the missing documents actually exist."  *Id.* at 16 (citing
*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-1702, 2021 WL
4033071, at *7 (D.D.C. Sept. 3, 2021)).  OpenSky further argues that the
Decision ruled on OpenSky's objection to providing a privilege log without
giving OpenSky an opportunity to cure.  *Id.*  OpenSky argues that the lack of
opportunity to cure is contrary to previous USPTO practices.  *Id.* at 17–18
(citing *Ventex Co. Ltd. v. Columbia Sportswear No. Am., Inc.*, IPR2017-
00651, Paper 98 at 5 (PTAB Nov. 19, 2018)).

OpenSky's arguments against the adverse inferences taken in my
Decision fail for several reasons.  First, OpenSky filed its objections to the
Mandated Discovery on the day it was due, despite having had the
opportunity to object previously.  *See* Paper 54.  Thus, OpenSky's late
objection eliminated any period for curing.  Second, and more importantly,
OpenSky indicated that it did not intend to produce a privilege log
*regardless* of any ruling on its objections.  *See* Paper 91, 20.  Third, at least
some of the missing documents existed, as they were produced by VLSI and
Intel.  *See* Dec. 40–42.  Finally, I specifically warned OpenSky that I might
draw adverse inferences based on the failure to comply with my order.  *See*

7

IPR2021-01064
Patent 7,725,759 B2

Paper 52, 4. Despite that explicit warning, OpenSky chose noncompliance. *See* Dec. 19–25. For at least these reasons, OpenSky's arguments are unavailing.

### B. OpenSky's Misconduct Harmed VLSI

OpenSky separately argues that its misconduct did not harm VLSI, and, therefore, attorney fees are not an appropriate sanction. Paper 116, 18–23. First, OpenSky argues that the *Noerr-Pennington* doctrine precludes "awarding attorney's fees to compensate VLSI for defending against OpenSky's compelling, meritorious IPR challenge." *Id.* at 18–20. OpenSky argues that because the Petition itself was not "objectively baseless," there should be no sanctions, despite its "impermissible motive." *Id.* at 20 (citing *BE&K Construction Co. v. National Labor Relations Board*, 536 U.S. 516, 519–20, 522, 524, 536 (2002)). OpenSky then broadly argues that "[m]onetary sanctions cannot be levied against a party who files a meritorious IPR Petition (even if it had a profit motive)." Paper 120, 6–7.

OpenSky's argument for blanket immunity from sanctions for filing a meritorious Petition mischaracterizes the nature of the sanctions and would negate the purpose of imposing sanctions for misconduct before the Board as expressly provided in 35 U.S.C. § 316(a)(6). As an initial matter, OpenSky's argument ignores one of the congressional intents that undergirds the America Invents Act ("AIA") itself—"the integrity of the patent system"—which considers interests broader than just patentability. *See* 35 U.S.C. § 316. Accordingly, OpenSky's litigation misconduct cannot be excused simply because the Petition itself, which was substantively prepared by Intel, was meritorious. Case law further supports imposing sanctions for litigation misconduct, despite a meritorious suit. *See BE&K Construction*,

8

IPR2021-01064
Patent 7,725,759 B2

536 U.S. at 537 ("[N]othing in our holding today should be read to question
the validity of common litigation sanctions imposed by courts themselves—
such as those authorized under Rule 11 of the Federal Rules of Civil
Procedure."); *see also* 37 C.F.R. § 42.11(c) (Board counterpart to Rule 11).
More importantly, OpenSky's argument for blanket immunity
mischaracterizes the basis for these attorney fee sanctions. I am not
sanctioning OpenSky based on whether it filed a meritorious Petition. I am
imposing sanctions because of the manner in which OpenSky conducted
itself after the Petition was filed, as explained further below.

OpenSky contends that its misconduct—offering to undermine the
IPR (what it calls "settlement negotiations") and failing to comply with
Mandated Discovery—did not harm VLSI. Paper 116, 20–23. VLSI
responds that "OpenSky's actions caused extraordinary harm to VLSI, the
Office, and the patent system. OpenSky abused the IPR process for the sole
purpose of attempting to extort money from VLSI and Intel." Paper 119, 9–
10 (citing Dec. 43). More specifically, VLSI argues that "OpenSky's
misconduct caused VLSI massive harm by forcing it to spend extraordinary
amounts of time and money." Paper 117, 8. As to the damage to the Office
and the patent system, VLSI argues that "OpenSky's violation of the
Director's orders and its non-responsive and misleading interrogatory
responses are alone sufficient to justify a fee award." *Id.* at 10.
Accordingly, VLSI argues that "[a]n award of attorneys' fees and costs is
necessary to deter future misconduct by OpenSky and its like." *Id.* at 11.

OpenSky responds that:

If OpenSky had filed the same meritorious IPR Petition, but not
as an "attempt to extract payment" and had not sent the February
23 e-mail, VLSI would have incurred the exact same attorneys'

9

IPR2021-01064
Patent 7,725,759 B2

> fees and costs. Those expanded [sic] were not "solely" caused
> by the misconduct and cannot be awarded as monetary sanctions.

Paper 120, 4.

OpenSky ignores that VLSI raised arguments against OpenSky's misconduct—even apart from its motives in filing its petition—throughout the proceeding and that the entire Director review process was brought about due to that misconduct. *See* Paper 9, 1–29; Paper 16, 1–7; Paper 20, 1–10; Paper 45. My review was not limited solely to OpenSky's intent in filing the Petition, but instead considered whether to revisit the institution decision based on the totality of OpenSky's conduct and a number of factors. *See* Dec. 36–43. As a result, I concluded that OpenSky abused the IPR process. *Id.* at 43–44. As I explained:

> Seeking an AIA trial for the primary purpose of extorting money, while being willing to forego or sabotage the adversarial process, does not comport with the purpose and legitimate goals of the AIA and is an abuse of process. Opportunistic uses of AIA proceedings harm the IPR process, patent owners, the Office, and the public. To safeguard the proper functioning of the patent system, and the confidence therein, it is incumbent on me and the USPTO to protect against that harm.

*Id.* at 44 (internal citations omitted). My conclusion and related sanctions were based on the totality of OpenSky's conduct. That its intent informed my analysis does not make its intent the basis of these sanctions. Instead, it was just one of many factors that I considered in reaching my decision to impose sanctions for OpenSky's behavior in this proceeding. *See* Dec. 36–43. But even if I were to set aside OpenSky's improper motive in filing its petition to institute this IPR, I would reach the same decision based solely on

10

IPR2021-01064
Patent 7,725,759 B2

its misconduct revealed and committed in the course of my review of that institution decision.

In addition, OpenSky's failure to comply with Mandated Discovery further harmed VLSI during the Director review. I explained that "[a]s a result of OpenSky's failure to comply with my ordered Mandated Discovery provisions, I, VLSI, and Intel do not have a complete record to fully examine OpenSky's assertion that it has not committed an abuse of the IPR process, or to evaluate whether its allegation of 'harassment' is supported." *Id.* at 27.

OpenSky further seeks to excuse its discovery misconduct by arguing that the Director review is "ancillary to the Board's consideration of the Petition on its merits" and "[a]ttorneys' fee recoveries are not permitted for ancillary litigation, such as the process of sanctioning." Paper 116, 22 (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990)). Contrary to OpenSky's argument, the Director review process is not ancillary to the IPR process; it is an exercise of the Director's unilateral authority over the institution phase of that process. The Court in *Cooter*, cited by OpenSky, determined that Rule 11 sanctions were limited to actions at the trial level and did not apply to expenses incurred defending the award on appeal, because Federal Rule of Appellate Procedure 38 separately provided for appellate fees. *See* 496 U.S. at 407. *Cooter* is inapposite because it addressed successive phases of litigation, before separate levels of Article III courts, governed by different sets of federal rules. Here, Director review regarding whether to reverse the initial institution decision is central to the IPR process, as well as to investigating whether allegations of misconduct warrant such a reversal.

11

IPR2021-01064
Patent 7,725,759 B2

### C. OpenSky's Misconduct Took Place Throughout the Proceeding and Was the Basis for Director Review

OpenSky argues that "sanctions must be tied to harm 'solely' caused by the misconduct and may not be based on temporal limitations alone." Paper 116, 23–24 (citing *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017)). OpenSky identifies two specific periods of misconduct identified by the Decision. *Id.* at 24–25. The first is the nine-day period starting with the February 23, 2022, email from OpenSky's counsel to VLSI's counsel (Ex. 2055) and ending with VLSI's rejection of OpenSky's offer on March 2, 2022 (Ex. 2094). *Id.* at 24. The second is the "sixty-one-day period between when the Mandated Discovery was due and when the Director issued sanctions precluding OpenSky from further participating in the IPR: from August 4, 2022 to October 4, 2022." *Id.* (citing Paper 51, 4; Paper 102, 4).

As discussed above, OpenSky's misconduct was not so limited. *See supra*. Indeed, VLSI raised objections to OpenSky's misconduct throughout the proceeding. *See* Paper 9, 1–29; Paper 16, 1–7; Paper 20, 1–10; Paper 45; *see also Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1369 (Fed. Cir. 2013) ("[T]he litigation misconduct finding by the district court was not of isolated instances of unprofessional behavior by O2 Micro. Rather, O2 Micro's extensive misconduct was enough to comprise an abusive 'pattern' or a vexatious 'strategy' that was 'pervasive' enough to infect the entire litigation."). And the Director review process was initiated to examine OpenSky's misconduct and determine whether to reverse the institution decision. *See* Paper 47. But for OpenSky's misconduct, VLSI

12

IPR2021-01064
Patent 7,725,759 B2

would not have incurred the fees necessary to address OpenSky's
misconduct in the case and upon Director review.

Accordingly, I determine that the appropriate sanction is for OpenSky
to compensate VLSI for the reasonable attorney fees incurred in addressing
the issue of OpenSky's misconduct during the proceeding, and for the
Director review process in its entirety. I authorize VLSI to file a Motion for
Fees that includes specific information as to the total amount of fees
requested, details regarding the tasks performed underlying those fees, and
reasons why the amounts of those fees are reasonable. Any privileged
information may be redacted from billing information submitted with the
Motion. The Motion must be filed no later than two weeks after the entry of
this Decision and is limited to twenty pages. Detailed billing statements
may be filed as exhibits to the Motion and excluded from the page limit.
OpenSky is authorized to file an Opposition to the specific fees requested
that is limited to twenty pages and must be filed no later than two weeks
after the date on which VLSI files its Motion. The same parameters
regarding privileged information and exhibits provided for VLSI's Motion
apply to any filed Opposition.

### D. Sanctions Are Limited to This Proceeding

VLSI also seeks attorney fees as they relate to all three IPRs filed by
OpenSky (i.e., IPR2021-01056, IPR2021-01064, and IPR2022-00645) and
the IPRs with requests to join OpenSky's -1064 Petition (i.e., IPR2022-
00366 (Intel) and IPR2022-00480 (Patent Quality Assurance, LLC
("PQA"))). Paper 117, 13. VLSI argues "[b]ut for OpenSky's filings and
the PQA IPR it potentially inspired, Intel would not have been able to file

13

IPR2021-01064
Patent 7,725,759 B2

joinder petitions and attack VLSI's patents yet again nor could PQA have sought to join the present IPR." *Id.*

As discussed above, I distinguish the merits of this proceeding from the misconduct of OpenSky. *See supra*. This distinction between the merits and misconduct applies to the joinder requests. For example, IPR2022-00366 deals entirely with the merits, and there is no evidence of misconduct by Intel. *See* IPR2021-01064, Paper 43. Rather, Intel appears to be another target of OpenSky's misconduct. *See* Dec. 48. Accordingly, fees relating to IPR2022-00366 are not included in this sanction. I apply the same analysis to IPR2022-00480 (now terminated) in which PQA sought to join this IPR on the merits. *See* IPR2022-00480 Papers 2, 3. PQA's alleged misconduct in IPR2021-01229 is the subject of a different Director review. *See* IPR2021-01229, Paper 31. Accordingly, fees relating to IPR2022-00480 also are not included in this sanction.

OpenSky's other two Petitions may raise misconduct issues similar to this case. For example, in IPR2021-01056 (institution denied), OpenSky's failure to engage the expert on whom its petition relied may suggest that OpenSky was attempting to file a petition with the lowest possible cost in an effort to generate leverage against VLSI, but without the intent or expectation of litigating the proceeding through trial. *See* Dec. 43. OpenSky's Petition in IPR2022-00645 was dismissed before institution. *See* IPR2022-00645, Paper 13. Nevertheless, neither of these cases was raised in the Director review, and thus I exercise my discretion to limit the sanctions order to this proceeding.

14

IPR2021-01064
Patent 7,725,759 B2

### *E. Sanctions Are Assessed Against OpenSky*

VLSI argues that "OpenSky's attorneys were directly responsible for OpenSky's misconduct and should be found jointly and severally liable with OpenSky for VLSI's fees and costs." Paper 117, 15. VLSI argues that "[c]ourts have routinely held a party's attorneys jointly and severally liable for the sanctionable conduct of their clients when they have assisted in advancing the sanctionable conduct." *Id.* at 16–17. VLSI further argues that OpenSky's attorneys repeatedly misrepresented OpenSky's motives, conducted OpenSky's improper negotiations with VLSI and Intel, and blocked inquiries into the true relationship between OpenSky and its counsel. *Id.* at 17–20.

At this time, I decline to resolve VLSI's request to hold OpenSky's attorneys "jointly and severally liable" for VLSI's attorney fees. The Board's authority extends to both "a party," 37 C.F.R. § 42.12(a), and to "individuals involved in the proceeding," *Id.*, § 42.11(a). The latter "individuals" expressly includes "any attorney [or] registered practitioner" appearing before it. *Id.*, § 42.11(d). Consistent with that regulation, the Director review process examined OpenSky's misconduct as a party to the proceeding. *See* Paper 47, 7–9. I did not examine, however, whether OpenSky's counsel individually committed misconduct, and I reserve judgment on that issue. *See* Dec. 4. Accordingly, I decline to sanction OpenSky's counsel individually at this time.

### IV.    ORDER

Accordingly, based on the foregoing, it is:

ORDERED that OpenSky is restored as a petitioner;

15

IPR2021-01064
Patent 7,725,759 B2

FURTHER ORDERED that VLSI is awarded reasonable fees incurred in this proceeding in raising issues of misconduct by OpenSky before the Board, and the Director review process in its entirety;

FURTHER ORDERED that VLSI is authorized to file a Motion for Fees, in accordance with my instructions herein. Any such Motion must be filed no later than two weeks after the entry date of this Order and is limited to twenty pages;

FURTHER ORDERED that OpenSky is authorized to file an Opposition to VLSI's Motion for Fees. Any Opposition must be filed no later than two weeks after the date on which VLSI files it Motion, and is limited to twenty pages.

16

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Matthew K. Blackburn
Evan Boetticher
SULLIVAN BLACKBURN PRATT LLC
mblackburn@sullivanblackburn.com
eboetticher@sullivanblackburn.com

David Boundy
POTOMAC LAW GROUP, PLLC
dboundy@potomaclaw.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com

17

IPR2021-01064
Patent 7,725,759 B2

hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

18



Director_PTABDecision_Review@uspto.gov                    Paper 141
571-272-7822                                   Dated: December 15, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————————

IPR2021-01064[1]
Patent 7,725,759 B2

———————————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

ORDER
Granting Motion for Fees

———————————

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding. Paper 43.


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

## I.   INTRODUCTION

On October 4, 2022, I issued my decision on Director Review. Paper 102 ("Decision" or "Dec."). In my Decision, I determined that Petitioner OpenSky Industries, LLC ("OpenSky") abused the *inter partes* review ("IPR") process in an attempt to extract payment from both Patent Owner VLSI Technology LLC ("VLSI") and Petitioner Intel, who was joined to the proceeding. *Id.* at 3. I also determined that OpenSky engaged in discovery misconduct and unethical conduct, and violated my express orders in the Director Review process. *Id.* at 2–4. Due to OpenSky's actions, I ordered "OpenSky to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding." *Id.* at 4. "I further order[ed] OpenSky to address the appropriate time period for which any fees should be assessed." *Id.*

Following briefing by the parties (Papers 116, 117, 119, 120), I issued an order awarding reasonable fees as sanctions against OpenSky and authorizing VLSI to file a Motion for Fees. Paper 127.[2] Specifically, I determined that it was appropriate to award attorney fees to VLSI for the time spent addressing OpenSky's abusive behavior. *Id.* at 2, 13. I further issued an Order authorizing VLSI to submit declaratory evidence attesting to the facts set forth in its Motion for Fees, and OpenSky to file an objection to

---

[2] As previously discussed in Paper 127, this Order addresses only sanctions imposed against a party. It does not address, nor does it preclude, potential sanctions or discipline against those who practiced before the USPTO on behalf of the party. *See* 37 C.F.R. § 11.18(c)(2).



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

any evidence submitted by VLSI. Paper 134. VLSI filed its Motion for Fees (Paper 130, "Motion" or "Mot.") and accompanying evidence (Exhibits 2126–2135). OpenSky opposed the motion (Paper 131, "Opposition" or "Opp.") and objected to the evidence (Paper 137, "Objection" or "Obj.").

On July 13, 2023, VLSI and OpenSky each filed an appeal to the U.S. Court of Appeals for the Federal Circuit. Paper 139; Paper 140. On December 7, 2023, the Federal Circuit remanded the case back to the U.S. Patent and Trademark Office ("USPTO" or "the Office") to resolve any remaining sanctions issues. *See* Ex. 3027.

Based on the evidence and arguments, I award VLSI $413,264.15 in fees.

## II. ADDRESSING THE PARTIES' ARGUMENTS

VLSI argues that its requested fees are reasonable in both time spent and rates billed. *See* Mot. 2. OpenSky argues that I should reject VLSI's requested fees because: (A) OpenSky objects to Exhibits 2126–2135 and argues that VLSI has not submitted proper evidence in support of its request; (B) VLSI does not establish that the sought fees relate to OpenSky's abuse of process; and (C) VLSI has unclean hands. *See* Opp. 1; Obj. 1.

I address the parties' arguments and OpenSky's objections below.[3]

---

[3] I do not address OpenSky's arguments in its Objection that do not relate to VLSI's submitted evidence. *See* Obj. 2, n.1. To the extent OpenSky substantively argued against the Order to Show Cause (Papers 116, 120), I previously addressed these arguments (*see* Paper 127, "Order Restoring OpenSky as a Party, Awarding Sanctions, and Authorizing a Motion for Fees").



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

### A. Admissible Evidence

OpenSky objects to VLSI's evidence submitted as Exhibits 2126–2135 for failing to comply with 37 C.F.R. § 42.62(a), 5 U.S.C. § 556(d), and the applicable Federal Rules of Evidence. *See* Obj. 1. OpenSky argues that the Exhibits should be excluded from the proceeding and expunged from the record. *Id.* OpenSky argues that without the Exhibits, "VLSI's motion lacks the necessary substantial evidence support and should be denied." *Id.* For the reasons set forth below, I reject OpenSky's objections as to Exhibits 2126–2129, 2134, and 2135. I do not rely on Exhibits 2130–2133 and dismiss OpenSky's objections to those exhibits as moot.

### 1. VLSI's Tables of Billing Statements (Ex. 2126)

The parties agree that reasonable attorney fees may be determined "based on the 'lodestar,' *i.e.,* the number of hours worked multiplied by the prevailing hourly rates." *See* Mot. 2 (citing *Perdue v. Kenny A.*, 559 U.S. 542, 546 (2010)); Opp. 3 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.")). Under the lodestar method, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. Fee applicants routinely satisfy the burden of showing reasonable hours expended by submitting invoices and billing records. *Rumsey v. Dep't of Just.*, 866 F.3d 1375, 1379 (Fed. Cir. 2017). VLSI submitted a Table of Billing Statements (Ex. 2126, "Billing Statement") to satisfy its burden as the fee applicant. *See* Mot. 6–12. OpenSky objects to

4



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

VLSI's Billing Statement, arguing that the Billing Statement is not admissible evidence and does not qualify as contemporaneous time records for the lodestar calculation. *See* Opp. 4; Obj. 3–8.

I first address OpenSky's arguments that the Billing Statement should be excluded entirely. *See* Opp. 4–5; Obj. 3–8. OpenSky objects to the Billing Statement as impermissible hearsay under Rules 801 and 802. Obj. 3–8. OpenSky also objects to the Billing Statement under Rules 401–403 as an "after-the-fact" reconstruction rather than a contemporaneous billing record. *See id.* at 6–7. OpenSky further objects to the Billing Statement as lacking authentication because VLSI's "attorney declarations (Exhibit Nos. 2127–2129) cannot authenticate Exhibit 2126." *Id.* at 6. Finally, OpenSky objects to the Billing Statement as incomplete under Rule 106 and not the best evidence under Rules 1001–1003. *See id.* at 7–8.

I am not persuaded by OpenSky's arguments to entirely exclude the Billing Statement. VLSI's counsel declare that the Billing Statement was prepared by the attesting counsel who "personally went through contemporaneous billing entries" of attorneys at two law firms and listed the appropriate records in the Billing Statement. *See* Ex. 2127 ¶ 19; Ex. 2128 ¶ 14; Ex. 2129 ¶ 3. VLSI's counsel declare that the billing entries listed in the Billing Statement were cross-referenced with other contemporaneous records to ensure accuracy and responsiveness. *Id.* As discussed below, VLSI's counsel qualify as someone with knowledge of the billing entries.

OpenSky cites a series of cases to argue that "[c]ourts routinely reject after-the-fact reconstructions of billing records and insist on originals," and therefore Exhibit 2126 is "improper." *See* Obj. 6–7; *see also* Opp. 3–5. In


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

context, however, "after-the-fact reconstructions" means situations where billing attorneys did not keep contemporaneous records of the time spent on a matter and therefore had to go back, after the court awarded fees, to determine (i.e., reconstruct) how much time they had spent working on the case. *See, e.g.*, *National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) ("Casual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees"); *Leroy v. City of Houston*, 831 F.2d 576, 585 (5th Cir. 1987) (finding that the district court "repeatedly acknowledged deficiencies in the billing records in this case, noting that some were reconstructed, after-the-fact summaries . . . ."); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 49–56 (D.D.C. 2011) (determining that certain attorneys "failed to keep contemporaneous time records, and, instead, provided the Court with reconstructed timesheets.").

Even in situations where fee applicants relied on reconstructed billing entries, courts have reduced the lodestar rather than entirely exclude the evidence. *See Heller*, 832 F. Supp. 2d at 49–56; *Leroy*, 831 F.2d at 585–86 (5th Cir. 1987); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1459 (Fed. Cir. 1991). In *Heller*, for example, the court found the failure to keep contemporaneous records "deeply troubling." *Id.* at 50. In view of this defect, the court reduced the number of hours "by 10% in order to account for any inaccuracies or overbilling that may have occurred as a result of these attorneys' unacceptable timekeeping practices." *Id.*

There is no evidence that Exhibit 2126 is an after-the-fact reconstruction within the meaning of OpenSky's cited cases. Instead,



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

VLSI's counsel "went through contemporaneous billing entries to ensure that they fell within the scope of the Fee Order." Ex. 2129 ¶ 2. Counsel then "made reductions or exclusions if the entries did not solely apply to the 1064 IPR." Ex. 2129, ¶ 3; *see also* Ex. 2127 ¶ 19 and Ex. 2128 ¶ 14. "These itemized billing entries, and their reductions, were entered as Ex. 2126." Ex. 2129, ¶ 3. This evidence demonstrates that, unlike the reconstructed entries in *Heller* and *Leroy*, VLSI's Billing Statement is based on contemporaneous billing records. *See* Ex. 2126; Ex. 2127 ¶ 19; Ex. 2128 ¶ 14; Ex. 2129 ¶¶ 2–3. Therefore, I am not persuaded by OpenSky's argument.

I am also not persuaded by OpenSky's remaining objections to the Billing Statement. OpenSky objects to the Billing Statement under Rules 401–403 because the exhibit is not a contemporaneous billing record. Obj. 6. I reject this objection under Rules 401–403 because the Billing Statement is relevant evidence to the time and fees expended by VLSI to address OpenSky's misconduct, *see* Rule 401, and OpenSky does not attempt to argue that its probative value is substantially outweighed by, for example, unfair prejudice, *see* Rule 403. I reject OpenSky's objection under Rule 901 for lack of authentication, because VLSI's counsel's declarations provide foundation for the Billing Statement, as they declare that "Ex. 2126 is a true and accurate copy of the amount of time spent and work done regarding the 1064 IPR that we believe is permitted under the Fee Order." Ex. 2127 ¶ 19; Ex. 2128 ¶ 14; Ex. 2129 ¶ 3; *see also Bellflower Unified Sch. Dist. v. Arnold*, 586 F. Supp. 3d 1010, 1015 (C.D. Cal. 2022) (finding sufficient foundation where fee applicant's counsel "declared that he reviewed the

7



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

invoices on this matter, including the rates and hours billed by each attorney for services rendered in this litigation, and that they are reflected in the Billing Statement as an exhibit").

OpenSky objects to the Billing Statement under Rule 106 because the "exhibit is incomplete and purports to include and rely on portions of other documents that in fairness should be considered along with this document." *See* Obj. 7. Instead, OpenSky seeks to introduce "the remainders of those billing invoices." *Id.* However, that would require VLSI submitting time spent on other unrelated matters, as its counsel already reviewed the relevant time entries and listed the appropriate records in the Billing Statement. *See supra.* Accordingly, Rule 106 does not apply. Rule 106 "is designed to avoid creating a misleading impression by taking a statement out of its proper context, or otherwise conveying a distorted picture to the [fact finder] by the selective introduction of documents that are part of a comprehensive whole." *Merrick v. Mercantile-Safe Deposit & Tr. Co.*, 855 F.2d 1095, 1103–04 (4th Cir. 1988). There is no indication that the billing entries listed in the Billing Statement have been taken out of context or otherwise create a distorted picture that would be different from contemporaneous billing records. As discussed above, the Billing Statement itself is relevant evidence for determining reasonable attorney fees. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988) ("[A]s the general rules of relevancy permit a ready resolution to this litigation, we need go no further in exploring the scope and meaning of Rule 106.")

OpenSky objects to Exhibit 2126 under Rules 1001–1003 "because this exhibit is not the best evidence." Obj. 7–8. However, "Rule 1002


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

applies not when a piece of evidence sought to be introduced has been somewhere recorded in writing but when it is that written record itself that the party seeks to prove. The rule requiring the production of the original document applies only when the proponent is attempting to prove the contents or terms of a writing." *R & R Assocs., Inc. v. Visual Scene, Inc.*, 726 F.2d 36, 38 (1st Cir. 1984) (internal citation omitted); *see also Ecological Rts. Found. v. U.S. Env't Prot. Agency*, 541 F. Supp. 3d 34, 51 (D.D.C. 2021) ("[T]he best evidence rule is a rule of preference, not a solid bar on secondary evidence.") (internal quotes omitted). As discussed above, the Billing Statement itself is admissible evidence and acts as an original print-out of billing entries relevant to this proceeding. *See* Rule 1001(d). Accordingly, I reject OpenSky's objection under Rules 1001–1003.

## 2. VLSI's Declaratory Evidence (Exhibits 2127–2129)

OpenSky objects to the admissibility of Exhibits 2127–2129, declarations by VLSI's counsel, under F.R.E. 602, 701–703, 801, and 802; and 37 C.F.R. § 42.65. Obj. 8–17. To the extent that I do not rely on portions of Exhibits 2127–2129 in this Order, I reject OpenSky's objections as moot. As to the remaining objections, because OpenSky raises the same objections for all three declarations by VLSI's counsel, I address them together.

First, OpenSky objects to Exhibits 2127–2129 under Rule 602. Obj. 8–9, 12–15. Specifically, OpenSky objects to testimony about the "preparation of Exhibit 2126" in that the declarants lacked personal knowledge of the attested facts, including other attorneys' billing entries. *See id.* "Declarations in support of attorney fee awards should be based


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

upon personal knowledge." *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 222 (9th Cir. 2013) (finding inadmissible hearsay where declarant did not have personal knowledge of paralegal's reconstructed hours). However, "personal knowledge can come from the review of the contents of business records and an affiant may testify to acts that she did not personally observe but which have been described in business records." *Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1274 n.2 (N.D. Cal. 2014). The Seventh Circuit similarly held that an attorney's affidavit submitted on the issue of attorney fees with a billing statement listing other attorneys and paralegals was admissible under Rule 602 "as lay witness testimony on matters about which he has personal knowledge." *Lock Realty Corp. IX v. U.S. Health, LP*, 707 F.3d 764, 773 (7th Cir. 2013). Specifically, the court held that

> the affidavit taken as a whole amply demonstrated that [the affiant] had personal knowledge of the facts presented in the affidavit and was competent to testify to them. His affidavit supported a finding that the rates reflected in the billing sheets were the actual rates charged by the attorneys and paralegals who worked on the case, and that these rates were consistent with market rates in the area.

*Id.* Similarly, the declarants in this proceeding testify they have personal knowledge from reviewing the contents of contemporaneous billing entries that reflect the actual rates charged by the attorneys who worked on the case. *See* Ex. 2127 ¶¶ 18, 19; Ex. 2128 ¶¶ 13, 14; Ex. 2129 ¶ 3. Moreover, the declarations as a whole demonstrate that the declarants have personal knowledge of the facts presented in the declarations and are competent to testify to them. *See* Ex. 2127 ¶¶ 8–12; Ex. 2128 ¶¶ 6–10; Ex. 2129 ¶¶ 2–3.



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

Accordingly, I reject OpenSky's objection to Exhibits 2127–2129 under Rule 602.

Second, OpenSky objects to Exhibits 2127–2129 under Rules 701–703. Obj. 9, 13, 15–16. OpenSky objects to Exhibits 2127–2129 under Rule 701 for failing "to disclose the underlying facts or data on which the opinion is based" (*id.* at 9, 15), or being offered "outside of [the declarant]'s areas of expertise" (*id.* at 15). A lay opinion under F.R.E. 701 must be: (a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See* F.R.E. 701; *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed. Cir. 2001). Each of the declarants explains that their testimony is based on their personal review of contemporaneous billing entries that are represented in the Billing Statement. *See* Ex. 2127 ¶¶ 18, 19; Ex. 2128 ¶¶ 13, 14; Ex. 2129 ¶ 3. Further, the testimony is helpful in determining the attorney fees at issue in this proceeding and is not based on expert knowledge. *See id.* Although OpenSky argues that the declarants have not "demonstrated expertise to make . . . judgments" relating to which billing entries are within the scope of the fee order (for example, because certain of the declarants are not admitted to practice before the USPTO) (Obj. 16), OpenSky cites no authority that such expertise is required. OpenSky was free to challenge the exercise of judgment by challenging any billing entries VLSI included. Accordingly, I reject OpenSky's objections under Rule 701. VLSI does not offer Exhibits



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

2127–2129 as expert testimony. Thus, OpenSky's objections under Rule 702 and 703 do not apply.

OpenSky separately argues that Ms. Wen (the declarant of Ex. 2129) and other attorneys are not registered to practice before the USPTO and were not admitted *pro hac vice*, and therefore are not authorized to practice in this proceeding. *See* Obj. 16, n. 3. OpenSky does not specifically state how this point relates to its argument (the status of other attorneys is irrelevant to its argument that Ms. Wen did not have the expertise to make judgments relating to which billing entries to include), but appears to contend that fees by attorneys not authorized to practice in this proceeding may not be recovered. *See id.* OpenSky cites no authority for the proposition that counsel must be "authorized to practice in [a] proceeding," (*id.* at 16 n.3), for their hours to be eligible for compensation via a fees award. As OpenSky has provided no legal support for its position, I reject it. Moreover, USPTO regulations permit practitioners to use non-practitioners under their supervision "to assist the practitioner in matters pending or contemplated to be presented before the Office." 37 C.F.R. § 11.5(b); *see also id.* § 11.503. Fees accrued by others involved in this proceeding supported the work of designated lead and backup counsel. Thus, I reject OpenSky's objections regarding the attorneys allegedly not authorized to practice in this proceeding.

Third, OpenSky objects to Exhibits 2127–2129 as impermissible hearsay under Rules 801 and 802. Obj. 9–10, 13–14, 17. For example, OpenSky argues that paragraphs 4, 7, and 8 of Exhibit 2127 refer to "various out-of-court statements about awards or favorable press coverage regarding



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

Mr. Lowenstein[, Mr. Weatherwax,] or the Lowenstein Weatherwax firm." *Id.* at 9–10. I do not rely on these out-of-court statements in my fee calculation and, therefore, OpenSky's objection is moot as to paragraphs 4, 7, and 8.

OpenSky argues that paragraphs 13, 14, 18, and 19 of Exhibit 2127 contain hearsay relating to other firms' billing rates or actions. *Id.* at 10. I do not rely on paragraphs 13 and 14 that discuss other firms' billing rates and, therefore, OpenSky's objection is moot as to those paragraphs. Paragraphs 18 and 19 do not relate to out-of-court statements or assertions and thus are not hearsay.

Finally, OpenSky argues that paragraphs 22–26, 28, 30, 31, 33–40, and 42 of Exhibit 2127, and paragraphs 21–25, 27, and 28 of Exhibit 2128 are hearsay because they purport to provide testimony about the contents of the Billing Statement. *Id.* at 10–11, 13–14. As discussed above, the Billing Statement was prepared by the declarants of Exhibits 2127–2129. Accordingly, I reject OpenSky's objection to these paragraphs.

### 3. VLSI's Third-Party Documents (Exhibits 2130–2135)

OpenSky objects to the admissibility of Exhibits 2130–2135 under Rules 401–403, 801, 802, 901, and 902. Obj. 17–19. OpenSky also argues that these exhibits violate the May 8 Order by exceeding the scope of permitted submissions. *Id.* at 17 (citing Paper 134, 4). I address the scope of my May 8 Order, followed by OpenSky's evidentiary objections below.

In my Order, I authorized VLSI to submit evidence regarding the prevailing market rates for comparably experienced attorneys handling


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

litigation before the Patent Trial and Appeal Board. Paper 134, 4. As an example, I listed the American Intellectual Property Law Association's ("AIPLA") Economic Survey that lists the billing rates for intellectual property attorneys based on their degree of experience. *Id.*; *see View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 987–988 (Fed. Cir. 2000).

OpenSky argues that Exhibits 2130–2135 violate the scope of my May 8 Order because the references "are neither declaratory evidence nor evidence of prevailing market rates for comparably experienced attorneys handling litigation before the Patent Trial and Appeal Board." Obj. 17–18. OpenSky requests that I expunge these exhibits. *See id.*

I do not rely on Exhibits 2130–2133 in my fee determination, and I dismiss OpenSky's objection to these exhibits as moot. Exhibits 2134 and 2135 describe the rates charged by intellectual property attorneys with equivalent experience. *See View Eng'g*, 208 F.3d at 987; *see* Ex. 2134, 5 ("All the analyses included in the report derive from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment."); *see* Ex. 2135 ("[F]or private practitioners, data were collected for billable hours, rates, and the amount billed for legal services."). Exhibits 2134 and 2135 are relevant for determining whether the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonable comparable skill and reputation. Accordingly, OpenSky's argument that I did not authorize submission of Exhibits 2134 and 2135 is not well taken, and I deny OpenSky's request to expunge Exhibits 2134 and 2135.



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

OpenSky objects to Exhibits 2134 and 2135 under Rules 401–403 as not relevant. *See* Obj. 18–19. Specifically, OpenSky argues that Exhibit 2134 reports data compiled for very large law firms, unlike Lowenstein & Weatherwax, and "Exhibit 2135 is dated September 2021" and does not have "any bearing to VLSI's fee request (which is limited to the period between June 8, 2021 and December 5, 2022)." *See id.* Neither argument is persuasive. As discussed previously, Exhibits 2134 and 2135 are relevant for identifying the prevailing rates in the intellectual property community during a time period relevant to this proceeding. Both provide a useful point of comparison for determining the lodestar. *See Biery v. United States*, 818 F.3d 704, 714 (Fed. Cir. 2016) (holding that it is within a court's discretion to "use either the Adjusted *Laffey* Matrix or the Kavanaugh Matrix and any departure, or no departure, from the rates they suggest."). Accordingly, Exhibits 2134 and 2135 are relevant under Rule 401–402, and I reject OpenSky's objection. OpenSky does not argue that the probative value of the exhibits is outweighed by, e.g., undue prejudice under Rule 403, and therefore I reject OpenSky's objection based on that rule as well.

OpenSky objects to Exhibits 2134 and 2135 as inadmissible hearsay under Rules 801 and 802. Obj. 19. OpenSky argues that VLSI relies on Exhibits 2134 and 2135 for "various out-of-court statements about billing rates." *Id.* However, Exhibits 2134 and 2135 are both market reports that are generally relied on by the public or persons in particular occupations. *See* F.R.E. 803(17). Because Exhibits 2134 and 2135 fall under a hearsay exception, I reject OpenSky's objections under Rules 801 and 802.


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

OpenSky lists an objection under Rules 901 and 902 but provides no explanation or argument for this objection. *See* Obj. 17–19. Because there is no argument that addresses this objection, I dismiss the objection.

### B. Fees Linked to OpenSky's Misconduct

OpenSky argues that "VLSI says nothing to explain how the fees sought were caused by OpenSky's misconduct as required by the Director's order and *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103–104 (2017)." Opp. 5. Contrary to OpenSky's argument, VLSI explained how the requested fees are associated with OpenSky's misconduct. *See* Mot. 8–12. Accordingly, I am not persuaded by OpenSky's argument against the entirety of VLSI's fees. I apply the billing entries to the fee calculation below.

### C. VLSI's Misconduct not at Issue

OpenSky argues that "VLSI has engaged in serious litigation misconduct throughout the entire proceeding" and should not be awarded fees under the "unclean-hands doctrine." *See* Opp. 6–8. Specifically, OpenSky argues "that VLSI has unclean hands in this proceeding because VLSI made misrepresentations of law and fact and violated an NDA in an effort to avoid institution and thereby 'enhance' VLSI's position." *Id.* at 7–8 (quoting *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1240 (Fed. Cir. 2018)). OpenSky further refers to VLSI's actions in another proceeding, IPR2021-01229, as evidence of unclean hands. *See id.* at 8.

I do not agree that VLSI's alleged misconduct excuses OpenSky's abusive behavior. To the extent that VLSI mispresented issues of fact and


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

law, I addressed VLSI's misconduct separately in this proceeding. *See* Paper 121, 4.

### III. CALCULATING THE LODESTAR

"In calculating an attorney fee award, a district court usually applies the lodestar method, which provides a presumptively reasonable fee amount, by multiplying a reasonable hourly rate by the reasonable number of hours . . . ." *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 483 (Fed. Cir. 2016) (internal citation omitted). I previously determined that it is appropriate to award attorney fees to VLSI for the time spent addressing OpenSky's abusive behavior, including the Director Review process in its entirety.[4] Paper 127, 2. Accordingly, I examine VLSI's hours submitted for the time spent in addressing OpenSky's abusive behavior and the hourly rate charged by VLSI's counsel.

#### A. Reasonable Number of Hours

VLSI argues that the "unique challenges" of this proceeding required employing two law firms, Lowenstein & Weatherwax ("L&W") and Irell & Manella ("Irell"). Mot. 3–4. VLSI further argues that this proceeding is unusual and complex, raises questions of first impression, and deals with issues important to the Office in fulfilling its mission. *Id.* at 3 (citing Paper 121, 5; Dec. 2). VLSI divides its billing entries for both law firms into the various parts of this proceeding. *See id.* at 6–12. OpenSky responds to VLSI's arguments as to each part of the proceeding, arguing that the

---

[4] To the extent VLSI requests attorney fees for activity outside this IPR and Director Review, I reject that request and exclude the requested amount from the sanction against OpenSky. *See* Paper 127, 2, 13–15.

17



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

requested fees must be reduced or excluded. *See* Opp. 8–19 (citing Ex. 1068). Accordingly, I address the parties' arguments as to each part of the proceeding in turn.

### 1. Pre-Institution Activities

VLSI asserts that it spent time addressing OpenSky's misconduct prior to the Board's Institution Decision, including preparing the Patent Owner Preliminary Response ("POPR") and the Board-authorized Preliminary Sur-reply. Mot. 6–8. VLSI argues that its pre-institution briefs reflect this argument as VLSI "maintained that OpenSky was a 'prospector,' 'seek[ing] a payout,' and 'under no threat of infringement allegations,' and that its 'harassment should not be encouraged'" from the beginning of this proceeding. *Id.* at 6 (alteration in original). VLSI further asserts that "[m]uch of the factual and legal research and initial drafting for the POPRs and Preliminary Surreplies applied to both IPR2021-01056 (the '1056') and IPR2021-1064 (the '1064')." *Id.* at 8. Thus, VLSI seeks 50% of the time listed in billing entries for both the 1056 and 1064 IPRs, and 40% of the entries for drafting the 1056 IPR. *Id.*

OpenSky responds that "VLSI's pre-institution factual research, legal research, POPR, sur-reply, and POP are all focused [on] the *Fintiv* and *General Plastic* factors, prior art invalidity, hearsay in expert reports, recycling Intel's petition, and immunity to IPR challenges after trial, which all are unrelated to a supposed abuse of process." Opp. 10. OpenSky further argues that "[t]here is no mention of misconduct, ethical violations, or abuse of process in any of the time entries and no legal citations in briefs until *after* February 23, 2022." *Id.* at 11.



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

I am persuaded by OpenSky's argument to exclude VLSI's pre-institution activities from the fee calculation. I previously indicated that I would not award attorney fees for responding to the merits of the case. Paper 127, 2. VLSI's POPR and Preliminary Sur-Reply primarily address the merits of the case, including the substance of the Petition, discretionary denial under *Fintiv* and *General Plastic*, and hearsay based on expert declarations. *See* Paper 9; Paper 16. The Billing Statement reflects this focus. *See* Ex. 2126, 2–7. Although VLSI raised the potential for abuse in its initial filings, the vast majority of time was spent on addressing the merits or seeking discretionary denial independent of abuse. Accordingly, I exclude VLSI's billing entries for "Pre-Institution Activities" (Billing Statement 2–7) from the fee calculation.

2. *Precedential Opinion Panel ("POP") Request for Review*

VLSI asserts that its request for POP review ("POP Request") "centered upon OpenSky's misconduct and abuse of the IPR process." Mot. 8 (citing Paper 20, 1, 3–4, 6–8; Decision, 10–11; Paper 127, 12). Specifically, VLSI argues that its POP Request raised the issue of OpenSky seeking payment in exchange for dropping its challenge and seeking to extract payouts from patent owners. *See id.* (citing Paper 20, 3, 5). VLSI's Billing Statement reflects the time spent on preparing the POP Request. *See* Ex. 2126, 8–9 (Table 2.1).

OpenSky responds that "POP-related fees should be excluded [as] an unnecessary and strategic decision in response to VLSI's merits loss, not OpenSky abuse." Opp. 14. OpenSky further argues that, if allowed, the


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

time should be reduced due to reiterating prior arguments and vague time entries. *See id.*

I am persuaded by VLSI's arguments to include the billing entries related to preparing the POP Request. Although the POP Request was denied, the POP Request raised issues relevant to Director Review of OpenSky's misconduct. *See* Paper 41; Paper 47, 7–9. Accordingly, VLSI's POP Request addresses OpenSky's abusive behavior and is part of the Director Review process. *See* Paper 127, 2. I further find VLSI's descriptions of the time billed adequate without further reduction. *See Rumsey*, 866 F.3d at 1379 (noting that counsel "is not required to record in great detail how each minute of his time was expended" but "should identify the general subject matter of his time expenditures").

### 3. Settlement Negotiations

VLSI asserts that the settlement negotiations between counsel for VLSI and OpenSky "were 'entirely distinguishable from conventional settlement negotiations that take place in an adversarial proceeding' (Decision, 3) and through which OpenSky attempted to extort money from VLSI (*id.*, 40)." Mot. 9 (quoting Dec. 3). VLSI's billing entries include time attributed to settlement negotiations with Patent Quality Assurance ("PQA") in IPR2021-01229. *See id.*; Billing Statement 10 (Table 3.1). Accordingly, VLSI reduces its fees with mixed billing entries to 40% of the billing amount. *Id.*

OpenSky does not specifically address the settlement negotiations. *See generally* Opp. However, OpenSky generally argues that "the Director previously rejected VLSI's attempt to seek attorney fees for proceedings


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

other than the 1064 IPR." Opp. 9 (citing Paper 127, 14). Accordingly, OpenSky argues that "VLSI cannot be awarded fees for time entries that are not expressly directed to the 1064 IPR" and that "because the lack of detail is VLSI's fault, the fees must be reduced." *Id.*

I am persuaded by VLSI's arguments to include the billing entries related to the settlement negotiations, as these are directly relevant to OpenSky's abuse of process. I also find adequate VLSI's reduction to 40% of any billing entries that also reference IPR2021-01229 as a good faith effort to exclude fee request hours that are excessive, redundant, or otherwise unnecessary. *See Hensley*, 461 U.S. at 434.

### 4. Ethical Research

VLSI asserts that OpenSky's actions "forced VLSI's counsel to research the extent of OpenSky's ethical violations, VLSI's own ethical obligations, and various strategic considerations." Mot. 10 (citing Dec. 3, 31–32). VLSI's billing entries reflect this time. Ex. 2126, 11–12 (Table 4.1). OpenSky does not specifically challenge VLSI's request on these billing entries.

I am persuaded by VLSI's arguments to include the billing entries related to legal research on the ethical ramifications of OpenSky's misconduct. As I noted in my Decision, the circumstances of this particular case are unusual and serious. *See* Dec. 43, 48. Accordingly, it was appropriate for VLSI to spend a substantial amount of time investigating OpenSky's actions and VLSI's corresponding obligations.



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

### 5. *Director Review Process*

VLSI asserts that "[t]he Fee Order makes clear that OpenSky must compensate VLSI for its reasonable attorney fees incurred during the entirety of the Director Review process." Mot. 10 (citing Paper 127, 1). VLSI argues that this time includes addressing the granted Director Review and Scheduling Order, responding to Mandated Discovery, and responding to my inquiries. *Id.* at 10–11. VLSI acknowledges that several billing entries list time entered for both this proceeding and IPR2021-01229. *See id.* VLSI has accordingly reduced to 50% the time entries applied to this proceeding that also list IPR2021-01229. *See id.* VLSI's Billing Statement reflects the time spent and the reduced hours. *See* Ex. 2126, 13–31 (Table 5).

OpenSky responds that fees should be limited to entries identifying the 1064 IPR, and entries citing IPR2021-01229 "must be reduced by 50% for the lodestar percentage." Opp. 14. OpenSky further argues that VLSI's fees "are consistently excessive." *Id.* at 15. For example, OpenSky argues that VLSI's entries in Table 5.1 "should be at least further halved" "for taking an unreasonable amount of time to just talk strategy," for being vague, and for not necessarily addressing abuse. *See id.* OpenSky argues that VLSI's entries in Tables 5.3A and 5.3B should be reduced "for unreasonably spending over 240 hours on documents when only three requests applied to VLSI documents," "spending 88.9 hours on its . . . request for in camera review," "for using partner level fees to perform entry level work," and for vague entries. *See id.* at 15–16. OpenSky argues that VLSI's entries in Tables 5.4.A and 5.4.B should be disallowed "because



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

seventy-one hours for legal research is indefensible considering VLSI's opening brief only citing to *eight* cases," or reduced due to excessive time spent and duplication. *See id.* at 15–16. OpenSky argues that VLSI's entries in Tables 5.5A and 5.5B should be reduced for including PQA time and for "unreasonably taking over 220 hours to write [a] 25 page[] brief," overstaffing, and block billing with vague entries. *See id.* at 17. Finally, OpenSky argues that VLSI's entries in Table 5.6A should be reduced for identifying PQA and for excessive hours, overstaffing, vague entries, and not being related to OpenSky's abuse. *See id.* at 17–18.

   I am persuaded by VLSI's arguments to include the time listed in the Billing Statement in Tables 5.1–5.6 as applied to the Director Review process. VLSI has already reduced the majority of the billing entries as a good faith effort to exclude hours that are excessive, redundant, or otherwise unnecessary, including those that overlap with IPR2021-01229. *See* Ex. 2126, 13–31. I recognize OpenSky's arguments that VLSI spent an overly large amount of time on these issues. However, this Director Review raised numerous novel and complex issues. *See Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir. 1974) (holding that courts should consider "[t]he novelty and difficulty of the questions" when assessing whether attorney fees are reasonable), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). It is not unreasonable for VLSI's counsel to have spent significant time to address the novel and complex issues of misconduct raised in the Director Review process. Accordingly, I accept VLSI's billing entries including the reductions already proposed by VLSI.



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

### 6. *Attorney Fees Briefing*

VLSI asserts that "[t]he briefing ordered by the Director to show cause why attorney fees sanctions should or should not be levied against OpenSky was also a part of the Director review process and directly related to OpenSky's misconduct." Mot. 11.

OpenSky responds that VLSI's fees are excessive as "[a] 21-page brief does not require 3½ weeks of attorney work (6 hours per page) and VLSI double charges for sanctions legal research (*see e.g.*, Tables 4.1, 5.4.A, Table 6.1, e.g. 10/5/2022, 10/27/2023, 11/3/2022)." Opp. 18. OpenSky further argues that VLSI's time went outside the scope of the show cause order for researching opposition to attorney withdrawal and arguing attorney liability. *Id.* at 18 (citing Paper 117, 15–21). Finally, OpenSky argues that VLSI's time entries on the responsive brief are excessive and improperly vague. *See id.*

I am persuaded by VLSI's arguments to include the time listed in the Billing Statement in Tables 6.1–6.2 as applied to the sanctions process. The sanctions are a direct result of OpenSky's misconduct. There is no indication that VLSI's billing entries directed to legal research are duplicative or excessive. VLSI has further reduced the hours in the entries, including those specifically identified by OpenSky as being outside the scope of the show cause order. *See* Ex. 2126, 33. Accordingly, I accept VLSI's billing entries including the reductions already proposed by VLSI.



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

### B.  Reasonable Rate

"The fee applicant . . . has the burden of proving that the 'requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation.'" *View Eng'g*, 208 F.3d at 987 (approving of a lodestar determination that reduced the billing rates of attorneys whose "rates were on the high-end of rates charged by other intellectual property attorneys with equivalent experience" as compared to the AIPLA Economic Survey).  As discussed above, VLSI engaged attorneys from two different law firms for this proceeding.  VLSI further submits two different rates reports as evidence of the prevailing rates in the community.  *See* Ex. 2134; Ex. 2135; *see also Covington v. D.C.*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) ("Although fee matrices are somewhat crude—the Laffey matrix, for example, lumps attorneys with four to seven years of experience in the same category; attorneys with eleven to nineteen also share the same hourly rate—the matrices do provide a useful starting point.")

Accordingly, I consider the reasonableness of the rates submitted by VLSI's counsel.

### 1.  Lowenstein & Weatherwax

VLSI asserts that L&W "is a boutique that specializes in IPRs, Federal Circuit appeals thereto, and ex parte reexaminations."  Mot. 13; Ex. 2127 ¶ 3.  VLSI asserts that "L&W has had a distinguished record of success before the Board and in the Federal Circuit" as counsel of record in over 300 PTAB proceedings and 45 Federal Circuit appeals.  *Id.*; Ex. 2127 ¶ 5.  VLSI asserts that "L&W billed VLSI at a significantly discounted rate



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

in this matter. For instance, Messrs. Lowenstein's and Weatherwax's rates per hour to VLSI were $▮ in 2021 and $▮ in 2022 while Ms. Woo's rates were $▮ in 2021 and $▮ in 2022. These rates are significantly lower than what the firm charges in many other matters." Mot. 14; Ex. 2127 ¶ 18. Mr. Lowenstein declares that Mr. Linger's rate in 2021 was $▮/hour. Ex. 2127 ¶ 18.

Mr. Lowenstein describes the experience for L&W's billing attorneys. *See* Ex. 2127. For example, Mr. Lowenstein "worked together with Mr. Kenneth Weatherwax for many years . . . since at least 2006" (at least 17 years of experience). *Id.* ¶ 8. Colette Woo "joined L&W approximately three-and-a-half years ago" (3–5 years of experience). *Id.* ¶ 9. "Mr. Robert Pistone joined L&W in September 2022" (less than 3 years of experience). *Id.* ¶ 10.

As to the billing rates in the community, Mr. Lowenstein declares that "[t]he Los Angeles market, where both L&W and Irell are based, also garners relatively high rates." *Id.* ¶ 15. Mr. Lowenstein references the 2022 Real Rate Report that lists mean rates for patent practitioners in the 2022 Los Angeles market (firms with more than 1,000 lawyers) as $1,128/hour for partners and $771/hour for associates. *Id.* ¶ 15 (citing Ex. 2134, 178).

OpenSky argues that "Exhibit 2134 reports data compiled for very large law firms with 'More Than 1,000 Lawyers'" and has no bearing on the fees of L&W, a small boutique. Obj. 18–19.

I am persuaded that L&W's rates are reasonable and require no further adjustment. Although Mr. Lowenstein cites to data for a firm size of "more than 1,000 lawyers," the data otherwise includes similar rates for



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

patent practitioners in Los Angeles. *See* Ex. 2134, 154 (2022 partner mean of $943/hour; 2022 associate mean of $736/hour). The 2022 Real Rate Report also lists prevailing rates in the patent-litigation community. Ex. 2134, 156–158. For example, the mean real rates for partners in patent litigation (fewer than 21 years of experience) was $746/hour in 2021 and $856/hour in 2022. *Id.* at 156. Ex. 2134, 157. The mean real rates for associates in patent litigation was $545/hour in 2021 and $652/hour in 2022 for 3–7 years of experience and $341/hour in 2021 and $427/hour in 2022 for less than 3 years of experience. *Id.* The 2022 Real Rate Report also provides information on firms of varying size. Ex. 2134, 158. For 50 lawyers or fewer, the mean real rates for patent litigation at the partner level was $551/hour in 2021 and $562/hour in 2022. The mean real rates for patent litigation at the associate level was $410/hour in 2021 and $488/hour in 2022. *Id.*

The AIPLA Economic Survey for 2012 (Ex. 2135) lists lower rates for both partners and associates. *See* Ex. 2135, 24–25 (partner mean $545/hour), 30 (associate mean $375/hour with fewer than 5 years' experience). However, the AIPLA Economic Survey does not distinguish between litigation similar to AIA proceedings and non-litigation patent practice. *See id.*; *see* Ex. 2134, 156. L&W's rates fall within the mean ranges prevalent in the community for patent litigators of similar skill and experience. Accordingly, I determine L&W's billed rates are reasonable.

### 2. *Irell & Manella*

VLSI asserts that Irell is a leading patent litigation firm "and VLSI's chief district court litigation counsel." Mot. 5. Mr. Heinrich declares that


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

Irell "specializes in a wide array of legal areas, including Patent Office Trials, Intellectual Property Litigation, and Intellectual Property Transactions." Ex. 2128 ¶ 3. Mr. Heinrich declares that "Mr. Phillip Warrick is Counsel at Irell," and has 15 years of experience. *Id.* ¶ 7. "VLSI is seeking an hourly rate of $▆ for Mr. Warrick." *Id.* ¶ 13. Mr. Heinrich declares that "Ms. Charlotte Wen is a senior associate at Irell" and graduated law school in 2016. *Id.* ¶ 8. "VLSI [] seeks an hourly rate of $▆ for Ms. Wen." *Id.* ¶ 13. VLSI asserts that "[i]n another patent litigation matter concerning Irell's fee rates, the opposing party had "stipulated that the rates claimed by [Irell] are reasonable.'" Mot. 17 (citing *Finjan, Inc. v. Juniper Network*, No. 3:17-cv-05659-WHA, 2021 WL 3674101, at *3 (N.D. Cal. May 20, 2021)).

OpenSky argues that "any fees awarded for any Irell timekeepers should be reduced by fifty percent. Contrary to VLSI's brief, plaintiff Finjan did not stipulate to Irell's rates, but to market rates." Opp. 10 (citing *Finjan*, 2021 WL 3674101, at *3). OpenSky provides no other argument that the Irell attorneys' rates are unreasonable.

I am persuaded that the Irell attorneys' rates are reasonable and require no further adjustment. Irell's requested rates for Mr. Warrick ($▆/hour) and Ms. Wen ($▆/hour) are below the mean rates reported for the Los Angeles billing market for patent practitioners (Ex. 2134, 154) and are commensurate with the rates for patent litigation practice for attorneys with similar experience in law firms of similar size (*id.* at 156–157).



*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

### C.  Total Attorney Fees

VLSI requests total attorney fees of $489,511.15.  *See* Ex. 2126, 40. As discussed above, I exclude the attorney fees for "Pre-Institution Activities" (amounting to $66,117.65) and any activities outside the IPR and Director Review proceedings (amounting to $10,129.35).  Reducing the total attorney fees by the excluded fees results in $413,364.15.  Accordingly, I sanction OpenSky for VLSI's reasonable fees of $413,264.15.

### IV.    ORDER

Accordingly, based on the foregoing, it is:

ORDERED that VLSI's Motion for Fees is granted; and

FURTHER ORDERED that, within thirty (30) days of the date of this Order, OpenSky shall pay VLSI $413,264.15 as a sanction.


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

For PETITIONER:

Matthew K. Blackburn
Evan Boetticher
SULLIVAN BLACKBURN PRATT LLC
mblackburn@sullivanblackburn.com
eboetticher@sullivanblackburn.com

David Boundy
POTOMAC LAW GROUP, PLLC
P.O. Box 590638
Newton, MA 02456
dboundy@potomaclaw.com

Benjamin Fernandez
David Cavanaugh
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
steven.horn@wilmerhale.com

For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP


*PUBLIC VERSION*

IPR2021-01064
Patent 7,725,759 B2

weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com